**ORAL ARGUMENT NOT YET SCHEDULED**

No. 20-1335

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents*.

On Petition for Review of Final Action by the
United States Environmental Protection Agency

**PROOF REPLY BRIEF OF PETITIONER NRDC**

Sarah V. Fort
Charles R. Corbett
Natural Resources Defense Council
1152 15th Street NW, Ste. 300
Washington, DC 20005
Telephone: (202) 513-6247
sfort@nrdc.org
ccorbett@nrdc.org

*Counsel for Petitioner*
*Natural Resources Defense Council*

Dated: November 4, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................. ii

TABLE OF AUTHORITIES .................................................... iv

GLOSSARY OF ABBREVIATIONS ...................................... vii

INTRODUCTION ...................................................................... 1

STATUTES AND REGULATIONS ......................................... 3

ARGUMENT ............................................................................. 3

I.     EPA lacks authority to reverse its 2011 final
       decision to regulate perchlorate ...................................... 3

       A.     EPA has no "inherent" reconsideration authority ................ 3

       B.     The Safe Drinking Water Act forecloses
              reconsideration of final determinations to regulate .............. 4

       C.     Even if EPA could reconsider its decision,
              the withdrawal was untimely ............................................. 12

II.    EPA selected "levels of public health concern" that
       do not protect the public from harm .............................. 13

       A.     EPA's decision not to regulate relied on flawed potential
              maximum contaminant level goals; EPA cannot shield its
              analysis from review ......................................................... 13

       B.     EPA failed to protect the
              public against IQ loss ........................................................ 16

       C.     EPA failed to protect the public against
              harms other than IQ loss ................................................... 19

III.   EPA's estimate of current perchlorate contamination
       was biased and unreasonable ...................................................... 23

       A.   EPA's "update" to the 2001-2005 data presents
            a biased picture of current levels of perchlorate
            contamination........................................................................ 24

       B.   EPA still has not acknowledged that it changed
            position without explanation when it excluded
            nearly 200 samples from its dataset.................................... 28

       C.   Data in the record cast doubt on EPA's
            conclusion that perchlorate rarely contaminates
            drinking water........................................................................ 30

CONCLUSION ...................................................................................... 34

CERTIFICATE OF COMPLIANCE....................................................... 35

CERTIFICATE OF SERVICE................................................................ 36

# TABLE OF AUTHORITIES

## Cases

*Air Alliance Houst. v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018)...........................................................9

*Am. Methyl Corp. v. EPA*,
  749 F.2d 826 (D.C. Cir. 1984)...................................................... 4, 5-6

*\*Am. Farm Bureau Fed'n v. EPA*,
  559 F.3d 512 (D.C. Cir. 2009).............................................. 20, 21, 30

*California v. EPA*,
  940 F.3d 1342 (D.C. Cir. 2019)......................................................8-9

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .........................................................................4

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................... 4, 30

*\*HTH Corp. v. NLRB*,
  823 F.3d 668 (D.C. Cir. 2016)........................................................3

*Idaho Conservation League v. Wheeler*,
  930 F.3d 494 (D.C. Cir. 2019).........................................................9

*Ivy Sports Med., LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014) ..................................................... 3, 12

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.
  State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................... 17, 22

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012).......................................................4

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008)....................................................... 5, 12

*New York v. NHTSA*,
    974 F.3d 87 (2d Cir. 2020)...........................................................5, 6-7

*NRDC v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ..................................................... 5, 11

*NRDC v. EPA*,
    735 F.3d 873 (9th Cir. 2013) ............................................................ 22

*NRDC v. EPA*,
    824 F.2d 1211 (D.C. Cir. 1987)........................................................ 19

*Sorenson Commc'ns, Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)........................................................ 32

## Statutes

42 U.S.C. § 300g-1(b)(1)(A) ............................................................... 7

*42 U.S.C. § 300g-1(b)(1)(B)................................................. 5, 7, 9-10, 11

42 U.S.C. § 300g-1(b)(1)(C)............................................................ 7, 18

*42 U.S.C. § 300g-1(b)(1)(E)............................................. 5, 7, 8, 9, 11, 12

42 U.S.C. § 300g-1(b)(3)(A)............................................................ 9, 10

42 U.S.C. § 300g-1(b)(4)(A)........................................................... 13, 19

42 U.S.C. § 300g-1(b)(6)(A)............................................................... 10

42 U.S.C. § 300g-1(b)(9) ............................................................... 5, 12

42 U.S.C. § 300g-1(e) .................................................................9-10

42 U.S.C. § 300g-7 ................................................................................ 10

## Federal Register Notices

63 Fed. Reg. 10,274 (Mar. 2, 1998) ...........................................7-8

70 Fed. Reg. 9071 (Feb. 24, 2005) ............................................7-8

73 Fed. Reg. 60,262 (Oct. 10, 2008).............................................8

74 Fed. Reg. 51,850 (Oct. 8, 2009)...........................................7-8

75 Fed. Reg. 24,848 (May 6, 2010) ...........................................18

76 Fed. Reg. 7762 (Feb. 11, 2011) ....................................8, 9, 11

*84 Fed. Reg. 30,524 (June 26, 2019) .........2, 13, 16, 20, 23, 28, 30, 32-33

*85 Fed. Reg. 43,990 (July 21, 2020) ....................... 4, 14, 15, 16

## Other Authorities

H.R. Rep. No. 104-632 (1996)..................................................6

S. Rep. No. 99-56 (1985) ..........................................................6

S. Rep. No. 104-169 (1995) ....................................................19

## GLOSSARY OF ABBREVIATIONS

EPA        U.S. Environmental Protection Agency

IQ         intelligence quotient

NRDC       Natural Resources Defense Council

ppb        parts per billion

## INTRODUCTION

The central aim of the Safe Drinking Water Act is to ensure that public drinking water is safe.

EPA's decision not to regulate perchlorate—a chemical that causes permanent cognitive harm—fails to fulfill that aim. It does not protect at-risk fetuses, infants, and children living in known areas of perchlorate contamination: EPA concedes that these individuals will suffer irreversible harm. Nor does it protect the vast majority of Americans, whose water systems have not been required to test for perchlorate in decades and who have no way of knowing whether their water is contaminated with perchlorate.

Though EPA repeatedly defends its decision by invoking its scientific model and consultations with the Science Advisory Board and two peer review panels, *none* of the choices that NRDC challenges were dictated by that model or reviewed by those expert bodies. NRDC contests the Agency's arbitrary policy choices: its selection of proposed regulatory thresholds that allow IQ loss in at-risk children and infants; its failure to protect against other types of health harm; its reliance on those potential thresholds as "levels of public health concern"; and its

1

flawed estimate of how widely perchlorate contaminates drinking water.

These "policy decision[s]," 84 Fed. Reg. 30,524, 30,536 (June 26, 2019), led EPA to reverse its 2011 decision to regulate perchlorate. They do not reflect scientific advances or expert advice, but rather the preferences of the defense and aerospace industries, which—as the primary sources of perchlorate contamination—face substantial cleanup costs if EPA enacts strict limits. NRDC Br. 7-9, 12-13. Those industries' opposition to perchlorate regulation does not depend on new science: it has been consistent for over two decades. *See id.*; *see also* Amici Br. in Supp. of EPA iii (disclosing funding from Lockheed Martin Corporation, Aerojet Rocketdyne, and American Pacific Corporation).

Regulating perchlorate is not just the right decision for public health. It is the outcome the Safe Drinking Water Act requires. EPA has no "inherent" authority to reverse its 2011 decision to regulate perchlorate, and reconsideration is incompatible with the Act.

NRDC respectfully asks that this Court vacate and remand EPA's unlawful decision and direct EPA to finalize perchlorate regulations

that fulfill the Safe Drinking Water Act's objective of ensuring that the water we drink is safe.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations were filed with NRDC's opening brief.

## ARGUMENT

## I. EPA lacks authority to reverse its 2011 final decision to regulate perchlorate

### A. EPA has no "inherent" reconsideration authority

EPA's assertion that the Safe Drinking Water Act "does not abrogate [its] inherent authority to withdraw its determination to regulate," EPA Br. 25-26; *see* American Water Works Ass'n ("Water Utils.") Br. 37, misunderstands this Court's precedent. "As a creature of statute," EPA "has only those powers conferred upon it by Congress." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016). While this Court has at times referred to "inherent" reconsideration authority, *e.g.*, *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014), "the more accurate label is 'statutorily implicit.'" *HTH Corp.*, 823 F.3d at 679 (quotation omitted). The inquiry thus is not whether the Act *prohibits* reconsideration, *contra* EPA Br. 16; Water Utils. Br. 37, but whether

reconsideration authority is consistent with and implicit in the statutory scheme.

EPA relies on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), and its progeny, EPA Br. 19-20; *see* Water Utils. Br. 37, but those cases stand for the proposition that the Administrative Procedure Act does not necessarily require an agency to provide a more detailed explanation when it changes its mind than it would for a new policy. 556 U.S. at 515-16; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036-37 (D.C. Cir. 2012). They do not address the question at issue here: whether the Safe Drinking Water Act authorizes reconsideration in the first place. That question is answered by the Act's text, structure, purpose, and history.

## B.    The Safe Drinking Water Act forecloses reconsideration of final determinations to regulate

EPA concedes that the Act does not expressly allow withdrawal of a decision to regulate a contaminant. 85 Fed. Reg. 43,990, 43,992 (July 21, 2020). Nor is such authority implicit in the Act, as "the traditional tools of statutory construction" show. *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 833, 834-37 (D.C. Cir. 1984) (quotation omitted).

EPA views the fact that the Act does not specify a process for reconsidering a determination to regulate as evidence that its withdrawal was lawful. EPA Br. 26-27. This is wrong. While an express reconsideration procedure is one way for Congress to constrain reconsideration authority, *e.g.*, *New Jersey v. EPA*, 517 F.3d 574, 582-83 (D.C. Cir. 2008), it is not the only way. Congress can foreclose reconsideration authority in other ways, including by an express command to regulate, *NRDC v. EPA*, 542 F.3d 1235, 1252-53 (9th Cir. 2008), or a "highly circumscribed schedule" that depends on a rule's finalization, *New York v. NHTSA*, 974 F.3d 87, 100 (2d Cir. 2020) (quotation omitted).

The Safe Drinking Water Act has both. Every five years, EPA must evaluate at least five contaminants and determine whether they meet the statute's criteria for regulation. 42 U.S.C. § 300g-1(b)(1)(B)(i)-(ii). If EPA decides that a contaminant meets those criteria, the Agency "shall" propose and finalize drinking water regulations within four-and-a-half years. *Id.* § 300g-1(b)(1)(E). EPA must revisit these regulations every six years, but cannot backslide: it must "maintain, or provide for greater" health protections. *Id.* § 300g-1(b)(9). EPA's claim to

5

"revocation authority" exercisable "over an indefinite term" would hollow out this scheme, *Am. Methyl*, 749 F.2d at 836-37, and contradict express statutory limits on the Agency's discretion.

EPA's assertion that the "animating" concern of the Safe Drinking Water Act's 1996 amendments was to avoid overregulation, EPA Br. 26-27; Water Utils. Br. 31, tells only half of the story. Since the Act's passage in 1974, EPA has almost entirely failed to select contaminants to regulate. In the Act's first twelve years, EPA regulated only "a small fraction" of drinking water contaminants. S. Rep. No. 99-56 at 2 (1985). Congress responded in 1986 by amending the Act to "rectify major deficiencies in [EPA's] implementation," *id.*: the amendments directed EPA to regulate more than 80 named contaminants within 3 years, and to choose another 25 to regulate every 3 years thereafter. *See id.* at 3. EPA failed to regulate any contaminant beyond those named by Congress. Meanwhile, EPA and water systems complained that the Act's strict quotas wasted resources. *See* H.R. Rep. No. 104-632 at 9 (1996).

The 1996 amendments sought to solve both problems. Congress eliminated the statute's quotas, giving EPA flexibility to focus on

contaminants of greatest public health concern. But Congress *also* enacted a "highly circumscribed schedule," *New York v. NHTSA*, 974 F.3d at 100 (quotation omitted), for EPA to evaluate unregulated contaminants. And it imposed a mandatory duty at the end of that process: if EPA concludes that a contaminant meets the Act's public health risk criteria, it *must* regulate. 42 U.S.C. § 300g-1(b)(1)(E).

EPA's complaint that this interpretation undermines Congress's direction to focus on the most pressing dangers to public health, EPA Br. 22, ignores that Congress told EPA exactly how to implement that mandate. The Act directs EPA to make a list of unregulated contaminants that may require regulation. 42 U.S.C. § 300g-1(b)(1)(B)(i). It instructs EPA to pick five or more contaminants from this list for a determination of whether to regulate. *Id.* § 300g-1(b)(1)(B)(ii). At both steps, EPA must prioritize the contaminants that "present the greatest public health concern," paying special attention to vulnerable populations like infants, children, and pregnant women. *Id.* § 300g-1(b)(1)(C). Finally, the Act tells EPA what criteria to consider in making its decision whether to regulate. *Id.* § 300g-1(b)(1)(A).

7

That exact process led EPA to its 2011 final determination to regulate perchlorate. EPA selected perchlorate as a high-priority contaminant: not once, but three times. 63 Fed. Reg. 10,274, 10,275 tbl.1 (Mar. 2, 1998); 70 Fed. Reg. 9071, 9072 tbl.III-1 (Feb. 24, 2005); 74 Fed. Reg. 51,850, 51,852 ex.1 (Oct. 8, 2009). EPA prioritized perchlorate for a regulatory determination, and made a final determination to regulate perchlorate. 76 Fed. Reg. 7762 (Feb. 11, 2011).

Indeed, perchlorate was the *first* contaminant that EPA decided to regulate pursuant to the process Congress established in the 1996 amendments. Because EPA reversed that decision, even now—26 years after those amendments—the Agency has not regulated a single new contaminant under that process. Holding EPA to its duty to regulate perchlorate would not undermine Congress's intent that the Agency regulate high-priority contaminants—it would effectuate that intent.

EPA's "final determination to regulate perchlorate," 76 Fed. Reg. at 7762, was no "preliminary" matter. *Contra* EPA Br. 18; Water Utils. Br. 37. The decision followed a lengthy process, including notice and comment on the Agency's actual preliminary determination. *See* 73 Fed. Reg. 60,262, 60,262 (Oct. 10, 2008). And, by the plain terms of the Act,

8

it triggered a duty to regulate. *See* 42 U.S.C. § 300g-1(b)(1)(E). It is therefore unlike the Clean Air Act determination at issue in *California v. EPA*, *contra* EPA Br. 18, which merely required EPA to reconsider a rule. 940 F.3d 1342, 1350-51 (D.C. Cir. 2019).[1]

EPA argues it could not comply with the Act's instruction to use best available science if it lacked reconsideration authority. EPA Br. 23; Water Utils. Br. 32. But EPA's 2011 determination to regulate *was* based on the best available information. *See* 76 Fed. Reg. at 7765. EPA must also use best available science in subsequent steps of the regulatory process, 42 U.S.C. § 300g-1(b)(3)(A), but that does not override the Act's explicit command to regulate in the first place based on the 2011 decision: "the specific governs the general." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) (in parenthetical, quotation

---

[1] The statutory scheme is also unlike the one at issue in *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 500, 504 (D.C. Cir. 2019). *Contra* EPA Br. 18; Water Utils. Br. 38. That statute provided that EPA "shall" regulate "certain 'classes of facilities,'" but did "not specify which classes" the Agency had to regulate. 930 F.3d at 504. By contrast, the Safe Drinking Water Act's mandate applies to "each contaminant that the Administrator determines to regulate." 42 U.S.C. § 300g-1(b)(1)(E).

omitted).[2] Indeed, the statute expressly warns that consultation with the Scientific Advisory Board "shall, under no circumstances, be used to delay final promulgation of any national primary drinking water standard." 42 U.S.C. § 300g-1(e). It would make no sense for Congress to expressly prohibit EPA from delaying a rule due to scientific consultation, while implicitly allowing EPA to *never* publish a rule based on a more general instruction to use best available science.

Giving effect to the text of the statute will not unreasonably burden regulated water systems. *Contra* EPA Br. 26-27. The Safe Drinking Water Act grants EPA and states significant discretion to tailor regulatory controls. If EPA determines that the benefits of setting a maximum contaminant level "would not justify the costs of complying with the level," the Agency may set an alternate limit. 42 U.S.C. § 300g-

---

[2] The Act includes a provision that governs the use of science in making a determination to regulate, separate from the general instruction to use best available science in carrying out the Act. *Compare* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II), *with id.* § 300g-1(b)(3)(A). This structure provides further proof that Congress did not mean for its direction to use best available science to impose a continuing duty to reevaluate a determination to regulate. EPA's reading of the statute would mean that both provisions apply at all times of the regulatory process, rendering one surplusage.

1(b)(6)(A). EPA and states may also grant temporary or permanent monitoring relief to water systems. *Id.* § 300g-7.

EPA's argument that it cannot regulate if the Act's criteria are not met, EPA Br. 21; Water Utils. Br. 31, is beside the point. EPA already concluded that the criteria *were* met. 76 Fed. Reg. at 7762. That is all EPA needs in order to regulate. EPA's contrary argument would mean that, though the statute expressly refers to a "preliminary determination," 42 U.S.C. § 300g-1(b)(1)(B)(ii), followed by a "determination to regulate," *id.*, the "determination to regulate" would necessarily remain preliminary until the Agency issues final regulations. That interpretation would render the mandate and deadline at Section 300g-1(b)(1)(E) meaningless, as EPA could reopen its decision at any time. *See NRDC*, 542 F.3d at 1253. And far from allowing EPA to move quickly to regulate priority contaminants, it would put EPA in the position of repeatedly revisiting every threshold decision.[3]

---

[3] The judicial reviewability of a decision *not* to regulate is irrelevant here, *contra* EPA Br. 18-19, where the question is whether EPA could lawfully withdraw a determination *to* regulate.

11

**C.    Even if EPA could reconsider its decision, the withdrawal was untimely**

Even if the Safe Drinking Water Act implicitly grants EPA reconsideration authority, EPA's nine-year delay in reconsidering its determination to regulate was unreasonable. An agency with the power to reverse itself must exercise that power "within a reasonable period of time." *See Ivy Sports*, 767 F.3d at 86 (in parenthetical, quotation omitted). EPA asserts that only certain adjudications require timely reconsideration, EPA Br. 31, but this Court has never articulated that distinction. Indeed, the *Ivy Sports* framework for analyzing agency reconsideration authority cites to a case involving the exact type of statutory scheme at issue here. 767 F.3d at 86 (citing *New Jersey*, 517 F.3d at 583). While the question of what time period is reasonable may turn on the type of proceeding, the requirement of timely reconsideration does not.

Had EPA complied with the Act's deadline, it would have finalized perchlorate regulations by 2014, and could not now backslide from those regulations. 42 U.S.C. § 300g-1(b)(1)(E), (b)(9). Instead, EPA violated the Act's deadline and withdrew the triggering decision six years later. EPA's belated reconsideration was unreasonable and should be vacated.

12

## II.    EPA selected "levels of public health concern" that do not protect the public from harm

### A.    EPA's decision not to regulate relied on flawed potential maximum contaminant level goals; EPA cannot shield its analysis from review

EPA's decision to leave perchlorate unregulated relied on faulty analysis in its proposed regulation. Though the Safe Drinking Water Act directs the Agency to set maximum contaminant level goals at "the level at which no known or anticipated adverse effects" on human health occur, with "an adequate margin of safety," 42 U.S.C. § 300g-1(b)(4)(A), EPA proposed maximum contaminant level goals that would allow vulnerable fetuses, infants, and children to suffer measurable IQ loss. The Agency entirely failed to protect against other cognitive and behavioral harms, including language delays, reduced school performance, and heightened risks of ADHD, autism, and schizophrenia. *See* 84 Fed. Reg. at 30,527, 30,557; EPA Technical Support Document 9-9 (May 2019) [JA__] ("EPA Technical Document").

EPA argues that it is irrelevant whether those proposed maximum contaminant level goals complied with the Safe Drinking Water Act, because it decided not to regulate based on a different statutory threshold—"levels of public health concern," and the Act does

13

not require EPA to select "levels of public health concern" that prevent

adverse health effects. EPA Br. 37, 39. But EPA put its proposed

maximum contaminant level goals at issue when it relied on them in its

decision not to regulate. In that decision, the *only* rationale EPA offered

for its "levels of public health concern" was that they were its proposed

maximum contaminant level goals. EPA explained:

> For the 2019 proposal, the EPA derived three potential
> MCLGs[4] for perchlorate of 18, 56, and 90 [parts per billion
> (ppb)] .... **[T]he EPA used these potential MCLGs as the
> levels of public health concern in assessing the
> frequency of occurrence of perchlorate in this
> regulatory determination** .... The rationale used in
> deriving the numerical values is presented in greater detail
> in the EPA technical support document entitled "Deriving a
> Maximum Contaminant Level Goal for Perchlorate in
> Drinking Water."

85 Fed. Reg. at 43,995 (emphasis added). Even EPA's brief cites to

portions of the record that explain its process for selecting proposed

maximum contaminant level goals. *See id.* at 43,999 (cited by EPA at

34-35); *see also* EPA Technical Doc. 10-1 [JA__] (cited by EPA at 34-35).

Both in the record and in its brief, EPA treats "levels of public health

---

[4] EPA's final decision used the acronym "MCLG" for maximum
contaminant level goals. This brief retains the acronym in quotes from
that decision.

14

concern" and potential maximum contaminant level goals as one and the same. *See, e.g.*, 85 Fed. Reg. at 43,992 (discussing "levels of public health concern (i.e., the proposed MCLG levels, 18-90 [ppb])"); *id.* at 43,995 (stating EPA made its determination not to regulate "by comparing the best available data on the occurrence of perchlorate in public water systems with potential MCLGs for perchlorate").

EPA did not need to define "levels of public health concern" in this way. But it did. EPA cannot rely on its potential maximum contaminant level goals to conclude that perchlorate does not occur in drinking water at levels of public health concern, then disclaim as irrelevant the question of whether it reasonably selected those thresholds. Either the Agency's proposed maximum contaminant level goals are relevant, and this Court may determine whether they complied with the Act; or they are not, and there is no record basis for the perchlorate thresholds that EPA selected as "levels of public health concern." The result is the same either way: EPA's analysis of whether perchlorate occurs in drinking water at levels of public health concern was arbitrary.

15

**B.      EPA failed to protect the public against IQ loss**

EPA's brief rewrites history, asserting that the Agency followed technical guidance by "[u]sing a 1% IQ decrease to define the level of public health concern." EPA Br. 35. It did not. The Agency used its three potential maximum contaminant level goals to define "levels of public health concern." 85 Fed. Reg. at 43,995; *supra* Arg. II.A. While EPA consulted its Benchmark Dose Technical Guidance as "a starting point" in selecting those proposed thresholds, 85 Fed. Reg. at 43,999, the Agency did not claim to follow it. Instead, EPA "made a policy decision to use a 2 IQ point decrement" (i.e., a 2% decrease in IQ) as the basis for its proposed maximum contaminant level goal. 84 Fed. Reg. at 30,536; *id.* at 30,540-41 (explaining that "EPA selected a 2 percent decrease in IQ for the proposed perchlorate MCLG"). While EPA also analyzed alternate potential maximum contaminant level goals based on 1% and 3% decreases in IQ, *id.* at 30,536, and considered all three levels in its final decision, 85 Fed. Reg. at 43,995, EPA's assertion that

it "based its analysis on the concentration of perchlorate that would avoid a 1 IQ point decrement," EPA Br. 33, is wrong.

It is understandable that EPA wants to distance itself from a choice to allow average losses of 2 or 3 IQ points among at-risk fetuses and children. But EPA's action must stand or fall based on the explanation provided in the record. "[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

Even on its merits, the Agency's post hoc reliance on agency guidance, EPA Br. 34-36, cannot save its potential maximum contaminant level goals. EPA did not, as it now suggests, follow its Benchmark Dose Technical Guidance. *Contra id.* It departed from that guidance by selecting a 2% loss in IQ as its proposed regulatory level. Nor could EPA reasonably have relied on the Benchmark Dose Technical Guidance, which states outright that it is "beyond the scope of this document to define what degree of change in a health effect is adverse." Benchmark Dose Technical Guidance at 2 [JA__].

EPA and the Water Utilities argue that there is no clear threshold at which IQ loss becomes "biologically significant," and that EPA reasonably chose thresholds that allowed at-risk children to lose an average of 1-3 IQ points. EPA Br. 36; *see also* Water Util. Br. 21 (arguing that EPA "had to select *some* threshold"). EPA's own child-health experts vehemently disagreed, warning that a 2-point average IQ loss was "a significant health problem for children." NRDC Mot. to Suppl., Ex. A at 1. So did members of the 2012 Science Advisory Board, who cautioned that EPA's "unprotective" IQ threshold "will have a negative impact on populations." Scientists' Public Comment 2 [JA__]. As EPA itself has described, small losses in average population IQ are especially significant for children at the very high and very low ends of the IQ spectrum; even a few lost IQ points can cause an individual in the low-IQ range "increased risk of educational, vocational, and social failure." 75 Fed. Reg. 24,848, 24,853 (May 6, 2010); *see also* 42 U.S.C. § 300g-1(b)(1)(C) (directing EPA to consider effects on the most vulnerable subpopulations). EPA cites no contrary record evidence.

In any event, the Safe Drinking Water Act does not tell EPA to prevent "significant" harm—it directs the Agency to prevent *any*

adverse effects. 42 U.S.C. § 300g-1(b)(4)(A); *see also* S. Rep. No. 104-169, at 3 (1995) (explaining that Congress meant to define a "safe" level of exposure). A contaminant need not "pos[e] a *significant* risk" to "have some adverse effect." *NRDC v. EPA*, 824 F.2d 1211, 1216 (D.C. Cir. 1987) (emphasis added). EPA nowhere contests that IQ loss is an adverse effect: its own cost-benefit analysis shows that each 1-point IQ loss causes a measurable reduction in lifetime earnings. EPA, Health Risk Reduction and Cost Analysis 4-14 (May 2019) [JA__].

EPA's determination that perchlorate is not present in drinking water at "levels of public health concern" relied on potential maximum contaminant level goals that allowed vulnerable children to suffer measurable IQ losses. Because those levels violated the Safe Drinking Water Act's command to allow "no known or anticipated adverse effects," 42 U.S.C. § 300g-1(b)(4)(A), EPA's final decision was arbitrary.

## C. EPA failed to protect the public against harms other than IQ loss

Despite acknowledging that perchlorate exposure causes a wide range of neurodevelopmental harms, EPA used a single study measuring IQ loss to choose potential maximum contaminant level goals. EPA claimed that IQ was "a surrogate for a suite of potential

19

neurodevelopmental effects." 84 Fed. Reg. at 30,536. EPA's final decision relied on those potential goals without adequately explaining why—or indeed, whether—they would protect against other health harms. That was arbitrary. *See* NRDC Br. 49-56.

EPA defends its analysis by explaining that it picked the study that best fit its model. EPA Br. 40-42. But EPA's exclusive reliance on that study was not a good fit for the *statute*, which directs EPA to protect against all health harms that perchlorate may cause, with a margin of safety. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 520, 524-26 (D.C. Cir. 2009) (finding EPA selection of studies unreasonable in light of statutory command to protect vulnerable populations from harm). It was unreasonable for EPA to rely exclusively on a study measuring IQ loss without explaining why a regulatory threshold derived using IQ loss would also protect against other health harms—including language delay; reduced school performance; and increased risks of schizophrenia, ADHD, and autism—that EPA agrees perchlorate exposure can cause. *See* 84 Fed. Reg. at 30,557.

EPA now asserts that it did not consider studies focused on other health harms because they "were not adequately robust or well-suited

20

to EPA's model," EPA Br. 41. But in the record, EPA said there were multiple studies, focusing on multiple endpoints, that would have worked with its model. *See, e.g.*, Draft Report: Proposed Approaches to Inform the Derivation of a Maximum Contaminant Level Goal 5-6 (Sept. 2017) [JA__] ("5 studies present analyses or data that would allow EPA to quantitatively connect the results of the [model] to incremental changes in adverse neurodevelopmental effects"); *see id.* at 5-42 [JA__]. The final report EPA sent to peer review "focus[ed] on five studies and their associated neurodevelopmental endpoints." Post-Meeting Peer Review Summary Report 5 (Mar. 2018) [JA__] ("2018 Peer Review Report"). EPA's conclusion that the study it selected worked best with its model explains why EPA did not consider other studies *instead* of that one, but it does not explain why it did not consider them *in addition* to that study, or why it did not justify its assumption that IQ was an appropriate stand-in for all health harms. *See Am. Farm Bureau Fed'n*, 559 F.3d at 520-22 (concluding EPA failed to explain decision to disregard relevant studies).

EPA contends that the peer review panel "indicated IQ was preferred," but cites only its own response to comments. EPA Br. 42

(citing Response to Comments 8-57 to 8-58 [JA__-__]); *see also* Water Utils. Br. 19-20. The peer review report said no such thing; to the contrary, peer reviewers noted that it "would have been better to have more than five studies," 2018 Peer Review Report 61 [JA__], and that EPA "should consider expanding the endpoints considered relevant for assessment of adverse neurodevelopmental outcomes," *id.* at 64 [JA__].

Though EPA and others point to "conservative assumptions" in *other* parts of the Agency's analysis as a reason to uphold its decision, *see* EPA Br. 42, Water Util. Br. 15, Industry Amici Br. 2-3, those assumptions are legally irrelevant to the question whether EPA's exclusive focus on IQ loss was reasonable. *See NRDC v. EPA*, 735 F.3d 873, 884 (9th Cir. 2013) (reasoning "an agency's action must be upheld, if at all, on the basis articulated by the agency itself") (quoting *State Farm*, 463 U.S. at 50). In the record, EPA did not justify its exclusive focus on IQ by pointing to other parts of its analysis; it cannot do so for the first time here.[5]

_____

[5] The Water Utilities' defense of EPA's decision focuses in large part on the wrong EPA decision. The Water Utilities repeatedly cite a 2010 report critiquing EPA's 2005 interim reference dose as overly conservative. *E.g.*, Water Utils. Br. 7-8. That report predates even

EPA dismisses evidence that other types of harm occurred at lower levels of exposure than IQ loss, *see* NRDC Br. 54, suggesting that differences in study design might be the reason, EPA Br. 43. That hypothesis appears nowhere in the record. It also does not respond to NRDC's central point—EPA provided no explanation for assuming IQ loss was an appropriate surrogate for other harm.

The Safe Drinking Water Act directs EPA to protect against *all* adverse health effects. EPA's reliance on potential maximum contaminant level goals that failed to do so was arbitrary.

## III. EPA's estimate of current perchlorate contamination was biased and unreasonable

Because EPA has not regulated perchlorate levels in drinking water, most public drinking water systems do not test for it. The last nationally representative sampling concluded more than 17 years ago. *See* 84 Fed. Reg. at 30,541. Though Industry Amici confidently assert that contamination has gone down since then, Amici Br. in Supp. of EPA 5, current nationwide perchlorate occurrence is unknown.

---

EPA's determination to regulate, and provides no relevant information about the decision at issue here.

NRDC does not challenge EPA's conclusion that the 2001-2005

sampling data remain the best available information about perchlorate

levels in drinking water. Rather, we take issue with three subsequent

decisions. First, EPA selectively updated that data in a way that

"introduce[d] bias into the analysis of national occurrence." NRDC Mot.

to Suppl., Ex. B at 2. Second, EPA reversed a prior decision about how

to handle samples taken from water bodies that are sources of drinking

water without explaining why or acknowledging that it was changing

its mind. And third, in relying on biased sampling results to conclude

that perchlorate contamination in drinking water was rare, EPA

ignored reliable record data undermining that conclusion.

**A.     EPA's "update" to the 2001-2005 data presents a
        biased picture of current levels of perchlorate
        contamination**

EPA contends that the record "tells a convincing story of declining

contamination" since it last required testing. EPA Br. 50. That story is

less compelling than EPA suggests. *See infra* Section III.C. It is also a

biased narrative, because EPA did not review post-2005 data from any

sites that were not already contaminated during the 2001-2005

sampling period. The Agency considered new data only where

perchlorate had previously been found, and only where subsequent regulatory action made cleanup likely. *See* NRDC Br. 61-63. In other words, EPA only found evidence of declining contamination because it only looked where declines were most likely to have occurred. Thus, EPA's conclusion that perchlorate does not occur frequently enough to warrant regulation was based on a biased assessment of current conditions.

EPA asserts that there is "no similarly significant story indicating that perchlorate contamination elsewhere in the country has increased," EPA Br. 52—but cites no consideration in the record of this possibility. The Agency also ignores the reality that, because it has neither regulated perchlorate nor required recent national sampling, most water systems do not test for perchlorate. You will not find what you do not look for.

EPA defends its decision to update data for California and Massachusetts because both states have set enforceable drinking water standards for perchlorate since the Agency last required sampling, making it likely that perchlorate contamination has decreased in those states. EPA Br. 51-52. But for exactly that reason, it was unreasonable

for EPA to cherry-pick those states as the only places from which to seek updated data. The 2001-2005 sampling data was designed to be nationally representative. Perchlorate Occurrence and Monitoring Report i (May 2019) [JA__] ("Occurrence Report"). Selectively updating data only for California and Massachusetts—two states that are unique in the nation in having regulated perchlorate in drinking water—is unlikely to capture a nationally representative picture of current contamination levels. As EPA itself stated, "[w]ith a select and very incomplete update, it is not possible to know more current conditions for perchlorate occurrence nationally." *Id.* at B-6 [JA__]. "Therefore, it is not appropriate to update some systems' data and not others given the need for high data quality, consistency, and national representativeness that is provided by the [2001-2005] perchlorate data." *Id.* Yet that is exactly what EPA did.

Even if EPA could reasonably have focused on conditions in California and Massachusetts, the Agency conducted a biased update *within* those states. EPA did not seek updated information from all California and Massachusetts sites that were sampled for perchlorate as part of the 2001-2005 monitoring period, or from a representative

26

sample of sites. EPA sought updated information only from sites where perchlorate had previously been found. Occurrence Report 19 [JA__]. That EPA did not find any evidence of new contamination is unsurprising: by definition, the sites EPA selected could not have developed new contamination.

EPA raised the *very same* concerns when the Chamber of Commerce lobbied the Agency in 2012 to update data from California and Massachusetts. EPA declined the Chamber's request, reasoning it would not be "appropriate to introduce bias into the analysis of national perchlorate occurrence by selectively eliminating only" sites "where there is information that suggests perchlorate levels have decreased." NRDC Mot. to Suppl., Ex. B at 2. Because "in other cases the levels of perchlorate may have increased," EPA rebuffed the Chamber. *Id.* Six years later, without any mention of the potential for bias, EPA acquiesced to the Chamber's demand.

The 2001-2005 dataset captured a snapshot in time of perchlorate contamination that, while outdated, was statistically representative. By selectively revisiting only sites that had previously detected perchlorate, EPA set up a one-way ratchet: it acknowledged

contaminated water could be cleaned up, but not that clean water could become contaminated. Because this approach did not reasonably estimate current levels of perchlorate contamination, EPA's conclusion that perchlorate occurs too infrequently to warrant regulation was arbitrary.

**B.    EPA still has not acknowledged that it changed position without explanation when it excluded nearly 200 samples from its dataset**

EPA's 2019 modifications to its 2001-2005 dataset also granted a second Chamber of Commerce request: EPA excluded 199 water samples from the dataset, almost half of which showed contamination. These samples were taken from ground and surface waters that were the original sources of drinking water, rather than from treated drinking water. For that reason, the Chamber lobbied EPA in 2012 to remove them from its dataset, arguing that they violated data quality guidelines. *See* 84 Fed. Reg. at 30,541-42.

EPA's brief offers a lengthy defense of the reasonableness of its decision to exclude these samples. *See* EPA Br. 45-47. That post hoc explanation does not appear in the record. Nor does it respond to NRDC's claim: EPA nowhere admitted that it had previously decided

not to exclude these samples or explained why it was changing course.
*See* NRDC Br. 65-67.

EPA argues that it did not change its position on these samples,
asserting that it told the Chamber it would continue to reassess the
data and consider its comments. EPA Br. 47. That is true as to "several
of the data issues" that the Chamber raised. EPA Letter to U.S.
Chamber of Commerce at 1 (Feb. 28, 2013),
https://www.epa.gov/sites/default/files/2015-06/documents/12004-
response.pdf. It is *not* true as to the Chamber's demand that EPA
exclude these 199 water samples because they violated data quality
guidelines. After stating that EPA would continue to assess other
issues, the Agency's response definitively rejected that demand:

> The EPA is, however, responding to one aspect of [the
> Chamber's letter] here. Specifically, your letter suggests that
> source water monitoring data under [the 2001-2005 water
> sampling] do not comply with data quality guidelines
> because they were not collected by accepted methods ....
> [T]he EPA believes that the source water results serve as an
> indicator of likely perchlorate occurrence in drinking water.
> Furthermore, the OMB's Government Wide Information
> Quality Guidelines emphasize that the quality of
> information should be commensurate with the use to which
> the information will be put. **The EPA continues to
> conclude that the data were appropriate for use in the
> context of the regulatory determination for
> perchlorate**.

29

*Id.* at 1-2 (emphasis added). Even the Chamber of Commerce understood that EPA had "denied the Chamber's request" to exclude these sites. *See* Chamber of Commerce Req. for Recons. 2 [JA__].

In withdrawing its regulatory determination, EPA did an about-face on how it would treat these samples. It deleted 199 samples from its dataset—nearly half of which detected perchlorate contamination—without acknowledging its earlier conclusion or explaining why it was reaching a different conclusion. 84 Fed. Reg. at 30,542. EPA stated only that "it was most appropriate" to exclude the samples. *Id.*

An agency may, of course, change its mind. *FCC v. Fox*, 556 U.S. at 515; *Am. Farm Bureau Fed'n*, 559 F.3d at 521-22. But it cannot do so without acknowledging that it *is* changing its mind and explaining why. *Id.* Here, EPA did neither. Its failure to do so was arbitrary.

## C.    Data in the record cast doubt on EPA's conclusion that perchlorate rarely contaminates drinking water

EPA withdrew its regulatory determination based on its assessment that there is "infrequent occurrence" of harmful levels of perchlorate in public drinking water. 84 Fed. Reg. at 30,555. Yet record evidence suggests the opposite: that perchlorate contamination is

ubiquitous in tap water and in the surface and ground water that are sources of public drinking water. *See* NRDC Br. 67-70; *see also* Occurrence Report App. A [JA__-__]. By EPA's own admission, this data was relevant: because "[l]akes, rivers, and aquifers are the sources of most drinking water," contamination in these water bodies "provides information on the potential for contaminants to adversely affect drinking water supplies." Occurrence Report A-1 [JA__]. Yet EPA failed to explain, on the record, why this evidence was consistent with the Agency's conclusion that perchlorate does not occur frequently in public drinking water. That failure makes its decision arbitrary.

EPA, appearing to misunderstand NRDC's claim, argues that these additional sources of data support its decision. *See* EPA Br. 55-56. But the time to consider these data sources, and explain how they informed and supported EPA's conclusions, was when EPA made its decision. EPA failed to do so. The Agency did not reference these studies anywhere in its final decision document; they appear only in an appendix to a technical document released alongside its 2019 proposed decision. Occurrence Report App. A [JA__-__]. Even there, though EPA summarized these data sources, it did not explain how it had considered

31

them in reaching its assessment. It simply stated that the data were "available" and asserted that it had reviewed them. *Id.* at A-1 [JA__].

Where record evidence raises questions about the appropriateness of an agency's conclusion, it is arbitrary to leave such "serious concerns unaddressed." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 709-10 (D.C. Cir. 2014). EPA's counsel cannot now fill in those gaps with a post hoc argument that these studies support the Agency's decision.

Nor is that argument correct: even the studies EPA cites in its brief undermine its conclusion that perchlorate contamination is now rare. For instance, EPA describes "dramatic declines" in perchlorate contamination in California after the state set an enforceable drinking water standard in 2007. EPA Br. 51. But it cites data showing that, even with binding regulations in place, 11.4% of California's large drinking water systems and 6.6% of its small systems detected perchlorate above the state's legal limit between 2007 and 2018. *Id.* These percentages are, at minimum, hundreds of times higher than EPA's estimate that between 0.004-0.03% of drinking water systems nationwide are contaminated with perchlorate at levels of public health concern. *See* 84 Fed. Reg. at 30,557.

32

EPA dismisses the studies NRDC highlights, arguing that while large percentages of samples were contaminated with perchlorate, the median levels were relatively low. EPA Br. 57. But the median is, by definition, a midpoint. Fully half of the samples detected higher levels of contamination—sometimes far higher. For instance, in the U.S. Geological Survey study of thousands of ground and surface water samples that EPA cites, EPA Br. 57, the 90th-percentile detection level was *12,000 ppb* in groundwater, and 37 ppb in surface water, Occurrence Report A-4 to A-5 [JA__-__]. Another study, which found perchlorate contamination in 88% of its nearly 9,000 samples, had a 90th-percentile detection level of 16.99 ppb. *Id.* at A-6 [JA__]. In other words, 10% of samples detected perchlorate at these levels or higher. EPA nowhere explained why these numbers do not undermine its conclusion that perchlorate contamination is infrequent.

Given EPA's failure to address this contrary evidence, its conclusion that perchlorate contamination is rare was arbitrary.

33

# CONCLUSION

Petitioner NRDC respectfully asks this Court to grant the petition for review, vacate EPA's reversal of its determination to regulate perchlorate, and direct EPA to finalize lawful perchlorate regulations.

Respectfully submitted,

/s/ *Sarah V. Fort*
Sarah V. Fort
Charles R. Corbett
Natural Resources Defense Council
1152 15th Street NW, Ste. 300
Washington, DC 20005
Telephone: (202) 513-6247
sfort@nrdc.org
ccorbett@nrdc.org

*Counsel for Petitioner*
Dated: November 4, 2022          *Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's order of May 12, 2022, because it contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the count of Microsoft Word.

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

Dated: November 4, 2022        /s/ Sarah V. Fort
                                    Sarah V. Fort

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2022, the foregoing Proof Reply Brief of Petitioner NRDC has been served on all registered counsel through the Court's electronic filing system.

/s/ *Sarah V. Fort*
Sarah V. Fort