**ORAL ARGUMENT NOT YET SCHEDULED**

No. 20-1335

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents*.

---

On Petition for Review of Final Action by the
United States Environmental Protection Agency

---

### INITIAL OPENING BRIEF OF PETITIONER NRDC

---

Sarah V. Fort
Charles R. Corbett
Natural Resources Defense Council
1152 15th Street NW, Ste. 300
Washington, DC 20005
Telephone: (202) 513-6247
sfort@nrdc.org
ccorbett@nrdc.org

*Counsel for Petitioner*
*Natural Resources Defense Council*

Dated: June 24, 2022

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner Natural

Resources Defense Council certifies as follows:

**(A) Parties**

The parties in No. 20-1335 are petitioner Natural Resources

Defense Council; respondents the U.S. Environmental Protection

Agency and Michael Regan, in his official capacity as Administrator of

the U.S. Environmental Protection Agency; and intervenor American

Water Works Association.

**(B) Ruling Under Review**

The petition for review challenges the Environmental Protection

Agency's final action titled "Drinking Water: Final Action on

Perchlorate," which appears in the Federal Register at 85 Fed. Reg.

43,990 (July 21, 2020).

**(C) Related Cases**

The undersigned is not aware of any related cases within the

meaning of Circuit Rule 28(a)(1)(C).

*/s/ Sarah V. Fort*
Sarah V. Fort

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioner Natural Resources Defense Council (NRDC) certifies that it is a non-governmental corporation with no parent corporation and no publicly held company holding 10% or more of its stock. NRDC, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.....................................................................ii

RULE 26.1 DISCLOSURE STATEMENT...............................................iii

TABLE OF CONTENTS ....................................................................iv

TABLE OF AUTHORITIES...............................................................viii

GLOSSARY OF ABBREVIATIONS ........................................................xiii

INTRODUCTION...............................................................................1

STATEMENT OF JURISDICTION..........................................................3

STATUTES AND REGULATIONS ..........................................................4

STATEMENT OF THE ISSUES PRESENTED ........................................4

STATEMENT OF THE CASE ..............................................................4

I.      Statutory Background.................................................................4

II.     Factual Background ..................................................................7

      A.      The military and space industries are primary sources of perchlorate contamination..............................................................7

      B.      Perchlorate exposure is widespread and threatens human health .......................................................10

III.    Regulatory and Procedural Background ....................................12

      A.      EPA prioritizes perchlorate for regulation ...........................12

B. EPA misses the statutory deadline to issue perchlorate regulations ......................................................... 14

C. States act to fill the regulatory void on perchlorate ........................................................... 15

D. EPA proposes perchlorate regulations .................................. 16

E. Public commenters object to EPA's analysis ........................ 20

F. EPA "withdraws" its final determination to regulate perchlorate ............................................................. 21

SUMMARY OF THE ARGUMENT .......................................................... 22

STANDING ................................................................................................. 24

STANDARD OF REVIEW ......................................................................... 28

ARGUMENT ............................................................................................... 28

I. EPA lacks statutory authority to reverse its final determination to regulate perchlorate ........................................... 28

A. The Safe Drinking Water Act confers no authority to reconsider a final determination to regulate ............................................................................... 29

1. The Act's text and structure foreclose reversal of EPA's decision to regulate perchlorate ................................................................ 30

2. The Act's statutory history confirms that indefinite authority to withdraw final regulatory decisions would undermine Congress's intent ....................................... 36

B.    Even if EPA did have some implied reconsideration authority, it has long since expired ........................................................ 39

II.  EPA failed to reasonably analyze both the level at which perchlorate threatens public health and how widely perchlorate contamination occurs ...................... 40

A.    EPA identified "levels of public health concern" that do not protect children from IQ loss and other health harms ........................................... 41

1.    IQ loss is an adverse health effect ............................... 44

2.    EPA failed to protect against known and anticipated adverse health effects other than IQ loss ........................................................ 49

3.    EPA unreasonably relied on its proposed maximum contaminant level goals in evaluating whether perchlorate contaminates drinking water at levels of public health concern ............................................... 56

B.    EPA did not reasonably assess how widely perchlorate contamination occurs in public drinking water ........................................................ 58

1.    EPA's selective update of old data created a biased picture of current perchlorate contamination ........................................... 58

a.    EPA's data "update" was biased ........................ 61

b.    EPA excluded nearly 200 water samples without acknowledging its prior decision to rely on them ............................ 65

2.  EPA ignored relevant data that
    undermine its assessment of
    perchlorate occurrence ................................................. 67

CONCLUSION ............................................................................. 70

CERTIFICATE OF COMPLIANCE ......................................................... 72

CERTIFICATE OF SERVICE ............................................................... 73

# TABLE OF AUTHORITIES

## Cases

*Air Alliance Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018)..........................................67

*Am. Methyl Corp. v. EPA,*
    749 F.2d 826 (D.C. Cir. 1984).............................................30, 35, 36

*Am. Mining Congress v. EPA,*
    907 F.2d 1179 (D.C. Cir. 1990)........................................52

*Animal Legal Def. Fund v. Perdue,*
    872 F.3d 602 (D.C. Cir. 2017)....................................48, 64

*Cal. Metro Mobile Commc'ns, Inc. v. FCC,*
    365 F.3d 38 (D.C. Cir. 2004) ..........................................30

*Chlorine Chemistry Council v. EPA,*
    206 F.3d 1286 (D.C. Cir. 2000)....................................6, 35-36, 48

*Cigar Ass'n of Am. v. USDA,*
    964 F.3d 56 (D.C. Cir. 2020) ..........................................65

*City of Portland v. EPA,*
    507 F.3d 706 (D.C. Cir. 2007)............................................4

*Clean Wisc. v. EPA,*
    964 F.3d 1145 (D.C. Cir. 2020)..................................25, 26

*Elec. Privacy Info. Ctr. v. Presidential Advisory*
    *Comm'n on Election Integrity,*
    878 F.3d 371 (D.C. Cir. 2017)..........................................26

*Env't Def. Fund v. FERC,*
    2 F.4th 953 (D.C. Cir. 2021)....................................28, 40

*FCC v. Fox Tel. Sta., Inc.,*
 556 U.S. 502 (2009) ................................................................ 66, 67

*Fogo De Chao (Holdings) Inc. v DHS,*
 769 F.3d 1127 (D.C. Cir. 2014)....................................................... 45

*Genuine Parts Co. v. EPA,*
 890 F.3d 304 (D.C. Cir. 2018)......................................................52-53

*HTH Corp. v. NLRB,*
 823 F.3d 668 (D.C. Cir. 2016)..................................................... 29, 30

*Hunt v. Wash. State Apple Advertising Comm'n,*
 432 U.S. 333 (1977) .................................................................. 24, 25

*Int'l Union, United Mine Workers v. Mine Safety*
 *& Health Admin.,*
 626 F.3d 84, 94 (D.C. Cir. 2010)................................................52-53

*Ivy Sports Med., LLC v. Burwell,*
 767 F.3d 81 (D.C. Cir. 2014) ......................................................... 39

*La. Pub. Serv. Comm'n v. FCC,*
 476 U.S. 355 (1986) ..................................................................... 29

*Mazaleski v. Treusdell,*
 562 F.2d 701 (D.C. Cir. 1977).......................................................... 39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc., v.*
 *State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) ....................................................... 43-44, 65, 70

*New Jersey v. EPA,*
 517 F.3d 574 (D.C. Cir. 2008)...................................... 32, 33, 34, 35

*New York v. NHTSA,*
 974 F.3d 87 (2d Cir. 2020)............................................................. 39

*NRDC v. EPA,*
    464 F.3d 1 (D.C. Cir. 2006) .......................................................... 10

*NRDC v. EPA,*
    542 F.3d 1235 (9th Cir. 2008) .............................................. 33, 34

*NRDC v. EPA,*
    755 F.3d 1010 (D.C. Cir. 2014)...................................................... 26

*NRDC v. EPA,*
    812 F.2d 721 (D.C. Cir. 1987).............................................. 45, 46, 49

*NRDC v. EPA,*
    824 F.2d 1211 (D.C. Cir. 1987).............................................. 44, 45

*NRDC v. NHTSA,*
    894 F.3d 95 (2d Cir. 2018)............................................................ 39

*NRDC v. Pritzker,*
    828 F.3d 1125 (9th Cir. 2016) ...................................................... 48

*NRDC v. EPA,*
    Case No. 16-cv-1251 (S.D.N.Y.) .................................................... 14

*Physicians for Social Responsibility v. Wheeler,*
    956 F.3d 634 (D.C. Cir. 2020)...................................................... 67

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002)...................................................... 10

*Sorenson Comm'ns, Inc. v. FCC,*
    755 F.3d 702 (D.C. Cir. 2014)...................................................... 70

*Waterkeeper All. v. EPA,*
    853 F.3d 527 (D.C. Cir. 2017)...................................................... 26

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................... 34

## Statutes

5 U.S.C. § 706(2)(A) ................................................................. 28

5 U.S.C. § 706(2)(C) ................................................................. 28

33 U.S.C. § 1314(m) ................................................................. 33

42 U.S.C. § 300f note ................................................................ 38

42 U.S.C. § 300g-1 ................................................................... 35

42 U.S.C. § 300g-1(b)(1)(A) ................................. 4, 5, 6, 14, 32, 40-41, 56

42 U.S.C. § 300g-1(b)(1)(B) ............................... 5, 13, 29, 31, 35, 38

42 U.S.C. § 300g-1(b)(1)(C) ............................................................. 5

42 U.S.C. § 300g-1(b)(1)(E) ................................. 6, 14, 28, 32, 39

42 U.S.C. § 300g-1(b)(3)(A) .......................................... 29, 35, 36

42 U.S.C. § 300g-1(b)(3)(C) ............................................................. 5

42 U.S.C. § 300g-1(b)(4)(A) ............................... 6, 17, 35, 42, 44

42 U.S.C. § 300g-1(b)(4)(B) ............................................................. 6

42 U.S.C. § 300g-1(b)(6) ........................................................... 35

42 U.S.C. § 300g-1(b)(9) ........................................................... 40

42 U.S.C. § 300g-1(e) ............................................................... 36

42 U.S.C. § 300g-3(c) .................................................. 5, 7, 26, 27

42 U.S.C. § 300g-4 ................................................................... 35

42 U.S.C. § 300g-5 ...................................................................... 35

42 U.S.C. §300j-4(a)(1) ..............................................................6-7

42 U.S.C. § 300j-7(a) .................................................................... 3

42 U.S.C. § 7412 ......................................................................... 32

Pub. L. No. 104-182 § 3(8)(A), 110 Stat. 1613 (1996) ........................37-38

## Federal Register Notices

63 Fed. Reg. 10,274 (Mar. 2, 1998) ......................................................... 12

73 Fed. Reg. 66,964 (Nov. 12, 2008) ........................................................ 48

75 Fed. Reg. 24,848 (May 6, 2010) .......................................................... 46

76 Fed. Reg. 7762 (Feb. 11, 2011) ........................................ 13, 28, 31, 59

84 Fed. Reg. 30,524 (June 26, 2019) ..................10, 11, 16, 17, 18, 19, 42,
44, 45, 46, 47, 50, 52, 53,
54, 55, 58, 59, 60, 65, 66, 67

85 Fed. Reg. 43,990 (July 21, 2020) ................ ii, 3, 21, 22, 29, 30, 32, 35,
41, 45, 56, 60, 62, 67

## Other Authorities

H.R. Rep. No. 93-1185 (1974) .......................................................27, 36-37

H.R. Rep. No. 104-632 (1996) ....................................................... 6, 27, 37

S. Rep. No. 99-56 (1985) ............................................................... 37

S. Rep. No. 104-169 (1995) ........................................................... 6, 44, 48

## GLOSSARY OF ABBREVIATIONS

CDC        Centers for Disease Control and Prevention

EPA        U.S. Environmental Protection Agency

NRDC       Natural Resources Defense Council

ppb        parts per billion

USGS       United States Geological Survey

# INTRODUCTION

Perchlorate—a chemical ingredient of rocket fuel and military explosives that presents a known threat to human health—is in our drinking water. At least 16 million people rely on tap water from systems where perchlorate has been found; the true number may be much higher. For many young children and fetuses, perchlorate ingestion can cause permanent cognitive harm.

More than a decade ago, the U.S. Environmental Protection Agency ("EPA" or "the Agency") determined that it must regulate perchlorate levels in tap water under the Safe Drinking Water Act. EPA's 2011 decision was based on its conclusion that setting limits on perchlorate would advance public health and protect millions of people from contaminated tap water.

If EPA had set enforceable drinking water standards, as the Safe Drinking Water Act requires, parents nationwide could now drink from their taps without worrying that perchlorate exposure could harm them or their children. And because regulation triggers mandatory monitoring and reporting, they could rest assured that if perchlorate

*were* detected in their water, they would be informed and could protect their families.

   None of this came to pass. Instead, after years of pressure from the federal agencies and industries who are the primary causes of perchlorate contamination, EPA abandoned its plan to regulate. In 2020, EPA proclaimed that perchlorate in drinking water is neither found at high enough levels, nor pervasive enough, to be a public health concern. As a result, perchlorate remains both unmonitored and unregulated.

   EPA's decision fails to protect the public from a chemical that threatens irreversible harm to children. It is also unlawful. EPA violated the Safe Drinking Water Act when it purported to "withdraw" its determination to regulate—an action the Act does not authorize. And EPA's analysis of whether perchlorate should be regulated was arbitrary, in at least two ways. First, in deciding at what *levels* perchlorate is harmful to human health, EPA set an exposure threshold that expressly allows IQ loss and fails to protect against other kinds of harm. Second, in deciding how *frequently* perchlorate contaminates public water at harmful levels, EPA manipulated decades-old sampling

data to paint an overly rosy picture of current prevalence, while ignoring additional information that undermines that picture.

Any one of these flaws, by itself, warrants vacatur of EPA's decision. Together, they represent a complete failure to ensure that the water we and our children drink is safe.

Accordingly, Petitioner Natural Resources Defense Council (NRDC) respectfully asks this Court to vacate and remand EPA's unlawful decision and direct EPA to finalize perchlorate regulations that protect the public against preventable, permanent harm.

## STATEMENT OF JURISDICTION

NRDC seeks review of EPA's final action titled "Drinking Water: Final Action on Perchlorate," published at 85 Fed. Reg. 43,990 (July 21, 2020). The Safe Drinking Water Act grants this Court jurisdiction to review the challenged action. 42 U.S.C. § 300j-7(a). NRDC timely filed this petition on September 3, 2020—within 45 days of the date of the action's publication in the Federal Register. *Id*.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in a separately bound addendum.

## STATEMENT OF THE ISSUES PRESENTED

1.    Whether EPA violated the Safe Drinking Water Act when it purported to withdraw its determination to regulate perchlorate more than five years after the Act required EPA to finalize drinking water standards;

2.    Whether EPA's withdrawal decision was arbitrary and capricious because EPA (a) excluded perchlorate contamination that will cause permanent harm to children and fetuses from its assessment of "levels of public health concern," and (b) relied on a biased analysis of how widely perchlorate contamination occurs in drinking water.

## STATEMENT OF THE CASE

## I.    Statutory Background

Congress enacted the Safe Drinking Water Act to protect public health by limiting the levels of harmful contaminants in public drinking water. *City of Portland v. EPA*, 507 F.3d 706, 709 (D.C. Cir. 2007). The Act directs EPA to place enforceable limits on contaminants that "may

have an adverse effect" on human health. 42 U.S.C. § 300g-1(b)(1)(A)(i).

Once EPA sets a drinking water standard for a contaminant, water

systems nationwide must test for it, and must inform the public when it

is found. *Id*. § 300g-3(c)(1)-(2) & (c)(4).

In selecting contaminants for regulation and in setting standards,

the Act directs EPA to consider effects on "infants, children, pregnant

women," and other people "at greater risk of adverse health effects due

to exposure to contaminants in drinking water." *Id*. § 300g-1(b)(1)(C) &

(b)(3)(C)(i)(V). In assessing whether to regulate a contaminant, the Act

directs EPA to determine whether

> (i) the contaminant may have an adverse effect on the health
> of persons;
>
> (ii) the contaminant is known to occur or there is a
> substantial likelihood that the contaminant will occur in
> public water systems with a frequency and at levels of public
> health concern; and
>
> (iii) in the sole judgment of the Administrator, regulation of
> such contaminant presents a meaningful opportunity for
> health risk reduction for persons served by public water
> systems.

*Id*. § 300g-1(b)(1)(A)(i)-(iii), (b)(1)(B)(ii)(II).

If EPA determines a contaminant meets these criteria, EPA

"shall" set drinking water standards for that contaminant. *Id*.

§ 300g-1(b)(1)(A). These standards include a "maximum contaminant level goal," set at "the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *Id.* § 300g-1(b)(4)(A). Congress meant this threshold to define a "safe" level of exposure, S. Rep. No. 104-169, at 3 (1995), with a margin of safety that reflects "the particular susceptibility of some groups (e.g., children) within the general population," *id.*; *see also* H.R Rep. No. 104-632, at 26 (1996). Simultaneously, EPA must propose an enforceable "maximum contaminant level," set as close as feasible to the maximum contaminant level goal, "tak[ing] practical considerations into account." *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1287 (D.C. Cir. 2000) (citing 42 U.S.C. § 300g-1(b)(4)(B)).

The Act requires EPA to issue drinking water standards promptly after making a final determination to regulate. EPA must propose regulations within 24 months and promulgate final regulations within 18 months after proposal, although EPA may extend the deadline by 9 months. 42 U.S.C. § 300g-1(b)(1)(E).

Once EPA regulates a contaminant under the Safe Drinking Water Act, public drinking water systems must test their water to

ensure it complies with EPA's limits. *See* 42 U.S.C. §300j-4(a)(1). If

testing reveals the presence of a regulated contaminant above the

maximum contaminant level, public water systems must promptly

notify all customers. 42 U.S.C. § 300g-3(c)(1). Water systems must also

provide customers with an annual report detailing whether, and at

what levels, regulated contaminants have been found in the system's

drinking water. *Id*. § 300g-3(c)(4).

In the twenty-six years since Congress amended the Act to put

regulatory criteria in place, EPA has not regulated a single new

contaminant under those criteria. *See* Part III.A, *infra*.

## II.    Factual Background

### A.    The military and space industries are primary sources of perchlorate contamination

Perchlorate is a chemical ingredient of rocket fuel, missiles,

fireworks, and other explosives. EPA, Technical Support Document 3-1

(May 2019), EPA-HQ-OW-2018-0780-0123 [JA__] (hereinafter, "EPA

Technical Document"). The Department of Defense, NASA, and defense

industry all rely heavily on perchlorate, and have for many decades.

U.S. Dep't of Def., Perchlorate Treatment Demonstration xi (Jan. 2009),

EPA-HQ-OW-2018-0780-0084 [JA__]; U.S. Gov't Accountability Office,

Perchlorate Report 1, GAO-10-769 (Aug. 2010) (hereinafter,

"Perchlorate Report").[1] Perchlorate can also occur naturally in soils and

fertilizers, and can form as a byproduct of improperly stored

disinfectant products. EPA, Comment Responses 6-8–6-9 (June 2020),

EPA-HQ-OW-2018-0780-0304 [JA__-JA__]; EPA Technical Document at

3-3 [JA__].

Perchlorate contamination is widespread. Government sampling

has detected perchlorate in soil, sediment, surface water, groundwater,

and drinking water samples spanning 45 states, the District of

Columbia, and three U.S. territories. Perchlorate Report 12 [JA__].

Once perchlorate enters the environment, it moves easily into ground

and surface water, where it can "persist for decades." Occurrence Report

10. Perchlorate can also travel through ground and surface water,

contaminating water many miles downstream from its source. *Id*. at

A-12; Solomon Decl. ¶ 18.

---

[1] Though this report is not in the record index, it is part of the
administrative record because it is "referenced in [an] indexed
document[] authored by EPA." Am. Certified Index at 4 n.1, ECF No.
187007; *see* EPA, Perchlorate Occurrence and Monitoring Report 51
(May 2019), EPA-HQ-OW-2018-0780-0127 [JA__] (hereinafter,
"Occurrence Report") (citing document).

The defense and space industries are the primary sources of perchlorate contamination in groundwater, U.S. Dep't of Def., Perchlorate Treatment Demonstration xi [JA__], although the fireworks industry shares responsibility, *e.g.*, Occurrence Report 8, A-7, A-18 [JA__, JA__, JA__]. Past disposal practices by the defense and space programs, including open burning and open detonation of munitions containing perchlorate, have contaminated multiple drinking water aquifers. Dep't of Defense, Demonstration Report xi, EPA-HQ-OW-2018-0780-0084 [JA__]. Military and NASA facilities are known contamination hotspots. Between 1997 and 2009, the Department of Defense detected perchlorate contamination at 70% of the 284 facilities tested. Perchlorate Report 10 [JA__]. NASA found perchlorate at four of the seven facilities it sampled. *Id.* at 11 [JA__]. Perchlorate is a known contaminant at 40 sites on the Superfund National Priorities List, including 25 sites maintained by NASA and the Departments of Defense, Energy, and Interior. *Id.* at 12 [JA_].

9

**B.    Perchlorate exposure is widespread and threatens human health**

Perchlorate poses "a clear and present danger to human health." Zoeller Decl. ¶ 7.[2] If ingested, perchlorate is absorbed into the bloodstream. EPA Technical Document at 7-1 [JA_]. The body then transports it to the thyroid gland, where it interferes with production of thyroid hormones. 84 Fed. Reg. 30,524, 30,526 (June 26, 2019); Zoeller Decl. ¶¶ 18-20.

Thyroid hormones are "essential" for brain development— particularly for fetuses and young children, whose brains are developing rapidly. EPA Technical Document 6-4 [JA__]. Even brief interruptions can cause harm. *Id*. at 6-5 [JA__]; Zoeller Decl. ¶ 23; Solomon Decl. ¶¶ 31, 33. Studies of children whose mothers had low thyroid hormone levels during pregnancy reveal a wide range of adverse health effects, including reduced cognitive abilities; behavioral problems; language delays; and heightened rates of ADHD, autism, and schizophrenia. 84 Fed. Reg. at 30,557.

---

[2] Dr. Zoeller's declaration is offered in support of NRDC's standing. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006).

In the United States, most perchlorate exposure occurs by eating or drinking contaminated food or water. *Id*. at 30,525. Such exposure is ubiquitous: large studies of urine have detected perchlorate in every person studied. EPA, Proposed Approaches to Inform Perchlorate Regulation 1-2 (May 2019), EPA-HQ-OW-2018-0780-0110 [JA__].

EPA has required nationwide testing for perchlorate in public drinking water systems only once—during testing conducted between 2001 and 2005. That testing (hereinafter the "2001-2005 water sampling") included all large water drinking water systems and a statistically representative sample of small water systems. 84 Fed. Reg. at 30,541. Public water systems detected perchlorate in 637 samples across 26 states and two U.S. territories. Occurrence Report at i, 18. These detections likely undercount perchlorate's prevalence in drinking water, as EPA did not require reporting of detections at levels below 4 parts per billion (ppb).[3] *See* 84 Fed. Reg. at 30,541.

---

[3] Record documents refer to concentration using two interchangeable units of measurement: parts per billion and micrograms per liter (μg/L). This brief uses parts per billion.

## III.    Regulatory and Procedural Background

For more than twenty years, EPA waffled on whether to regulate perchlorate levels in drinking water. And for more than twenty years, the federal agencies and industry contractors who bear primary responsibility for perchlorate contamination pressured EPA not to regulate. Even after EPA's final determination in 2011 to set a drinking water standard for perchlorate, the pressure campaign continued. EPA yielded in 2020, announcing that it would not regulate perchlorate after all. That decision failed to properly consider and analyze the evidence before the Agency.

### A.    EPA prioritizes perchlorate for regulation

EPA began assessing whether to regulate perchlorate in drinking water in 1998. 63 Fed. Reg. 10,274, 10,274-75 (Mar. 2, 1998). In 2002, the Agency published a draft risk assessment suggesting a provisional drinking water threshold of 1 ppb for the chemical. *See* Nat. Research Council, Health Implications of Perchlorate Ingestion at 12-17, 23 (2005), EPA-HQ-OW-2018-0780-0060 [JA__-JA__, JA__]. The proposal provoked immediate controversy at NASA and the Departments of Defense and Energy, *see id*. at 19 [JA__]: a strict drinking water

12

standard for perchlorate would trigger cleanup responsibilities for

military and space agencies and their contractors. The price tag "could

be billions of dollars" for the Department of Defense alone. Dep't of

Defense, Perchlorate Removal Demonstration 2, EPA-HQ-OW-2018-

0780-0083 [JA__]. In the years that followed, industry groups like

Lockheed Martin, Northrup Grumman, and Aerojet Rocketdyne

sponsored dozens of studies to undermine EPA's analysis. EPA-HQ-OW-

2018-0780-0262 C-1 to C-5 [JA__ to JA__] (detailing industry-funded

studies).

In 2011, EPA published a final determination to regulate

perchlorate. 76 Fed. Reg. 7762, 7762 (Feb. 11, 2011). The Agency

concluded that:

> [P]erchlorate may have an adverse effect on the health of
> persons, that perchlorate occurs or there is a substantial
> likelihood that perchlorate will occur in public water systems
> with a frequency and at levels of public health concern, and
> that regulation of perchlorate in drinking water systems
> presents a meaningful opportunity for health risk reduction
> for persons served by public water systems.

Id. at 7763. The decision marked the first time in 15 years that EPA

determined that an unregulated contaminant met the criteria for

regulation set out in 42 U.S.C. § 300g-1(b)(1)(B)(ii).

13

**B.    EPA misses the statutory deadline to issue perchlorate regulations**

EPA's 2011 determination to regulate perchlorate created a statutory duty to propose regulations within 24 months (by February 2013), and to finalize regulations within 18 months of proposal (by August 2014). *Id.* at 7763; *see also* 42 U.S.C. § 300g-1(b)(1)(A), (E).

EPA missed both deadlines. In 2016, NRDC sued to compel EPA to fulfill its duty to regulate perchlorate. Compl., *NRDC v. EPA*, Case No. 16-cv-1251 (S.D.N.Y.), ECF No. 1. The parties entered a Consent Decree requiring EPA to propose perchlorate regulations by 2018 and finalize regulations by 2019. Consent Decree 4, *NRDC v. EPA*, Case No. 16-cv-1251, ECF No. 38. EPA later sought and received extensions to these deadlines. Dec. 11, 2018, Order, *NRDC v. EPA*, Case No. 16-cv-1251, ECF No. 57; Stipulation, *NRDC v. EPA*, Case No. 16-cv-1251, ECF No. 60-1.

As the Act's deadline for perchlorate drinking water standards came and went, the Department of Defense, NASA, and affiliated industry groups provided detailed critiques of EPA's regulatory process and proposed approach to selecting a perchlorate standard. *See, e.g.*, EPA-HQ-2016-0438-0013 [JA__]; EPA-HQ-2016-0438-0032 [JA__];

14

EPA-HQ-2016-0438-0039 [JA__]; EPA-HQ-2016-0438-0012 [JA__].

Among other things, lobbyists accused EPA of being biased and "overly

conservative" in its approach to regulation. EPA-HQ-OW-2016-0438-

0036 at 3 [JA__]. Because EPA excluded interagency exchanges from

the record before this Court, the full scope of these critiques is

unknown.

## C.    States act to fill the regulatory void on perchlorate

As the federal government spent decades debating whether to

regulate perchlorate, many states acted to protect their residents from

exposure. Massachusetts and California enacted enforceable drinking

water limits, and at least 10 other states set advisory or guidance

levels. Occurrence Report 4 [JA__]. Most states set limits below 10 ppb;

none set limits higher than 18 ppb. *Id*.

**Table 1: Summary of State Perchlorate Standards**

| State | Level (ppb) |
|-------|-------------|
| **Enforceable limits** | |
| California | 6 |
| Massachusetts | 2 |
| **Guidance and advisory levels** | |
| Arizona | 14 |
| Hawaii | 15 |
| Maine | 0.8 |
| Maryland | 1 |
| Nevada | 18 |
| New Jersey | 5 |
| New Mexico | 1 |
| New York | 5 |
| Oregon | 4 |
| Vermont | 4 |

Source: Occurrence Report 4 [JA__].

## D.    EPA proposes perchlorate regulations

At long last, in June 2019, EPA proposed a federal drinking water standard for perchlorate. 84 Fed. Reg. at 30,525. EPA determined that the populations most at risk from perchlorate exposure are those "with developing brains," including fetuses, infants, and children. *Id.* at 30,527. EPA proposed setting a maximum contaminant level goal of 56 parts per billion to protect these populations—more than three times the highest level set by any state, and 28 times the level set by Massachusetts. *Id.* at 30,525. At that level, EPA conceded that the fetuses, infants, and children most at risk from perchlorate exposure

16

would suffer, on average, a 2-point drop in IQ scores. *Id*. at 30,536, 30,540-41. EPA indicated that it had "made a policy decision," 84 Fed. Reg. at 30,536, to use this 2-point drop in average IQ as the threshold at which "no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *Id*. at 30,540 (citing 42 U.S.C. § 300g-1(b)(4)(A)).

In addition to IQ loss, EPA's proposed rule highlighted "a variety of adverse neurodevelopmental outcomes" associated with inadequate thyroid hormone production, including reduced cognitive functioning; reduced school performance; behavioral problems; and increases in autism spectrum disorder, attention deficit/hyperactivity disorder (ADHD), and schizophrenia. 84 Fed. Reg. at 30,527, 30,557; EPA Technical Document 9-9 [JA__]. EPA used IQ loss as a "surrogate" for all health effects caused by perchlorate; it did not separately analyze whether its proposed level would protect against these other health harms. 84 Fed. Reg. at 30,536.

EPA also sought comment on two alternative maximum contaminant level goals—18 ppb and 90 ppb—levels that corresponded, respectively, with a 1-point and 3-point reduction in average IQ scores

17

in the same at-risk population. *Id*. at 30,541. For all three potential maximum contaminant level goals, the Agency proposed setting the enforceable maximum contaminant level at the same level as the goal. *Id.* at 30,541.

EPA's proposed rule also announced an "updated" estimate of how widely perchlorate contaminates drinking water. *Id.* at 30,541-42. That estimate relied on the same 2001-2005 water sampling data that formed the basis of EPA's determination to regulate more than a decade ago. However, EPA modified its earlier data by "updating" two-thirds of the samples where perchlorate had been found between 2001-2005 with alternate data. EPA "updated" only 0.3% of the samples that did not detect perchlorate. *See* 84 Fed. Reg. at 30,542.

Even after these updates, nearly 5% of large public water systems, serving more than 16 million people, reported at least one sample with perchlorate contamination at levels of 4 ppb or higher. Occurrence Report i [JA_]. EPA did not base its analysis of how widely perchlorate occurs "at levels of public health concern" on these detections. Instead, EPA looked at how many times perchlorate was detected at levels above the Agency's proposed maximum contaminant level goal of 56 ppb, and

above its alternative maximum contaminant level goals of 18 ppb and 90 ppb. *See* 84 Fed. Reg. at 30,543. EPA deemed these the "possible levels expected to cause adverse health effects." 84 Fed. Reg. at 30,557 n.17. EPA estimated that approximately 65,000 people are exposed to perchlorate contamination in tap water at levels of 56 ppb or higher; for its alternative goals of 18 ppb and 90 ppb, EPA estimated that approximately 700,000 people and 26,000 people, respectively, received water from systems with detections above the limit. 84 Fed. Reg. at 30,543–544.

In light of these estimates, EPA suggested that perchlorate contamination is "infrequent" at levels of public health concern. 84 Fed. Reg. at 30,557 n.18. In addition to proposing a maximum contaminant level goal and two alternatives, EPA also sought comment on "withdraw[ing] the perchlorate regulatory determination." *Id*. at 30,558.

In an appendix to a technical supporting document issued in support of the proposed decision, EPA described dozens of other sources of data on perchlorate occurrence. Occurrence Report A-1 [JA_]. These sources included more recent studies that detected perchlorate in 83% of tap water samples, and in 88% of ground and surface water samples

that "are the sources of most drinking water." *Id.* at A-1, A-6, A-15 [JA__, JA__, JA__]. EPA did not use this data in estimating the prevalence of perchlorate contamination.

### E.    Public commenters object to EPA's analysis

EPA's proposed drinking water standard prompted thousands of public comments. *See* EPA Comment Responses viii [JA__]. Public health experts, regulators, and advocates—including the American Academy of Pediatrics; the states of California, New York, New Jersey, and Massachusetts; and previous members of EPA's own Science Advisory Board—objected that EPA's proposed and alternate maximum contaminant level goals were not protective of public health. They took issue with, among other things, EPA's decision to treat the loss of multiple IQ points as an acceptable, non-adverse effect, EPA-HQ-OW-2018-0780-0280 at 2 [JA__], as well as EPA's failure to protect against other health harms, *see id*. They also objected to EPA's attempt to downplay perchlorate's prevalence in drinking water. They noted that EPA relied on old information, selectively updated that information in a biased way, and failed to consider additional data showing ongoing contamination. *See, e.g.*, EPA-HQ-OW-2018-0780-0241 at 5-8 [JA__-

JA__], EPA-HQ-OW-2018-0780-0256 at 2-3 [JA__-JA__]. Public health professionals expressed particular alarm that EPA was considering leaving perchlorate completely unregulated. EPA-HQ-OW-2018-0780-0264 at 2 [JA__].

Defense industry representatives, by contrast, urged EPA to reverse its determination to regulate, *e.g.*, EPA-HQ-OW-2018-0780-0262 at 1 [JA__], arguing that drinking water contaminated with perchlorate does not cause adverse health effects, *id.* at 11-12 [JA__-JA__].

**F.    EPA "withdraws" its final determination to regulate perchlorate**

In July 2020, EPA announced that it was "withdraw[ing]" its determination to regulate perchlorate. 85 Fed. Reg. 43,990, 43,990 (July 21, 2020). EPA conceded that ingesting perchlorate is dangerous, particularly for fetuses, infants, and children. *Id*. at 43,994-995. Nonetheless, EPA asserted that perchlorate does not meet the Safe Drinking Water Act's criteria for regulation. *Id*. at 43,990-91. In

particular, EPA found that perchlorate does not occur in drinking water with a frequency and at levels of public health concern. *Id*. at 43,992.[4]

Like its proposed rule, EPA's final rule relied on 18, 56, and 90 ppb as important thresholds—this time, to define "levels of public health concern." *Id*. at 43,995. EPA treated perchlorate contamination at levels below 18 ppb as "safe." Then, based on its estimates of how frequently people are being exposed to perchlorate above 18 ppb, 56 ppb, and 90 ppb, EPA concluded that harmful levels of perchlorate contamination are not found in public drinking water frequently enough to warrant regulation. *Id*. at 43,995-998. The Agency did not mention data showing widespread perchlorate contamination in ground, surface, and drinking water.

### SUMMARY OF ARGUMENT

I.    The Court should vacate EPA's decision not to set a drinking water standard for perchlorate for a simple reason: EPA had no authority to "withdraw" its final determination to regulate. The Safe

---

[4] EPA also stated that regulating perchlorate would not "present a meaningful opportunity for health risk reduction." 85 Fed Reg. at 43,997. That conclusion relied on the Agency's analysis of the levels and frequency of perchlorate exposure that present a public health concern, *see id.*, and was not an independent basis for EPA's decision.

Drinking Water Act establishes a clear process EPA must follow in evaluating unregulated chemicals and deciding when to set enforceable limits. That process provides no explicit or implicit authority to "undo" a final regulatory determination nearly a decade after it was made. To the contrary, the text, structure, and purpose of the Act all reveal that once EPA determines that a chemical meets the statute's criteria, EPA has no discretion to decide not to regulate.

II.    Even if EPA had authority to reverse its regulatory determination, the way it did so here was unlawful. EPA's decision relies on two analytical pillars, both of which crumble upon review. Each error presents an independent reason to vacate EPA's decision.

A.    First, EPA's decision assumes that the Agency reasonably assessed the *level* of perchlorate exposure that causes "public health concern." It did not. EPA's analysis rests on three proposed maximum contaminant level goals that the Agency incorporated into its final decision as the "levels of public health concern." But none of EPA's proposed levels prevent measurable IQ loss in children, and all three fail to protect against other health harms that can occur at lower levels

of exposure. No rational consideration of the level of contamination that triggers "public health concern" would exclude these harms.

**B.**    Second, EPA's decision assumes that the Agency reasonably estimated the *frequency* of perchlorate exposure that causes "public health concern." Again, it did not. EPA relied on sampling data that was nearly two decades old as the best available information about perchlorate occurrence—then conducted a "reanalysis" of that data that systematically excluded samples from sites where contamination had been found. And EPA ignored additional relevant evidence indicating that perchlorate contamination is pervasive nationwide. Because EPA's estimate of perchlorate's prevalence was flawed, its conclusion that perchlorate prevalence is not "frequent" enough to be of public health concern is arbitrary.

## STANDING

NRDC has standing to sue on behalf of its members. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). NRDC is an environmental and public health organization that works to protect its members from pollutants in drinking water. Trujillo Decl. ¶¶ 7-8. The interests NRDC seeks to protect here are germane to

24

that purpose. *See Hunt*, 432 U.S. at 343. Neither the adjudication of the claims nor the requested relief require individual NRDC members' participation in this lawsuit. *See id.* at 342-43. And NRDC members would have standing to challenge EPA's action on their own behalf: they suffer (1) concrete and particularized injuries, that are (2) caused by EPA's action, and (3) redressable by a favorable judicial decision. *See Clean Wisc. v. EPA*, 964 F.3d 1145, 1156-57 (D.C. Cir. 2020).

NRDC's members have realistic concerns that they and their children are being exposed to harmful levels of perchlorate. Leimer Decl. ¶¶ 5, 8, 11; Carpenter Decl. ¶ 15; Kiszla Decl. ¶ 10. Members live in areas where perchlorate has been found in drinking water, including near military facilities used for artillery testing and firing ranges. Leimer Decl. ¶ 2, 6; Carpenter Decl. ¶¶ 7, 10-12; Kiszla Decl. ¶¶ 3-4, 9; Kamaras Decl. ¶¶ 3-5; Tarantino Decl. ¶¶ 4, 8. They, and their children, drink tap water; some are at heightened risk from exposure as a result of their family medical histories. Leimer Decl. ¶¶ 9-11; Carpenter Decl. ¶¶ 8-9; Kiszla Decl. ¶¶ 5, 6, 11, 13. They worry about the risks perchlorate poses to their families. Leimer Decl. ¶¶ 5, 8, 11; Carpenter Decl. ¶ 15; Kiszla Decl. ¶ 10; *see also* Zoeller Decl. ¶ 25 (estimating that

at least 5,000 NRDC members are women of reproductive age with low iodine levels). "Adverse health effects," including "realistic health concerns," are Article III injuries. *Clean Wisc.*, 964 F.3d at 1156 ; *see also NRDC v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (recognizing standing based on actual and imminent health concerns).

EPA's refusal to regulate perchlorate also prevents NRDC's members from accessing information that would allow them to protect their families from exposure. A petitioner sustains an informational injury when she is deprived of information that a statute requires the government to disclose and "suffers . . . the type of harm Congress sought to prevent by requiring disclosure." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017); *see also Waterkeeper All. v. EPA*, 853 F.3d 527, 533-34 (D.C. Cir. 2017) (finding informational injury where EPA action reduced polluters' reporting and disclosure obligations).

Under the Safe Drinking Water Act, community water systems must notify their customers of violations of drinking water standards, 42 U.S.C. § 300g-3(c)(1)(A), and must provide annual reports disclosing the levels of any regulated contaminant found in its drinking water,

*id.* § 300g-3(c)(4)(B)(iii)(III), (vii). Both requirements were designed to inform the public about the safety of their drinking water. H.R. Rep. No. 93-1185, at 24 (1974) (explaining notice was designed to "advise the public of potential or actual health hazards"); H.R. Rep. No. 104-632, at 36 (1996) (indicating annual reports should inform customers about whether their systems were complying with regulations). Because EPA reversed its decision to regulate, NRDC members have "no way of knowing whether [their] children are being exposed to perchlorate, and in what amounts." Carpenter Decl. ¶ 17; Tarantino Decl. ¶ 10.

NRDC's members' injuries are traceable to EPA's unlawful action, and redressable through a favorable ruling. If EPA had regulated perchlorate, NRDC members would be protected from health effects caused by perchlorate exposure, and would have access to information that would allow them to make informed decisions about how best to protect their families. This suit provides redress for those injuries. If this Court vacates EPA's 2020 action and EPA regulates perchlorate on remand, NRDC's members will worry less, face reduced risks of harm, and have access to the information they seek.

## STANDARD OF REVIEW

This Court reverses agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The Court also sets aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). "[T]he overarching question" is whether the Agency's "decisionmaking was reasoned, principled, and based upon the record." *Env't Def. Fund v. FERC*, 2 F.4th 953, 967-68 (D.C. Cir. 2021) (internal quotation omitted). When an Agency's "explanation for a contested action is lacking or inadequate, it will not survive judicial review." *Id.* at 968.

## ARGUMENT

## I.    EPA lacks statutory authority to reverse its final determination to regulate perchlorate

In 2011, EPA made a "final determination to regulate perchlorate in drinking water." 76 Fed. Reg. at 7762-63. That determination triggered a duty to issue enforceable perchlorate regulations by 2014. *See id*. at 7762-63; 42 U.S.C. § 300g-1(b)(1)(E).

Nine years later, in purporting to "withdraw" its regulatory determination, EPA acknowledged that no part of the Safe Drinking

28

Water Act "explicitly authoriz[ed] withdrawal." 85 Fed. Reg. at 43,992.

The Agency reasoned instead that it has the "inherent authority to

withdraw a regulatory determination" if information changes before

EPA promulgates a drinking water standard. *Id.* EPA hypothesized

that promulgating regulations—as the statute requires—would

contradict Congress's instruction to use "the best available public health

information" and "peer-reviewed science" in implementing the Act. *Id.*

(quoting 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II), (b)(3)(A)).

EPA is wrong. The agency has no "inherent" reconsideration

authority. And the reconsideration authority EPA reads into the statute

would violate the Act's text and frustrate its purpose. The Act expressly

prescribes EPA's next step: the agency must set a drinking water

standard for perchlorate.

## A.    The Safe Drinking Water Act confers no authority to reconsider a final determination to regulate

EPA is a creature of Congress and as such "literally has no power

to act . . . unless and until Congress confers power upon it." *La. Pub.*

*Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986). EPA may reconsider its

decision to regulate "only if some provision or provisions of the Act

explicitly or implicitly grant it power to do so." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016).

Because EPA concedes the Safe Drinking Water Act does not expressly authorize withdrawal of a final determination to regulate, 85 Fed. Reg. at 43,992, any reconsideration authority must be "statutorily implicit" in the Act. *HTH Corp.*, 823 F.3d at 679 (quotation omitted). To determine whether such authority exists, this Court looks to the "traditional tools of statutory construction," *see Am. Methyl Corp. v. EPA*, 749 F.2d 826, 833, 834-37 (D.C. Cir. 1984) (quotation omitted), including the Act's "text, structure, purpose, and legislative history," *see Cal. Metro Mobile Commc'ns, Inc. v. FCC*, 365 F.3d 38, 44-45 (D.C. Cir. 2004) (quotation omitted).

A review of the Safe Drinking Water Act confirms that Congress intended a decision to regulate to lead swiftly to regulation—not slowly to reversal.

### 1.    The Act's text and structure foreclose reversal of EPA's decision to regulate perchlorate

The Safe Drinking Water Act's text and structure reveal two separate processes relating to regulation of new contaminants: one scheme directed at answering the question of *whether* to regulate; the

30

other directed at answering the question of *at what level* to regulate.

EPA has discretion on which contaminants to prioritize for regulation.

But once EPA has decided to regulate a chemical, it must follow

through and set a standard.

When EPA is deciding whether to regulate a new contaminant, it

possesses substantial discretion. The Act requires EPA to regularly

publish a list of unregulated drinking water contaminants that may

require regulation; it leaves to EPA what contaminants to include on

that list. 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). The Act sets regular deadlines

by which EPA must decide whether or not to regulate at least five

contaminants; it leaves to EPA the selection of those five contaminants.

*Id.* § 300g-1(b)(1)(B)(ii)(I). For each selected contaminant, EPA must

make a "preliminary determination," subject to notice and comment,

about whether the contaminant meets the Act's criteria for regulation.

*Id.* Lastly, it must make a final determination. *Id.*; *see also* 76 Fed. Reg.

at 7762 (referring to EPA's "final determination to regulate

perchlorate"). A determination to regulate thus represents the

culmination of a lengthy process for deciding *whether* to regulate—not,

as EPA asserts, a "preliminary step" in the separate process of issuing final drinking water regulations. 85 Fed. Reg. at 43,992.

Once EPA issues a final determination to regulate a contaminant, the Act expressly directs the Agency's next move: the Agency "*shall* publish maximum contaminant level goals and promulgate, by rule, national primary drinking water regulations." 42 U.S.C. § 300g-1(b)(1)(E) (emphasis added); *see also id.* § 300g-1(b)(1)(A). It also prescribes when to regulate: EPA must propose regulations within 24 months of its determination and finalize them within 18 months thereafter. *Id.* § 300g-1(b)(1)(E).

The Safe Drinking Water Act's structure mirrors other environmental statutes that separate a discretionary decision whether to regulate a pollutant or source from the mandatory regulations triggered by that determination. For example, section 112 of the Clean Air Act first requires EPA to determine whether it is "appropriate and necessary" to regulate certain emission sources of hazardous air pollutants, based on public health risks. *New Jersey v. EPA*, 517 F.3d 574, 579 (D.C. Cir. 2008) (quoting 42 U.S.C. § 7412(n)(1)(A)). If EPA makes the requisite finding, it must then regulate those emission

sources. *Id.* Similarly, Section 304(m) of the Clean Water Act requires EPA to publish a list of sources of unregulated pollutants every two years, then provides that EPA "shall" promulgate regulations for those sources "no later than . . . 3 years after the publication" of the list. *NRDC v. EPA*, 542 F.3d 1235, 1239 (9th Cir. 2008) (quoting 33 U.S.C. § 1314(m)(1)(B), (C)).

Courts have rejected EPA's attempts to reverse regulatory determinations reached under these analogous processes. The Ninth Circuit held that EPA could not backtrack on its decision to regulate sources listed under section 304(m) of the Clean Water Act. *Id.* at 1250-53. Congress's intent on the question was clear: after listing a pollutant source, EPA "*shall*" promulgate a regulation within three years. *Id.* at 1250-51 (quoting 33 U.S.C. § 1314(m)(1) (emphasis added by court)). "[T]he three-year delay provided for in [section 304(m)] is not to decide *whether* to list a pollutant, but to allow the EPA to consider what the *substance*" of the regulations will be. *Id.* at 1253. And in *New Jersey v. EPA*, this Court held that EPA has no implied power to reconsider final determinations to list and regulate emission sources, even if the agency believes the listing decision was mistaken, because it would contravene

express commands of the statute. 517 F.3d at 582-83 (reasoning EPA's desire to correct a purported error could not "overcome the [statute's] plain text" regarding delisting).

Like the provisions at issue in these cases, the Safe Drinking Water Act gives EPA discretion to determine, in the first instance, what contaminants to regulate. But the Act eliminates EPA's discretion once the Agency decides to regulate. EPA's assertion of "inherent" reconsideration authority would "completely nullif[y] textually applicable provisions meant to limit [agency] discretion," *see New Jersey*, 517 F.3d at 583 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001)); it would mean that "EPA could delist any [contaminant] to avoid the deadline," *see NRDC v. EPA*, 542 F.3d at 1253. The statute's text and structure foreclose EPA's position.

That the Safe Drinking Water Act does not provide an express mechanism for delisting a contaminant does not distinguish this case from *New Jersey v. EPA*. The Safe Drinking Water Act's text and structure, which specify both what EPA must do and by when it must do it, "unambiguously limit[]" EPA's "discretion to reverse itself." *New Jersey*, 517 F.3d at 583. And like the Clean Air Act's delisting provision,

34

the Safe Drinking Water Act provides mechanisms that allow EPA to

adjust to changing circumstances. The Agency may account for new

information in setting the maximum contaminant level goal that will

protect against all known or anticipated adverse effects, 42 U.S.C.

§ 300g-1(b)(4)(A); it may set a maximum contaminant level that is less

stringent than the maximum contaminant level goal, depending on cost-

benefit analysis, *id.* § 300g-1(b)(6); and it may tailor monitoring

requirements for a contaminant, or authorize variances and

exemptions, to ensure its regulations are grounded in science and not

unduly burdensome. *Id.* §§ 300g-1, 300g-4, 300g-5. Where Congress has

expressly provided such other ways to "rectify[] mistaken actions," "it is

not reasonable to infer authority to reconsider." 517 F.3d at 583

(quoting *Am. Methyl*, 749 F.2d at 835).

Of course, EPA must use "the best available public health

information" and "peer-reviewed science" to inform its decision to

regulate. 85 Fed. Reg. at 43,992 (quoting 42 U.S.C. § 300g-

1(b)(1)(B)(ii)(II), (b)(3)(A)). But that means only that EPA had to use the

"best available evidence *at the time*" the regulatory determination was

made. *See Chlorine Chemistry Council*, 206 F.3d at 1291 (construing 42

35

U.S.C. § 300g-1(b)(3)(A)). It does not alter Congress's command that EPA "shall" regulate once it makes such a determination. Indeed, though Congress directed EPA to consult with scientific advisors in setting a drinking water standard, it made clear that such consultations "shall, *under no circumstances*, be used to delay final promulgation of any national primary drinking water standard." 42 U.S.C. § 300g-1(e) (emphasis added).

EPA can make no textual claim to "revocation authority" exercisable "over an indefinite term"—the grant of which would undermine substantive and procedural criteria meant to promote prompt regulation of contaminants posing public health risks. *See Am. Methyl*, 749 F.2d at 836-37. Once EPA makes a final determination to regulate, it must do just that.

### 2.    The Act's statutory history confirms that indefinite authority to withdraw final regulatory decisions would undermine Congress's intent

The Safe Drinking Water Act's current structure grew out of Congress's frustration with EPA's early implementation of the Act. As initially enacted, the Act directed EPA to limit all contaminants that "may have an adverse effect" on human health. H.R. Rep. No. 93-1185

at 10. Congress meant this threshold to be relatively low: EPA should not "require conclusive proof," but rather should act on "a reasoned and plausible judgment that a contaminant *may*" cause health harms. *Id.*

Despite this low bar, EPA persistently failed to regulate harmful chemicals other than those expressly named by Congress. Between 1976 and 1986, EPA did not issue a single new contaminant regulation. H.R. Rep. No. 104-632, at 8 (1996). Congress amended the Act in 1986 to "rectify major deficiencies in [EPA]'s implementation." S. Rep. No. 99-56, at 2 (1985). Rather than leaving selection of contaminants for regulations completely to EPA, Congress directed EPA to regulate more than 80 specific contaminants within 3 years, and another 25 new chemicals every 3 years thereafter. *See id.* at 3.

Again, EPA failed to regulate any chemicals other than those Congress expressly identified. By 1996, though the Agency set limits for the contaminants Congress named in the Act, it had not regulated a single additional new contaminant. Instead, the Agency complained that the Act's aggressive numerical quotas diverted resources away from contaminants that posed the most serious threats to public health. *See* H.R. Rep. No. 104-632 at 10. In response, Congress removed the 25-

37

contaminant target and replaced it with the current statutory scheme. Pub. L. No. 104-182 § 3(5), (8)(A), 110 Stat. 1613, 1615 (1996). These amendments were designed to allow EPA to expeditiously target "the drinking water problems of greatest public health concern." *Id*.

Thus, the Safe Drinking Water Act's structure demonstrates Congress's intent to allow EPA discretion in selecting what chemicals to evaluate for regulation, while constraining agency foot-dragging. By leaving to agency discretion which contaminants to prioritize for regulation, Congress gave EPA what it asked for: the ability to target "the drinking water problems of greatest public health concern." 42 U.S.C. § 300f note. But, mindful of EPA's history of inaction, Congress crafted a regulatory scheme that created a steady, one-way conveyor belt toward regulating contaminants of public health concern.

History bears out the necessity of that scheme. More than 25 years after Congress last amended the Safe Drinking Water Act, EPA has not set enforceable limits for a single new contaminant under section 300g-1(b)(1)(B)(ii). And for perchlorate—the first new contaminant EPA decided to regulate under this scheme—EPA spent

nearly a decade thinking about what limit to set, only to announce that it would not set any limit at all.

## B.    Even if EPA did have some implied reconsideration authority, it has long since expired

Even if the Safe Drinking Water Act did give EPA some authority to revisit a decision to regulate, that authority does not extend to EPA's delayed reversal here. An agency's use of reconsideration authority not expressly granted by statute must be timely. *Ivy Sports Med.*, *LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). The "reasonable time period" for reconsideration is typically short—"weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977).

Here, EPA's delay far exceeds any reasonable period for reevaluation. The Act requires EPA to issue final drinking water standards within four-and-a-half years of a final decision to regulate. *See* 42 U.S.C. § 300g-1(b)(1)(E). For perchlorate, standards were due in 2014. *Id.* Thus, any implied reconsideration authority expired, at the latest, in 2014. EPA has no authority to reconsider its decision outside the "highly circumscribed schedule" set out by Congress. *See New York v. NHTSA*, 974 F.3d 87, 100 (2d Cir. 2020) (quoting *NRDC v. NHTSA*, 894 F.3d 95, 109 (2d Cir. 2018)).

39

Indeed, the Safe Drinking Water Act contains an antibacksliding provision that, if EPA had promulgated timely regulations, would expressly prevent the Agency from removing those protections now. Though the Act directs EPA to "review and revise" drinking water regulations periodically, it specifies that "each revision shall maintain, or provide for greater, protection of the health of persons." *Id.* § 300g-1(b)(9). If EPA had complied with the Act's direction to issue regulations by 2014, the Agency would have no authority to revoke those regulations now. Congress could not have meant to imply that EPA had authority to reconsider a determination to regulate nearly a decade later when it expressly prohibited that exact result.

The time for reconsideration, if any, has long passed. EPA must issue a drinking water standard for perchlorate.

## II.    EPA failed to reasonably analyze both the level at which perchlorate threatens public health and how widely perchlorate contamination occurs

To be lawful, EPA's action must not only be within the Agency's authority; it must also be the product of reasoned decisionmaking. *Env't Def. Fund*, 2 F.4th at 967-68. But in considering whether perchlorate contamination is found in public water systems "with a frequency and

40

at levels of public health concern," 42 U.S.C. § 300g-1(b)(1)(A)(ii), EPA committed twin errors. First, EPA selected an unreasonable threshold for what *levels* of contamination are of concern—one that failed to protect against "predictable and permanent" harm to developing brains. Zoeller Decl. ¶ 7. Second, EPA conducted an unreasonable analysis of how *frequently* perchlorate contamination is found in public water systems—one that ignored relevant information and relied on a biased reassessment of decades-old data. Each error provides an independent basis for vacating EPA's determination.

## A. EPA identified "levels of public health concern" that do not protect children from IQ loss and other health harms

EPA's conclusion that perchlorate concentrations found in public drinking water are not "levels of public health concern," 85 Fed. Reg. at 43,991, relied on an unreasonable assessment of what perchlorate levels *are* of public health concern. EPA used three potential maximum contaminant level goals it sought comment on in 2019—a proposed level of 56 ppb, and alternative levels of 18 ppb or 90 ppb—to define what amount of perchlorate exposure was a cause for public health concern. *Id.* at 43,995. Those levels are, respectively, the levels of exposure that

41

EPA estimated would cause a 2%, 1%, and 3% decrease in average IQ scores among at-risk children. 84 Fed. Reg. at 30,536, 30,540-41.

While a maximum contaminant level goal could, in principle, provide a reasonable threshold for evaluating "levels of public health concern," the three contaminant levels relied on by EPA do not. In selecting all three levels, EPA violated Congress's command to set a maximum contaminant level goal at "the level at which no known or anticipated adverse effects on the health of persons occur," 42 U.S.C. § 300g-1(b)(4)(A). And in carrying those levels forward as the basis for its analysis of whether perchlorate contamination in drinking water occurs at "levels of public health concern," EPA compounded its error.

EPA's selected thresholds fail to protect against at least two types of adverse health effects, and thus two causes of public health concerns. First, IQ loss—whether 1 point, 2 points, or 3 points—is an adverse health effect and a public health concern. Yet, by design, EPA's contaminant thresholds allow measurable reductions in the average IQ of vulnerable populations of fetuses, infants, and children. In its cost-benefit analysis, EPA even quantified the monetary harm that children suffer from each lost IQ point. There is no way to square EPA's

42

thresholds with its own calculation that, for vulnerable children and fetuses, exposure to contamination at those thresholds will cause a measurable reduction in lifetime income.

Second, EPA's selected thresholds ignore that IQ loss is not the only, or even the most sensitive, type of harm that perchlorate exposure can cause to a developing brain. The record indicates that perchlorate exposure causes other cognitive and behavioral harms at far lower levels. EPA's cursory explanation for not evaluating these other negative health effects when it selected its potential maximum contaminant level goals—and consequently, when it evaluated whether perchlorate represents a public health concern—conflicts with record evidence.

Because EPA's proposed maximum contaminant level goals fail to protect against known health harms, EPA's reliance on those thresholds as the basis for defining the levels of perchlorate that cause "public health concern" was unreasonable. Both in selecting those thresholds in the first place, and in incorporating them into its final decision, EPA failed to provide a reasonable explanation for its decision, failed to consider an important part of the problem, and provided an explanation

43

that runs counter to the evidence before it. *See Motor Vehicle Mfrs.*

*Ass'n of the U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

### 1.    IQ loss is an adverse health effect

The Safe Drinking Water Act directs EPA to set a maximum

contaminant level goal at "the level at which no known or anticipated

adverse effects" on human health occur, allowing for "an adequate

margin of safety." 42 U.S.C. § 300g-1(b)(4)(A); *see NRDC v. EPA*, 824

F.2d 1211, 1215 (D.C. Cir. 1987). Congress's intent was that drinking

water that contains a regulated contaminant at levels "at or below" the

maximum contaminant level goal "will not cause adverse health

effects." S. Rep. No. 104-169 at 3.

Instead, EPA proposed maximum contaminant level goals that are

*defined* by an adverse health effect. The Agency "made a policy decision

to evaluate the level of perchlorate in water associated with a 1 percent

decrease, a 2 percent decrease, and a 3 percent decrease in the mean

population IQ (*i.e.*, 1, 2 and 3 IQ points)" among vulnerable populations.

84 Fed. Reg. at 30,536. These were the levels for which EPA sought

public comment, *id.* at 30,540-41, and the levels it used in deciding not to regulate perchlorate, 85 Fed. Reg. at 43,995.

EPA's "policy decision" in selecting potential maximum contaminant level goals conflicts with the plain text of the Safe Drinking Water Act.[5] Though the Act does not define the term, an "adverse effect" is not a high bar, and a contaminant need not "pos[e] a significant risk to human health" to "have some adverse effect." *NRDC v. EPA*, 824 F.2d at 1216. Rather, this Court has embraced defining the term to mean "some functional impairment." *NRDC v. EPA*, 812 F.2d 721, 724 (D.C. Cir. 1987) (per curiam).

IQ loss is, by definition, evidence of functional impairment. IQ scores are designed "to assess a child's global functioning" based on completion of various verbal and performance tasks. 84 Fed. Reg. at

---

[5] EPA's interpretation of "no . . . adverse effects" is not entitled to deference. *See Fogo De Chao (Holdings) Inc. v DHS*, 769 F.3d 1127, 1136-37 (D.C. Cir. 2014) (holding that interpretations of statutory language in non-precedential rulings are generally not entitled to deference). EPA made clear it "is not establishing a precedent for future Agency actions." 84 Fed. Reg. at 30,536. Even if EPA's interpretation was of the sort typically afforded deference, such deference would be inappropriate here because it contradicts the statute's text and the evidence before the Agency.

45

30,536. If a chemical exposure causes the mean IQ score of the target population to go down, it does so by negatively affecting the performance of individuals who belong to that population. This kind of functional impairment is an adverse health effect. *See NRDC v. EPA*, 812 F.2d at 724. As EPA itself has explained, "[a] downward shift in the mean IQ value is associated with both substantial decreases in percentages [of individuals] achieving very high scores and substantial increases in the percentage of individuals achieving very low scores." 75 Fed. Reg. 24,848, 24,853 (May 6, 2010); *see also* Solomon Decl. ¶ 44. For an individual who is already in the low-IQ range, an IQ decline of even a few points "might be sufficient to drop that individual into the range associated with increased risk of educational, vocational, and social failure." 75 Fed. Reg. at 24,853 (internal quotation marks omitted); *see* Solomon Decl. ¶ 45.

EPA justified its proposed maximum contaminant level goals by arguing that "there are no robust population studies to inform the precise decrement in population IQ that represents an adverse impact," EPA Technical Document 10-1 [JA__], and "the data do not provide clear choices," 84 Fed. Reg. at 30,536. But the Agency's own analysis

belies this defense. In conducting a cost-benefit analysis of its proposed action, EPA estimated that a 1-point reduction in IQ "results in a 1.865 percent change in lifetime earnings for males and a 3.397 percent change in lifetime earnings for females." EPA, Health Risk Reduction and Cost Analysis 4-14 (May 2019), EPA-HQ-OW-2018-0780-0124 [JA__]. Each 1-point loss in IQ causes an individual's lifetime income potential to go down by an estimated $18,686. 84 Fed. Reg. at 30,552. It is impossible to square this acknowledgement—that the loss of a single IQ point reduces an individual's earning potential—with the assertion that the same loss is not an adverse effect on that individual's neurodevelopment.

EPA also failed to consider that its "policy decision" here is inconsistent with its own experts' assessment of IQ loss. EPA's Office of Children's Health Protection objected to the Agency's threshold, describing a 2-point IQ loss as "a significant health problem for children." EPA, Off. of Children's Health Prot., Memorandum re: Input on Perchlorate Rule at 1 (Feb. 14, 2019).[6] That position is consistent

---

[6] Though EPA did not include this memo in the administrative record, the Court may consider it as background information needed "to

47

with previous expert statements, quoted by EPA, that "a population loss of 1 [to] 2 IQ points is highly significant from a public health perspective." 73 Fed. Reg. 66,964, 66,985-86, 67,000 (Nov. 12, 2008) (citation omitted); *see also* Solomon Decl. ¶ 47. EPA nowhere acknowledges these prior statements, or that its own scientists disagree with its threshold. *Cf. NRDC v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (holding that an agency conclusion "in direct conflict with the conclusion of its own experts" "is arbitrary and capricious" (internal quotation marks omitted)).

EPA's selected thresholds misunderstand the scheme Congress established. Congress intended that a maximum contaminant level goal be set at the level that avoids *any* effect. It was meant to define "how much exposure to any particular substance from drinking water is 'safe.'" S. Rep. No. 104-169 at 3. "[P]ractical considerations" were reserved for the separate process of setting a maximum contaminant level. *Chlorine Chemistry Council*, 206 F.3d at 1287.

---

determine whether the agency considered all of the relevant factors." *See* Pet'r's Mot. to Suppl. Admin. R. 3 (quoting *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017)).

None of EPA's selected thresholds—which allow children to lose multiple IQ points—are safe. It was not reasonable to propose them as maximum contaminant level goals, and it was not reasonable to rely on them to define what levels of contamination cause public health concern. *See infra* Arg. II.A.3.

> ### 2. EPA failed to protect against known and anticipated adverse health effects other than IQ loss

EPA's proposed maximum contaminant level goals were flawed for an additional reason: they failed to protect against a wide range of additional neurodevelopmental harms associated with perchlorate exposure, often at doses lower than those that cause IQ loss.

In setting maximum contaminant level goals, while EPA need not account for health effects that are "merely possible," *NRDC v. EPA*, 812 F.2d at 725, it must prevent any adverse effects that "can be reasonably anticipated." H.R. Rep. No. 93-1185 at 20. EPA failed to heed these instructions for perchlorate.

There are numerous adverse health effects associated with the thyroid hormone disruptions that perchlorate causes, especially for the fetuses, infants, and children of women exposed to perchlorate during

pregnancy. EPA acknowledged as much. The Agency referred to
"substantial epidemiological evidence" of "a variety of adverse
neurodevelopmental outcomes, including those related to both cognition
and behavior." 84 Fed. Reg. at 30,531. Those affected "show reduced
levels of global and specific cognitive abilities, as well as increased rates
of behavior problems." *Id*. at 30,557 (internal quotation marks omitted).
EPA noted evidence of impacts on "the risk of schizophrenia, ADHD,
expressive language delay, reduced school performance and increased
odds of autism, among others." *Id*.; *see also* EPA, Proposed Approaches
to Inform Perchlorate Regulation vol. I 5-1, EPA-HQ-OW-2018-0780-
0110 [JA__].

      EPA's proposed maximum contaminant level goals do not account
for either the wide variety of health effects that perchlorate exposure
can cause or the wide variety of tests scientists use to measure those
harms. Instead, EPA relied on data from a single paper that evaluated
a single measure of a single type of harm—IQ loss. 84 Fed. Reg. at
30,534. EPA justified its selection of IQ loss as the sole metric it would
use to measure adverse health effects by explaining that "this was the
endpoint evaluated in the Korevaar et al., (2016) study [hereinafter,

'the Korevaar study]"—the paper EPA identified as most rigorous. *See id.* at 30,536. EPA stated that it used IQ as "a surrogate for a suite of potential neurodevelopmental effects that might occur." *Id.*

IQ loss is no doubt an adverse health effect. *Supra* Part II.A.1. But, as EPA repeatedly acknowledged, it is far from the only adverse health effect of perchlorate exposure. *See, e.g.*, EPA Comment Responses 8-27 [JA__] (stating "IQ changes do not account for all neurodevelopment effects"). EPA nowhere explains why it did not analyze additional types of harm when proposing maximum contaminant level goals. That decision was unreasonable, and ignores an important aspect of the problem—particularly given that expert public health professionals, state regulators, and members of the public implored EPA to consider other harms. For instance, commenters:

- Advised that EPA should consider "additional neurodevelopmental toxic risks due to perchlorate" in its calculations, "rather than the single endpoint of IQ," Comment, Am. Acad. of Pediatrics 2, EPA-HQ-OW-2018-0780-0264 [JA__];

- Critiqued EPA's proposed rule because it "could have missed some of the more sensitive effects of thyroid deficiency and perchlorate," Comment, Cal. Env't Prot. Agency, Off. of Env't Health Hazard Assessment 7, EPA-HQ-OW-2018-0780-0242 [JA__]; and

- Noted that EPA failed to follow peer reviewers' recommendations to "include additional studies with a broader range of neurodevelopmental outcomes, including for example ADHD and autism"), Comment, NRDC 4, EPA-HQ-OW-2018-0780-0249 [JA__].

EPA's withdrawal decision did not respond to any of these comments. An agency's failure to respond to comments that challenge its analysis on an issue central to the agency's decision renders its decision arbitrary. *Am. Mining Congress v. EPA*, 907 F.2d 1179, 1191 (D.C. Cir. 1990).

EPA also provided no reasoned basis for concluding that IQ loss is an appropriate "surrogate," 84 Fed. Reg. at 30,536, for other neurodevelopmental harms. In particular, EPA failed to explain its assumption that an exposure threshold derived using IQ loss will protect against all other harms. In light of the Safe Drinking Water Act's command to protect against *all* known and anticipated adverse health effects, *with* an adequate margin of safety, and with particular focus on vulnerable populations like pregnant women, fetuses, children, and infants, EPA's unexplained designation of IQ loss as an appropriate surrogate for all health harms is unreasonable. "Conclusory explanations for matters involving a central factual dispute . . . do not

suffice." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) (quoting *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010)). EPA failed to explain how IQ loss stands in for "a suite of potential neurodevelopmental effects," 84 Fed. Reg. at 30,536—particularly those, like ADHD or autism, that do not reflect cognitive harm.

Record evidence cuts against EPA's assumption that IQ loss is an appropriate surrogate. The following table, which simplifies and summarizes data relied on by EPA, highlights the defect in EPA's analysis. After reviewing dozens of studies documenting perchlorate's anticipated effects on neurodevelopment, EPA identified five studies that met all its criteria for calculating a maximum contaminant level goal, including one evaluating two different endpoints. 84 Fed. Reg. at 30,532-34 & tbl.III-2. The Agency then "reanaly[zed]" the data from the Korevaar study, which measured IQ. *Id*. at 30,534-35. Counting that reanalysis, EPA had seven options for data to use in calculating the level of perchlorate exposure at which health harms would begin to occur. *Id*. at 30,533-34.

**Table 2: Estimated Health Effects of Perchlorate Exposure**

| Study Author | Adverse Health Effect | Perchlorate dose[1] associated with 1%, 2%, and 3% adverse health effect | | |
|---|---|---|---|---|
| | | 1% | 2% | 3% |
| Endendijk et al. | Anxiety/depression scores | 0.4 | 1.1 | 1.8 |
| Pop et al. (1999) | Psychomotor development (Bayley Scales) | 0.8 | 1.7 | 2.6 |
| Pop et al. (2003) | Mental development (Bayley Scales) | 1.3 | 2.8 | 4.3 |
| | Psychomotor development (Bayley Scales) | 1.1 | 2.3 | 3.5 |
| Korevaar study (original) | IQ | 1.9 | 3.9 | 6.1 |
| EPA Reanalysis of Korevaar study | IQ | 3.1 | 6.7 | 10.8 |
| Finken et al. | Standard deviation of reaction time | 4.4 | 9.8 | 16.5 |

[1] Dose measured in micrograms/kilogram/day
(Source: 84 Fed. Reg. at 30,533-34 & tbl.III-2)

Of the seven analyses EPA considered, all but one showed harm at lower levels of perchlorate exposure than the one EPA selected. *Id.*; *see also* Comment, Cal. Env't Prot. Agency, Off. of Env't Health Hazard Assessment 8 [JA__] (noting the same); Solomon Decl. ¶¶ 40-41. The differences were substantial: while EPA predicted a 1% decrease in IQ scores at a perchlorate dose of 3.1 micrograms per kilogram per day, an

54

equivalent 1% change in anxiety and depression scores occurred at doses nearly 8 times lower. *See* 84 Fed. Reg. at 30,533-34 tbl.III-2. Adverse effects on Bayley Scale scores—a measurement of psychomotor and mental development that EPA refers to as "the gold standard for neurodevelopmental assessment of children," EPA, Proposed Approaches to Inform Perchlorate Regulation vol. III F-1, EPA-HQ-OW-2016-0438-0021 [JA__]—occurred at doses 2 to nearly 4 times lower than those EPA selected. 84 Fed. Reg. at 30,533-34 tbl.III-2.

These studies provide compelling evidence that IQ loss is *not* an appropriate surrogate for all adverse health effects, and that other adverse health effects can occur at far lower levels of perchlorate exposure than IQ loss. EPA failed to acknowledge that fact, or to explain why—in the face of this contrary evidence—it deemed IQ loss an appropriate surrogate for all health harms.

### 3. EPA unreasonably relied on its proposed maximum contaminant level goals in evaluating whether perchlorate contaminates drinking water at levels of public health concern

Although EPA's 2020 final determination did not finalize any of the Agency's proposed maximum contaminant level goals, it continued to rely on them. In evaluating whether perchlorate occurs, or is likely to occur, in public water systems "at levels of public health concern," 42 U.S.C. § 300g-1(b)(1)(A)(ii), EPA "used these potential [maximum contaminant level goals]" to define "the levels of public health concern." 85 Fed. Reg. at 43,995. EPA compared these levels with its "updated" estimates of perchlorate occurrence to assess how many water systems are contaminated with potentially harmful levels of perchlorate. *Id.* EPA estimated that roughly 620,000 people receive water from systems that detected perchlorate levels at or above 18 ppb; it estimated that far fewer people receive water from systems with detections above 56 ppb or 90 ppb. *Id.* Based on these levels, EPA concluded that perchlorate does not frequently occur in public water systems at levels of public health concern. *Id.* at 43,995-96.

EPA's reliance on those thresholds as the "levels of public health concern" was unreasonable, for the same reasons that its selection of

them as potential maximum contaminant level goals was unreasonable. As described above, EPA's selected thresholds fail to protect the public against IQ loss and other measurable health harms. In selecting these thresholds, EPA failed to consider important aspects of the problem— namely, that IQ loss is itself an adverse effect; that thresholds selected based on IQ loss would not necessarily protect against all adverse health effects; and that both outside public health professionals and the Agency's own experts objected to its thresholds. EPA's assertion that IQ loss is an appropriate "surrogate" for other health harm also runs counter to the evidence before the Agency, which shows that other neurodevelopmental harm can occur at lower levels of perchlorate exposure than IQ loss.

By relying on its flawed proposed thresholds in its decision not to regulate, EPA repeated these errors. Moreover, EPA failed to adequately explain why it selected these potential maximum contaminant level goals as the appropriate "levels of public health concern." In sum, EPA's assessment of whether perchlorate contamination occurs at levels of public health concern was arbitrary.

**B.    EPA did not reasonably assess how widely perchlorate contamination occurs in public drinking water**

EPA's conclusion that perchlorate does not contaminate drinking water frequently enough to merit regulation stands on equally shaky footing. That conclusion relied on a biased "update" of decades-old water testing in which EPA replaced two-thirds of the samples that detected perchlorate, cherry-picking data to present a picture of lessening contamination. And it ignored relevant data that undermines EPA's characterization of perchlorate contamination as rare. For both reasons, EPA failed to provide a reasonable basis for its conclusion.

**1.    EPA's selective update of old data created a biased picture of current perchlorate contamination**

Because EPA does not generally require public water systems to test for federally unregulated chemicals, most water systems do not routinely monitor for perchlorate. EPA has required nationwide testing for perchlorate only once—between 2001 and 2005. At that time, EPA required all large community water systems nationwide, as well as a statistically representative selection of small community water systems,

to test for perchlorate and report detections at or above 4 ppb. 84 Fed. Reg. at 30,541.

Water systems detected perchlorate 637 times, in samples spanning 26 states and two U.S. territories. 76 Fed. Reg. at 7764. In 2011, EPA estimated that water systems that detected perchlorate in at least one sample served a population of up to 16.6 million, and concluded that perchlorate contaminates drinking water frequently enough to warrant regulation. *Id.* at 7765 & tbl.2.

Fifteen years after the end of the 2001-2005 water sampling, and without any new nationwide testing, EPA reversed that conclusion based on a re-evaluation of the same data. Occurrence Report 19-20 [JA__-JA__]. That re-evaluation—prompted by lobbying from the U.S. Chamber of Commerce, *see id.* at 18 [JA__]—included two steps. First, EPA deleted 199 samples that, according to the Chamber, violated EPA's data quality guidelines because they were collected from untreated source water, rather than from the entry point to the consumer drinking water distribution system (after treatment). 84 Fed. Reg. at 30,542. Second, EPA selectively replaced 321 samples from sites

in California and Massachusetts where perchlorate contamination had been found. Occurrence Report 19 [JA__].

In total, EPA replaced or deleted 520 samples from the original dataset. *See* 84 Fed. Reg. at 30,542 (stating EPA deleted 199 source water samples, including 97 detections, and replaced another 321 samples, all of which included detections from California and Massachusetts). More than 80% (418 out of 520) of these "updates" involved sampling sites where perchlorate contamination had been found. *See id.* EPA removed or replaced 66% of the original samples that had detected perchlorate (418 out of 637); it removed only 0.3% of the samples that had not detected perchlorate (102 out of 33,694). *See id.* at 30,541-42. Based on this revised dataset, EPA concluded that perchlorate contamination in public water systems is lower than EPA had previously estimated, and that perchlorate did not warrant regulation. 85 Fed. Reg. at 43,992.

EPA's one-sided revision of its occurrence analysis is unlawful in at least two ways. First, EPA failed to consider an important aspect of the problem—namely, that selectively replacing samples from only two states, and only from places where perchlorate contamination was

found between 2001-2005, created a biased dataset that is not representative of current conditions nationwide. Second, EPA failed to either acknowledge that it had previously refused to throw out these samples or explain why it was reversing its earlier conclusion that those samples were appropriate.

### a.     EPA's data "update" was biased

Because EPA has not required sampling for perchlorate since 2005, "conditions may have changed" since drinking water systems last tested for perchlorate contamination. Occurrence Report 19 [JA__]; *see also id.* at 13 [JA__] (admitting contamination could have "stayed the same, increased, or decreased"). EPA's "update" to its prior occurrence estimate considered only one way in which conditions have changed: namely, California and Massachusetts enacted enforceable drinking water limits to protect their residents from perchlorate. Occurrence Report 19 [JA__]; *see also* Curriero Decl. ¶ 14. EPA sought updated perchlorate sampling information *only* from California and Massachusetts, and *only* from sites where perchlorate contamination

was found between 2001 and 2005. Occurrence Report 19 [JA__].[7] EPA

made no effort, either in California and Massachusetts or anywhere

else, to update data from sites where new contamination could have

developed in the intervening decades. Thus, EPA set up a one-way

ratchet: contaminated water could become clean, but clean water could

not become contaminated.

EPA's approach to revising its prior perchlorate estimate is

"scientifically indefensible." Curriero Decl. ¶ 15; *see also* Occurrence

Report at B-6 (stressing "the importance of using the [2001-2005]

perchlorate data set (given the data quality and representativeness),

and not modifying it with select, ad hoc, or incomplete data"). By

updating data only for two states where it had reason to believe

conditions have improved due to regulation, and only at sites where

perchlorate contamination was found between 2001-2005, Curriero

Decl. ¶¶ 20-21, EPA "layered multiple types of bias on top of each

---

[7] After concluding that perchlorate contamination in public drinking
water systems is infrequent, EPA "confirm[ed]" its conclusion by
contacting other water systems that had previously recorded high levels
of perchlorate to ask whether anything had changed since earlier
sampling. 85 Fed. Reg. at 43,996-97. Because EPA does not appear to
have relied on these "updates" in deciding not to regulate, NRDC does
not here focus on the reasons why they, too, were flawed and biased.

other," *id.* ¶ 31. The Agency's methodology "guaranteed that it would get a lower estimate of overall perchlorate levels." *Id.* ¶ 22; Solomon Decl. ¶ 50. It also virtually guaranteed that EPA *would not* find evidence of any new perchlorate contamination that had developed in the nearly 20 years since EPA last required sampling. Solomon Decl. ¶¶ 49-50.

EPA's one-sided "update" ignores that many circumstances that could affect perchlorate's prevalence have changed in the last 20 years. As just one example, the fireworks industry—a known source of perchlorate contamination—has grown more than 300%. *Id.* ¶ 16. But EPA did not evaluate the potential effects of any developments other than those raised by the Chamber of Commerce. This biased approach to "updating" occurrence estimates provided no reasonable basis for concluding that perchlorate contamination has improved.

EPA's failure to consider the bias in its approach is even more remarkable because its own staff once vetoed the one-sided data purge EPA now embraces, for the exact reason Petitioner objects to it here. In 2013, EPA rejected the Chamber of Commerce's approach because the Agency "d[id] not believe it is appropriate to introduce bias into the

analysis of national perchlorate occurrence by selectively eliminating"

sites "where there is information that suggests perchlorate levels have

decreased." Pet'r's Mot. to Supplement Admin. Record, Exh. B

(Memorandum from U.S. EPA, Re: Office of Management and Budget

Briefing, Response to Perchlorate Request for Correction (Feb. 1, 2013))

at *2.[8] While EPA acknowledged that perchlorate levels may have

decreased in some places, "in other cases the levels of perchlorate may

have increased when perchlorate is introduced into a previously

uncontaminated drinking water source or when a [water system]

commenced using a water source contaminated by perchlorate following

[the 2001-2005] monitoring." *Id*. Accordingly, EPA "disagree[d]" that

replacing data from California and Massachusetts would result in

"more accurate and reliable data on perchlorate occurrence." *Id.*

Six years later, without acknowledging its prior concerns about

bias, EPA ratified the exact approach it previously rejected. EPA failed

---

[8] Though EPA did not include this memo in the administrative record,
the Court may consider it as background information needed "to
determine whether the agency considered all of the relevant factors."
*See* Pet'r's Mot. to Supplement the Admin. Record at 3 (quoting *Animal
Legal*, 872 F.3d at 611).

to provide any explanation for its about-face, and failed to grapple with its own critique of that approach as biasing the occurrence analysis in a way that underestimates current levels of perchlorate contamination. Despite numerous comments raising concerns about the Agency's approach, *see, e.g.*, EPA-HQ-OW-2018-0780-0241 5-8 [JA__], EPA-HQ-OW-2018-0780-0256 at 2 [JA__], EPA acquiesced to industry's request to selectively update its data.

"It is difficult to imagine a more important 'aspect of the problem,'" *Cigar Ass'n of Am. v. USDA*, 964 F.3d 56, 62 (D.C. Cir. 2020), than whether EPA's analysis systematically underestimates current levels of perchlorate exposure. EPA's failure to even consider the possibility that selectively revising its dataset would create unreliable and misleading results renders its conclusion that perchlorate does not occur widely enough to warrant regulation unreasonable. *See State Farm*, 463 U.S. at 43.

> **b.    EPA excluded nearly 200 water samples without acknowledging its prior decision to rely on them**

EPA also excluded from its "updated" dataset 199 water samples that came from untreated ground water and surface water, almost half

of which showed evidence of perchlorate contamination. 84 Fed. Reg. at 30,542. It again did so at the request of the Chamber of Commerce, which argued in 2012 that these samples "did 'not comply with data quality guidelines because [they] were not collected by accepted methods.'" Occurrence Report 18 [JA__] (quoting the Chamber).

EPA publicly rejected the Chamber's argument in 2013, stating these samples were consistent with its data quality guidelines and "appropriate for use in the context of the regulatory determination for perchlorate." EPA Letter to U.S. Chamber of Commerce at 1-2 (Feb. 28, 2013), https://www.epa.gov/sites/default/files/2015-06/documents/12004-response.pdf.[9]

Six years later, EPA deleted all 199 samples from its dataset. 84 Fed. Reg. at 30,542. EPA nowhere acknowledged its earlier decision, stating only that it had "determined that it was most appropriate" to exclude the samples. *Id.*

An agency may, of course, change its position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But it must "display

---

[9] This letter, though not in the administrative record index, is specifically referenced in an indexed EPA document and therefore part of the administrative record. *See supra* n.1.

66

awareness that it *is* changing position," and "show that there are good reasons for the new policy." *Id*.; *see also Air Alliance Houston v. EPA*, 906 F.3d 1049, 1066-67 (D.C. Cir. 2018) (noting EPA failed to explain departure from earlier decisions adopting or rejecting public comments). Here, EPA nowhere "even hints that EPA . . . had previously reached exactly the opposite conclusion." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 646-47 (D.C. Cir. 2020). Nor does EPA provide any reasons for its about-face. EPA's failure to acknowledge or explain its changed position was arbitrary.

### 2.     EPA ignored relevant data that undermine its assessment of perchlorate occurrence

EPA determined the 2001-2005 water sampling data were the "best available, national assessment of perchlorate occurrence in drinking water." 85 Fed. Reg. at 43,995. EPA relied almost exclusively on those data in concluding that "there is infrequent occurrence" in public drinking water of harmful levels of perchlorate. 84 Fed. Reg. at 30,541.

Yet, in an appendix to a technical supporting document released in 2019, EPA disclosed that "[o]ccurrence data for perchlorate are available from a variety of [other] sources." Occurrence Report A-1

[JA__]. These sources include a dozen studies of perchlorate occurrence in drinking water from data other than the 2001-2005 sampling, *id.* at A-10 to A-12 [JA__ to JA__], as well as samples from lakes, rivers, and aquifers that "are the sources of most drinking water." *Id.* at A-1 [JA__]. Many of the studies include more recent data than the 2001-2005 water sampling on which EPA relies. *Id.* at A-1 to A-29 [JA__ to JA__]; Curriero Decl. ¶¶ 28-29. Almost all come from governmental sources, including databases and studies run by EPA, the USGS, and the CDC.

Many of these studies facially contradict EPA's description of perchlorate occurrence as "infrequent." For instance, data collected in 2017 from the USGS's National Water Information System detected perchlorate in more than 72% of drinking water samples, with a median detection level of 16 ppb. Occurrence Report A-4, A-5 [JA__, JA__]. Accompanying data from ground water and surface water reinforce that perchlorate contamination appears to be ubiquitous: nearly 55% of groundwater samples and over 93% of surface water samples detected perchlorate. *Id.* at A-5 [JA__]. Separate data collected in 2018 from an EPA database reveal perchlorate contamination in 88% of water samples. *Id.* at A-6 [JA__]. A 2005-2006 survey collected by the CDC's

68

National Center for Health Statistics detected perchlorate in 83% of tap water samples. *Id*. at A-14, A-15 [JA__, JA__].

Some of these data appear to undermine EPA's conclusion that perchlorate prevalence in drinking water sources is decreasing. Whereas 47.71% of USGS groundwater samples taken between 2003-2012 detected perchlorate, the chemical was found in 67.86% of samples taken between 2013-2016. *Id*. at A-3 [JA__]. According to data from California collected between 2007-2018, nearly 23% of large water systems detected perchlorate at or above 4 ppb at least once. *Id*. at A-25 [JA__].

In other instances, the data suggest that the 2001-2005 water sampling may itself have underestimated perchlorate contamination. In a study of drinking water samples from 52 public water systems in Texas, conducted around the same time as the 2001-2005 water sampling, 44% of the systems detected perchlorate at levels greater than 4 ppb. *Id*. at A-24 [JA__].

EPA purports to have "reviewed" these data, *id*. at A-1 [JA__]. But the Agency provides no information about the nature or extent of its review. Nor does it explain how (if at all) these additional data informed

69

its analysis, or why they do not undermine its characterization of perchlorate contamination in drinking water as "infrequent." Given that EPA admits "conditions may have changed" since the Agency collected the 2001-2005 data, *id*. at 19 [JA__], there is "no reasonable explanation, consistent with sound science, for ignoring these additional data." Curriero Decl. ¶ 30. Where "contrary evidence" in the record raises questions about the appropriateness of an agency's conclusion, it is arbitrary to leave such "serious concerns unaddressed." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 709-10 (D.C. Cir. 2014).

Because EPA's flawed assessment of perchlorate occurrence was pivotal to the Agency's decision not to regulate, its failure to grapple with whether other available data sources support its conclusion renders its decision arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review, vacate EPA's decision not to regulate perchlorate in drinking water, and direct EPA to finalize perchlorate regulations.

Respectfully submitted,

/s/ *Sarah V. Fort*
Sarah V. Fort
Charles R. Corbett
Natural Resources Defense Council
1152 15th Street NW, Ste. 300
Washington, DC 20005
Telephone: (202) 513-6247
sfort@nrdc.org
ccorbett@nrdc.org

*Counsel for Petitioner*
Dated: June 24, 2022          *Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's order of May 12, 2022, because it contains 12,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the count of Microsoft Word.

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

Dated: June 24, 2022                       /s/ Sarah V. Fort
                                           Sarah V. Fort

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June, 2022, the foregoing

Opening Brief of Petitioner Natural Resources Defense Council has

been served on all registered counsel through the Court's electronic

filing system.


/s/ *Sarah V. Fort*
Sarah V. Fort