ORAL ARGUMENT SCHEDULED JANUARY 27, 2023

No. 20-1335

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NATURAL RESOURCES DEFENSE COUNCIL,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

_____

Petition for Review of Action of the U.S. Environmental Protection Agency

_____

**EPA'S FINAL RESPONSE BRIEF**

_____

|  |  |
|---|---|
| | TODD KIM |
| Of Counsel: | *Assistant Attorney General* |
| | SARAH A. BUCKLEY |
| POOJA PARIKH | *Senior Attorney* |
| *Attorney-Advisor* | Environment and Natural Resources Division |
| U.S. Environmental Protection Agency | U.S. Department of Justice |
| | Post Office Box 7411 |
| | Washington, D.C. 20044 |
| | (202) 616-7554 |
| Dated: December 6, 2022 | sarah.buckley@usdoj.gov |

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici**

All parties, intervenors, and amici appearing are listed in the Brief for

Petitioner NRDC.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Petitioner NRDC.

**C.    Related Cases**

The undersigned is not aware of any related cases within the meaning of

Circuit Rule 28(a)(1)(C).

/s/ *Sarah A. Buckley*

SARAH A. BUCKLEY

Counsel for Respondents

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................................................................................................. ii

TABLE OF AUTHORITIES ..................................................................... vi

GLOSSARY ................................................................................................. x

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ........................................................... 2

STATEMENT OF THE ISSUES ............................................................... 2

PERTINENT STATUTES AND REGULATIONS .................................... 3

STATEMENT OF THE CASE ................................................................... 3

    A.    Statutory and regulatory background ................................... 3

    B.    Factual background ................................................................. 6

    C.    Agency proceedings ................................................................ 8

        1.    Developing Levels of Health Concern for Perchlorate ................................................................ 9

        2.    Assessing the Frequency of Perchlorate Occurrence .............................................................. 12

        3.    EPA's Proposed and Final Actions on Perchlorate ............... 14

SUMMARY OF ARGUMENT ................................................................. 15

STANDARD OF REVIEW ...................................................................... 17

ARGUMENT ............................................................................................ 18

I.    EPA Has the Authority to Withdraw its Determination to Regulate Perchlorate. ............................................................... 18

A.   Withdrawing a regulatory determination when EPA determines a contaminant does not in fact meet the SDWA's criteria for regulation is consistent with the statute.................................................................................21

B.   The SDWA does not abrogate EPA's inherent authority to withdraw its determination to regulate perchlorate. ......................25

C.   EPA's reconsideration authority is not time-limited...........................30

II.   EPA Reasonably Used a "State-of-the-Science" Approach to Determine the Levels at Which Perchlorate Presents a Public Health Concern. ..........................................................................32

A.   EPA's determination that perchlorate was not present at "levels of public health concern" was consistent with technical guidance. ...............................................................34

B.   EPA reasonably evaluated IQ effects as a surrogate for other neurodevelopmental effects in assessing the levels at which perchlorate would present a public health concern. ..................................................................40

C.   EPA reasonably concluded that perchlorate was not present in drinking water at levels of public health concern. ..................................................................44

III.   EPA Reasonably Updated Its Perchlorate Occurrence Data to Account for Methodological Discrepancies and Regulatory Developments Significantly Affecting Real-World Conditions. ..................45

A.   EPA reasonably removed data points from source water samples where the system had concurrently or in follow-up sampling taken superseding samples from entry points. ...............................................................45

B.   EPA reasonably accounted for state regulation that dramatically changed the national perchlorate contamination landscape. ...................................................49

1.    There is convincing evidence that perchlorate contamination has declined since the UCMR 1 data were collected. ................................................................ 50

2.    EPA's method for incorporating more recent California and Massachusetts perchlorate monitoring data was sound. ........................................ 53

3.    EPA's data update is consistent with other record evidence that perchlorate contamination has declined. ................................................................ 55

CONCLUSION ................................................................ 58

CERTIFICATE OF COMPLIANCE ................................................ 59

STATUTORY & REGULATORY ADDENDUM ................................ 60

# TABLE OF AUTHORITIES*

## CASES

*Am. Forest & Paper Ass'n Inc. v. EPA*,
  294 F.3d 113 (D.C. Cir. 2002)..................................................................39

*Am. Methyl Corp. v. EPA*,
  749 F.2d 826 (D.C. Cir. 1984)..................................................................26

*California v. EPA*,
  940 F.3d 1342 (D.C. Cir. 2019)................................................................18

*California Metro Mobile Comm'cns, Inc. v. FCC*,
  365 F.3d 38 (D.C. Cir. 2004)....................................................................31

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003).............................................18, 33, 37, 43

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)..................................................................................19

*FCC v. Fox Television Studios*,
  556 U.S. 502 (2009)..................................................................19, 29, 31

*HTH Corp. v. NLRB*,
  823 F.3d 668 (D.C. Cir. 2016)..................................................................26

*Huls Am. Inc. v. Browner*,
  83 F.3d 445 (D.C. Cir. 1996)....................................................................17

*Idaho Conservation League v. Wheeler*,
  930 F.3d 494 (D.C. Cir. 2019)..................................................................18

*Ivy Sports Med., LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014)..........................................................25, 26, 31

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Mazaleski v. Treusdell*,
    562 F.2d 701 (D.C. Cir. 1977) ...............................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................17, 21

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ............................................19, 20, 21

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ................................................................25

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010) .............................................................30

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008) .............................................................27

*New York v. NHTSA*,
    974 F.3d 87 (2d Cir. 2020) ..................................................................32

*NRDC v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) .........................................28, 29, 30

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) ..........................................................26

## STATUTES

5 U.S.C. § 706(2) .........................................................................17

33 U.S.C. § 1314(m) ....................................................................28

33 U.S.C. § 1314(m)(1) ...............................................................28

42 U.S.C. § 300f–300j-27 ...............................................................3

42 U.S.C. § 300f(4)(A) ................................................................3, 4

42 U.S.C. § 300g-1(b)(1)(A)........................................................4, 5, 15

42 U.S.C. § 300g-1(b)(1)(A)(i)–(ii)................................................................39

42 U.S.C. § 300g-1(b)(1)(A)(ii)...............................................................23, 24

42 U.S.C. § 300g-1(b)(1)(A)(ii)–(iii)............................................................20

42 U.S.C. § 300g-1(b)(1)(A)(iii)..............................................................22, 23

42 U.S.C. § 300g-1(b)(1)(B)(i)(I)....................................................................4

42 U.S.C. § 300g-1(b)(1)(B)(ii)(II)........................................................4, 21, 23

42 U.S.C. § 300g-1(b)(1)(B)(ii)(IV).......................................................5, 18, 19

42 U.S.C. § 300g-1(b)(1)(E)........................................................................5, 9

42 U.S.C. § 300g-1(b)(2)...............................................................................44

42 U.S.C. § 300g-1(b)(3)(A).......................................................................6, 23

42 U.S.C. § 300g-1(b)(4)(A)...................................................................5, 37, 44

42 U.S.C. § 300g-1(b)(4)(B)............................................................................5

42 U.S.C. § 300g-1(b)(4)(D)............................................................................5

42 U.S.C. § 300g-1(b)(6)............................................................................5, 6

42 U.S.C. § 300g-1(b)(7)................................................................................6

42 U.S.C. § 300g-1(b)(9)..............................................................................28

42 U.S.C. § 300g-1(d)....................................................................................9

42 U.S.C. § 300g-1(e)...................................................................................33

42 U.S.C. § 300j-7(a)(1).................................................................................2

42 U.S.C. § 7412(c)......................................................................................27

42 U.S.C. § 7412(c)(9) ............................................................27

42 U.S.C. § 7412(n)(1)(A) .......................................................27

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 142.2 ...............................................................45, 46

**FEDERAL REGISTER**

64 Fed. Reg. 50556 (Sept. 17, 1999) .......................................12

73 Fed. Reg. 60262 (Oct. 10, 2008).........................................8

74 Fed. Reg. 41883 (Aug. 19, 2009).........................................9

75 Fed. Reg. 24848 (May 6, 2010) ..........................................38

76 Fed. Reg. 7762 (Feb. 11, 2011) ..........................9, 24, 44, 45

84 Fed. Reg. 30524 (June 26, 2019) ............... 7, 8, 9, 10, 11, 12, 13, 14, 15, 35, 36,
............................................................ 37, 40, 41, 42, 43, 46, 48, 49, 53, 54

85 Fed. Reg. 43990 (July 21, 2020)................ 2, 6, 7, 10, 11, 13, 20, 21, 22, 24, 25,
............................................................ 32, 33, 34, 35, 36, 37, 44, 50, 51, 55

**LEGISLATIVE HISTORY**

S. Rep. No. 104-169 (1995) .............................................22, 27

# GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| IQ | Intelligence Quotient |
| NRDC | Natural Resources Defense Council |
| SDWA | Safe Drinking Water Act |
| UCMR | Unregulated Contaminant Monitoring Rule |

# INTRODUCTION

This case concerns EPA's authority to reevaluate a regulatory determination in light of new facts. In 2011, EPA determined that perchlorate, a contaminant linked to neurodevelopmental health effects, occurred in drinking water with sufficient frequency and at levels of public health concern to warrant regulation under the Safe Drinking Water Act ("SDWA"). After developing a new, "state-of-the-science" model for measuring perchlorate's effects in the most sensitive subpopulation, however, EPA determined that perchlorate does not present a public health concern until individuals are exposed at higher concentrations than the Agency had previously thought. Considering that level and updated data about perchlorate's occurrence in drinking water, EPA concluded in 2020 that perchlorate did not in fact meet the SDWA's criteria for regulation and withdrew its 2011 determination to regulate.

That withdrawal was within EPA's well-established authority to change course when a new look at the best available science supports a different approach. In the Final Action on Perchlorate, EPA provided a reasoned explanation for reversing its prior regulatory determination in light of an updated analysis of the best available science. That analysis, undertaken at the direction of the Science Advisory Board and supported by two independent peer review panels, rationally addressed complex, highly technical scientific and methodological issues. The

resulting regulatory conclusion was reasonable and supported by the record. EPA also reasonably accounted for a substantial decline in perchlorate contamination due to state regulation and cleanup actions. The Court should defer to EPA's reasoned scientific analysis and deny the petition for review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 300j-7(a)(1), which provides for a petition for review of any action pertaining to the establishment of national primary drinking water regulations. The petition was timely filed because the Final Action on Perchlorate was published on July 21, 2020, *see* 85 Fed. Reg. 43,990, and the petition for review was filed on September 3, 2020.

## STATEMENT OF THE ISSUES

This petition presents three questions:

1.      Whether, once EPA initially determines that a contaminant meets the criteria for regulation under the SDWA, the statute requires the Agency to regulate even if it finds after further study that those criteria are not met.

2.      Whether EPA acted arbitrarily and capriciously by evaluating the level of public health concern presented by perchlorate in drinking water based on a dose that would avoid a 1% IQ decrease for the population most sensitive to perchlorate exposure, as recommended by applicable technical guidance, in light of

the difficulty associated with identifying the precise IQ effect representing an adverse impact for this contaminant.

3.    Whether, in evaluating the frequency of perchlorate occurrence, EPA acted arbitrarily or capriciously by eliminating redundant samples and updating others to account for state regulation and remediation efforts that decreased perchlorate detections in drinking water after EPA's national monitoring data was collected.

## PERTINENT STATUTES AND REGULATIONS

Except for those included in the attached addendum, all applicable statutes and regulations are contained in the Brief for Petitioner Natural Resources Defense Council, Inc. ("NRDC").

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

The SDWA, 42 U.S.C. §§ 300f–300j-27, was enacted in 1974 and substantially amended and reauthorized in 1986, 1996, 2016, and 2018. SDWA programs, among other things, establish standards and treatment requirements for public water systems and protect underground sources of drinking water. A "public water system" is "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at

least fifteen service connections or regularly serves at least twenty five individuals." 42 U.S.C. § 300f(4)(A).

Congress amended the SDWA in 1996 to establish a process for EPA to identify unregulated contaminants and assess whether they are appropriate for regulation under the Act. Beginning 18 months after August 6, 1996, and every five years thereafter, the SDWA directs EPA to publish a list of contaminants that are not subject to national primary drinking water standards. 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). This is known as the "Contaminant Candidate List."

Then, every five years, EPA must assess at least five contaminants on the Contaminant Candidate List and, "after notice of the preliminary determination and opportunity for public comment," make a regulatory determination "whether or not to regulate such contaminants." *Id*. § 300g-1(b)(1)(B)(ii)(I). EPA's determination to regulate must be based on findings that three criteria are met:

(i)     the contaminant may have an adverse effect on the health of persons;

(ii)    the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern; [and]

(iii)   in the sole discretion of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems.

*Id*. §§ 300g-1(b)(1)(A), 300g-1(b)(1)(B)(ii)(II).

If EPA determines these criteria are not met, that decision not to regulate is considered final agency action subject to judicial review. *Id*. § 300g-1(b)(1)(B)(ii)(IV). If EPA instead determines that these criteria *are* met, the Agency's determination is not final action, but triggers further administrative process.

If EPA finds that regulation is warranted, it must "publish a maximum contaminant level goal and promulgate a national primary drinking water regulation" for that contaminant. *Id*. §§ 300g-1(b)(1)(A), 300g-1(b)(1)(E). EPA must propose the goal and regulation within 24 months of its final regulatory determination, and finalize those actions within 18 months after the proposal, subject to a 9 month extension. *Id*. § 300g-1(b)(1)(E).

Maximum contaminant level goals are non-enforceable health objectives set at a level at which "no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." 42 U.S.C. § 300g-1(b)(4)(A). EPA must generally also include an enforceable "maximum contaminant level" in its national primary drinking water regulations for that contaminant, set at a level that is as close to the maximum contaminant level goal "as is feasible," as defined in the SDWA. *Id*. §§ 300g-1(b)(4)(B), 300g-1(b)(4)(D). The Act provides exceptions, however, such as when the costs associated with the maximum contaminant level outweigh the health risk reduction benefits, *id*.

§ 300g-1(b)(6), or when "the Administrator finds that it is not economically or technologically feasible to ascertain the level of the contaminant," *id*. § 300g-1(b)(7). In those cases, EPA may issue alternative standards.

EPA's actions carrying out the standard-setting provisions of the SDWA must be based on "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and (ii) data collected by accepted methods or best available methods." *Id*. § 300g-1(b)(3)(A).

## B.    Factual background

Perchlorate is an inorganic ion that occurs naturally within certain mineral deposits and is also produced by industrial processes. 85 Fed. Reg. at 43,991. Most commonly, perchlorate compounds are used as oxidizers in solid fuels to power rockets, missiles, and fireworks. *Id*. Perchlorate associated with the production of these oxidizers and perchlorate found in certain fertilizers are the largest anthropogenic contributors of perchlorate to the food chain. Perchlorate Occurrence and Monitoring Report ("Occurrence Report") at 9, JA435; *see also* Technical Support Document at 3-2, JA379 (describing environmental release of perchlorate).

People are typically exposed to perchlorate through the ingestion of contaminated food or drinking water. *Id*. Above certain levels, perchlorate can

inhibit iodide[2] absorption in the thyroid gland, which can affect thyroid hormone production. *Id*. Sufficient changes in thyroid hormone levels can cause changes in brain development, particularly in fetuses and preterm newborns. *Id*. These changes can affect a number of neurodevelopmental outcomes, including effects on neurocognitive function. *Id*.; *see* 84 Fed. Reg. 30,524, 30,527 (June 26, 2019) (describing evidence of adverse neurodevelopmental effects from decreased maternal thyroid hormone levels during pregnancy).

EPA included perchlorate on its 1998, 2005, and 2009 Contaminant Candidate Lists. 85 Fed. Reg. at 43,992. In its first Unregulated Contaminant Monitoring Rule, published in 1999, EPA required all large public water systems (those that serve more than 10,000 people) and a representative sample of small water systems to monitor for perchlorate and 25 other contaminants. 85 Fed. Reg. at 43,993. Those data, known as the UCMR 1 data, were collected from 2001 to 2005. *Id*.

Following the collection of the UCMR 1 data, at the request of EPA and other federal agencies, the National Research Council issued a report evaluating the health implications of perchlorate ingestion. 84 Fed. Reg. at 30,525–26. The report concluded that perchlorate exposure inhibits the transport of iodide into the

---

[2] In EPA's decision and this brief, "iodine" refers to dietary intake of the mineral; "iodide" refers to the ionic form once in the body. *See* 85 Fed. Reg. at 43,993 n.1.

thyroid, which may then lead to decreases in the production of two thyroid hormones. It identified the fetuses of pregnant women who might have hypothyroidism or iodide deficiency as the most sensitive population to perchlorate exposure. *Id*. at 30,526. The report further recommended a reference dose—"the estimate of a daily exposure to humans that is likely to be without an appreciable risk of adverse effects"—of 0.7 µg per kilogram of bodyweight per day. *Id*.

In January 2009, EPA published a non-regulatory interim health advisory for perchlorate of 15 µg/L, based on chronic exposure to the National Research Council-derived reference dose. *Id*. at 30526.

## C.    Agency proceedings

In 2008, EPA published its first preliminary regulatory determination not to regulate perchlorate in drinking water. Applying the 15 µg/L Health Reference Level based on the reference dose recommended by the National Research Council to the UCMR 1 data on perchlorate occurrence in public water systems, EPA estimated that less than 1% of drinking water systems serving approximately 1 million people had perchlorate levels above levels of concern. EPA proposed to determine that perchlorate did not occur with a frequency and at levels of public health concern, and that there was not meaningful opportunity for drinking water regulation to reduce health risks. Drinking Water: Preliminary Regulatory Determination on Perchlorate, 73 Fed. Reg. 60,262 (Oct. 10, 2008).

In response to comments that EPA should consider potential alternative Health Reference Levels, in 2009 EPA published a supplemental request for comment with new analysis proposing a range of between 1 µg/L and 47 µg/L as potential Health Reference Levels. Drinking Water: Perchlorate Supplemental Request for Comments, 74 Fed. Reg. 41,883 (Aug. 19, 2009). Using that range as levels of concern, EPA then published a determination to regulate perchlorate on February 11, 2011. Drinking Water: Regulatory Determination on Perchlorate, 76 Fed. Reg. 7,762. EPA found that as many as 4% of public water systems serving up to 16.6 million people could potentially be exposed to perchlorate at those levels. *Id*. at 7,765. EPA next began work to establish a maximum contaminant level goal and drinking water regulations under 42 U.S.C. § 300g-1(b)(1)(E).

### 1.    Developing Levels of Health Concern for Perchlorate

To develop a proposed maximum contaminant level goal and drinking water regulations, and as required by 42 U.S.C. § 300g-1(d), EPA requested guidance from EPA's Science Advisory Board in 2012. 84 Fed. Reg. at 30,527. In May 2013, the Board recommended changes to the reference dose approach used by the National Research Council that would precisely model perchlorate's mode of action and its effect on sensitive life stages. *Id*. Whereas the prior approach looked to perchlorate's effect on iodide uptake, the Board advised EPA to expand its

modeling approach to account for the changes in thyroid hormone levels that result from iodide insufficiency. *Id*.; *see* Technical Support Document at 1-3, JA375.

Responding to these recommendations, EPA developed a new biologically based dose-response model that predicts changes in thyroid hormone levels as a result of iodine intake and perchlorate exposure in women prior to pregnancy and early gestation. 84 Fed. Reg. at 30,528; Technical Support Document at 1-3, JA375. Although the effects of perchlorate on iodide uptake were well understood, and the link between decreased maternal thyroid hormone levels on neurodevelopmental outcomes in offspring was well documented, the reference dose model did not directly connect iodide uptake inhibition caused by perchlorate to changes in thyroid hormone levels. The model recommended by the Science Advisory Board allowed EPA to make that connection, which then allowed EPA to connect perchlorate exposure to adverse neurodevelopmental outcomes. 84 Fed. Reg. at 30,527–28; Technical Support Document at 1-3, JA375.

EPA convened an independent peer review panel in 2017 to review its new model. 85 Fed. Reg. at 43,994. EPA revised the model further to incorporate the panel's suggestions. *Id*. EPA then sought input from a second independent peer review panel in 2018 on the revised model and several approaches for linking the thyroid hormone changes predicted by the model to neurodevelopmental effects using existing epidemiological literature. *Id*. That peer review panel stated that

EPA's model was "a highly innovative state-of-the-science set of quantitative tools to evaluate neurodevelopmental effects that could arise from drinking water exposure to perchlorate." *Id*. at 43,999.

After thoroughly reviewing the relevant scientific literature, EPA identified a 2016 study that evaluated the effect of maternal thyroid hormone levels on her offspring's cognition, measured as intelligence quotient ("IQ") effects, as representing the most rigorous data applicable to the new model. 84 Fed. Reg. at 30,534–35; Technical Support Document at 9-15, JA413. At the recommendation of the peer review panel, EPA reanalyzed the data to exclude certain unrelated variables and other data that were not as directly measured. 84 Fed. Reg. at 30,535; Technical Support Document at 9-15, JA413. EPA then took the maternal thyroid hormone levels from its perchlorate-hormone model and assessed the neurodevelopmental impacts of those levels based on the reanalyzed hormone-neurodevelopmental outcome data. 84 Fed. Reg. at 30,536. EPA calculated the concentration of perchlorate that would avoid a 1, 2, or 3 percent IQ decrease—or a 1, 2, or 3 IQ point decrement—in the most sensitive subpopulation, the offspring of thyroid-deficient mothers. *Id*. EPA determined that those perchlorate levels were 18, 56, and 90 μg/L, respectively. *Id*. at 30,540.

## 2. Assessing the Frequency of Perchlorate Occurrence

EPA next assessed how frequently perchlorate occurs in public water systems at those levels. To do so, EPA relied on the UCMR 1 occurrence data, updated to address two issues.

*First*, EPA eliminated 199 data points where data from source water sampling was superseded by samples taken from the entry point of the drinking water distribution system. 84 Fed. Reg. at 30,542. The UCMR 1 monitoring required all large systems and a representative sample of small systems to monitor for perchlorate and 25 other contaminants at the entry points to the drinking water distribution system. *Id*. at 30,525; *see* Revisions to the Unregulated Contaminant Monitoring Regulation for Public Water Systems, 64 Fed. Reg. 50,556, 50,570 (Sept. 17, 1999). In some cases, EPA allowed monitoring at source or "raw" water sampling points—the untreated water a system draws from. *Id*. However, any system that reported perchlorate detection in source water was required to undertake follow-up sampling at the system entry point associated with that source water sample detection. Occurrence Report Appx. B at B-1, JA496.

After reviewing records on the follow-up monitoring, EPA identified 65 systems that collected both source water and entry point samples concurrently and 134 systems that collected follow-up entry point samples that had reported both source water and entry point results. *Id*. at B-2–B-3, JA497–98. EPA then excluded

12

the source water samples from these 199 systems in favor of the more precise entry

point samples that had already been reported. *Id*. at B-3, JA498. This eliminated 99

detections and 102 non-detections. *Id*.

*Second*, EPA substituted updated perchlorate values for systems in

Massachusetts and California where more recent compliance monitoring sampling

data from the same entry points was available. 85 Fed. Reg. at 43,993. EPA

explained that California and Massachusetts had both enacted enforceable state

maximum contaminant level regulations that had significantly decreased the

occurrence and concentration of perchlorate in drinking water in those states. *Id*.;

*see also* 84 Fed. Reg. at 30,542.[3] For California sample points where there was a

detection of perchlorate in the UCMR 1 data but no detection of perchlorate in

more recent state compliance sampling, EPA substituted a value of 4 μg/L for the

UCMR 1 detection value, equal to UCMR 1's minimum reporting level.

Occurrence Report Appx. B at B-7, JA502. In other words, the new value would

indicate that perchlorate had been detected, but at UCMR 1's lowest level. For

sample points where there was a detection of perchlorate in the UCMR 1 data and

for which more recent compliance records were available, EPA assigned the

average result of the most recent compliance sampling.

---

[3] Although other states have promulgated health advisory levels or other non-enforceable standards, only Massachusetts and California have enacted enforceable standards. Occurrence Report at 4, JA430.

EPA also updated the state data based on federally mandated Consumer Confidence Reports. Where that Report indicated compliance with state standards, EPA assigned a numerical value consistent with compliance levels in the state regulation: 6 µg/L for California and 2 µg/L for Massachusetts. *Id*. For any sampling point for which EPA could not find updated information that could be matched with the UCMR 1 dataset, the original value from UCMR 1 was retained.

The updated UCMR 1 data showed very low levels of perchlorate occurrence at all of the perchlorate levels EPA proposed to evaluate.

**Table 1: Perchlorate Occurrence and Exposure (Updated UCMR1 Data Set)[4]**

| Threshold concentration (µg/L) | Entry points with detections above threshold | Water systems with detections above threshold | Percent of U.S. water systems with detections above threshold (percent) | Population served |
|---|---|---|---|---|
| 18 µg/L ........................................................... | 17 | 15 | 0.03 | 620,560 |
| 56 µg/L ........................................................... | 2 | 2 | 0.004 | 32,432 |
| 90 µg/L ........................................................... | 1 | 1 | 0.002 | 25,972 |

### 3.    EPA's Proposed and Final Actions on Perchlorate

In compliance with a deadline established by a consent decree to resolve a citizen suit in the Southern District of New York (1:16-cv-01251-ER), EPA published a proposed action on perchlorate on May 23, 2019. In the proposal, EPA proposed to set a maximum contaminant level goal at 56 µg/L, the level associated with a 2 IQ point decrement in the most sensitive subpopulation and requested

---

[4] 85 Fed. Reg. 43,995.

comment on the 18 and 90 μg/L alternative levels associated with a 1 and 3 IQ point decrement, respectively. 84 Fed. Reg. at 30,524.

Alternatively, EPA proposed to withdraw its 2011 determination that perchlorate met Section 300g-1(b)(1)(A)'s three criteria for regulation under the SDWA. *Id*. EPA explained its analysis that even at the most conservative maximum contaminant level goal proposed, 18 μg/L, only 0.03% of public water systems, 15 total, serving approximately 620,000 people would exceed that regulatory threshold. 84 Fed. Reg. at 30,543–44.

Following public notice and comment, EPA published the Final Action on Perchlorate on July 21, 2022. Drinking Water: Final Action on Perchlorate, 85 Fed. Reg. 43,990. The Final Action withdrew the determination to regulate perchlorate under the SDWA given EPA's conclusion that perchlorate did not meet the second and third statutory criteria for regulation. *Id*. at 43,990–91. EPA explained that it could consider relisting perchlorate on the Contaminant Candidate List and proceed to regulation in the future if occurrence or health risk information changed.

## SUMMARY OF ARGUMENT

1.      The determination to regulate under the SDWA is a preliminary, non-reviewable step that EPA appropriately revisited when new information demonstrated that perchlorate did not meet the SDWA's criteria for regulation. The

SDWA does not abrogate EPA's inherent authority to reevaluate its regulatory decision or provide an alternate procedure for withdrawing determinations to regulate. Nor does the Act impose any time limitation on EPA's reconsideration. EPA's withdrawal action, undertaken after public notice and comment, acknowledged its changed position, fully explained the reasons for changing its assessment of the facts related to perchlorate occurrence, and articulated EPA's reasonable conclusion that perchlorate does not meet the SDWA's statutory criteria.

2.      In withdrawing its determination to regulate perchlorate, EPA determined that the level of perchlorate exposure that would avoid a 1% IQ decrease in the most sensitive subpopulation was the "level[] of public health concern" against which to assess how frequently perchlorate occurs in drinking water. That scientific determination was not arbitrary or capricious. Using an approach recommended by the Science Advisory Board and assessed by two independent peer review panels, EPA calculated the perchlorate concentration necessary to avoid that effect using an innovative biological model applied to robust epidemiological data. EPA's decision to use a 1% IQ effect followed EPA technical guidance and was a reasonable approach given the methodological difficulties with identifying a starting point for identifying risk based on IQ. EPA's approach to this complex technical analysis was rational and reasonably explained.

3.    EPA also updated its national data on perchlorate's occurrence in drinking water to remove redundant samples and to reflect substantial real-world changes in the extent of perchlorate contamination. Those updates were not arbitrary or capricious. EPA eliminated 199 samples taken from various public water systems' source waters that had been superseded by subsequent samples from the entry point of the systems' drinking water distribution systems. Where available, EPA also substituted current compliance and monitoring data from California and Massachusetts to account for the effect of state drinking water regulations on perchlorate detections in those States. EPA's approach was a reasonable way to correct errors in the data and incorporate relevant new facts.

The Court should uphold EPA's action and deny the petition for review.

## STANDARD OF REVIEW

Because the SDWA does not prescribe a standard of review of EPA's decision not to regulate a contaminant, that decision is reviewed under the Administrative Procedure Act's narrow arbitrary and capricious standard of review. 5 U.S.C. § 706(2). Under that standard, courts "review only to ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" and will not "substitute [their] judgment for that of the agency." *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut Auto. Ins. Co.*, 463 U.S. 29, 43

17

(1983)). Courts give an "extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (cleaned up).

## ARGUMENT

### I.  EPA Has the Authority to Withdraw its Determination to Regulate Perchlorate.

A determination to regulate perchlorate is a necessary, but necessarily preliminary, step on the road to regulation. The challenged Final Action is EPA's "withdrawal" of such a non-final determination. NRDC argues that once that preliminary step is taken, EPA must inexorably continue down that road, regardless of whether information discovered along the route indicates that regulation is not warranted. NRDC's position must be rejected.

To begin, a determination to regulate under the SDWA is an interlocutory step that does not itself "create[] enforceable rules for regulated parties in future proceedings." *California v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019). In such circumstances, this Court has recognized the Agency's authority to decline to regulate. *See id.*; *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 504 (D.C. Cir. 2019) (holding that EPA's decision to undertake a rulemaking does not remove its discretion to determine that the rule should not issue). The SDWA's text and structure do not dictate a different result. Whereas the statute provides that a determination *not* to regulate is immediately judicially reviewable, 42 U.S.C.

§ 300g-1(b)(1)(B)(ii)(IV), a determination *to* regulate is not. Consistent with

Congress's admonition that EPA base its standards on the best available health

information, *id.* § 300g-1(b)(1)(B)(ii)(II), the SDWA does not prevent EPA from

revisiting, prior to regulating a contaminant, whether regulation is warranted at all.

Further, whereas Congress expressly circumscribed EPA's ability to remove or

make less stringent national primary drinking water standards *once they are*

*promulgated*, *see id.* § 300g-1(b)(9), Congress did not prohibit withdrawing a

regulatory determination once made.

Even setting this statutory structure aside, it is a foundational principle of

administrative law that agencies are permitted to change course when presented

with new facts and to reevaluate "which policy would be better in light of the

facts." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir.

2012) (citing *FCC v. Fox Television Studios*, 556 U.S. 502, 514–15 (2009)). When

changing positions, an agency must provide "a reasoned explanation . . . for

disregarding facts and circumstances that underlay or were engendered by the prior

policy." *Fox*, 556 U.S. at 516. But so long as the agency supplies that explanation

and acknowledges it is changing course, "it suffices that the new policy is

permissible under the statute, that there are good reasons for it, and that the agency

*believes* it to be better." *Fox*, 556 U.S. at 515 (emphasis in original); *see also*

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (stating that

agencies are "free to change their existing policies" and need not provide additional justification beyond "what would suffice for a new policy created on a blank slate").

In the Final Action on Perchlorate, EPA did just that. After determining in 2011 that perchlorate met the SDWA's criteria for regulation, EPA developed a new biological model to determine the threshold perchlorate exposure that presented a risk of adverse health effects. That new analysis indicated the threshold was higher than that which EPA had considered in the 2011 determination: 18 µg/L–90 µg/L, as opposed to 1 µg/L–47 µg/L. 85 Fed. Reg. at 43,995. That, along with a reanalysis of how frequently perchlorate occurs in drinking water, led EPA to conclude that perchlorate no longer met two of the criteria for regulation: (1) it did not occur with a frequency and at levels of public health concern; and (2) regulation did not present a meaningful opportunity for health risk reduction for persons served by public water systems. 42 U.S.C. § 300g-1(b)(1)(A)(ii)–(iii); *see* 85 Fed. Reg. at 43,998. EPA accordingly determined it lacked the authority to regulate perchlorate and withdrew the 2011 determination.

EPA's reevaluation and withdrawal of its determination to regulate was "well within [the] agency's discretion." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038. EPA provided full notice and opportunity for public comment on its reevaluation and reasonably explained the new factual findings that contradicted

the 2011 determination's conclusion. *See* 85 Fed. Reg. at 43,995; *Fox*, 556 U.S. at 515. EPA's action was reasonably explained and adequately justified and should be upheld for the reasons described in greater detail below. *State Farm*, 463 U.S. at 43; *see infra* Parts II & III.

Disregarding these established principles, NRDC insists that once EPA has identified a contaminant for regulation under the SDWA, it must continue on the path to regulation no matter how dramatically the circumstances underlying the initial determination may have changed. *See* Pet. Br. at 30. NRDC's argument, however, is belied by the SDWA's text and structure, which provide EPA ample discretion to change course where, as here, the best available health information warrants. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1038.

### A. Withdrawing a regulatory determination when EPA determines a contaminant does not in fact meet the SDWA's criteria for regulation is consistent with the statute.

EPA's authority to withdraw a determination to regulate a contaminant before regulations are issued is consistent with the SDWA's text, structure, and history. EPA may only regulate a contaminant when all three statutory criteria have been satisfied. 42 U.S.C. §§ 300g-1(b)(1)(B)(ii)(II). If EPA determines a contaminant no longer meets those criteria, it lacks authority to issue drinking water regulations for that contaminant. *See* 85 Fed. Reg. at 43,992.

EPA's inherent authority to withdraw a determination to regulate is consistent with Congress's intention to enable EPA to allocate scarce resources to the most pressing dangers to public health. *See* 85 Fed. Reg. at 43,992 (citing legislative history and discussing purpose). Whereas, prior to 1996, EPA was required to issue drinking water regulations for 25 new contaminants every three years, the 1996 amendments to the SDWA removed that requirement in favor of the current process. S. Rep. No. 104-169 (1995) at 12. Congress found that that requirement unreasonably required EPA to regulate contaminants that "occur so infrequently in public water systems that the costs of monitoring . . . far outweigh any health benefit that could be realized at the few systems that may detect the contaminant." *Id*. That requirement to regulate was "the quintessential example of an arbitrary Federal law imposing burdens on consumers and the taxpayers of other governments with no rational relationship to the public benefits that might be realized." *Id*. at 13.

To address these unnecessary costs, Congress amended the SDWA to require that EPA consider five contaminants for regulation every five years, but granted EPA authority to determine whether or not regulation is warranted given the statutory criteria. Significantly, Congress provided that the EPA Administrator, in her "sole discretion," must determine that regulation "presents a meaningful opportunity for health risk reduction." 42 U.S.C. § 300g-1(b)(1)(A)(iii).

EPA's authority to withdraw a regulatory determination is critical to allow the Agency to account for changed circumstances presented by new and up-to-date science. EPA's determination that a contaminant meets the criteria for regulation must "be based on the best available health information." *Id*. § 300g-1(b)(1)(B)(ii)(II). Elsewhere, the SDWA provides all of EPA's actions "[i]n carrying out" the Act's standard-setting requirements must be based on the "best available, peer-reviewed science and supporting studies" and "data collected by . . . best available methods." 42 U.S.C. § 300g-1(b)(3)(A). NRDC can hardly dispute that the best available information and science can change over time. When that information changes, EPA must have the authority to respond by changing course. NRDC's position that EPA must be stuck with an earlier determination to regulate based on a stale record conflicts with EPA's duty to "consider[] the relevant matter presented" during the rulemaking process. 5 U.S.C. § 553(c).

Indeed, the process of determining an appropriate maximum contaminant level goal can very well reveal new information that refines EPA's understanding of whether a contaminant meets the criteria for regulation. The regulatory determination standard requires EPA to determine the "level" at which a contaminant may present "public health concern." 42 U.S.C. § 300g-1(b)(1)(A)(ii). EPA typically makes a determination whether a contaminant is found "at levels of public health concern" based on health reference levels. 76 Fed. Reg. at 7,764.

Those health reference levels "are not final determinations about the level of a contaminant in drinking water that is necessary to protect any particular population," but are "benchmarks" that provide information on whether a contaminant meets the criteria for regulation under the SDWA. *Id.*; *accord* 85 Fed. Reg. at 43,995 ("These [health reference levels] were not final decisions about the level of perchlorate in drinking water that is without adverse effects.").

After conducting a more refined analysis to determine its maximum contaminant level goal, EPA may discover that the less precise assumptions made in the regulatory determination were not correct. That is what happened here: after applying a more refined model and analysis and new data that became available after the regulatory determination, EPA found that perchlorate does not present a health concern until a higher level than it had considered during the earlier step in the regulatory process. *See* 85 Fed. Reg. at 43,995.

As EPA reasoned, "Congress could not have intended that the EPA's regulatory decision-making be hamstrung by older data when newer, more accurate scientific and public health data are available." 85 Fed. Reg. at 43,992. That is especially true "when those data demonstrate that regulation of a new contaminant would not present a meaningful opportunity for health risk reduction." *Id.*; *see also, e.g.*, *Nat'l Cable & Telecomms Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (explaining that an agency "must consider . . . the wisdom of its

policy on a continuing basis, for example, in response to changed factual circumstances").

### B.    The SDWA does not abrogate EPA's inherent authority to withdraw its determination to regulate perchlorate.

Contrary to NRDC's contention, *see* Pet. Br. at 29–30, the SDWA need not expressly grant EPA authority to reconsider or withdraw its determination to regulate perchlorate for EPA to possess that authority. To be sure, a statute can expressly limit an agency's inherent authority to change its mind. But, unlike in the cases NRDC cites, nothing in the SDWA unambiguously limits EPA's authority to withdraw the determination.

First, NRDC's suggestion that EPA lacks inherent authority to reconsider or withdraw its determination to regulate perchlorate absent express statutory authorization is incorrect. As discussed above, the Supreme Court in *Fox* and other cases has made clear that agencies are permitted to change positions. And this Court has repeatedly held that agencies possess the authority and, indeed, the obligation, to reverse course where the facts so warrant. *See, e.g.*, *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions[.]"); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) ("[W]e expect that an[] agency may well change its past practices with advances in knowledge in its given field or as its relevant experience and expertise

expands."). The case NRDC cites, *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016), says as much, citing *Ivy Sports Medicine* for the proposition that agencies possess the inherent "power to reconsider prior decisions" even where not "expressly enumerated by Congress."

Second, withdrawing the regulatory determination does not "contravene" any express statutory command. Pet. Br. at 33–34. The SDWA provides no "mechanism capable of rectifying" a mistaken determination that a contaminant occurs with a frequency and at levels such that regulation presents a meaningful opportunity for health risk reduction. *Ivy Sports Med.*, 767 F.3d at 86 (quoting *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984)). The provisions NRDC identifies as "allow[ing] EPA to adjust to changing circumstances," Pet. Br. at 35, do not perform the same function as withdrawing a regulatory determination. NRDC contends that EPA may simply set less stringent regulations and monitoring requirements for that contaminant or authorize variance and exemptions from those regulations. *See* Pet. Br. at 35. But setting less stringent regulation is different in kind from declining to regulate. Regardless of the stringency, regulation inevitably imposes costs on water systems across the country, such as for monitoring and reporting. That result would be inconsistent with the concern animating the 1996 SDWA amendments: Congress's desire for EPA to avoid the needless expenditure

of federal and state resources on regulations that would not produce meaningful public benefits. *See* S. Rep. No. 104-169 at 12.

That the SDWA provides no equivalent process for reconsidering a regulatory determination makes it unlike the Clean Air Act provision at issue in *New Jersey v. EPA*, 517 F.3d 574, 579 (D.C. Cir. 2008). In that case, EPA had determined, pursuant to 42 U.S.C. § 7412(n)(1)(A), that it was "appropriate and necessary" to regulate mercury from certain coal- and gas-fired electric generating units. It then listed those units as sources of hazardous air pollutants under 42 U.S.C. § 7412(c). *See New Jersey*, 517 F.3d at 579. EPA later reconsidered and removed those electric generating units from that list, arguing that it had the authority to do so "at any time that it makes a negative appropriate and necessary finding." *Id*. at 580. This Court explained that, in the usual course, an agency has discretion to "change its position and reverse a decision," but that Congress "undoubtedly can limit" that discretion. *Id*. at 582–83. Because, under 42 U.S.C. § 7412(c)(9), the Clean Air Act provided an express mechanism for removing sources from the source list, the Court held that EPA could not avoid the statutory delisting process by invoking inherent reconsideration authority. *Id*. at 583.

Here, EPA's action does not avoid any otherwise applicable statutory process. EPA's action was based on the statutory criteria applicable to regulatory determinations under the SDWA. NRDC's argument that EPA's ability to

withdraw a regulatory determination is limited by the SDWA's deadlines for promulgating drinking water regulations is not consistent with the SDWA's overall structure. *See supra* 18–19. Additionally, the anti-backsliding provisions that NRDC points to, Pet. Br. at 40, apply only once a maximum contaminant level goal and national primary drinking water standards have been finalized. *See* 42 U.S.C. § 300g-1(b)(9). Before those regulations issue, EPA is not bound to a determination to regulate when the best available science indicates the statutory criteria are not in fact met.

The Ninth Circuit's decision in *NRDC v. EPA*, 542 F.3d 1235, 1239 (9th Cir. 2008), is not to the contrary. That case concerned section 304(m) of the Clean Water Act, 33 U.S.C. § 1314(m), which requires EPA to establish a schedule for promulgating effluent guidelines for water pollutant source categories identified by EPA that discharged toxic or nonconventional pollutants and that lacked such guidelines. *Id.* § 1314(m)(1). The statute also set a three-year deadline for promulgating those guidelines. NRDC sought review of EPA's final action withdrawing proposed guidelines for a source category that had been identified pursuant to section 304(m). *NRDC*, 542 F.3d at 1239–40. After that action, EPA removed the source category from that Section 304(m) list.

Two pivotal factors distinguish that *NRDC* case from this one. First, in the Ninth Circuit's case, EPA "unilaterally delist[ed]" the source category "with no

process." *Id*. at 1252. There was no notice and comment or other formal proceedings to remove the disputed category from the 304(m) list. That is in contrast to EPA's action here, where the proposed withdrawal action was subject to public notice and comment. In fact, the *NRDC* court expressly noted that it did not "reach the question of whether the EPA could avoid promulgating [effluent limitation guidelines]" for a source category "if the EPA formally amended the § 304(m) plan that triggered the duty to promulgate or undertook some other formal process to delist the point-source category." *Id*. at 1252 n.10. That principle is consistent with *FCC v. Fox*, 556 U.S. at 515, which affirmed agencies' inherent authority to change their mind when they provide a reasoned explanation and acknowledge the change in position. *Id*. ("An agency may not, for example, depart from a prior policy *sub silentio*.").

Second, whereas the Court interpreted the Clean Water Act to *require* effluent guidelines for new point source categories identified by EPA, the SDWA expressly provides EPA discretion in determining which drinking water pollutants warrant regulation. As the Ninth Circuit explained, the Clean Water Act "does not contemplate that the EPA might never promulgate the requirements referenced in [33 U.S.C. § 1342(a)(1)(A)]." *NRDC*, 542 F.3d at 1251. By contrast, although the SDWA requires EPA to evaluate five contaminants every five years, it is ultimately a matter of the Administrator's "sole judgment" to determine whether a

contaminant "presents a meaningful opportunity for health risk reduction" and thus whether to promulgate drinking water regulations. EPA's withdrawal of its determination to regulate perchlorate, taken after public notice and comment and hewing closely to the statutory text, was a permissible exercise of agency authority.

## C. EPA's reconsideration authority is not time-limited.

Finally, EPA's power to change course as to whether it should regulate a contaminant under the SDWA is not time-limited. NRDC contends that EPA's authority evaporated when its statutory deadlines to propose and finalize drinking water regulations expired. Pet. Br. at 39. But this Court has held in other contexts that, absent a clear statutory direction to the contrary, agencies retain their authority to act even when they miss a statutory deadline. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154 (D.C. Cir. 2010) ("[W]here there are less drastic remedies available for an agency's failure to meet a statutory deadline, courts should not assume Congress intended for the agency to lose its power to act."). The same principle applies here: the fact that EPA missed its statutory deadline to promulgate drinking water regulations for perchlorate does not divest it of its inherent authority to reconsider its initial finding that such regulation was appropriate.

Unlike this case, this Court's decisions stating agencies' reconsideration authority is time-limited concern adjudications conferring an individual benefit. In those cases, concerns about individual reliance interests in administrative repose or in the result of the agency determination animated the outcomes. *See, e.g.*, *Ivy Sports Med.*, 767 F.3d at 86 (concerning the FDA's classification of an individual applicant's medical device);[5] *California Metro Mobile Comm'cns, Inc. v. FCC*, 365 F.3d 38, 45 (D.C. Cir. 2004) (noting the individual licensee's "strong and legitimate interest in administrative repose"); *Mazaleski v. Treusdell*, 562 F.2d 701, 719–20 (D.C. Cir. 1977) (involving time for correcting agency error in an employee termination proceeding, where "scrupulous compliance" with procedural regulations "is required to avoid any injustice"). Those concerns are not present here, where EPA decided not to issue regulations of general applicability. Notably, there is no mention of any time-limitation in the *FCC v. Fox*, 556 U.S. at 514–15, line of cases concerning agency authority to change course in such circumstances.

Nor is this a case like *New York v. NHTSA*, 974 F.3d 87, 100 (2d Cir. 2020), where the Second Circuit held that the National Highway and Transit Safety Authority could not, in 2019, reconsider a 2016 fuel standards penalty interim rule. The "highly circumscribed schedule" applicable in that case required annual

---

[5] Notably, when stating that agencies have a limited time in which to "revisit their prior decisions," the court in *Ivy Sports Med.*, cites only cases concerning individual adjudications, not rulemaking. 767 F.3d at 86.

penalty increases that "would necessarily build on" the initial 2016 rule. *Id*. at 100–01. The court's conclusion that the Authority's reconsideration authority was time-limited was thus driven by the particular statutory structure, not any inherent limitation on agency authority. As the SDWA does not contain a similar escalating structure or express limitations on EPA's authority to withdraw a determination, *New York* does not apply.

Finally, NRDC's argument (at 40) that, "if EPA had promulgated timely regulations," the SDWA's anti-backsliding provision, 42 U.S.C. § 300g-1(b)(9), would prevent eliminating such regulations, only reinforces EPA's authority to withdraw the determination here. That provision emphasizes that where Congress wanted to circumscribed EPA's authority, it has generally done so expressly.

The Court should reject NRDC's argument and deny the petition for review.

## II.    EPA Reasonably Used a "State-of-the-Science" Approach to Determine the Levels at Which Perchlorate Presents a Public Health Concern.

In its Final Action on Perchlorate, EPA employed an "'innovative state-of-the-science'" analysis to model the most sensitive subpopulations' thyroid response to perchlorate. 85 Fed. Reg. at 43,999 (quoting 2018 External Peer Review Report). EPA then linked the results of that model to epidemiological data on thyroid hormone levels and neurodevelopmental outcomes to determine the level at which perchlorate in drinking water presents a public health concern.

EPA's approach was developed at the recommendation of the Science Advisory Board—which EPA is required to consult prior to proposing a drinking water standard, 42 U.S.C. § 300g-1(e)—and refined in response to comments from two independent peer review panels. The design of EPA's modeling approach and the Agency's selection of the best epidemiological data applicable to that model were reasonable and well within EPA's scientific and technical expertise.

NRDC objects to EPA's approach for three main reasons. First, NRDC contends that EPA inappropriately based its analysis on the concentration of perchlorate that would avoid a 1 IQ point decrement in the most sensitive subpopulation. Second, NRDC contends that EPA erred in analyzing only IQ loss rather than other neurodevelopmental effects. Finally, NRDC suggests that EPA should not have used its proposed maximum contaminant level goals as indicators of "levels of public health concern." For the reasons below, the Court should reject these arguments and defer to EPA's reasonable application of its technical expertise to the available data. *See City of Waukesha*, 320 F.3d at 252 (holding that courts defer to EPA's choice of scientific model in setting drinking water standards).

A.    **EPA's determination that perchlorate was not present at "levels of public health concern" was consistent with technical guidance.**

EPA's decision to consider the level of perchlorate that avoids a 1% IQ decrease in the most sensitive population as the "level of public health concern" for its regulatory determination analysis was reasonable and supported by the record. The SDWA does not provide a particular technical approach for determining what constitutes "a level of public health concern." As EPA explained, it has used "a variety of science policy approaches to select points of departure for developing regulatory values." 85 Fed. Reg. at 43,999. Here, given the difficulty in identifying a precise IQ decrement representing an adverse health impact, EPA ultimately "looked to its Benchmark Dose Guidance," which supported using a 1% effect as a starting point for assessing the level of perchlorate contamination that presents "public health concern." *Id*. The Court should defer to EPA's reasonable selection of that level of health concern.

EPA's Benchmark Dose Technical Guidance provides approaches for using dose-response modeling to calculate a benchmark dose—the dose level that leads to a specific biological response level. Benchmark Dose Guidance at 1, JA269. EPA explained that in other contexts, it has used a 5%, 10%, or one half to one standard deviation from the mean to define the point at which toxicological effects constitute an adverse health outcome. 85 Fed. Reg. at 43,999; Technical Support

Doc. at 10-1, JA415; *see also* Benchmark Dose Guidance at 20, JA271 (stating that "a response level of 10% extra risk has been commonly used to define [benchmark doses]"). For the type of data available for EPA's perchlorate analysis ("quantal human data from epidemiological studies"), the Guidance provides that "1% extra risk is often used as a [benchmark response]." *Id*. at 21, JA272; *see* 85 Fed. Reg. at 43,999.

Using a 1% IQ decrease to define the level of public health concern was consistent with this guidance and was a reasonable—and reasonably explained—exercise of EPA's scientific policy and risk management judgment. As EPA explained, there are scientific challenges to "evaluating a continuous outcome such as IQ" where there is natural variability in the human population. *See* Technical Support Document at 10-1, JA415; 85 Fed. Reg. at 43,999; 84 Fed. Reg. at 30,537. Unlike non-continuous outcomes, where it is clear that an individual either has or does not have the adverse effect (for example, acute gastrointestinal illness), a continuous response in an outcome like IQ is often reported as a relative change from some control point. *See* Benchmark Dose Guidance at ix, JA266 (explaining "dichotomous" versus "continuous" response); *see also* 84 Fed. Reg. at 30,536 (discussing the array of tests and tasks used to measure diverse IQ-related skills, and research suggesting that children's IQ scores can change by several points based on their rearing environments). The Benchmark Dose Technical Guidance is

meant to help identify the level of observable variation that can be attributed to exposure to the contaminant. Given that "there are no robust population studies" or otherwise a consensus scientific definition of a biologically significant level of IQ change, EPA reasonably used the Guidance's recommendation to define perchlorate's level of public health concern. *See* Benchmark Dose Guidance at 22, JA273; *see also* 85 Fed. Reg. at 43,999; Response to Comments at 8-25, JA730. [6]

EPA also built many conservative assumptions into its biologically-based dose response model to account for uncertainties and ensure protectiveness. First, EPA's model focused on the thyroid response within a specific, sensitive population—offspring of iodide-deficient pregnant mothers in the first trimester of pregnancy—as recommended by the SAB and independent peer reviewers. *See* 84 Fed. Reg. at 30,528. Second, EPA applied conservative assumptions about the hypothetical iodide-deficient pregnant mother: the model assumes very low iodine intake levels, Technical Support Document at 9-7, JA405; low baseline levels of the key fT4 thyroid hormone, *id.* at 9-8–9-9, JA406–07; and reduced "TSH feedback"—the compensatory increase of thyroid stimulating hormone in response

---

[6] EPA noted that its approach was based on the particular "challenges associated with identifying a[ maximum contaminant level goal] for perchlorate," and that "[b]y selecting this approach, the EPA is not establishing a precedent for future Agency actions on other contaminants, since this approach might not be appropriate for conducting risks assessments or informing Agency policy for other contaminants and associated health effects." Technical Support Document at 10-1, JA415.

to decreases in the fT4 hormone, *see id*. at 6-1, JA381—to a level approximately

60 percent less effective than for the median individual, *id*. at 9-8, JA406. *See also*

84 Fed. Reg. at 30,529. Finally, to account for uncertainties and provide an

additional margin of safety, EPA applied an "uncertainty factor" to the model

calculation. 85 Fed. Reg. at 44,000. These measures further bolster the

reasonableness of EPA's assessment of perchlorate's "levels of public health

concern" within the meaning of the statute.

NRDC conflates the standard for deriving a maximum contaminant level

goal—"the level at which no known or anticipated adverse effects on the health of

persons occur[s]," 42 U.S.C. § 300g-1(b)(4)(A)—with the criteria that must be met

for EPA to promulgate a national primary drinking water regulation. Contrary to

NRDC's suggestion, EPA is not required to set the "levels of public health

concern" for determining whether to regulate at the level at which there are "no . . .

adverse effects." Rather, determining "levels of public health concern" is a science

policy and risk management judgment. Here, EPA reasonably exercised that

judgment, using the Guidance to define a starting point for estimating risk. EPA's

judgment in this complicated technical area is entitled to deference. *See City of*

*Waukesha*, 320 F.3d at 247.

NRDC does not contend that that Guidance is unsuitable or identify any

record evidence supporting a lower "level of public health concern." Citing the

preamble of an advanced notice of proposed rulemaking for regulations under the Toxic Substances Control Act related to lead, *see* Pet. Br. at 46 (citing 75 Fed. Reg. 24,848 (May 6, 2010)), NRDC highlights the distinction between population and individual risk as it relates to IQ. 75 Fed. Reg. at 24,853. That preamble, however, does not suggest a smaller than 1% quantum of extra risk for measuring adverse IQ effects, and does not provide any alternate method for characterizing those effects.[7]

The other evidence NRDC turns to is extra-record documents that should be disregarded for the reasons articulated in EPA's Response to NRDC's Motion to Supplement. *See* Doc. No. 1957926. But even if those documents are considered, they do not indicate that EPA's approach was unreasonable. Dr. Solomon's extra-record declaration merely opines that even a 1 IQ point loss across a population can have significant effects. But she does not counter EPA's observation that there are not robust population studies to guide its effort to define the IQ impact that represents an adverse health effect, or show that EPA's Benchmark Dose Guidance should have been disregarded. Regardless, the "presence of disputing expert witnesses offers a classic example of a factual dispute the resolution of which

---

[7] EPA addressed the significance of population-level IQ changes versus individual IQ changes in its Response to Comments at 8-83–8-84, JA743–44. There, EPA also noted one study, Carlisle et al (2009), that "identified a one IQ point decrement at the population level as a de minimus change in IQ[.]" *Id*. at 8-84, JA744.

implicates substantial agency expertise and requires that [the Court] defer to the informed discretion of the responsible federal agencies." *Am. Forest & Paper Ass'n Inc. v. EPA*, 294 F.3d 113, 121 (D.C. Cir. 2002) (cleaned up).

NRDC's argument boils down to a misguided attack on the sufficiency of EPA's proposed maximum contaminant level goals, arguing that "IQ loss is, by definition, evidence of functional impairment." Pet. Br. at 45. But that is beside the point: EPA is not issuing a maximum contaminant level goal in the challenged action, so the question of whether the perchlorate levels EPA analyzed would have "no known or anticipated adverse effect" is not relevant here. Contrary to NRDC's suggestion, EPA did not conclude in its Final Action that IQ loss below 1% does not represent an adverse health effect. Rather, EPA reasonably determined the perchlorate level that would avoid a 1% IQ effect in the most sensitive populations was an appropriate "level[] of public health concern" against which to evaluate how frequently perchlorate occurs in drinking water. 42 U.S.C. § 300g-1(b)(1)(A)(i)–(ii). That EPA also used a 1% IQ effect in setting its lowest proposed maximum contaminant level goal does not change the statutory standard applicable here.

## B.   EPA reasonably evaluated IQ effects as a surrogate for other neurodevelopmental effects in assessing the levels at which perchlorate would present a public health concern.

EPA also reasonably used effects on IQ as a surrogate for the potential neurodevelopmental effects of perchlorate exposure in withdrawing its regulatory determination. Following the Science Advisory Board's recommendation, EPA looked to epidemiological studies that showed the effects of very low thyroid hormones in early pregnancy on the risk of adverse neurodevelopmental outcomes in the pregnant person's offspring. 84 Fed. Reg. at 30,531. To connect the data on neurodevelopmental effects to the model of perchlorate's effects on key thyroid hormones, EPA looked for data that would allow it to develop "a dose-response function that estimates incremental changes in a neurodevelopmental endpoint based on a given change in thyroid hormone concentration." *Id*. at 30,352. After identifying and screening 71 epidemiological studies, EPA ultimately determined that a 2016 study by Korevaar et al. that measured IQ effects associated with low maternal thyroid hormone levels provided the most robust data that allowed EPA to create the function necessary to fit its model. *Id*. at 30536; *see also* Response to Comments at 8-3, JA724; Technical Support Document at 9-15, JA413.

NRDC is simply wrong that EPA did not explain why it did not evaluate other neurodevelopmental effects. *See* Pet. Br. at 51. The preamble for the Proposed Action explained that "EPA selected IQ decrements because this was the

endpoint evaluated in the Korevaar et al. (2016) study," which EPA determined "was the most rigorous analysis that examined the relationship between decreased thyroid hormones and neurodevelopmental effects." 84 Fed. Reg. at 30,536. Specifically, EPA explained that the Korevaar study (1) provides "sufficient quantitative data to derive a health impact function for the sensitive population of interest"; (2) its "analysis adjusts for an appropriate set of confounders"; and (3) "the neurodevelopmental endpoint—intelligence quotient (IQ)—is more straightforward to interpret because there is more national and cross-national data available." *Id*. at 30,534. The preamble walks through the methodology for the literature review that ultimately led EPA to that conclusion in great detail. *See id*. at 30,531–37.

Further, in its Response to Comments, EPA explained that the Korevaar study "provided the most robust data available with a clear measure of neurodevelopment that could be expressed as a function of changing maternal fT4." Response to Comments at 8-37, JA735; *see also id*. at 8-57, JA740 (explaining that the Korevaar data "lent itself to the development of the model"). "Continuous variables," like those in the Korevaar study, "are more informative to dose-response evaluations than categorical variables," and thus "studies with continuous measures of fT4 were more useful in model development." *Id*. at 8-92, JA752. EPA reanalyzed the Korevaar data based on feedback from an independent

41

peer review panel. Technical Support Document at 9-15, JA413; *see also* Response to Comments 8-4–8-5, JA725–26.

In contrast, other studies analyzing different effects were not adequately robust or well-suited to EPA's model. For instance, the 1999 and 2003 Pop studies have "small sample sizes (n<50) which made the generalizability of their results questionable" and failed to adjust for "confounders," that is, unmeasured variables that could distort the variables and outcome EPA was concerned with. *See* Technical Support Document at 9-15, JA413; Response to Comments at 8-3, JA724. Additionally, the authors did not respond to "[m]ultiple requests for raw data from the study" that would have allowed EPA to better assess the data. *Id*. Similarly, neither the 2017 Endendijk study that evaluated anxiety and depression scores nor the 2013 Finken study that evaluated reaction times focused on the low-end of thyroid hormone levels that fit the sensitive life stage for which EPA's model was designed. *Id*.; Technical Support Document at 9-15, JA413.

EPA also explained that using the IQ effects derived from the Korevaar data would be a surrogate for other types of neurodevelopmental effects. 84 Fed. Reg. at 30,536. Given the strength of the Korevaar data, as contrasted with the other options, EPA reasonably accepted the recommendation of its independent peer review panel that "indicated IQ was preferred." Response to Comments at 8-27, JA732. EPA reasonably concluded that other critical outcomes associated with

perchlorate would be captured by the Agency's IQ endpoint approach, particularly given the many conservative assumptions built into its model. *See* Response to Comments at 8-57–8-58, JA740–41; *supra* pp. 36–37.

NRDC suggests that IQ is not an appropriate surrogate for other neurodevelopmental effects because the Pop (1999), Pop (2003), and Endendijk studies showed 1–3% adverse effects to the non-IQ neurodevelopmental endpoints they evaluated at lower perchlorate doses than the Korevaar reanalysis. Pet. Br. at 54. (The Finken study on reaction times had higher exposure levels). But there is no reason to believe that the reason these studies observed an effect at lower exposure levels is due any greater sensitivity of those types of health rather than the reasons EPA eliminated those studies from consideration: the significantly smaller study size and failure to adjust for confounders in the two Pop studies, or the difficulty of interpreting anxiety and depression scores in Endendijk. *See* 84 Fed. Reg. at 30,534–35.

In the end, EPA's focus on IQ effects to determine what perchlorate levels present public health concern resulted from its reasonable selection of the most rigorous data that best fit its model. Given that EPA's explanation demonstrates a "rational relationship" between the model and the study that provided data best suited for that modeling exercise, its reasoned determination should be upheld. *City of Waukesha*, 320 F.3d at 247.

**C.    EPA reasonably concluded that perchlorate was not present in drinking water at levels of public health concern.**

NRDC suggests that EPA arbitrarily relied on the proposed maximum contaminant level goals to reassess the level at which perchlorate presents a public health concern. NRDC's concern is misplaced. In its Proposed Action, EPA considered whether perchlorate concentrations between 18 µg/L–90 µg/L would be levels "at which no known or anticipated adverse effects on the health of persons occur[s]," for the purpose of proposing a maximum contaminant level goal. 42 U.S.C. § 300g-1(b)(4)(A). But EPA's ultimate conclusion was that those levels represented the "levels of public health concern" for assessing perchlorate's frequency of occurrence for determining whether to regulate perchlorate under the SDWA. 42 U.S.C. § 300g-1(b)(2); *see* 85 Fed. Reg. at 43,995. That is the relevant determination here, and the relevant standard under which to review EPA's action.

NRDC provides no reason that levels proposed as maximum contaminant level goals could not also be "levels of public health concern." The "levels of public health concern" standard for making the regulatory determination is not defined in the statute and is more flexible than the "no known or anticipated adverse effects" standard for maximum contaminant level goals. In its initial regulatory determination, EPA analyzed perchlorate's occurrence and effects based on health reference levels that are "benchmarks" to determine whether a contaminant meets the criteria for regulation under the SDWA. 76 Fed. Reg. at

7,764. EPA reasonably reassessed that regulatory determination with the more precise analysis developed to support the proposed maximum contaminant level goal. And, for the reasons explained above, EPA reasonably assessed perchlorate at the level that would avoid a 1% IQ decrease in the most sensitive population. EPA's determination is entitled to deference and should be upheld.

## III.    EPA Reasonably Updated Its Perchlorate Occurrence Data to Account for Methodological Discrepancies and Regulatory Developments Significantly Affecting Real-World Conditions.

To evaluate whether perchlorate occurs with sufficient *frequency* at levels of public health concern, EPA reasonably relied on UCMR 1 monitoring data updated to address data inconsistencies and to reflect substantial real-world changes in the fifteen years between UCMR 1 sampling and EPA's ultimate regulatory decision.

### A.    EPA reasonably removed data points from source water samples where the system had concurrently or in follow-up sampling taken superseding samples from entry points.

The first of EPA's two "updates" to the UCMR 1 data set was excluding redundant, less-meaningful samples. The UCMR 1 data collection was aimed at evaluating the contaminant occurrence in public drinking water systems, that is, "a system for the provision to the public of water for human consumption." 40 C.F.R. § 142.2. EPA's UCMR 1 guidelines accordingly required that any public water system that reported detecting perchlorate in source water was to take follow-up samples from the entry point to the distribution system, which provides a closer

measure of the contaminant levels to which drinking water consumers are actually exposed. Occurrence Report Appx. B at B-1, JA496. After reviewing the UCMR 1 dataset, EPA identified 199 source water samples for which there was already concurrent or follow-up sampling from the system entry point already in the dataset. *Id*. EPA then excluded those redundant 199 source water samples in favor of the entry point samples.

EPA's decision to exclude those source water samples was reasonable. Removing the 199 source water samples is consistent with EPA's pre-existing guidelines for the UCMR 1 sampling effort. Occurrence Report Appx. B at B-1, JA496. Furthermore, EPA's correction was limited to source water samples that could be paired with a second concurrent or follow-up sample taken from where water enters the distribution system. 84 Fed. Reg. at 30,542. Excluding those samples provided a more accurate description of consumers' true exposure to the contaminant.

Moreover, eliminating source water samples in favor of entry point samples for the same system provides a more accurate picture of perchlorate's incidence and concentration in actual drinking water. Water systems may mix source waters, diluting potentially contaminated sources, or apply treatments that remove contaminated solids. *See, e.g.*, Occurrence Report at 14, Appx. A at A-10, JA440, JA475. That may explain why a disproportionate number of the 199 source water

samples—48.7% (97 of 199), compared with 1.58% (540 of 34,132) of the full

UCMR 1 dataset—were detections. The fact that eliminating those 199 eliminated

15.2% (97 of 637) of the UCMR 1's original detections is a function of the low

overall number of detections. Although NRDC tries to paint the exclusion of the

199 source water samples as biased, EPA applied neutral criteria: whether the

samples were from source waters, and whether there were samples from the

distribution entry point of the very same system already included in the dataset.

NRDC provides no reason to believe that eliminating such superseded source water

samples would create an inaccurate picture of actual perchlorate contamination in

drinking water systems.

Additionally, the exclusion of these samples from EPA's updated

perchlorate occurrence evaluation does not, as NRDC contends, reverse any prior

decision. *See* Pet. Br. at 65–66. NRDC suggests that a letter to the U.S. Chamber of

Commerce in which EPA wrote that the UCMR 1 data "were appropriate for use in

the context of the regulatory determination for perchlorate" represents a decision

that the 199 samples were "consistent with its data quality guidelines." Pet. Br. at

66.

That reads far too much into the Chamber of Commerce letter. In that letter,

EPA stated that it would "further evaluate available information on the occurrence

of perchlorate in public water systems, including data provided in [the Chamber's

Request for Correction].” Letter from EPA to William L. Kovacs, U.S. Chamber of Commerce (February 28, 2013) at 1, JA290. Indeed, EPA explicitly stated that it would “reassess” the UCMR 1 data and “carefully consider your comments.” *Id*. EPA further noted that UCMR 1 guidelines did allow source water sampling under some circumstances. *Id*. EPA then stated, “Notwithstanding the fact that some public water systems with source-water positives did not also collect samples at the entry point to the distribution system, as provided for in UCMR1, the EPA believes that the source water results serve as an indicator of likely perchlorate occurrence in drinking water.” *Id*. at 1–2, JA290–91.

That statement is consistent with the approach that EPA took here: Where EPA identified samples taken from source waters where there was *not* follow-up sampling at the system entry point, EPA retained those samples. *See* Occurrence Report Appx. B at B-3, JA498. But where the system *had* conducted the more accurate follow-up sampling, EPA eliminated the redundant and less meaningful source water sample from the data set. *Id*.

But even if eliminating the 199 redundant samples could be characterized as a change in position, EPA adequately explained why it did so. *See* 84 Fed. Reg. at 30,541–42; Occurrence Report Appx. B at B-1–B-3, JA496–98. EPA's action, and the reasons given for that action, were reasonable.

**B.    EPA reasonably accounted for state regulation that dramatically changed the national perchlorate contamination landscape.**

EPA's second update to its perchlorate occurrence data was a reasonable way to address state regulatory changes that indisputably had a dramatic effect on the incidence and level of perchlorate contamination. After the UCMR 1 data was collected between 2001 and 2005, Massachusetts and California each implemented state drinking water standards that require public water systems to keep perchlorate levels in drinking water below state limits of 2 µg/L and 6 µg/L, respectively. 84 Fed. Reg. at 30,542. These actions, in addition to remediation and treatment at two major sources of perchlorate contamination on the Lower Colorado River, which provides drinking water to Southern California, led to decreased perchlorate contamination after the UCMR 1 data were collected. Although EPA concluded that the UCMR 1 data still was the best, most representative data from which to make a determination about national perchlorate occurrence, there was nevertheless convincing evidence that circumstances on the ground—particularly in California, a state with an outsized effect on the number and concentration of perchlorate detections in the UCMR 1 dataset—had changed. EPA's decision to update the data was a reasonable response to the evidence of that change, and its methodology for doing so was sound.

### 1. There is convincing evidence that perchlorate contamination has declined since the UCMR 1 data were collected.

Faced with substantial record evidence that perchlorate contamination in key areas of the country has declined in the last 15 years, EPA reasonably determined it should find a way to address those changed circumstances in its regulatory determination. As EPA explained, the Agency "recognized that the promulgation of State . . . perchlorate standards represented a significant action that needed to be considered to adequately estimate perchlorate occurrence." Response to Comments at 6-18, JA717. The evidence in the record tells a convincing story of declining contamination.

First, perchlorate remediation efforts in the Lower Colorado River upstream of Lake Mead have led to sustained decreases in perchlorate concentrations. *See* 85 Fed. Reg. at 43,995; Response to Comments at 6-1, JA700; Occurrence Report Appx. A at A-8, JA473. Lake Mead is the main source of drinking water for Southern California and a major source for public water systems in Arizona. *Id*. The primary sources of perchlorate contamination in the Lower Colorado River are manufacturing facilities in Nevada. *Id*. Following successful remediation efforts at two industrial sites in that area, water sampling from several downstream locations around Lake Mead have showed "a consistent decreasing trend in perchlorate

concentrations," with most samples from three different locations showing

concentrations at or below 2 µg/L. *Id.*

Second, state regulation has led to dramatic declines in perchlorate

contamination in California and Massachusetts. 85 Fed. Reg. at 43,995;

Occurrence Report Appx. A at A-8, JA473. Since the UCMR 1 sampling between

2001 and 2005, Massachusetts (in 2006) established an enforceable drinking water

standard for perchlorate of 2 µg/L and California (in 2007) set an enforceable

standard of 6 µg/L. *Id.* These regulations have had a significant impact on

perchlorate contamination in those states. Monitoring data from these states

demonstrates that perchlorate contamination has decreased since the standards

were implemented. In California, the percentage of small systems detecting

perchlorate over the state standard of 6 µg/L dropped from 11.7% from 1997–2006

to 6.6% from 2007–2018; for large systems, that proportion dropped from 13.0%

to 11.4%.[8] Furthermore, of the 43 systems where perchlorate had been detected

during UCMR 1 sampling had no or lower perchlorate detection; only two had

higher detections, although those still met the 6 µg/L state standard. *See*

Occurrence Report Appx. B. at B-7–B-9, JA502–04. State monitoring in

---

[8] EPA explained the methodological limitations of this monitoring dataset,
including that it includes detections in "finished" drinking water and raw source
water, in Appendix A of the Occurrence Report. Occurrence Report Appx. A at A-
25–A-26, JA490–91.

Massachusetts shows that, in 2019, no large systems and only 0.8% of small systems detected perchlorate above 4 µg/L. Occurrence Report Appx. A at A-20, JA485.

The effect of state regulation, particularly in California, is significant to the national perchlorate contamination picture because California represented a disproportionate share of the perchlorate contamination observed in the UCMR 1 results. In the original UCMR 1 dataset, after the elimination of the 199 redundant samples addressed in Part III.A, *supra*, 320 of 540 samples in which perchlorate was detected were in California. Occurrence Report Appx. D at D-3, JA523. California represents 50 of 149 public water systems where perchlorate was detected. *Id*. at D-1, JA521. The 8,387,543 people served by those 50 systems represents more than 50% of the total population served by public water systems with perchlorate detections in the UCMR 1 data. *Id*. at D-5, JA525.[9]

In contrast, there is no similarly significant story indicating that perchlorate contamination elsewhere in the country has increased. NRDC contends that "the fireworks industry . . . has grown more than 300%," Pet. Br. at 63, but it cites only its extra-record expert declaration. That declaration should be disregarded for the reasons set out in EPA's response to NRDC's Motion to Supplement the

---

[9] Massachusetts had one detection in one public water system serving approximately 13,000 people. *Id*. at D-3, D-5, JA523, 525.

Administrative Record. Nevertheless, the declaration states only that "fireworks industry *revenue* increased by 300%" between 2001 and 2020, and does not address whether that growth has contributed to additional environmental releases. Solomon Decl. ¶ 16.

In sum, EPA was confronted with compelling evidence of a substantial change in circumstances between the time the UCMR 1 data were collected and the time of its proposed action. EPA's decision to address these circumstances with a limited update of the UCMR 1 data, described further below, was reasonable.

> ### 2. EPA's method for incorporating more recent California and Massachusetts perchlorate monitoring data was sound.

EPA decided to address the real-world changes described above with limited data substitutions to better reflect current conditions in Massachusetts and California. Because of the regulations, both States had robust state compliance monitoring data available. Using that data, EPA identified all systems and corresponding entry points that had reported perchlorate detections in UCMR 1. 84 Fed. Reg. at 30,542. EPA then used available data from annual reports required by the SDWA and state compliance monitoring data to match current data to the corresponding water systems and entry points sampled during UCMR 1. *Id*. If there was not more recent data, EPA retained the original UCMR 1 data. *Id*.

To account for different minimum reporting levels between the state compliance monitoring and UCMR 1, EPA developed a convention. If a system reported that perchlorate was not detected in the more recent data, EPA still noted that system as a detection, but substituted 4 µg/L—the minimum reporting level for the method used in the UCMR 1 sampling—for the concentration previously detected. 84 Fed. Reg. at 30,542; Occurrence Report Appx. B at B-7, JA502. If a system reported that it detected perchlorate within state standards, EPA substituted 2 µg/L (for Massachusetts) or 6 µg/L (for California) for the concentration previously detected. *Id*. And if the system reported a concentration above state standards, EPA substituted in that reported concentration. *Id*.

This substitution exercise did not change the number of detections—540, following the elimination of the 199 redundant sampling points discussed in Part III.A, above.[10] The substitution for more recent data changed only the concentration of perchlorate for those California and Massachusetts sample points where more recent data was available. Moreover, the limited substitution did not dramatically change the number of systems affected at levels of public health concern. Notably, EPA's 2019 analysis that 15 public water systems (0.03%) had perchlorate detection over 18 µg/L is not significantly different from its 2008 preliminary determination *not* to regulate perchlorate, which, using the UCMR 1

---

[10] Of those 540, 320 detections were in California and 1 was in Massachusetts.

database and a 15 µg/L Health Reference Level, indicated that perchlorate occurred at levels of health concern in only 0.8% of public water systems serving less than one million people. 85 Fed. Reg. at 43,996. EPA's approach, which substituted perchlorate concentration values only where recent data could be reliably matched to an existing UCRM 1 entry point result, reasonably incorporated new facts on the ground while retaining the benefits of the methodological rigor and national representativeness of the UCMR 1 data. Occurrence Report Appx. B at B-7, JA502; *see also* Response to Comments at 6-18, JA717.

EPA's approach appropriately balanced two conflicting but valid concerns: that UCMR 1 was the only dataset providing a nationally representative picture of perchlorate contamination across the country, but also that UCMR 1 would not reflect reductions in perchlorate contamination from more recent remediation and state regulation. *See* Response to Comments at 6-1, JA700. EPA's limited update was a reasonable compromise to account for current conditions. *Id*.

### 3. EPA's data update is consistent with other record evidence that perchlorate contamination has declined.

Other sources of water quality monitoring data also support the view that perchlorate contamination has declined in the last fifteen years. For instance, EPA contacted the 15 water systems at which perchlorate had been detected at or above 18 µg/L based on the updated UCMR 1 data and found that many systems had

conducted monitoring after the UCMR 1 collection and had found decreased levels or had taken mitigation efforts to address perchlorate. 85 Fed. Reg. at 43,996. Some systems had addressed contamination by removing perchlorate-contaminated wells from service, *e.g.* Oconee County Georgia, Deming Municipal Water System, New Mexico, and City of Levelland, Texas, or had installed perchlorate treatment, *e.g.*, City of Aberdeen and Chapel Hill-Aberdeen Proving Grounds, Maryland. *Id*.

Similarly, other monitoring data shows a declining trend. As discussed above, sampling in the Lower Colorado River, which contributes drinking water to a number of public water systems, significantly decreased between 1997 and 2016, following remediation efforts at two industrial sites. Occurrence Report Appx. A at A-8, JA473. A U.S. Geological Survey's study of ambient ground and surface waters—not finished drinking water—has showed a general decline in detected perchlorate concentrations. *Id*. at A-3, JA468.

Although NRDC contends that this survey shows that the overall number of perchlorate detections has increased between 2003–2012 and 2013–2016, Pet. Br. at 69, EPA explained that minimum reporting levels for a perchlorate detection varied over time, meaning that "in some cases the minimum concentration reported as a detection could be lower than the highest reporting level." Occurrence Report Appx. A at A-2, JA467. Regardless, even the maximum perchlorate concentrations

reported in the survey were below the 18 µg/L level that EPA concluded could present public health concerns. *Id*. at A-3, JA468.

NRDC also mischaracterizes other data in EPA's Occurrence Report. For instance, NRDC contends that 2017 data from the U.S. Geological Survey's National Water Information System showed that 72.22% of drinking water samples detected perchlorate with a median concentration of 15 µg/L. Pet. Br. at 68. But that number represents only 13 total samples; the vast majority of the sampling in that survey was of ambient water, where the median concentration of perchlorate detection was 1.5 µg/L for groundwater and 0.248 µg/L for surface water. Occurrence Report at A-4–A-5, JA469–70. Similarly, although ambient water samples in an EPA dataset showed perchlorate detections in 88% of sampled groundwater and surface waters, *see* Pet. Br. at 68, the median concentration for all sites was 2.9 µg/L. Occurrence Report Appx. A at A-6, JA471. And although Petitioners point to a 2005–2006 survey by the Centers for Disease Control detected perchlorate in 83% of tapwater samples, even the 95th percentile detection concentration was just 1.89 µg/L. *Id*. at A-15, JA480.

Finally, NRDC contends that sampling in Texas around the same time as the UCMR 1 showed more perchlorate detections, indicating that UCMR 1 underestimated perchlorate contamination. Pet. Br. at 60. That state sampling used a much lower minimum reporting level than the UCMR 1—1 µg/L rather than 4

µg/L—so comparing detection rates is comparing apples to oranges. *See* Occurrence Report Appx. A at A-24, JA489. Moreover, EPA already acknowledged that the UCMR 1 data could underestimate actual perchlorate occurrence in Texas because a substantial portion of Texas's large public water systems (12 of 32) failed to report their perchlorate results. Occurrence Report at 17, JA443. EPA noted, however, that all non-responsive large systems across the country, including those in Texas, serve only about 0.7% of the country's total population. *Id*.

In sum, available information supports EPA's decision to update the UCMR 1 dataset to account for new information showing declining perchlorate contamination. NRDC's petition for review should be denied.

## CONCLUSION

For the foregoing reasons, the court should deny the petition for review.

Respectfully submitted,

/s/ *Sarah A. Buckley*
TODD KIM
*Assistant Attorney General*

Of Counsel:                SARAH A. BUCKLEY
                          *Senior Attorney*
POOJA PARIKH              Environment and Natural Resources Division
*Attorney Advisor*        U.S. Department of Justice
U.S. Environmental Protection Agency

December 6, 2022

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,945 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY

Counsel for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2022, the foregoing EPA's

Final Response Brief has been served on all registered counsel through the Court's

electronic filing systems.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY

Counsel for Respondent

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 142.2 ........................................................................ADD 0001

**FEDERAL REGISTER**

64 Fed. Reg. 50556 (Jan. 4, 1999) ...............................................ADD 0004

74 Fed. Reg. 41883 (Aug. 19, 2009).......................................... ADD 0037

**LEGISLATIVE HISTORY**

S. Rep. No. 104-169 (1995) ........................................................ADD 0060

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 142. National Primary Drinking Water Regulations Implementation (Refs & Annos)
                    Subpart A. General Provisions

40 C.F.R. § 142.2

§ 142.2 Definitions.

Currentness

As used in this part, and except as otherwise specifically provided:

Act means the Public Health Service Act.

Administrator means the Administrator of the United States Environmental Protection Agency or his authorized representative.

Agency means the United States Environmental Protection Agency.

Approved State primacy program consists of those program elements listed in § 142.11(a) that were submitted with the initial State application for primary enforcement authority and approved by the EPA Administrator and all State program revisions thereafter that were approved by the EPA Administrator.

Contaminant means any physical, chemical, biological, or radiological substance or matter in water.

Federal agency means any department, agency, or instrumentality of the United States.

Indian Tribe means any Indian Tribe having a Federally recognized governing body carrying out substantial governmental duties and powers over a defined area.

Interstate Agency means an agency of two or more States established by or under an agreement or compact approved by the Congress, or any other agency of two or more States or Indian Tribes having substantial powers or duties pertaining to the control of pollution as determined and approved by the Administrator.

Maximum contaminant level means the maximum permissible level of a contaminant in water which is delivered to the free flowing outlet of the ultimate user of a public water system; except in the case of turbidity where the maximum permissible level is measured at the point of entry to the distribution system. Contaminants added to the water under circumstances controlled by the user, except for those resulting from corrosion of piping and plumbing caused by water quality are excluded from this definition.

Municipality means a city, town, or other public body created by or pursuant to State law, or an Indian Tribe which does not meet the requirements of subpart H of this part.

National primary drinking water regulation means any primary drinking water regulation contained in part 141 of this chapter.

Person means an individual; corporation; company; association; partnership; municipality; or State, federal, or Tribal agency.

Primary enforcement responsibility means the primary responsibility for administration and enforcement of primary drinking water regulations and related requirements applicable to public water systems within a State.

Public water system or PWS means a system for the provision to the public of water for human consumption through pipes or, after August 5, 1998, other constructed conveyances, if such system has at least fifteen service connections or regularly serves an average of at least twenty-five individuals daily at least 60 days out of the year. Such term includes:

Any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system; and any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system. Such term does not include any "special irrigation district." A public water system is either a "community water system" or a "noncommunity water system" as defined in § 141.2.

Sanitary survey means an onsite review of the water source, facilities, equipment, operation and maintenance of a public water system for the purpose of evaluating the adequacy of such source, facilities, equipment, operation and maintenance for producing and distributing safe drinking water.

Service connection, as used in the definition of public water system, does not include a connection to a system that delivers water by a constructed conveyance other than a pipe if:

(1) The water is used exclusively for purposes other than residential uses (consisting of drinking, bathing, and cooking, or other similar uses);

(2) The Administrator or the State exercising primary enforcement responsibility for public water systems, determines that alternative water to achieve the equivalent level of public health protection provided by the applicable national primary drinking water regulation is provided for residential or similar uses for drinking and cooking; or

(3) The Administrator or the State exercising primary enforcement responsibility for public water systems, determines that the water provided for residential or similar uses for drinking, cooking, and bathing is centrally treated or treated at the point of entry by the provider, a pass-through entity, or the user to achieve the equivalent level of protection provided by the applicable national primary drinking water regulations.

Special irrigation district means an irrigation district in existence prior to May 18, 1994 that provides primarily agricultural service through a piped water system with only incidental residential or similar use where the system or the residential or similar users of the system comply with the exclusion provisions in section 1401(4)(B)(i)(II) or (III).

State means one of the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Trust Territory of the Pacific Islands, or an eligible Indian tribe.

State primary drinking water regulation means a drinking water regulation of a State which is comparable to a national primary drinking water regulation.

State program revision means a change in an approved State primacy program.

Supplier of water means any person who owns or operates a public water system.

Treatment technique requirement means a requirement of the national primary drinking water regulations which specifies for a contaminant a specific treatment technique(s) known to the Administrator which leads to a reduction in the level of such contaminant sufficient to comply with the requirements of part 141 of this chapter.

**Credits**

[53 FR 37410, Sept. 26, 1988; 54 FR 52137, Dec. 20, 1989; 59 FR 64344, Dec. 14, 1994; 63 FR 23367, April 28, 1998]

SOURCE: 41 FR 2918, Jan. 20, 1976; 52 FR 20674, June 2, 1987; 52 FR 41550, Oct. 28, 1987; 53 FR 37410, Sept. 26, 1988; 54 FR 27537, June 29, 1989; 54 FR 52137, Dec. 20, 1989; 63 FR 44535, Aug. 19, 1998, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f, 300g–1, 300g–2, 300g–3, 300g–4, 300g–5, 300g–6, 300j–4, 300j–9, and 300j–11.

Current through Sept. 16, 2022, 87 FR 57135, except for 40 CFR § 52.220, which is current through Sept. 1, 2022. Some sections may be more current. See credits for details.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

64 FR 50556-01, 1999 WL 719398(F.R.)

RULES and REGULATIONS

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Parts 9, 141 and 142

[FRL-6433-1]

RIN 2040-AD15

Revisions to the Unregulated Contaminant Monitoring Regulation for Public Water Systems

Friday, September 17, 1999

**\*50556**  AGENCY: Environmental Protection Agency.

ACTION: Final rule.

SUMMARY: The Safe Drinking Water Act (SDWA), as amended in 1996, requires the U.S. Environmental Protection Agency (EPA) to establish criteria for a program to monitor unregulated contaminants and, by August 6, 1999, to publish a list of contaminants to be monitored. To conform to the Amendments, today EPA is promulgating the Unregulated Contaminant Monitoring Regulation (UCMR) for Public Water Systems (PWSs), which revises substantially the existing regulations for unregulated contaminant monitoring.

This final rule includes a list of contaminants to be monitored, procedures for selecting a representative nationwide sample of small PWSs that will be required to monitor, the frequency and schedule for monitoring, the sampling points, the approved analytical methods to be used, and procedures for entering the monitoring data in the National Drinking Water Contaminant Occurrence Database (NCOD), as required under section 1445 of SDWA, as amended. The data in the database will be used to identify contaminants on the Drinking Water Contaminant Candidate List (CCL), to support the Administrator's determination of whether or not to develop drinking water standards for a particular contaminant, and to develop standards for the contaminants that the Administrator selects.

DATES: Effective Date: The final rule is effective January 1, 2001.

For purposes of judicial review, this final rule is promulgated as on 1 p.m. Eastern time on October 1, 1999 as provided in 40 CFR 23.7.

The incorporation by reference of the publications listed in today's rule is approved by the Director of the Federal Register as of January 1, 2001.

ADDRESSES: Documents relevant to this action are available for inspection from 9 a.m. to 4 p.m. Monday through Friday, excluding legal holidays, at the Water Docket, East Tower Basement, U.S. EPA, 401 M Street, SW, Washington DC. For access to docket (Docket No. W-98-02) materials, please call (202) 260-3027 between 9 a.m. and 3:30 p.m, Eastern Time, Monday through Friday, to schedule an appointment. A reasonable fee may be charged for copying.

FOR FURTHER INFORMATION CONTACT: Charles Job, Standards and Risk Management Division, Office of Ground Water and Drinking Water (MC-4607), U.S. Environmental Protection Agency, 401 M Street, SW, Washington, D.C. 20460, (202) 260-7084. General information may also be obtained from the EPA Safe Drinking Water Hotline. Callers within the United States may reach the Hotline at (800) 426-4791. The Hotline is open Monday through Friday, excluding federal holidays, from 9:00 a.m. to 5:30 p.m. Eastern Time.

SUPPLEMENTARY INFORMATION:

**Regional Contacts**

I. Jane Downing, JFK Federal Bldg., Room 2203, Boston, MA 02203. Phone: 617-918-1571.

II. Bruce Kiselica, 290 Broadway, Room 2432, New York, NY 10007-1866. Phone: 212-637-3879.

III. Michelle Hoover, 1650 Arch Street, Philadelphia, PA 19103-2029. Phone: 215-814-5258.

IV. Janine Morris, 345 Courtland Street, NE, Atlanta, GA 30365. Phone: 404-562-9480.

V. Thomas Poleck, 77 West Jackson Blvd., Chicago, IL 60604-3507. Phone: 312-886-2407.

VI. Larry Wright, 1445 Ross Avenue, Dallas, TX 75202. Phone: 214-665-7150.

VII. Stan Calow, 726 Minnesota Ave., Kansas City, KS 66101. Phone: 913-551-7410.

VIII. Rod Glebe, One Denver Place, 999 18th Street, Suite 500, Denver, CO 80202. Phone: 303-312-6627.

IX. Bruce Macler, 75 Hawthorne Street, San Francisco, CA 94105. Phone: 415-744-1884.

X. Gene Taylor, 1200 Sixth Avenue, Seattle, WA 98101. Phone: 206-553-1389.

**Abbreviations and Acronyms Used in the Preamble and Final Rule**

2,4-DNT—2,4-dinitrotoluene

2,6-DNT—2,6-dinitrotoluene

4,4′-DDE—4,4′-dichloro dichlorophenyl ethylene, a degradation product of DDT

Alachlor ESA—alachlor ethanesulfonic acid, a degradation product of alachlor

AOAC—Association of Official Analytical Chemists

APHA—American Public Health Association

ASDWA—Association of State Drinking Water Administrators

ASTM—American Society for Testing and Materials

BGM—Buffalo Green Monkey cells, a specific cell line used to grow viruses

CAS—Chemical Abstract Service

CASRN—Chemical Abstract Service Registry Number

CCL—Contaminant Candidate List

CCR—Consumer Confidence Reports

CERCLA—Comprehensive Environmental Response, Compensation & Liability Act

CFR—Code of Federal Regulations

CFU—colony forming unit

CFU/mL—colony forming units per milliliter

CWS—community water system

DCPA—dimethyl tetrachloroterephthalate, chemical name of the herbicide dacthal

DCPA mono- and di-acid degradates—degradation products of DCPA

DDE—dichloro dichlorophenyl ethylene, a degradation product of DDT

DDT—dichloro diphenyl trichloroethane, a general insecticide

DNA—deoxyribonucleic acid

EDL—estimated detection limit

EPA—Environmental Protection Agency

EPTC—s-ethyl-dipropylthiocarbamate, an herbicide

EPTDS—Entry Point to the Distribution System

ESA—ethanesulfonic acid, a degradation product of alachlor

FACA—Federal Advisory Committee Act

FTE—full-time equivalent

GC—gas chromatography, a laboratory method

GLI method—Great Lakes Instruments method

GW—ground water

GWUDI—ground water under the direct influence (of surface water)

HPLC—high performance liquid chromatography, a laboratory method

ICR—Information Collection Request/Rule

IRFA—initial regulatory flexibility analysis

IMS—immunomagnetic separation

IRIS—Integrated Risk Information System

IS—internal standard

LLE—liquid/liquid extraction, a laboratory method

MAC—Mycobacterium avium complex

MOA—Memorandum of Agreement

MCL—maximum contaminant level

MDL—method detection limit

MRL—minimum reporting level

MS—mass spectrometry, a laboratory method

MSD—sample matrix spike duplicate

MTBE—methyl-tertiary-butyl-ether, a gasoline additive

NAWQA—National Water Quality Assessment Program

NCOD—National Drinking Water Contaminant Occurrence Database

NDWAC—National Drinking Water Advisory Council

NERL—National Environmental Research Laboratory

NPS—National Pesticide Survey

NTIS—National Technical Information Service

NTNCWS—non-transient non-community water system

NTTAA—National Technology Transfer and Advancement Act

OGWDW—Office of Ground Water and Drinking Water

OMB—Office of Management and Budget

PAH—Poly-aromatic hydrocarbon

PB—particle beam

PBMS—Performance-Based Measurement System

pCi/L—picocuries per liter

PCR—polymerase chain reaction  **50557**

$^{210}$Pb—Lead-210 (also Pb-210), a lead isotope and radionuclide; part of the uranium decay series

$^{210}$Po—Polonium-210 (also Po-210), a polonium isotope and radionuclide; part of the uranium decay series

PWS—Public Water System

PWSF—Public Water System Facility

QA—quality assurance

QC—quality control

RDX—royal demolition explosive, hexahydro-1,3,5-trinitro-1,3,5-triazine

RFA—Regulatory Flexibility Act

RPD—relative percent difference

RSD—relative standard deviation

SBREFA—Small Business Regulatory Enforcement Fairness Act

SD—standard deviation

SDWA—Safe Drinking Water Act

SDWIS—Safe Drinking Water Information System

SDWIS FED—the Federal Safe Drinking Water Information System

SM—Standard Methods

SMF—Standard Compliance Monitoring Framework

SMS—sample matrix spike

SOC—synthetic organic compound

SPE—solid phase extraction, a laboratory method

SRF—State Revolving Fund

STORET—Storage and Retrieval System

SW—surface water

TBD—to be determined

TNCWS—transient non-community water system

UCMR—Unregulated Contaminant Monitoring Regulation/Rule

UCM—Unregulated Contaminant Monitoring

UMRA—Unfunded Mandates Reform Act of 1995

USEPA—United States Environmental Protection Agency

UV—ultraviolet

VOC—volatile organic compound

MUg/L—micrograms per liter

**Preamble Outline**

I. Statutory Authority

II. Major Program Revisions

III. Regulatory Background

IV. Process of Preparing the Final Rule

V. Concise Description of Today's Action

A. Which Systems Must Monitor

B. System Monitoring Requirements

C. System Reporting Requirements

D. State and Tribal Participation

VI. Final Changes in the Unregulated Contaminant Monitoring Program

A. Revised List of Unregulated Contaminants to be Monitored

1. Criteria for Selecting Contaminants for the UCMR

(a) Revising the UCMR (1999) List

(b) Regulatory Approach for the UCMR (1999) List

(c) Analytical Methods Applicable to the UCMR (1999) List

(i) Chemical Analytical Methods

(ii) Microbiological Analytical Methods

2. List of Contaminants To Be Monitored

(a) Final UCMR (1999) List

(b) Number of Contaminants on the UCMR (1999) List

B. Public Water Systems Subject to the UCMR

C. Type of Monitoring Required of Public Water Systems Based on Listing Group

1. Assessment Monitoring

2. Screening Survey

3. Pre-Screen Testing

D. Monitoring Requirements Under the Final UCMR

1. Monitoring Frequency

(a) Systems Serving More Than 10,000 Persons

(i) Chemical Contaminants.

(ii) Microbiological Contaminants.

(b) Systems Serving 10,000 or Fewer Persons

2. Monitoring Time for Vulnerable Period

3. Monitoring Location

(a) Chemical Contaminants

(b) Microbiological Contaminants

4. Quality Control Procedures for Sampling and Testing

5. Monitoring of Routinely Tested Water Quality Parameters

6. Relation to Compliance Monitoring Requirements

7. Previous Monitoring of the Contaminants on the Final UCMR (1999) List

E. Waivers

1. Waivers for Systems Serving More than 10,000 Persons

2. Waivers for Small Systems in State Plans

F. Representative Sample of Systems Serving 10,000 or Fewer Persons

1. System Size

2. System Type

(a) Public Water System Monitoring

(b) Nontransient Non-Community Water Systems

(c) Transient Non-Community Systems

3. Geographic Location

4. Likelihood of Finding Contaminants

5. State Plans for the Representative Sample

(a) Representative State Plans

(b) Systems Selected for Pre-Screen Testing

(c) Tribal Water Systems

(d) "Index" Systems

(e) Other State Data

G. Reporting of Monitoring Results

1. Reporting Requirements (Data Elements)

2. Reporting to the Primacy Agency

3. Timing of Reporting

4. Method of Reporting

5. Public Notification of Availability of Results

VII. Section-by-Section Analysis of Public Comment and EPA Response

A. Section 141.35—Reporting of Unregulated Contaminant Monitoring Results

1. Does this reporting apply to me?

2. To whom must I report?

3. When do I report monitoring results?

4. What information must I report?

5. How must I report this information?

6. Can the laboratory to which I send samples report the results for me?

7. Can I report previously collected data to meet the testing and reporting requirements for the contaminants in §141.40(a)(3)?

B. §141.40—Monitoring Requirements for Unregulated Contaminants

1. Requirements for Owners and Operators of Public Water Systems

(a) Do I have to monitor for unregulated contaminants?

(b) How would I be selected for the monitoring under the State Monitoring Plan, the screening survey, or the pre-screen testing?

(c) For which contaminants must I monitor?

(d) What general monitoring requirements must I follow for List 1 monitoring?

(e) What specific sampling and quality control requirements must I follow for monitoring of List 1 contaminants?

(i) All systems

(ii) Large systems

(A) Timeframe

(B) Frequency

(C) Location

(D) Sampling instructions

(E) Testing and analytical methods

(F) Sampling deviations

(G) Testing

(iii) Small systems that are part of the State Monitoring Plan

(A) Frequency

(B) Location

(C) Sampling deviations

(D) Sample kits

(E) Sampling instructions

(F) Duplicate samples

(G) Sampling forms

(H) Sample submission

(f) What additional requirements must I follow if my system is selected as an Index system?

(g) What must I do if my system is selected for the Screening Survey or Pre-Screen Testing?

(h) What is a violation of this rule?

2. Requirements for State and Tribal Participation

(a) How can I as the director of a State or Tribal drinking water program participate in unregulated contaminant monitoring, including the State Monitoring Plan for small systems, and the Screening Survey and Pre-Screen Testing of all systems?

(b) What if I decide not to enter into an MOA?

(c) Can I add contaminants to the Unregulated Contaminant Monitoring List?

(d) Can I waive monitoring requirements?

C. Appendix A—Quality Control Requirements for Testing All Samples Collected

D. §142.15—Reports by States

E. §142.16—Special primacy requirements

VIII. General Issues From Public Comment and EPA Response

A. Data Quality

B. EPA Funding for Small System Testing

C. Lab Certification

D. Research

E. Regulation Format

F. Voluntary Data Submittal

IX. Other Changes Related to the Regulation

A. Implementation of the Rule

1. Setting an Effective Date.

2. Analytical Methods for the Testing Program.

3. Testing Program for Large Systems.

4. Testing Program for Small Systems.

5. Continued Development of Analytical Methods.

6. Determining the Representative National Sample and State Monitoring Plans.  **50558**

7. Specifying the Vulnerable Monitoring Period.

8. Conducting the Sampling.

9. Establishing Sampling Points.

10. Large Systems.

11. Systems in State Monitoring Plans.

12. Screening Survey.

13. Pre-Screen Testing.

14. Testing.

15. Reporting Requirements.

16. Record Keeping.

17. Previously Collected Data.

18. Modifying the Monitoring List.

B. Implementation in Indian Country

C. Performance-based Measurement System

X. Guidance Manuals

XI Costs and Benefits of the Rule

A. Program Cost Estimates

1. Assumptions: Assessment Monitoring

2. Estimated Average Annual Cost for 5-Year Program: Assessment Monitoring Only

B. Estimated Net Costs

C. Benefits

XII. Administrative Requirements

A. Executive Order 12866—Regulatory Planning and Review

B. Executive Order 13045—Protection of Children From Environmental Health Risks and Safety Risks

C. Unfunded Mandates Reform Act

D. Paperwork Reduction Act

E. Regulatory Flexibility Act

1. Full Assessment Monitoring Implementation Scenario

2. Limited Implementation Scenario

F. National Technology Transfer and Advancement Act

G. Executive Order 12898—Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

H. Federalism Executive Orders

I. Executive Order 13084—Consultation and Coordination with Indian Tribal Governments

J. Congressional Review Act

XIII. Public Involvement in Regulation Development

XIV. References

**Potentially Regulated Entities**

The regulated entities are public water systems. All large community and non-transient non-community water systems serving more than 10,000 persons are required to monitor. A community water system (CWS) means a public water system which serves at least 15 service connections used by year-round residents or regularly serves at least 25 year-round residents. Non-transient non-community water system (NTNCWS) means a public water system that is not a community water system and that regularly serves at least 25 of the same persons over 6 months per year. Only a national representative sample of community and non-transient non-community systems serving 10,000 or fewer persons would be required to monitor. Transient non-community systems (i.e., systems that do not regularly serve at least 25 of the same persons over six months per year) would not be required to monitor. States, Territories, and Tribes, with primacy to administer the regulatory program for public water systems under the Safe Drinking Water Act sometimes conduct analyses to measure for contaminants in water samples and are regulated by this action. Categories and entities potentially regulated by this action include the following:

| Category | Examples of potentially regulated entities | SIC |
| --- | --- | --- |
| State, Territorial and Tribal Governments | States, Territories, and Tribes that analyze water samples on behalf of public water systems required to conduct such analysis; States, Territories, and Tribes that themselves operate community and non-transient non-community water systems required to monitor | 9511 |
| Industry | Private operators of community and non-transient non-community water systems required to monitor | 4941 |

| Municipalities | Municipal operators of community and non-transient non-community water systems required to monitor | 9511 |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this action. This table lists the types of entities that EPA is now aware of that could potentially be regulated by this action. Other types of entities not listed in the table could also be regulated. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the preceding FOR FURTHER INFORMATION CONTACT section.

## I. Statutory Authority

SDWA section 1445(a)(2), as amended in 1996, requires EPA to establish criteria for a program to monitor unregulated contaminants and to publish, by August 6, 1999, a list of contaminants to be monitored. To meet these requirements, today's rule EPA substantially revises the existing Unregulated Contaminant Monitoring (UCM) Program, which is codified at 40 CFR 141.40. This final rule revises the regulations at 40 CFR 9.1, 141.35, 141.40, 142.16 and deletes and reserves 142.15(c)(3). The rule covers: (1) the frequency and schedule for monitoring, based on PWS size, water source, and likelihood of finding contaminants; (2) a new, shorter list of contaminants for which systems will monitor; (3) procedures for selecting and monitoring a nationally representative sample of small PWSs (those serving 10,000 or fewer persons), and; (4) procedures for entering the monitoring data in the National Drinking Water Contaminant Occurrence Data Base (NCOD), as required under section 1445.

## II. Major Program Revisions

Since its inception in 1988, the UCM Program has collected occurrence data to help EPA determine which contaminants EPA should regulate based on contaminant concentrations in PWSs and the contaminants' adverse health effects levels. Today's rule is designed to improve and enhance this program in several important ways:

(1) A statistical approach to select only 800 representative systems for monitoring from the national total of 65,600 small systems reduces the monitoring burden of the water supply industry; the burden on small systems is significantly further reduced in that EPA will pay for virtually all of the costs associated with monitoring for the small systems that are part of the representative sample;

(2) A smaller number of contaminants to be monitored also reduces the testing and reporting burden of the water industry overall;

(3) The required information to be reported about each contaminant has been refined to improve the data quality for regulatory decisions; and

(4) Direct reporting of data for regulatory determination and development from systems to EPA reduces State reporting burden, and the opportunity for electronic reporting reduces the potential for data entry and submission.

A three-tier monitoring approach allows monitoring to start promptly for contaminants with approved analytical methods, while accommodating the need to delay implementation for contaminants needing further methods development. The rule also allows use of a State-EPA Memorandum of **50559** Agreement, providing direct implementation in each State rather than implementation through primacy revisions, to address the three-tiered approach of the UCMR.

This program is a cornerstone of the "sound science" approach to future drinking water regulations, which is a goal of the 1996 SDWA Amendments. Data generated by this final rule will be used to: (1) evaluate and prioritize contaminants on the Contaminant Candidate List (CCL) and refine the CCL; (2) support the Administrator's determination of whether to regulate a contaminant under the drinking water program; and, (3) support the development of drinking water regulations.

In a related, cost-savings action, EPA published a Direct Final Rule (64 FR 1494) on January 8, 1999, suspending the monitoring requirements in effect for small systems serving 10,000 or fewer persons. The third round of monitoring by small systems under the existing list of unregulated contaminants would have overlapped with the monitoring required under this final rule. The Direct Final Rule saved small systems and States the cost of unnecessary monitoring. EPA believes it obtained sufficient data from the previous monitoring rounds to make decisions concerning the occurrence of the unregulated contaminants on its prior monitoring list for these systems. Large systems were not included in this Direct Final Rule since they had already begun the third round of monitoring in January 1998. This large system monitoring will provide confirming information on the occurrence of those contaminants. However, this final regulation cancels further monitoring by large systems for the existing list of contaminants effective January 1, 2001. Until that date, large systems must continue to monitor for the 48 contaminants listed in 40 CFR 141.40 (and also listed in Table 1 of "Revisions to the Unregulated Contaminant Monitoring Regulation for Public Water Systems," Federal Register, vol. 64, no. 83, April 30, 1999, p. 23401 (64 FR 23401)).

## III. Regulatory Background

The requirements for unregulated contaminant monitoring were first established by the 1986 SDWA Amendments. Under this law, EPA implemented the drinking water standards in phases, with each phase having a set of contaminants for which maximum contaminant levels in drinking water were established. The phases also included unregulated contaminants for which more information was needed before decisions could be made regarding regulation of the contaminants. EPA included unregulated contaminant monitoring requirements in the Phase I chemical regulation, under 40 CFR 141.40(a)-(e). The Phase II regulation later superceded the Phase I rule, and some of the Phase I unregulated contaminants became regulated under Phase II. Additional contaminants were also added to the list of unregulated contaminants. The Phase V chemical regulation further modified the list of contaminants, as additional unregulated contaminants became regulated.

The basic monitoring and reporting requirements for unregulated contaminants were the same under the Phase I, Phase II, and Phase V regulations. PWSs were required to report their monitoring results to the primacy agencies (either the State or EPA), with States, in turn, reporting to EPA. Only systems serving fewer than 150 service connections were exempt from monitoring —provided they made their facilities available for monitoring by the States. Repeat monitoring was required every 5 years.

Section 125 of the 1996 SDWA Amendments substantially revised unregulated contaminant monitoring program. The new program includes: (1) a new list of contaminants (i.e., the Unregulated Contaminant Monitoring Regulation (UCMR) (1999) List; (2) a representative sample of PWSs serving 10,000 or fewer persons to monitor; (3) placement of the monitoring data in the NCOD, and; (4) notification of consumers that the monitoring results are available.

The 1996 amendments limit the number of contaminants to be monitored on the UCMR list to a maximum of 30. The amendments specify that only a representative sample of small systems are required to monitor, and that EPA must pay the reasonable costs of analyzing the samples taken by those systems. EPA will use the data generated by this monitoring effort in the development of future drinking water regulations.

Today's final rule will completely replace the requirements of the existing rule on the final rule's effective date of January 1, 2001. The existing requirements of 40 CFR 141.35 and 141.40 still apply to large systems serving more than 10,000 persons, (since their third round of monitoring had begun in January 1998) until January 1, 2001, as noted above in II. Major Program Revisions.

## IV. Process of Preparing the Final Rule

EPA has been developing the final revisions to the Unregulated Contaminant Monitoring Regulation (UCMR) for public water systems since 1997. In December, 1997, EPA's UCMR development workgroup held a stakeholders meeting to obtain input from the public on major issues and options affecting the program and emanating from the Safe Drinking Water Act, as amended in 1996. EPA held a second stakeholders meeting in May 1998, on options under serious consideration for the UCMR. EPA engaged eleven external expert reviewers from March 1 through April 22, 1999 to examine and comment on the technical aspects

of the proposed rule. These technical reviewers evaluated and commented on the chemical and microbiological contaminant analytical methods and reporting requirements, the statistical approach for the representative sample of small systems, and the sampling and monitoring approach. The comments of the technical reviewers were available to the public through the official docket and on the Internet through EPA's Office of Ground Water and Drinking Water electronic homepage.

EPA published the proposed rule in the Federal Register on April 30, 1999, for public comment. The comment period closed on June 14, with submissions from 39 commenters meeting the deadline and addressing all major aspects of the proposed regulation. EPA received one hundred sixteen comments after the public comment period closed, principally concerning the inclusion of perchlorate on the UCMR monitoring list. EPA considered and addressed all comments in the process of developing this final regulation.

## V. Concise Description of Today's Action

### A. Which Systems Must Monitor

Owners and operators of community and non-transient noncommunity water systems must monitor for unregulated contaminants if they serve more than 10,000 persons or if they are part of the representative sample of small systems serving 10,000 or fewer persons that will be randomly selected to monitor for these contaminants. Transient systems are not required to monitor for unregulated contaminants. Only purchased water systems that are identified by EPA or the State to sample at locations of low disinfectant residual or longest residence time are required to monitor for distribution system contaminants.
 **\*50560**

### B. System Monitoring Requirements

The contaminants included in this action are: 2,4-dinitrotoluene, 2,6-dinitrotoluene, DCPA mono acid degradate, DCPA di acid degradate, 4,4′-DDE, EPTC, molinate, MTBE, nitrobenzene, terbacil, acetochlor, and perchlorate. Systems must also analyze for water quality parameters including, for chemical contaminants: pH; and for microbiological contaminants: pH, temperature, turbidity, free disinfectant residual and total disinfectant residual. Surface water systems must monitor during four consecutive quarters. Ground water systems must monitor two times five to seven months apart. One sampling event for surface and ground water systems must be during the vulnerable time of May 1 to July 31, or during an alternate vulnerable time selected by the State. Monitoring must be conducted at the entry point to the distribution system, or at other sampling locations previously specified by the State for compliance monitoring, for sampling points representative of each principal, non-emergency water source in use over the one year of monitoring. Large and small systems must monitor according to the quality control procedures described. Laboratories that are certified to use the indicated methods for the contaminants listed are automatically certified to analyze for unregulated contaminants. Small systems that are part of the representative sample which become part of State Monitoring Plans must follow instructions given them for unregulated contaminant sampling and shipment to the designated laboratory.

### C. System Reporting Requirements

After testing for the contaminants on the monitoring list, the systems must report the results electronically to, or in an alternate format previously arranged with, EPA within 30 days following the month they receive the results. EPA will report the results for the small systems that are selected to be part of the State Monitoring Plans. EPA will hold the data for 60 days to allow for quality control review by systems and States before placing the data in the National Drinking Water Contaminant Occurrence Database.

Data required to be reported include: Public Water System (PWS) Identification Number; Sample Identification Number; Sample Collection Date; Contaminant/Parameter; Analytical Results—Sign; Analytical Result—Value; Analytical Result—Unit of Measure; Analytical Method Number; Public Water System Facility Identification Number—Source, Treatment Plant and Sampling Point; Sample Analysis Type; Detection Level; Detection Level Unit of Measure; Batch Identification Number; Spiking Concentration; Analytical Precision; Analytical Accuracy; Presence/Absence.

A system can have a laboratory report the results for it, but the system retains the responsibility for reporting. A system can report previously collected data as long as the data meet the requirements specified in 40 CFR 141.40(a) (3), (4), (5) and Appendix A and include the applicable water quality parameters and data listed previously that are required to be reported.

### D. State and Tribal Participation

States and Tribes can enter into a Memorandum of Agreement (MOA) with the EPA concerning the implementation of the monitoring program. The MOA must address the following: accepting or modifying the State Monitoring Plan for small systems, determining an alternate vulnerable time, modifying the timing of monitoring, identifying sampling points for small systems, notifying small and large systems of their monitoring responsibilities, and providing instructions to systems. A State can remove a system from the State Monitoring Plan, after EPA review, as long as removal is not based on prior information on the occurrence or non-occurrence of contaminants at the system or the vulnerability of the system to the contaminants. States can decide not to participate in an MOA, in which case the EPA will establish a State Monitoring Plan. The governors of seven or more States can petition EPA to add contaminants to the monitoring list. States can apply to EPA to waive monitoring for large systems if they can demonstrate that the contaminants for which a monitoring waiver is sought have not occurred in the State in the past 15 years.

## VI. Final Changes in the Unregulated Contaminant Monitoring Program

### A. Revised List of Unregulated Contaminants To Be Monitored

#### 1. Criteria for Selecting Contaminants for the UCMR

#### (a) Revising the UCMR (1999) List

Section 1445(a)(2)(B) requires EPA to list not more than 30 unregulated contaminants to be monitored by public water systems. EPA used the 1998 Contaminant Candidate List (CCL), established under section 1412(b)(1)(B) of SDWA, as the primary basis for selecting contaminants for future monitoring under the UCMR. Development of the CCL is discussed in the preamble to the proposed rule at 64 FR 23402. EPA believes, and nearly all public commenters addressing the use of the CCL as the basis for the UCMR List indicated, that the CCL process already uses the best available information on contaminants of concern and emerging contaminants that may need regulation. SDWA section 1445 (a)(2)(B)(ii) provides for the governors of seven or more States to petition the Agency to add contaminants to the UCMR List. This petition process allows for the flexibility to include contaminants that are emerging as concerns between the five-year listing cycles.

The CCL lists 26 chemical and 8 microbiological contaminants as occurrence priorities because additional data on their occurrence in drinking water are needed to help decide whether they should be regulated. The proposed rule did not address the two contaminants identified in the preparation of the CCL as highly localized in occurrence: perchlorate and RDX (hexahydro-1,3,5-trinitro-1,3,5-triazine). EPA now has information indicating that the occurrence of these contaminants is more widespread than originally thought. In response to this information, some of which was provided in public comments, EPA has added perchlorate and RDX to the final UCMR (1999) List. Perchlorate was added to the UCMR (1999) List because EPA feels that there is enough information on its occurrence in public water systems to warrant its inclusion in a national monitoring program. Since it was not included on the proposed UCMR (1999) List, EPA did not take comment on its analytical method, minimum reporting level, or sampling location. EPA is currently engaged in final validation of an analytical method for perchlorate. This validation is important because earlier analytical methods did not make adjustments for interferences from sulfate and chloride, thus reducing or eliminating detected concentrations. EPA feels that with this validation, the analytical method should be sufficiently ready for monitoring, and thus EPA has included perchlorate on the UCMR List 1. EPA plans to publish, for public comment, the analytical method, minimum reporting level, and sampling location for perchlorate shortly after the promulgation of this final rule. RDX now appears on UCMR (1999) List 2, indicating that additional information is available, and initial monitoring of occurrence in public water systems should occur but that its method needs further refinement.  *50561

Additionally, based on technical peer review and public comments, EPA moved Aeromonas from UCMR (1999) List 1 to UCMR (1999) List 2 in Table 1, because its analytical method is not expected to be validated until 2000 or 2001. Also, in response to public comments that the Agency include as many contaminants that could be tested under the same multi-analyte method as possible in Assessment Monitoring, EPA moved acetochlor to List 1 from List 2. This action is based on information that only minor refinements are needed in the method and those can be resolved before the effective date of today's rule. As a result, the analytical method is reserved until the details of the method are resolved. EPA plans to publish a revision to this final rule to approve an analytical method for acetochlor shortly after this rule's promulgation. EPA will likely publish a joint request for public comment on the analytical methods for perchlorate and acetochlor. EPA intends to approve and publish the methods as early as possible to allow monitoring to begin on January 1, 2001, and to allow for the reporting of any data obtained prior to January 1, 2001 to meet the requirements of this final Rule.

For the remaining contaminants on the CCL Occurrence Priorities List, EPA has evaluated the availability of analytical methods published by EPA or voluntary consensus standards organizations, such as the American Society for Testing and Materials (ASTM) and Standard Methods (SM). In addition, EPA prioritized analytical methods development activities for those compounds and microorganisms for which suitable analytical methods are not currently available. As listed in List 1 of Table 1, EPA identified 10 of the 12 listed chemical contaminants for which analytical methods are now available. UCMR (1999) List 1 contaminants are those for which monitoring is required under today's Rule, with the added note that analytical methods have yet to be approved for perchlorate and acetochlor. UCMR (1999) List 2 of Table 1 lists 16 contaminants for which analytical methods are being refined: 14 chemical contaminants, Aeromonas (a microorganism), and polonium-210 (discussed in Table 1). UCMR (1999) List 3 of Table 1 identifies seven microbiological contaminants and lead-210 for which analytical methods are being researched. Monitoring for contaminants on UCMR (1999) Lists 2 and 3 is not required until EPA promulgates revisions to this rule to specify analytical methods and related sampling requirements for them.

EPA requested comment on the addition to the UCMR (1999) List of two naturally occurring radionuclides with health concerns at low levels, lead-210 (pb-210), and polonium-210 (po-210). Both nuclides are in the uranium decay series, which also includes radium-226 and radon-222. Lead-210, with a half-life of 22 years, and one of its degradates, polonium-210, with a half-life of 138 days, have been found in drinking water. EPA is aware of the occurrence of these contaminants in shallow aquifers in Florida (Harada, et al., 1989; Upchurch, 1991), and in at least two other States. Because of potential occurrence, consequent health risks, and in response to public comments, EPA has added polonium-210 and lead-210 to the UCMR (1999) List and has placed them on Lists 2 and 3 respectively.

### (b) Regulatory Approach for the UCMR (1999) List

EPA establishes in §141.40(a)(3) that the contaminants listed in Lists 1-3 comprise the UCMR (1999) List, categorized based on the availability of analytical methods. UCMR (1999) List 1 is the basis for Assessment Monitoring. Assessment Monitoring will occur at all 2,774 large community and non-transient non-community public water systems serving more than 10,000 persons and at a representative sample of approximately 800 systems serving 10,000 or fewer persons identified in State Monitoring Plans. UCMR (1999) List 2 will be the basis for two Screening Surveys of approximately 300 systems each, statistically selected from those systems required to conduct Assessment Monitoring. UCMR (1999) List 3 will be used for Pre-Screen Testing at up to 200 systems selected because of their potential vulnerability to the specific contaminants. This monitoring approach is described in detail under Section VI.C, "Type of Monitoring Required of Public Water Systems Based on Listing Group." Assessment Monitoring (and associated "Index system" monitoring) is the only monitoring that would be required by today's action. This includes contaminants for which EPA expects to have developed analytical methods before implementation: perchlorate and acetochlor.

For contaminants on UCMR (1999) List 2 for which analytical methods are developed by the time of initial monitoring in 2001, EPA will amend this rule to require the first Screening Survey to be conducted at selected systems. For those contaminants on List 2 and List 3 that do not have well developed methods by the time of initial monitoring in 2001, EPA will issue a revision to this regulation to activate monitoring for them at the time when the methods are considered implementable, up to the limit of 30 contaminants to be monitored within the five-year contaminant listing cycle. Monitoring for those contaminants will then begin

at a date specified in that prospective regulation. Therefore, monitoring of contaminants on UCMR (1999) Lists 2 and 3 is not required by today's action. Monitoring of these contaminants will only occur when EPA publishes a revision to this regulation specifying the analytical methods to be used and the period during which monitoring is to be completed.

**(c) Analytical Methods Applicable to the UCMR (1999) List**

The UCMR (1999) List development process focuses primarily on the availability of analytical methods for the listed contaminants and the level of information available for them at the time of its development. The discussion below highlights analytical method considerations in listing the contaminants for monitoring. Only the contaminants identified on UCMR (1999) List 1, will be monitored as a result of today's action, with the exceptions of perchlorate and acetochlor, for which analytical methods have yet to be approved. Contaminants on UCMR (1999) Lists 2 and 3 are included on the final UCMR (1999) List, but will not be activated for monitoring until EPA proposes and promulgates analytical methods that can be used to reliably measure their occurrence in drinking water. At that time, EPA will propose regulations for the monitoring of UCMR (1999) List 2 and 3 contaminants.

**(i) Chemical Analytical Methods**

The ability to correctly identify a chemical contaminant is directly related to the type of chemical and the analytical method used. Compounds such as disinfection byproducts are far less likely to be misidentified than pesticides because they are typically present at relatively high concentrations in disinfected waters, while pesticides are much less likely to occur, or occur at lower concentrations. The analytical method selected will determine the accuracy of the qualitative identification. In general, the most reliable qualitative identifications will come from methods that use mass spectral data for contaminant identification. However, these methods are typically less sensitive than methods that rely on less selective detectors.

**\*50562** Before EPA establishes a Maximum Contaminant Level (MCL), the Agency relies on an analytical method suitable for routine monitoring. It is likely that analytical methods in general use by laboratories performing drinking water analyses may not exist for some of the final compounds to be measured in the UCMR program. Complex analytical methods or methods requiring special handling often require more experienced laboratories than the laboratories performing routine compliance monitoring. Even when analytical methods that are in general use by analytical laboratories are available, limiting the analyses to a small number of laboratories operating under strict quality control requirements improves the precision and accuracy of the analyses, thereby increasing the usefulness of the data.

The option favored by many stakeholders for conducting the chemical laboratory analyses and made final today by EPA is the following:

For PWSs serving more than 10,000 people, the PWS is responsible for sample collection and analyses for Assessment Monitoring. This monitoring may be conducted at the same time as the required compliance monitoring, to the extent possible. For Assessment Monitoring, however, EPA requires in §141.40(a)(3) and §141.40 Appendix A, quality control procedures for both sampling and testing to ensure that the data collected under this regulation are of sufficient quality to meet the requirements of the related regulatory decisions. Thus, today's action specifies the analytical methods and procedures to be used in obtaining these data. The sampling and associated quality control requirements cover time frame, frequency, sample collection and submission, and review and reporting of results. The laboratory analytical quality control requirements address the use of a certified laboratory, sample collection/preservation, analytical methods, method detection limits, calibration, quality control samples, method performance tests, detection confirmation, and reporting. PWSs serving 10,000 or fewer persons must send their Assessment Monitoring samples to laboratories designated by EPA, since the Agency must pay for the reasonable costs of testing.

The purpose of the quality control requirements is to ensure that, since EPA will only be able to obtain results from 3,574 systems (2,774 large systems and a representative sample of 800 systems from 65,600 systems serving 10,000 or fewer persons), the Agency obtains the most reliable data possible. EPA is specifying the use of certain analytical methods that are currently

available for monitoring (see Table 3, UCMR (1999) List, column 3). While these methods are routinely used by commercial and public water system laboratories (including some that are currently used for compliance monitoring), they have not been routinely used for the contaminants on the UCMR (1999) List. Note that, as shown in §141.40(a)(3), Table 1, methods other than those that EPA has developed may be approved for use, but quality control procedures must also be followed, as specified in §141.40(a)(3), (4) and (5), and Appendix A.

For the compounds included in this regulation, the following summary, Table 1, Status of Analytical Methods for Chemical Contaminants on the UCMR (1999) List, presents a brief overview of methods availability for each chemical contaminant.

### Table 1.—Status of Analytical Methods for Chemical Contaminants on the UCMR (1999) List

|  | CAS No. | Analytical methods | Status of availability |
|---|---|---|---|
| UCMR (1999) List 1—Chemical Contaminant | | | |
| 2,4-dinitrotoluene | 121-14-2 | EPA 525.2 | Method is adequate for monitoring. |
| 2,6-dinitrotoluene | 606-20-2 | EPA 525.2 | Method is adequate for monitoring. |
| 4,4'-DDE | 72-55-9 | EPA 508 | Methods are adequate for monitoring. |
|  |  | EPA 508.1 |  |
|  |  | EPA 525.2 |  |
|  |  | D5812-96 |  |
|  |  | AOAC 990.06 |  |
| Acetochlor | 34256-82-1 | In validation process | EPA anticipates that this compound can be added to the scope of EPA Method 525.2. |
| DCPA di acid degradate | 2136-79-0 | EPA 515.1 | No method is available to measure the mono and di acid forms separately. All of the approved methods identify total mono and di acid forms. |
|  |  | EPA 515.2 |  |
|  |  | D5317-93 |  |
|  |  | AOAC 992.32 |  |
| DCPA mono acid degradate | 887-54-7 | EPA 515.1 | No method is available to measure the mono and di acid forms separately. All of the approved methods identify total mono and di acid forms. |
|  |  | EPA 515.2 |  |

|  |  |  |  |
|---|---|---|---|
|  |  | D5317-93 |  |
|  |  | AOAC 992.32 |  |
| EPTC | 759-94-4 | EPA 507 | Methods are adequate for monitoring. |
|  |  | EPA 525.2 |  |
|  |  | D5475-93 |  |
|  |  | AOAC 991.07 |  |
| Molinate | 2212-67-1 | EPA 507 | Methods are adequate for monitoring. |
|  |  | EPA 525.2 |  |
|  |  | D5475-93 |  |
|  |  | AOAC 991.07 |  |
| MTBE | 1634-04-4 | EPA 524.2 | Methods are adequate for monitoring. |
|  |  | D5790-95 |  |
|  |  | SM6210D |  |
|  |  | SM6200B |  |
| Nitrobenzene | 98-95-3 | EPA 524.2 | Methods are adequate for monitoring. |
|  |  | D5790-95 |  |
|  |  | SM6210D |  |
|  |  | SM6200B |  |
| Perchlorate | 14797-73-0 | In validation process | EPA is currently conducting analytical methods development to support the analyses of perchlorate. This new method will be based on the currently available ion chromatography methods, but will include a criteria detailing when a laboratory must perform a sample clean-up procedure to minimize the impact of elevated concentrations of chloride, sulfate or other dissolved solids. |
| Terbacil | 5902-51-2 | EPA 507 | Methods are adequate for monitoring. |

EPA 525.2

D5475-93

AOAC 991.07

UCMR (1999) List 2—
    Chemical Contaminant

| | | | |
|---|---|---|---|
| 1,2-diphenylhydrazine | 122-66-7 | In development | Some methods evaluated but inadequate for monitoring. Priority for analytical method development. EPA anticipates that contaminant will be added to the scope of EPA Method 525.2. |
| 2,4,6-trichlorophenol | 88-06-2 | In development | EPA Method 552 evaluated but subject to false positives from interferences of the derivitized byproduct of the contaminant. EPA anticipates that contaminant will be included in a new SPE/GC/MS method currently under development. |
| 2,4-dichlorophenol | 120-83-2 | In development | EPA Method 552 evaluated but subject to quantitative uncertainty due to inadequate derivatization of the contaminant. EPA anticipates that contaminant will be included in a new SPE/GC/MS method currently under development. |
| 2,4-dinitrophenol | 51-28-5 | In development | Some methods evaluated but inadequate for monitoring. EPA anticipates that contaminant will be included in a new SPE/GC/MS method currently under development. |
| 2-methylphenol | 95-48-7 | In development | Some methods evaluated but inadequate for monitoring. EPA anticipates that contaminant will be included in a new SPE/GC/MS method currently under development. |
| Alachlor ESA and degradation byproducts of acetanilide pesticides | ........................... | To be determined | EPA is evaluating which specific contaminants will be included within this group of compounds. Analytical methods will be determined for the targeted contaminants. |
| Diazinon | 333-41-5 | In development | Diazinon is listed as a contaminant in several EPA and voluntary consensus standard |

| | | | |
|---|---|---|---|
| | | | organization methods but it is subject to rapid aqueous degradation. Preservation research currently being conducted to develop a preservation technique that would permit adding this compound to EPA Method 525.2. |
| Disulfoton | 298-04-4 | In development | Disulfoton is listed as a contaminant in several EPA and voluntary consensus standard organization methods but it is subject to rapid aqueous degradation. Preservation research currently being conducted to develop a preservation technique that would permit adding this compound to EPA Method 525.2. |
| Diuron | 330-54-1 | In development | While this compound is included in the scope of NPS Method 4 (LLE/HLPC/UV) and EPA Method 553 (SPE/HPLC/MS), these methods are not adequate for this monitoring. EPA anticipates that this compound can be included in a new SPE/HPLC/UV method currently being developed. |
| Fonofos | 944-22-9 | In development | Fonofos is listed as a contaminant in several EPA and voluntary consensus standard organization methods but it is subject to rapid aqueous degradation. Preservation research is currently being conducted to develop a preservation technique that would permit adding this compound to EPA Method 525.2. |
| Linuron | 330-55-2 | In development | While this compound is included in the scope of NPS Method 4 (LLE/HLPC/UV) and EPA Method 553 (SPE/HPLC/MS), these methods are not adequate for this monitoring. EPA anticipates that this compound can be included in a new SPE/HPLC/UV method currently being developed. |
| Polonium-210 ($^{210}$Po) | 13981-52-7 | In development | Radiochemistry laboratory capacity is limited. |

| Prometon | 1610-18-0 | In development | Prometon is listed as a contaminant in several EPA and voluntary consensus standard organization methods but it is subject to rapid aqueous degradation in non-acidified samples and is not readily extracted in acidified samples. Preservation research is currently being conducted to add neutralizing the pH of acidified samples just prior to extraction. This would permit adding this compound to EPA Method 525.2. |
| RDX | 121-82-4 | In development | No EPA or consensus methods organization analytical methods for the analysis of RDX in water are currently available. |
| Terbufos | 13071-79-9 | In development | Terbufos is listed as a contaminant in several EPA and voluntary consensus standard organization methods but it is subject to rapid aqueous degradation. Preservation research is currently being conducted to develop a preservation technique that would permit adding this compound to EPA Method 525.2. |
| UCMR (1999) List 3—Chemical Contaminant | | | |
| Lead-210 ($^{210}$Pb) | 14255-04-0 | In development | Method is time-consuming and expensive. Radiochemistry laboratory capacity is limited. |

**\*50564  (ii) Microbiological Analytical Methods**

The discussion of data quality for chemical analytical methods also applies to microbiological testing when analytical methods are developed for CCL microorganisms. When microorganisms were proposed for the CCL, EPA recognized that analytical methods were not well developed for the majority of them. Because of the lack of available analytical methods, some of the CCL microorganisms were grouped either into one category where information was available about methodologies indicating a need to further refine them, or another category where more research, including research on detection methods and occurrence, was needed. At the present time, and based on technical peer review and public comment, Aeromonas is the only one of the microorganisms for which more occurrence data are needed that also has an analytical method likely to be sufficiently developed for monitoring in time for implementation of the Screening Surveys. Three other microorganisms have methods available, but are in need of further methods development. These microorganisms (Cyanobacteria, Echoviruses, and Coxsackieviruses) may be candidates for the Screening Surveys if methods development proceeds expeditiously (§141.40(a)(3), Table 1, List 2), but are currently identified for Pre-Screen Testing (Table 1, List 3). The remaining four microorganisms currently lack satisfactory methods and will be evaluated for Pre-Screen Testing.

Several microorganisms on the CCL are actually groups of microorganism taxa. In some cases, the taxa have so many members that, given the limited resources available for UCMR monitoring, EPA may have to prioritize which strains, species, or serotypes are the most important to consider and target those for monitoring or further study. Decisions will have to be made on the basis of health risk, disinfection resistance, occurrence in water, and other factors. To address the need to prioritize which microorganisms should be targeted for monitoring, EPA's Office of Research and Development is assisting the Office of Ground Water and Drinking Water in establishing a research program for health effects, treatment, and analytical methods.

**Table 2.—Status of Analytical Methods for Microbiological Contaminants on the UCMR (1999) List**

|  | Availability of analytical method | Status of availability |
|---|---|---|
| List 2—Microbiological Contaminant | | |
| Aeromonas | Analytical method likely to be available for monitoring | Current modification and evaluation of a published membrane filtration method (Havelaar et al., 1987) indicates that this method will be suitable for the monitoring program. |
| List 3—Microbiological Contaminant | | |
| Cyanobacteria (blue-green algae, other freshwater algae and their toxins) | Methods available but not standardized | Methods are available for counting cyanobacteria but new, standardized methods are needed for direct counts of targeted species with filtration methods or a counting chamber. Standardized analytical methods are also needed to detect the more important cyanobacterial toxins. |
| Echoviruses | Methods available but not standardized | Echoviruses can be cultured on BGM cells and detected by the ICR method but require supplemental methods such as serological typing to distinguish echoviruses from other viruses. Cost of cell culture assays plus serotyping can be high. RT/PCR methods are subject to interferences and do not demonstrate infectivity. Combined cell culture and PCR, which demonstrates infectivity, may be considered. |
| Coxsackieviruses | Methods available but not standardized | Group B coxsackieviruses are easy to grow in tissue culture but group A coxsackievirus detection in cell culture is variable. Culturable coxsackieviruses can be detected with the ICR method but serological typing is needed to distinguish coxsackieviruses from other viruses. RT/PCR methods are subject to interferences and do not demonstrate infectivity. New, standardized methods are needed. Combined cell culture and PCR methods may be considered. |

| | | |
|---|---|---|
| Helicobacter pylori | No suitable method currently available | Helicobacter pylori is difficult to cultivate because of its slow growth rate and the need for a low oxygen environment. No selective medium exists that will discriminate H. pylori from background bacteria. A culture-based method that demonstrates viability is preferred. Methods are needed for selective growth and identification. IMS has been used to concentrate Helicobacter pylori. Methods using PCR alone have been used but have not been validated by EPA. In general, PCR methods are not preferred due to interferences and their inability to demonstrate viability. A combined cultural and molecular method may be considered. |
| Microsporidia | No suitable method currently available | No methods are available for the monitoring of the two species of human microsporidia which may have a waterborne route of transmission [Enterocytozoon bienuesi and Encephalitozoon (formerly Septata) intestinalis]. Spores could possibly be detected by methods similar to those being developed for Cryptosporidium parvum. Potential methods may utilize water filtration, clean-up with IMS, and detection using microscopy with either fluorescent antibody or gene probe procedures. Provided that procedures are validated by EPA, reverse-transcriptase (RT)—PCR techniques may be considered for monitoring, although PCR methods in general are not preferred at this time due to interferences and their inability to demonstrate viability. Due to the small size of microsporidia, problems could be encountered during filtration. |
| Adenoviruses | No suitable method currently available | Adenoviruses serotypes 1 to 39 and 42 to 47 can be grown in tissue culture but enteric adenoviruses 40 to 41 are difficult to grow. Several selective tissue culture methods and detection methods have been reported. A selective, standardized method is needed for monitoring. PCR methods are not preferred, as they are subject to interferences and do not demonstrate infectivity. A combined cell culture and PCR method may be considered. |
| Caliciviruses | No suitable method currently available | No tissue culture methods exist for the two genogroups of caliciviruses on the |

CCL (the Norwalk-like and the Snow Mountain-like agents). No sensitive or fully developed detection methods exist. PCR methods are not preferred, as they are subject to interferences and do not demonstrate infectivity. A combined cell culture and PCR method may be considered if a suitable cell line is found.

*50565  **2. List of Contaminants To Be Monitored**

**(a) Final UCMR (1999) List**

Section 141.40 (a)(3) Table 1, Unregulated Contaminant Monitoring Regulation (1999) List, presents EPA's list of unregulated contaminants for monitoring under Section 1445(a)(2)(B)(i) of the 1996 Amendments for the first five-year listing cycle. The monitoring program for these contaminants is a three-tiered approach based on the availability of information about each contaminant and the availability of analytical methods for each contaminant. This approach is described in Section C., Type of Monitoring Required of Public Water Systems Based on Listing Group. The final monitoring program divides the listed unregulated contaminants into three lists: List 1, for which Assessment Monitoring will be required, List 2, designated for the Screening Surveys; and List 3, designated for Pre-Screen Testing. Today's final regulation only requires Assessment Monitoring for UCMR (1999) List 1 contaminants beginning on January 1, 2001, with the exceptions of perchlorate and acetochlor, for which analytical methods have not yet been approved (but are planned to have monitoring begin on that date, also, after rulemaking to specify their analytical methods). The monitoring for contaminants on Lists 2 and 3 will only be required after EPA promulgates further rules.

Technical peer review and public comments strongly supported the three-tier approach of the UCMR program. As a result, EPA requires in today's action Assessment Monitoring for the contaminants on UCMR (1999) List 1, because analytical methods for these contaminants currently exist or will shortly be validated. EPA will shortly publish a request for public comment on a revision to this final rule to implement the analytical methods and other sampling requirements for perchlorate and acetochlor. Also, by future rulemaking, EPA plans to implement the Screening Survey (List 2) monitoring in groups of contaminants, rather than one contaminant at a time, to minimize sampling and testing costs since some of the contaminants may be tested by the *50566  same method. EPA intends to take a similar approach with the contaminants on List 3, the Pre-Screen Testing. EPA plans to require, through future rulemaking, Pre-Screen Testing for contaminants for which EPA determines that new analytical methods can measure their existence in locations where they are most likely to be found. All analytical methods for contaminants on Lists 2 and 3 would be peer reviewed, following EPA's policy for peer review, before the Agency proposes regulations which would require public water systems to monitor for them.

In §141.40 (a)(3), Table 1, UCMR (1999) List 1 contaminants, for Assessment Monitoring, are chemical contaminants for which analytical methods capable of generating the quantity and quality of data required under the UCMR are currently available, or expected to be available shortly after today's final rule. Monitoring for these contaminants is required under today's final UCMR, with the exceptions of perchlorate and acetochlor, as noted.

UCMR (1999) List 2 contaminants (14 organic chemicals, one radiochemical and one microorganism), for the Screening Surveys, are those for which EPA is currently refining analytical methods. Development of these methods should be sufficient for Screening Surveys to be conducted in the first three years of the listing cycle, but may occur in the later years of the cycle. These contaminants are characterized in today's final rule at §141.40(a)(3), Table 1, Unregulated Contaminant Monitoring Regulation (1999) List, List 2.

UCMR (1999) List 3 contaminants (seven microbiological contaminants or contaminant groups and one inorganic chemical), for Pre-Screen Testing, are those for which EPA has begun or shortly will begin analytical methods development, but completion

of those efforts is not expected prior to the Assessment Monitoring required under implementation of this regulation. Instead, these contaminants will be tested for in Pre-Screen Testing. These contaminants are listed in today's final rule at §141.40(a)(3) as Table 1, Unregulated Contaminant Monitoring List, List 3.

Tables 3 and 4, in IV.A.1.(c), Analytical Methods Applicable to the UCMR (1999) List, present a summary of the status of the methods for all the contaminants on this list.

EPA believes that this three-tiered approach to the UCMR, which was recommended by stakeholders, reflects a balance between the implementability of current analytical methods and the need to obtain data in time frames that are useful for responding to concerns about the contaminants identified.

**(b) Number of Contaminants on the UCMR (1999) List**

Thirty-six contaminants are on today's final UCMR (1999) List. SDWA Section 1445 (a)(2)(B)(i) states that in August 1999 and every five years thereafter "the Administrator shall issue a list of * * * not more than 30 unregulated contaminants to be monitored by public water systems and to be included in the national drinking water occurrence data base * * *" EPA interprets this to mean that the UCMR list may contain more than 30 contaminants, as long as monitoring is not required for more than 30 contaminants during a five-year listing cycle. Public comments were split on whether the monitoring list should have more than 30 contaminants. EPA believes that maintaining a monitoring list with more than 30 contaminants, while requiring monitoring for no more than 30, is responsive to public concerns about contaminants in drinking water. This interpretation and approach also supports EPA's efforts to respond to and encourage analytical methods development for emerging contaminants.

Any PWS may voluntarily submit data to EPA, including data for contaminants that a PWS may monitor that are on the UCMR (1999) List of 36 contaminants, but that are not on the final list of 30 contaminants actually required for UCMR monitoring. EPA is preparing a guidance document specifying the procedures for future voluntary submission of such data to the National Drinking Water Contaminant Occurrence Database (NCOD).

**B. Public Water Systems Subject to the UCMR**

The monitoring in this final rule focuses ultimately on determination of, on a national basis, the occurrence or likely occurrence of contaminants in drinking water delivered by community water systems (CWS) and non-transient non-community water systems (NTNCWS). For regulatory purposes, public water systems are categorized as "community water systems," or "non-community water systems." Community water systems (CWSs) are specifically defined as "public water systems which serve at least 15 service connections used by year-round residents or regularly serve at least 25 year-round residents." (40 CFR 141.2) A "non-community water system" means any other public water system. Non-community water systems include nontransient non-community water systems (NTNCWSs) and transient non-community water systems. Non-community water systems are available to serve the public, but are not used on a year-round basis in most cases. Non-transient systems regularly serve at least 25 of the same persons over six months per year (e.g., schools). Transient systems do not regularly serve at least 25 of the same persons over six months per year. Additionally, some community water systems purchase all or part of their water supply from other water systems. Purchased water systems may be at the end of a distribution system from the water system selling the water.

One of the factors considered in establishing the UCMR program is the number of persons served by a system. With respect to size, about 2,774 large systems (each serving more than 10,000 persons) provide drinking water to about 80 percent of the U.S. population served by public water systems. Under today's final regulation, all large systems will be required to monitor the unregulated contaminants specified in §141.40(a)(3), List 1 of Table 1, UCMR (1999) List, with the exception of perchlorate and acetochlor for which analytical methods have not been promulgated. In response to public comment on purchased water systems representing the end of a distribution system, purchased water systems are also included in this monitoring requirement for microbiological contaminants that occur primarily in distribution systems with maximum residence times or low disinfectant residuals which may allow microorganisms that have human health effects to survive and reproduce.

Section 1445(a)(2)(A) requires that the UCMR ensure that only a representative sample of systems serving 10,000 or fewer persons (small systems) monitor for unregulated contaminants. Small community water systems and small non-transient, non-community water systems total 65,636 systems. From this total number of small systems, EPA will select a national representative sample of 800 small systems. EPA is excluding transient non-community systems from UCMR requirements. The variation in the 97,000 transient systems would be difficult to reflect in a national representative sample and would be very costly to monitor. Furthermore, projecting contaminant exposure results from such systems would be complex and inconclusive because of the transient nature of the population that uses them. The results from the very small community and non-transient non-community systems (NTNCWS) can be extrapolated to the transient non-community systems. Public comments **\*50567** supported not including these systems in the representative sample. One commenter suggested that transient systems be the subject of a special survey since they may be a pathway of exposure for a specific segment of the population. At this time, EPA is not planning any special surveys of transient systems because they are such a large and diffuse category and it is difficult to compile and evaluate population exposure information for this category of water systems.

EPA will pay for the reasonable costs of monitoring by the small systems selected for the representative sample, as long as the systems are part of a State Monitoring Plan. The EPA will select systems to monitor through the use of a random number generator according to a national representative sample selection plan developed primarily on the basis of population served by PWSs in each State. This detailed selection plan is necessary to ensure that the sample is statistically valid and representative of all small water systems nationally. This plan is also necessary because EPA typically has the least information about these systems and needs a consistent base of data for regulation development. EPA will use a national sample of approximately 800 systems serving 10,000 or fewer persons which the EPA will statistically draw from all small CWSs and NTNCWSs nationally. Section F, "Representative Sample of Systems Serving 10,000 or Fewer Persons," provides the details of the sample selection plan, including the sample size. The number of systems selected within each size category of systems will be based on the proportion of population served by that size category. System selection will be further allocated across water source type and distributed across all states.

The State-based component of this national representative sample, called a State Monitoring Plan (or State Plan), will include the list of systems statistically selected for UCMR monitoring. Other state responsibilities will be defined in the Memorandum of Agreement issued between the States and EPA. The State can review, and modify if necessary, the list of systems in the State Plan. The resulting State Plans will then be part of a national sample framework, providing the representative national sample requisite to drawing national conclusions for contaminant exposure.

To provide a more capable understanding of contaminants and conditions affecting small systems, and to provide additional quality assurance, EPA will randomly select up to 30 small public water systems from the systems in State Monitoring Plans as "Index" systems. Index systems must monitor every year during the five year UCMR listing cycle. These systems will also be required to report information on system operating conditions (such as water source, pumping rates, and environmental setting). This information will assist EPA in more fully evaluating small system operations and future regulations of small systems. EPA will conduct the sampling and testing for Index systems. At the time of sampling, EPA will also gather other system information to characterize the environmental setting affecting the system including precipitation, land and water resource use, and environmental factors (such as soil type and geology).

Also, up to 150 additional small systems might be selected for the Pre-Screen Testing. The systems for the Pre-Screen Testing will be selected on the basis of their representativeness of systems most vulnerable to the particular UCMR (1999) List 3 contaminants for which methods have been refined. The statistical selection of the 800 systems for the national representative sample may not include the systems determined to be most vulnerable to these contaminants, hence; the States and EPA may need to select additional systems for this targeted testing.

External expert peer review and public comments supported the statistical approach described to select small systems for the national representative sample and State Monitoring Plans.

### C. Type of Monitoring Required of Public Water Systems Based on Listing Group

At the UCMR Stakeholders Meeting on June 3-4, 1998, a diverse group of stakeholders suggested that the UCMR Program be developed through a progression of monitoring levels based on contaminant group characteristics. These characteristics reflect current information about both the occurrence of and method availability for the contaminants. Occurrence information and methods availability will determine which phase, or tier, of monitoring the contaminants will be placed. Both EPA and stakeholders are also concerned about contaminants that may be "emerging" as contaminants of concern. These emerging contaminants have not been monitored before, but have the potential to be found near or in drinking water supplies or recently have been identified as potential health problems. It is not likely that there exists approved EPA analytical methods for the "emerging contaminants of concern". Typically, "research" analytical methods are used to detect such emerging contaminants and may be expensive. EPA will have to either develop an approved method for inclusion in a regulatory approach, or perhaps substitute a regulatory approach with a study using a single laboratory and a "research" analytical method. The resources needed to develop an approved analytical method will face competing resource demands for other contaminants on the CCL that also require analytical method development. In recognition of these considerations, as described above, the final rule incorporates an approach with three monitoring levels, or tiers, referred to as "Assessment Monitoring," "Screening Survey," and "Pre-Screen Testing".

### 1. Assessment Monitoring

The first type of monitoring in the three-tiered monitoring program of today's rule pertains to the group of contaminants for which analytical methods are currently available and are specified in §141.40(a)(3), Table 1, UCMR (1999) List 1, Assessment Monitoring Importantly, these contaminants are ones for which initial data for PWSs indicate that the contaminants occur in at least two States or ten public water systems and should be monitored to assess national occurrence through the UCMR. Based on today's rule, all contaminants in §141.40(a)(3), Table 1, List 1 must be monitored in the Assessment Monitoring tier of the UCMR Program, except perchlorate and acetochlor, for which analytical methods are soon to be finalized.

In §141.40, EPA indicates that each system must conduct UCMR "Assessment Monitoring" of List 1 contaminants for a twelve-month period in the first three years (i.e., 2001 through 2003) of a five-year UCMR contaminant listing cycle (i.e., 2001 through 2005). Large systems must complete this monitoring in any twelve-month period within the years 2001 to 2003. Small systems in State Monitoring Plans must complete the monitoring according to the scheduled monitoring identified in those plans within the period of 2001 to 2003. Section F, "Representative Sample of Systems Serving 10,000 or fewer persons," describes in detail the selection of the subset of small systems required to monitor. The State could specify in the State Monitoring Plans a schedule that would correlate with compliance monitoring. This arrangement should enable systems to complete UCMR **\*50568** sampling coincident with their compliance monitoring for regulated contaminants during one of the years when compliance monitoring is required. However, EPA recognizes that some large systems may not be required to monitor for any regulated contaminants during the five-year UCMR listing cycle. In that case, such large systems could monitor for the unregulated contaminants during any twelve-month period within the three years they choose. This approach, as originally proposed, is responsive to public comments that UCMR monitoring be able to be conducted in conjunction with compliance monitoring.

EPA is requiring that surface water systems monitor for four consecutive quarters in the designated, or, in the case of large systems, selected, monitoring year, and that ground water systems monitor two times approximately five to seven months apart in their monitoring year. Under Assessment Monitoring, systems serving more than 10,000 persons must conduct and pay for their own sample collection and testing. Small systems included in State Monitoring Plans must collect the samples with EPA-supplied equipment and send the samples to EPA-specified laboratories. EPA will pay for the testing and reporting. Although the laboratory may report the information directly to EPA and provide a copy to the State, the system still has final reporting responsibility to ensure that results are reported to EPA and copied to the State. Frequency and location of monitoring are discussed in section D, "Monitoring Requirements under the Final UCMR."

### 2. Screening Surveys

ADD 0031

The contaminants that EPA is considering for the Screening Survey are listed in §141.40(a)(3), Table 1, List 2. These contaminants are those for which analytical methods are under development and for which EPA has less occurrence data than for the contaminants on List 1. The purpose of the Screening Survey is to analyze for contaminants where the use of newly developed, non-routine analytical methods are required. To do this and still maintain adequate quality of the occurrence data, EPA will use only a select, controlled group of laboratories. In addition, the Screening Survey approach might allow EPA to maximize scientifically-defensible occurrence data for emerging contaminants of concern than could be obtained through a more standard unregulated contaminant monitoring effort. The Screening Survey could, for example, be useful where questions concerning whether a contaminant of concern is in fact occurring in drinking water and the range of concentration of that occurrence. The Screening Survey is also intended to allow EPA to screen contaminants to see if they occur at high frequencies or concentrations that justify inclusion in future unregulated contaminant Assessment Monitoring or at sufficiently low frequencies that do not require further monitoring, but allow the Agency to evaluate standard development.

The contaminants in UCMR (1999) List 2 will be monitored by a smaller, statistically selected sample from all (large and small) community and non-transient non-community water systems (about 300 systems total). These systems will be selected through a random number generator. Systems will not have to initiate Screening Surveys until after EPA promulgates requirements for Screening Surveys. The sample size needed for estimating frequencies of contaminant occurrence are smaller if the actual occurrence frequencies are close to 0 or to 100 percent. When a contaminant is consistently present or consistently absent it requires fewer samples to determine its frequency with adequate statistical confidence than if it occurs about half the time. Only 300 PWSs are needed to determine if a contaminant is present 5 percent of the time or less frequently, at a 99 percent confidence level and with a 3 percent margin of error. (The same criteria require 1,844 samples when the frequency could be any number.) If the contaminant occurrence findings are above the thresholds established for the Screening Survey, EPA will include the contaminant in the next Assessment Monitoring round (projected to begin in 2006) of the UCMR Program. The statistical threshold for positive results from this monitoring to determine if further monitoring is warranted might be 1 to 2 percent of systems with detections. If the contaminant occurrence were under the threshold, then no further testing would be required, and the contaminant may be removed from the list in a future UCM rulemaking. EPA requested public comment on whether the statistical threshold of 1 to 2 percent of systems is adequate to make a determination that further Assessment Monitoring should be conducted to determine the extent of contaminant occurrence, and, if not, what percent should be used as the threshold for such a determination. One commenter suggested that EPA should use a threshold of 3 to 5 percent, but did not provide any rationale. EPA believes that 1 to 2 percent is consistent with the approach that this monitoring is a Screening Survey to determine whether the contaminant(s) are occurring in any public water system. One to 2 percent occurrence is equal to 3 to 6 systems for the sample, but statistically this can be extrapolated to 600 to 1,200 systems out of all small systems that may have an occurrence of the contaminants. For a sample size of 300, occurrence of a contaminant on the monitoring list in any system would indicate that the contaminant occurs at a frequency greater than 0 (zero). Therefore, EPA should give further consideration to the occurrence and concentration of such a contaminant and may evaluate the extent of its occurrence nationally. EPA considers this extent of occurrence to be significant and to warrant more extensive monitoring, perhaps even through Assessment Monitoring. Another commenter indicated that EPA should evaluate other factors and not just the extent of occurrence before deciding to regulate a contaminant. EPA agrees with this comment and will continue to evaluate other factors.

The anticipated analytical methods that might be used for Screening Surveys are identified in §141.40(a)(3), Table 1, List 2, as "Analytical Methods." These methods are being refined for the particular contaminants on List 2 and are not expected to be ready for use in an Assessment Monitoring program. Therefore, as analytical methods are developed for groups of contaminants on List 2, EPA will propose a rule modification for public comment and will promulgate analytical methods, minimum reporting levels and the location and timeframe for sampling for each contaminant.

Additionally, EPA requested public comment on two potential outcomes from the Screening Survey: (1) if the contaminant is observed at very few or no PWSs (i.e., less than the threshold of 1 to 2 percent of systems), then the contaminant may be dropped from the UCMR (1999) List 2 and no further monitoring for it will occur; and, (2) if the contaminant is observed extensively (i.e., in a higher percentage of PWSs, such as 5 to 10 percent) and EPA has health effects data for the contaminant that indicate a significant concern, then that specific contaminant may move directly to the regulation development stage. In these cases, there

may be no Assessment Monitoring tier of monitoring activity to provide additional occurrence data for that contaminant. One commenter expressed concern that EPA would move directly to regulation development after obtaining results from Screening Surveys for a contaminant and stated **\*50569** that EPA should move the contaminant up to Assessment Monitoring before taking any action. EPA believes that an occurrence of a contaminant in 5 or 10 percent of systems, for example, in the screening survey may be sufficient to determine whether or not to initiate regulation development. EPA may decide that it needs more information, in which case, EPA could move the contaminant to Assessment Monitoring (List 1) for more extensive monitoring to inform the regulatory process, but this may not always be necessary.

With respect to funding the Screening Survey, EPA will pay for the testing and reporting (as described in Preamble section V.G., Reporting of Monitoring Results) for systems serving 10,000 or fewer persons. Systems serving 10,000 or fewer persons will be responsible for sample collection and preparing the samples for shipment. EPA will pay for the shipment of these samples to an EPA-designated laboratory for testing and for reporting of monitoring results to EPA, with a copy to the State.

For large systems serving more than 10,000 persons, EPA requested public comment on whether it should set performance standards and allow systems to conduct their own laboratory analyses in compliance with the standards, or should approve a limited but sufficient number of laboratories to do lab analyses for large systems, providing for quality control across a manageable number of laboratories while allowing competitive pricing of services. Most commenters, including water system operators, favored EPA approval of a limited number of laboratories, but noted that a sufficient number of laboratories were needed so that competitive pricing would be available.

EPA expects the Screening Surveys will occur one or two times during the five-year listing cycle of 2001 through 2005. EPA expects that this Screening Survey monitoring will occur for groups of contaminants, rather than for one contaminant at a time, depending on when the different methods are promulgated and the timing of their promulgation. Systems selected for the Screening Surveys will monitor at the same frequency as for contaminants under Assessment Monitoring. Should approval and implementation of the analytical method for a particular contaminant become delayed, the contaminant might be moved into the category of Pre-Screen Testing, described next.

### 3. Pre-Screen Testing

The third tier of the final monitoring program is "Pre-Screen Testing", which will be conducted for contaminants with analytical methods that are in an early stage of development and at systems that are determined to be most vulnerable to the occurrence of contaminants on the Pre-Screen Testing list. Pre-Screen Testing means sampling, testing, and reporting of the listed contaminants that have newly emerged as drinking water concerns and, in most cases, for which methods are in an early stage of development. Pre-Screen Testing will be performed to determine whether a listed contaminant occurs in sufficient frequency in the most vulnerable systems or sampling locations to warrant its being included in future Assessment Monitoring or Screening Surveys. Pre-Screen Testing will only be required after additional rulemaking.

EPA will select a limited number of systems (up to 200) to conduct Pre-Screen Testing, possibly using a random number generator, selected from up to 25 of the most vulnerable systems identified by each State, or by EPA if a State decides not to participate in the Pre-Screen Testing system selection process. Up to 200 systems, a smaller sample size than under the Screening Survey or Assessment Monitoring, are considered sufficient for this type of monitoring because monitoring will occur at systems determined to be vulnerable to occurrence of the contaminants, based on the characteristics of the contaminants, system operation, climatic conditions, and land and water resource use. This monitoring is to determine whether the contaminant can be found in any public water system under most likely occurrence conditions specific to the contaminant. This tier of monitoring is not designed to determine the extent of occurrence. A portion (e.g., 100 to 150) of these 200 systems may be a different subset of small systems serving 10,000 or fewer persons than those selected for the national representative sample. The reason for this different subset is that States should identify the systems that are representative of the most vulnerable conditions for the contaminants specified for Pre-Screen Testing. These most vulnerable systems may not be those conducting Assessment Monitoring or the Screening Survey. It is possible, though, that some overlap of systems doing Assessment Monitoring and those selected for Pre-Screen Testing could occur.

Under Pre-Screen Testing, EPA will designate or approve a laboratory or laboratories to conduct sample analysis. The reason for this testing approach is that the analytical methods expected to be used will be emerging from research development, and most laboratories will not have any experience with them. For these laboratories to utilize the new methods could involve extensive investment in equipment and training. Rather than requiring this investment for contaminants which have uncertain occurrence in public water systems, EPA will develop and promulgate appropriate methods. EPA will also require that these methods be used by designated or approved laboratories. Pre-Screen Testing analysis is conducted at systems most likely to have the contaminants to determine whether further action is warranted and additional method development is needed.

Under this approach, once EPA has developed methods and promulgated the rule to test for List 3 contaminants, it will request States to identify at least 5 and not more than 25 systems (based on the population served by PWSs in each State) most vulnerable to the listed contaminants. States will select these systems from all community and non-transient non-community systems of all sizes. Selection criteria for these systems include States' determination of systems most vulnerable to the specified contaminants and numbers of systems per State based on the population served in each size category of system. The States will send the list of systems, any modification of their State Monitoring Plans, and the reasons for their list and modifications (considering the characteristics of the contaminants, precipitation, system operation, and environmental conditions) to the EPA. EPA will select up to 200 PWSs nationwide, from the pool of State-identified vulnerable systems, that must submit samples of the specified contaminants. Some small systems selected may not be part of the national representative sample of 800 small systems selected for Assessment Monitoring. Hence, some small systems may only be required to sample for Pre-Screen Testing. States or EPA will provide instructions to the systems for the necessary sampling and subsequent shipping to the EPA laboratory. At this time, EPA believes that the contaminants for which Pre-Screen Testing will likely be required are those listed in the final rule at § 141.40(a)(3) Table 1, List 3. Sampling and testing done for Pre-Screen Testing will most likely be required in the later years of the five-year UCMR listing cycle. This approach will assist EPA in refining the methods for these contaminants. If EPA finds any substantial frequency of occurrence of Pre-Screen Testing contaminants, the contaminants could **\*50570** become part of either the Screening Survey or part of Assessment Monitoring in future UCMR lists. Since the methods for these contaminants will have to be applied under highly controlled analytical conditions, EPA will pay for the shipping and analyses of these samples for small systems selected to participate. Large systems will pay for the shipping and testing of samples at EPA approved laboratories.

Public comments requested that EPA provide guidance on the selection of "most vulnerable" systems and on reporting requirements for Pre-Screen Testing. EPA plans to provide this guidance during the years 2001 and 2002, and obtain public comment before the guidance is final.

### D. Monitoring Requirements Under the Final UCMR

### 1. Monitoring Frequency

### (a) Systems Serving More Than 10,000 Persons

### (i) Chemical Contaminants.

The number of persons served affects exposure to contaminants and resources necessary to monitor. The final UCMR program requires large systems serving more than 10,000 persons to monitor at each entry point to the distribution system, or other representative compliance monitoring location specified by the State, whether or not the system applies treatment. If a system applies treatment, then it must monitor after treatment. In response to public comment, EPA modified the rule to allow alternative sampling points to be used: sampling points identified by the State for compliance monitoring under 40 CFR 141.24(f) (1), (2), and (3), and/or source (raw) water sampling points, if the State uses source water monitoring as a more stringent monitoring requirement. If monitoring at source (raw) water sampling points indicates detection of any of the contaminants on the monitoring list, then the system in most cases will be required to shift its unregulated contaminant monitoring to the entry

point to the distribution system. These flexibilities in the sampling location should enable systems and States to coordinate compliance and unregulated contaminant monitoring more extensively.

The law requires EPA to consider the source of water relative to unregulated contaminant monitoring requirements (SDWA Section 1445(a)(2)(A)). Over the twelve-month period of monitoring, the regulation requires that systems sample from all entry points to the distribution system, or other sampling points specified, representing all principal, non-emergency sources of water used over the monitoring period. Surface water-supplied systems will monitor each of these points every three months for a twelve-month period and ground water-supplied systems will monitor each of these points two times five to seven months apart within a twelve-month period. Today's final monitoring frequency for surface water systems is the same as in the previous program. For ground water systems, the two sampling events must be approximately six months apart, increasing the frequency from one sample in five years under the previous program to two. The reasons for this increase are that while ground water typically moves slowly, one sample is insufficient to characterize water quality at any particular location and will not provide evidence of any changes over a longer period of time. Furthermore, some ground water environments transmit water more rapidly, potentially resulting in changes in water quality over shorter timeframes. From a statistical standpoint, one sample is not representative and will not allow the data to be used for exposure assessment which uses an average annual value. This frequency applied to the average of 6.2 entry points to the distribution system for systems serving more than 10,000 persons will provide sufficient data for an adequate statistical analysis of the varied conditions in which these systems are located.

One of the monitoring events for both surface water and ground water systems must occur at the most vulnerable time of year for the PWS. The rationale for this approach is that it provides data representing potential variation in contaminant concentration over the course of a year. This potential variation in concentration is necessary to evaluate exposure related to contaminant occurrence. Some systems perform compliance monitoring on a quarterly basis and can collect UCMR samples coincident with their compliance samples, and therefore provide data on the range of variation. Other systems may only conduct compliance monitoring once every third year and will therefore have to collect additional samples under the UCMR. While one UCMR sample could be collected coincident with this compliance sample, EPA is requiring for ground water-supplied systems to take a second sample five to seven months later. This requirement will provide the necessary data on seasonal variation over a year to allow consistent exposure assessments to be done with a range of concentrations. Stakeholders supported this option. EPA originally proposed that the second sample be collected exactly six months later. State commenters indicated a need to provide flexibility to accommodate changes in monitoring schedules. Therefore, EPA modified the regulation to allow monitoring five to seven months before or after the initial vulnerable period sampling event.

**(ii) Microbiological Contaminants**

For microbiological contaminants, the sampling frequency will be two times within one year, with samples collected each time at two different locations after treatment in the distribution system: a site representative of water in the distribution system received by the general population that the system serves and a site in the distribution system representing the maximum residence time or lowest disinfectant residual, depending on the contaminant. The frequency should capture the most vulnerable time as well as a time five to seven months later to provide an average exposure. Furthermore, precipitation patterns may be a major factor in contaminant occurrence. Thus, frequency of sampling should be tailored to the most vulnerable times because increased seasonal precipitation may carry these contaminants at higher concentrations than other times during the year.

**(b) Systems Serving 10,000 or Fewer Persons**

The final rule states that approximately one third of the small systems (serving 10,000 or fewer persons) selected through the representative sample, be sampled each year over a three-year period at the frequencies indicated in Section D, "Monitoring Requirements Under the Final UCMR" (1)(a) above. This allows a relatively even submission of samples to be managed and tested by the EPA laboratory. EPA will pay for the reasonable costs of monitoring (i.e., containers, shipping, testing and reporting) for this representative sample of systems, including Assessment Monitoring, Screening Survey, and Pre-Screen Testing, and will conduct the analyses at its designated laboratories. EPA, therefore will need to be able to manage the number of samples being received at any time to closely correspond to the analytical capacity of its laboratories. Some public commenters

suggested that sampling for microbiological contaminants not occur at the maximum residence time in the distribution system, but at the point of lowest disinfectant residual, since the **\*50571** monitoring of concern is for effectiveness of treatment and booster disinfection stations that may be in use in long distribution lines. In response, EPA added another sampling point at the "lowest disinfectant residual" in the distribution system. However, EPA maintained the original sampling point location of "maximum residence time" because, given potential chemical degradation over long periods of time in a distribution system, such as for disinfection byproducts, the location of maximum residence time can often be the location of lowest disinfectant residual and, therefore, highest likelihood of microbiological contaminants.

Public comments also addressed the flexibility in monitoring schedules to allow for unforeseen events or factors in field sampling. Specifically, States asked that system sampling schedules allow for sampling over a month within a quarter, rather than exactly three months later. EPA modified the final rule to allow sampling by small and large surface water systems to occur within the same month in each quarter and for small and large ground water systems, to occur any time five to seven months before or after the initially selected month within the vulnerable time.

## 2. Monitoring Time for Vulnerable Period

Water quality studies and monitoring throughout the United States have clearly shown that contaminant occurrence and/or concentration vary over time, both seasonally as well as from year to year. The seasonality of occurrence, or period of peak concentration of contaminants, commonly varies with seasonal changes in the hydrologic cycle in relation to the source of contaminants and their fate and transport characteristics. Particularly for land-applied or land-disposed contaminants, the increased flux of water mobilizes the contaminants and moves them into surface or ground water flow systems. For the most vulnerable of water systems, such as surface waters, unconfined shallow ground water and karst flow systems, for example, higher levels of contaminant concentrations typically occur during annual runoff and recharge periods. For much of the United States, east of the Rocky Mountains, many studies have shown that the season of greatest vulnerability for contaminant occurrence is the late-spring, early-summer runoff-recharge period, particularly for contaminants such as pesticides and nitrate (e.g., Larson et al., 1997; Barbash and Resek, 1996; Hallberg, 1989a,b). For deeper, more confined ground water systems, defining vulnerable periods is much more difficult. The exact flow path and time of travel are much greater and more complex and are dependent upon many factors unique to a particular well and aquifer setting (e.g., Hallberg and Keeney, 1993). There is no generality that can be applied to these latter settings.

Because occurrence may vary seasonally, it is important to try to capture these vulnerable periods in a one-time survey of contaminant occurrence such as the UCMR. Statistical studies of sampling strategies in surface water (e.g., Battaglin and Hay, 1996) have shown that incorporating sampling during spring and early summer runoff periods provides a more accurate representation of annual occurrence than random quarterly sampling (that can avoid these months). Ground water studies (e.g., Pinsky et al., 1997) suggest that the more vulnerable ground water settings also show peaks during these periods. The default vulnerable period for sampling for the UCMR has been designated to coincide with this period of peak vulnerability for much of the United States: one sample must be collected during May, June, or July, unless the State has better information to designate another period. Also, for surface waters, three additional samples will be collected throughout the year, and for ground water systems, one additional sample will be collected five to seven months before or after the vulnerable time. This additional sampling will also capture the winter recharge and runoff period that may be more vulnerable in the western coastal regions or warmer southern climates for some contaminants. In the case of some deeper ground water systems, States or systems may have additional knowledge of seasonal vulnerability patterns, in which case the State can designate an alternative period for sampling.

Public comments generally supported monitoring in a vulnerable time, but desired flexibility in establishing the time and frequency. The rule already provided flexibility in selecting a time within the May to July period for a sampling event. However, because the statistical approach requires consistency, today's rule enables a State to determine the alternate vulnerable time for monitoring, rather than each system using its own criteria for choosing a vulnerable time. With respect to frequency, the statistical approach requires that systems monitor with the same frequency so that a national frequency distribution can be developed. This precludes the State or a system from establishing its own monitoring frequency.

74 FR 41883-01, 2009 WL 2512226(F.R.)

NOTICES

ENVIRONMENTAL PROTECTION AGENCY

[EPA-HQ-OW-2009-0297; FRL-8943-9]

RIN 2040-AF08

Drinking Water: Perchlorate Supplemental Request for Comments

Wednesday, August 19, 2009

AGENCY: Environmental Protection Agency (EPA).

**\*41883**  ACTION: Notice.

SUMMARY: The Agency is seeking comments on additional approaches to analyzing data related to EPA's perchlorate regulatory determination. These additional comments are sought in an effort to ensure consideration of all the potential options for evaluating whether there is a meaningful opportunity for human health risk reduction of perchlorate through a national primary drinking water rule. EPA will make a final regulatory determination for perchlorate after considering comments and information provided in the 30-day comment period following this notice.

DATES: Comments must be received on or before September 18, 2009.

ADDRESSES: Submit your comments, identified by Docket ID No. EPA-HQ-OW-2009-0297, by one of the following methods:

• http://www.regulations.gov: Follow the online instructions for submitting comments.

• Mail: Water Docket, Environmental Protection Agency, Mailcode: 2822T, 1200 Pennsylvania Ave., NW., Washington, DC 20460.

• Hand Delivery: Water Docket, EPA Docket Center (EPA/DC) EPA West, Room 3334, 1301 Constitution Ave., NW., Washington, DC. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.

Instructions: Direct your comments to Docket ID No. EPA-HQ-OW-2009-0297. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at http://www.regulations.gov, including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through http:// www.regulations.gov or e-mail. The http://www.regulations.gov Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail comment directly to EPA without going through http:// www.regulations.gov your e-mail address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD-ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional instructions on submitting comments, go to Unit I.A of the SUPPLEMENTARY INFORMATION section of this document.

Docket: All documents in the docket are listed in the http:// www.regulations.gov index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are

available either electronically in http://www.regulations.gov or in hard copy at the Water Docket, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566-1744, and the telephone number for the EPA Docket Center is (202) 566-2426.

FOR FURTHER INFORMATION CONTACT: Eric Burneson, Office of Ground Water and Drinking Water, Standards and Risk Management Division, at (202) 564-5250 or e-mail burneson.eric@epa.gov. For general information, contact the EPA Safe Drinking Water Hotline at (800) 426-4791 or e-mail: hotline-sdwa@epa.gov.

**Abbreviations and Acronyms**

>—greater than

<—less than

BW—body weight

CBI—confidential business information

CDC—Centers for Disease Control and Prevention

DWI—drinking water intake

EPA—U.S. Environmental Protection Agency

FDA—U.S. Food and Drug Administration

FR—Federal Register

HA—Health Advisory

HRL—health reference level

IRIS—Integrated Risk Information System

kg—kilogram

L—liter

mg/kg—milligram per kilogram of body weight

mg/L—milligrams per liter (equivalent to parts per million [ppm])

MRL—Method Reporting Limit

NAS—National Academy of Science

NHANES—National Health and Nutrition Examination Survey

NOAEL—no observed adverse effect level

NOEL—no observed effect level

NRC—National Research Council

OW—Office of Water

PBPK—Physiologically-Based Pharmacokinetic

POD —point of departure

RAIU—Radioactive Iodide Uptake

RfD—reference dose

RSC—relative source contribution

SDWA—Safe Drinking Water Act

UCMR—Unregulated Contaminant Monitoring Regulation

μg—microgram (one-millionth of a gram)

US—United States

USDA—U.S. Department of Agriculture


SUPPLEMENTARY INFORMATION

**I. General Information**

***A. What Should I Consider as I Prepare My Comments for EPA?***
You may find the following suggestions helpful for preparing your comments:

1. Explain your views as clearly as possible.

2. Describe any assumptions that you used.

3. Provide any technical information and/or data you used that support your views.

4. If you estimate potential burden or costs, explain how you arrived at your estimate.

5. Provide specific examples to illustrate your concerns.

6. Offer alternatives.

7. Make sure to submit your comments by the comment period deadline.

8. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line on the first page of your response. It would also be helpful if you provided the name, date, and Federal Register (FR) citation related to your comments.

### *41884  II. Background

The statutory and regulatory background for this action is described in detail in the October 10, 2008, FR notice discussing EPA's initial regulatory determination for perchlorate (USEPA, 2008a). Briefly, the Safe Drinking Water Act (SDWA) section 1412, as amended in 1996, requires EPA to make a determination whether to regulate at least 5 contaminants from its contaminant candidate list (CCL) every 5 years. Once EPA determines to regulate a contaminant in drinking water, EPA must issue a proposed national primary drinking water regulation (NPDWR) and final NPDWR within certain set time frames. To regulate a contaminant in drinking water, EPA must determine that it meets three criteria: (1) The contaminant may have an adverse effect on human health, (2) the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern, and (3) regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems. To date, EPA has made final regulatory determinations for 20 contaminants from CCL1 and CCL2 and has not found that any of these contaminants meet all three criteria.

On October 10, 2008, EPA published a preliminary regulatory determination for perchlorate, requesting public comment on its determination that perchlorate did not meet the second and third criteria for regulation. The October 2008 notice describes in detail the bases for EPA's determination (USEPA, 2008a). EPA received extensive public comment on that notice.

Today, the Agency is seeking comments on additional approaches to analyzing data related to EPA's perchlorate regulatory determination. The EPA is requesting the additional comments in an effort to ensure that the Agency considers the potential options for evaluating whether there is a meaningful opportunity for human health risk reduction from perchlorate through a national primary drinking water rule. EPA's final decision may be a determination to regulate. As discussed below, the additional alternatives under consideration could result in health reference levels which are much lower than the level identified in the October 2008 notice. The public comments EPA received pursuant to the October 10, 2008, notice of preliminary regulatory determination [FN1] and from the peer review of the supporting documents underscore the complexity of the scientific issues regarding the regulatory determination for perchlorate in drinking water.

EPA received 32,795 comment letters of which 31,632 (96%) letters were from seven different apparent mass mailing letter writing campaigns that did not support the preliminary determination. Of the remaining 1,163 comment letters that would be considered "unique," 30 commenters provided EPA with detailed comments. Of those 30 comment letters, six supported EPA's preliminary determination. These comments and other docket materials are available electronically at http:// www.regulations.gov (Docket ID No. EPA-HQ-OW-2008-0692).

In its October 2008 FRN, EPA referred to a draft report entitled "Inhibition of the Sodium-Iodide Symporter by Perchlorate: An Evaluation of Lifestage Sensitivity Using Physiologically-Based Pharmacokinetic (PBPK) Modeling" (USEPA, 2008b). This draft report, which is described in Section III.A.1, was peer reviewed during the comment period on the regulatory determination. The report (USEPA, 2008c) and a summary of significant comments made by the external peer reviewers and EPA's responses (USEPA, 2008e) can be found at http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=212508. The peer review comments were complimentary and supportive of EPA's modeling analysis and support document.

On January 8, 2009, EPA issued an interim health advisory (HA) to provide guidance to state and local officials in their efforts to address perchlorate contamination while EPA was reviewing scientific issues. A draft of the HA was peer reviewed by four external peer reviewers. The HA peer reviewers comments are discussed in Section III.A.2 of this notice. The Interim Health Advisory (USEPA. 2008d) can be found at http:// www.epa.gov/safewater/contaminants/unregulated/perchlorate.html and the summary of significant comments made by the external peer reviewers (USEPA. 2008e) can be found at http:// www.epa.gov/ ogwdw/contaminants/unregulated/pdfs/perchlorate—ha—comment—response.pdf.

In January of this year, EPA announced that we planned to seek additional input from the National Research Council (NRC) on perchlorate. The NRC previously studied perchlorate health implications from March, 2003 until they issued their report in January, 2005 (NRC, 2005). EPA has compiled and evaluated additional scientific studies relevant to perchlorate health effects and exposure available since publication of the 2005 NRC report. As previously stated, EPA also has obtained peer review and public comment on the Agency's analysis of a number of these studies. The Agency believes that further review by the NRC would unnecessarily delay regulatory decision making for perchlorate. Therefore, EPA is not, at present, planning to request additional NRC review of issues related to perchlorate. Instead, EPA is issuing this notice and seeking comment on a broad range of alternative approaches to the interpretation of the scientific data relevant to a regulatory determination for perchlorate in drinking water. However, EPA requests comment upon whether further review by the NRC is warranted. EPA also notes that if the Agency were to make a final determination to regulate perchlorate, the Agency, in accordance with the SDWA, would seek review by the Science Advisory Board prior to proposal of any maximum contaminant level goal and national primary drinking water rule.[FN2]

In issuing this supplemental notice, EPA is not making a final regulatory determination for perchlorate nor are we changing the Interim Health Advisory Level of 15 µg/L. EPA will consider comments on the information received on this notice, as well as those received on the October 10, 2008, FR notice, and those received on the peer review of supporting documents before completing its regulatory determination for perchlorate. EPA may also revise the Interim Health Advisory as part of this process.

### III. Alternative Approaches To Analyzing Scientific Data Related to Perchlorate in Drinking Water

EPA is requesting comment on key issues related to the regulatory determination for perchlorate in drinking water. EPA is now considering a broader range of alternatives for interpreting the available data on: the level of health concern, the frequency of occurrence of perchlorate in drinking water, and the opportunity for health risk reduction through a national **\*41885** primary drinking water standard. These alternative interpretations may impact the Agency's final regulatory determination for perchlorate. Therefore, EPA seeks comment on these issues and the alternative approaches the Agency is considering.

### A. Interpretation of the Physiologically-Based Pharmacokinetic (PBPK) Modeling

### 1. EPA's PBPK Modeling Analysis in the October 2008 FR Notice

The NRC (NRC, 2005) found that the inhibition of iodide uptake by the thyroid should be used as the basis for a perchlorate risk assessment. In the October, 2008, FR notice, EPA describes a Physiologically-Based Pharmacokinetic (PBPK) modeling analysis prepared by the Agency utilizing a series of papers (e.g., Clewell et al., 2007) discussing PBPK models that estimated the effect of perchlorate on iodide uptake for the pregnant woman and fetus, the lactating woman and neonate, and the young child. EPA used the PBPK modeling analysis to estimate the iodide uptake inhibition for these sensitive life stages consuming food containing perchlorate at mean levels, and drinking water containing perchlorate at an HRL of 15 µg/L at the 90th percentile consumption rate.

EPA found that the predicted radioactive iodide uptake (RAIU) inhibition for all subgroups was comparable to, or less than, the RAIU at the no observed effect level (NOEL) selected by the NRC. Based on this outcome, EPA concluded that by protecting the fetus of the hypothyroid or iodide-deficient woman from the effects of perchlorate on the thyroid, all other life stages and subgroups would be protected.

EPA requested comment on the model in the October 2008 FR notice in addition to conducting a peer review on the application of the model to non-adult life stages.

### 2. What Were the Key Scientific Issues Raised by Commenters

Many of the public comments EPA received on the PBPK model in response to the October 2008 FR notice objected to the Agency's use of a model that had not been peer reviewed. Concurrently with the public comment period, the PBPK model analysis underwent a rigorous peer review by eight experts. Response by the PB model analysis peer reviewers indicated that the modifications made to the model and the changes to physiological parameters were an improvement over the Clewell model, and all reviews were generally supportive of the analysis. Based on the external peer review comments, the models and the report entitled, "Inhibition of the Sodium-Iodide Symporter by Perchlorate: An Evaluation of Lifestage Sensitivity Using Physiologically-Based Pharmacokinetic (PBPK) Modeling" were revised.

As previously discussed, comments were also received from four peer reviewers for the Interim Drinking Water Health Advisory (HA) on the application of the model in identifying sensitive life stages. One HA peer reviewer noted that the use of the PBPK model did "provide an estimate of perchlorate exposure to average weight babies of healthy breastfeeding women." However, this HA peer reviewer continued on to recommend that the exposure estimate be expanded to include consideration of small birth weight and preterm infants.

Another peer reviewer recommended that the uncertainty inherent in the modeling exercise should be made more transparent to the public. This uncertainty was linked to the modeling code, the availability of data for the many variable parameters in the model, the combination and handling of the data selected for use in simulations, and, in particular, the lack of human data for specific life stages including pregnant women and their fetuses, lactating women and their babies, and bottle-fed infants for which rat data were adapted. The inability of the model to reflect iodide nutritional status also was cited by three peer reviewers as an important limitation.

Individual peer reviewers raised two additional concerns: (1) That the use of animal data to predict human responses appears to run counter to the NRC finding that animal data cannot be used to quantitatively predict the response of humans due to species differences, and (2) that EPA appeared to use the PBPK model to modify the reference dose (RfD) for infants, justifying the allowance of exposures that clearly exceeded the RfD established by the NRC.

Peer reviewers further noted that the PBPK model and the EPA assessment did not account for the activity of other compounds with similar actions on the thyroid. This issue was also raised by EPA's Office of Inspector General (OIG) in reference to EPA's perchlorate risk assessment (see section III.C.2 for more information). One reviewer stated that the application of the PBPK model by the Agency as cited in the Interim Health Advisory implied an inappropriate certainty in the results that was not warranted. This reviewer recommended confining the use of the PBPK model to exploring the impact of varying physiological parameters and exposure data among life stages.

**3. Alternative Approaches EPA Is Also Now Considering**

Based on the comments received on the application of the PBPK model as described in the October 2008 notice and the Interim HA, EPA is re-evaluating how best to incorporate the PBPK modeling analysis into its evaluation of perchlorate, if at all.

One approach might be to use the PBPK modeling analysis to explore the relative sensitivity of the various life stages of concern to a fixed dose such as the point of departure (POD) or the reference dose (RfD). For example, EPA has examined the effect of a dose equal to the POD on RAIU for a number of different life stages. The POD for the perchlorate risk assessment (7 μ g/kg/day) was recommended by the NRC. The POD is the lowest dose administered in the Greer et al. (2002) clinical study, and resulted in a "very small decrease (1.8%) in radioiodide uptake * * * well within the variation of repeated measurements of normal subjects (NRC, 2005)." The POD used was determined by NRC to be a No Observed Effect Level (NOEL). The NRC stated that use of a NOEL differs from the traditional approach to deriving an RfD, which bases the critical effect on an adverse outcome, and that using a nonadverse effect that is upstream of the adverse effect is a more conservative and health-protective approach to perchlorate hazard assessment. The NRC also recommended that EPA derive an RfD by applying a 10-fold uncertainty factor to the POD to account for differences between healthy adults and the most sensitive population, fetuses of pregnant women who might have hypothyroidism or iodide deficiency. When compared to the average adult, the 7-day old breast-fed infant and the fetus of the pregnant woman at gestation week 40 were identified by EPA's analysis as the most

sensitive subgroup with respect to percent RAIU inhibition at a dose to the lactating or pregnant women equal to the POD. (See Table 1 for the model-predicted RAIU inhibition and relative sensitivity at the POD of different subgroups compared to the average adult, based on EPA's modified PBPK model.)

The predicted percent RAIU inhibition is approximately 7.8-fold higher for the 7-day old breast-fed infant and 6.7-fold higher for the fetus (at gestational week 40) than for the average adult. (Simulations at earlier gestation weeks indicate that the fetus is more  **41886**  sensitive than the adult throughout pregnancy, but data available for validation of these parameters are minimal and are considered too quantitatively uncertain to assign exact relative sensitivities.) The same analysis shows that the predicted percent RAIU inhibition is approximately one and a half-fold higher for the bottle-fed infant (7-60 days) compared to the average adult, and is approximately equal for the 1-2 year old child and the average adult. However, the drinking water exposure data discussed in section III.B.3 show that infants less than six months in age generally consume five to eight times more water than pregnant women or women of child bearing age on a per body weight basis, and so will receive a higher dose for any given drinking water concentration.

**Table 1—Model-Predicted Radioactive Iodide Uptake (RAIU) Inhibition and Relative Sensitivity of Different Subgroups Compared to the Average Adult at a Dose Equal to the Point-of-Departure (POD) Based on the EPA's Modified PBPK Models**

| Population or life stage | Body weight (kg) | Dose[i] (µg/kg-d) | RAIU inhibition | Relative sensitivity vs. average adult |
|---|---|---|---|---|
| Average Adult[a] | | 70 | 7   1.6% | 1 |
| Woman (child-bearing age) | | 68 | 7  [b] 3.0% | 1.8 |
| Pregnant woman and Fetus (Gestation Week 40) | Mom: 79 | | 7  [c] 6.1% | |
| | Fetus: 3.5 | | [c] 11% —D 3.7 | |
| Lactating woman and Breast-fed infant (7 d) | Mom: 74 | | 7  [d] 2.1% | |
| | Infant: 3.6 | Mom = 7 | [d,e] 12.5% | |
| Lactating woman and Breast-fed infant (30 d) | Mom: 73 | | 7  [d] 2.0% | |
| | Infant: 4.2 | Mom = 7 | [d,e] 9.8% | |
| Lactating woman and Breast-fed infant (60 d) | Mom: 72 | | 7  [d] 2.0% | |
| | Infant: 5.0 | Mom = 7 | [d,e] 7.9% | |
| Bottle-fed infant (60 d) | Infant: 5.0 | | 7  [e] 2.5% | 1.5 |
| Child (0.97 yr)[g] | Child: 10 | | 7  [h] 1.7% | 1.1 |

| Child (2 yr) | Child: 14 | 7    h  1.7% | 1.1 |

.

The modeling analysis may be used as a tool to predict the impact of different perchlorate drinking water concentrations on RAIU across life stages. Understanding the potential impact of reducing perchlorate concentrations may be especially important for considering bottle-fed infants for whom a major portion of the diet may consist of water used to rehydrate formula.

Another approach EPA is also considering would be to not use the PBPK modeling analysis to inform the selection of the HRL for its regulatory determination but instead apply the RfD directly to the exposures of other sensitive life stages to develop separate HRLs for these life stages as described in Section III.B.

**4. Request for Comment on Alternative Approaches**

***EPA Seeks Comments on the Following Issues:***
a. EPA requests comment on using the PBPK model to evaluate the relative sensitivity of the various life stages to perchlorate exposure in drinking water.

b. EPA requests comment on the utility of the PBPK model for predicting the impact of different perchlorate drinking water concentrations on sensitive life stages to inform HRL selection.

c. EPA requests suggestions for ways to use the PBPK modeling analysis to inform the regulatory determination for perchlorate that are different from those described in this notice or the October 10, 2008, notice.

***B. Alternative HRLs Based Upon Body Weight and Water Consumption of Other Life Stages***

**1. Analysis and Interpretations From the October 2008 FR Notice**
In our October 2008 FR notice, EPA requested comments on an HRL of 15 μg/L to protect pregnant women and  **\*41887**  their fetuses based upon the Agency's RfD, recommended by the NRC, and the following exposure estimates:

HRL = RfD x BW/DWI x RSC

Where:

RfD = Reference dose (0.7 μg/kg/day)

BW = Body weight (70 kg, default value)

DWI = Drinking water intake (2 L/day, default value)

RSC = Relative source contribution (62% for pregnant women)

In calculating the HRL of 15 μg/L, EPA used adult default values for both body weight (the mean body weight for men and women, 70 kg) and drinking water intake (84th percentile, 2 L/day). The RSC is the percentage of the reference dose remaining for drinking water after other sources of exposure to perchlorate have been considered (e.g., food). EPA used the pregnant women's estimated 90th percentile perchlorate intake from food to determine the RSC of 62%. In past regulatory determinations on most other noncarcinogenic contaminants, EPA has used an RSC default value of 20% for screening purposes to estimate the HRL when it has lacked adequate data to develop empirical RSCs for those contaminants (for sulfate and sodium EPA did

not use an RSC to determine the HRL). For the October 2008 notice, the Agency believed that sufficient exposure data were available for perchlorate to enable EPA to estimate a better informed RSC and HRL that is more appropriate for fetuses of pregnant women (the most sensitive life stage identified by the NRC). These exposure data include the further analysis by EPA of the Unregulated Contaminant Monitoring Regulation (UCMR) data and the Centers for Disease Control and Prevention's (CDC's) National Health and Nutrition Examination Survey (NHANES) biomonitoring data, as well as the Food and Drug Administration's (FDA's) Total Diet Study (TDS) (73 FR 60269-72, October 10, 2008). The EPA analysis provided a distribution of exposure (not just a mean) specific to almost 100 pregnant women who are not likely to have been exposed to perchlorate from their drinking water, although it did not separate out iodine-deficient pregnant women because of data limitations. EPA estimated that for 90% of the pregnant women, exposure to perchlorate from food is equal to, or less than, 0.263 µg/kg/day (90th percentile). This represents nearly 38% of the RfD, leaving an RSC for water of 62%.

**2. What Were the Key Issues Raised by Public Commenters?**

The comments EPA received underscore the complexity of the scientific issues and many were critical of EPA's derivation of the HRL. Of those that provided detailed comments, many were concerned about the adequacy of the HRL to address all sensitive life stages (e.g., pre-term and full-term infants). For example, a number of commenters argued that the proposed HRL is too high for infants because an HRL of 15 µg/L would allow daily exposures that are two to five times higher than the RfD.

One commenter cites a March 8, 2006, letter from the Children's Health Protection Advisory Committee to the EPA Administrator. The commenter states, "* * * [T]he committee emphasized the higher exposure of infants to perchlorate and greater susceptibility to serious negative effects associated with perchlorate exposure. Neither of these issues, however, was given adequate consideration in the Preliminary Determination."

Another commenter addresses EPA's use of default values in deriving the HRL stating, "* * * EPA continues to use the obsolete default of 70 kg for body weight and 2 L/day of water consumption when these values certainly do not apply to pregnant women. These defaults are specifically intended for the population in general, and should be superseded by more specific and appropriate values when risk assessment is being conducted for a defined subpopulation (U.S. EPA, 2004, 2005)."

**3. Alternative Approaches for Calculating HRLs**

EPA agrees that reassessing exposure assumptions and other life stages warrants further consideration. The NRC (2005) identified "the fetuses of pregnant women who might have hypothyroidism or iodide deficiency" as "the most sensitive population," but also identified infants and developing children as additional "sensitive populations." Infants and young children have greater exposure to contaminants in food and water because of greater consumption of food and water on a per unit body weight basis. Therefore, these life stages may be the most vulnerable populations when their relative exposure is considered. Therefore, EPA is considering alternative approaches to deriving HRLs by evaluating exposures at different life stages. EPA is considering alternative HRLs that are estimates of the maximum concentration of perchlorate that can be consumed in drinking water without an individual's total perchlorate dose from food and water exceeding the RfD. EPA's Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants (USEPA, 2005) recommends the following 10 age groups be considered in exposure assessments for children.

• Less than 12 Months old: birth to < 1 month, 1 to < 3 months, 3 to < 6 months and 6 to < 12 months.

• Greater than 12 months old: 1 to < 2 years, 2 to < 3 years, 3 to < 6 years, 6 to < 11 years, 11 to < 16 years, and 16 to < 21 years.

EPA's Guidance for Risk Characterization (USEPA, 1995) recommends that when considering exposure to use both high end (i.e., 90th and 95th percentile) and central tendency (average or median estimates) descriptors to convey the variability in risk levels experienced by different individuals in the population.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Table 2 arrays the alternative HRLs at the average 90th and 95th percentile drinking water ingestion rates for each of the 10 childhood life stages (as well as for pregnant women and women of child-bearing age, 15 to 44). The table uses the life stage specific drinking water intake data that are adjusted to account for the body weight of the individual. EPA's Child-Specific Exposure Factors Handbook (USEPA, 2008f) recommends values for drinking water ingestion rates for each of recommended children's life stage based on a study of drinking water ingestion of the U.S. population by Kahn and Stralka (2008). The study reports ingestion estimates for "all individuals" and for "consumers only." Estimates reported for "all individuals" include all survey participants regardless of whether they consumed water during the 2-day survey period. Ingestion estimates for "consumers only" are generated from only the respondents who reported ingestion of drinking water from a community water system during the survey period. The authors report that this group is often the primary focus in analyses of risk due to ingestion of water that may be contaminated. Consequently, this is the only group presented in Table 2.

In addition to identifying infants and developing children as sensitive life stages, as noted previously, the NAS identified the fetuses of iodide deficient pregnant women as the most sensitive population (or life stage). To address concerns that the default weight and ingestion rates provided in the October 2008 notice do not apply to this group, EPA has included an alternative HRL for **41888** this life stage in Table 2. This value is calculated based on body weight and drinking water ingestion information specifically from pregnant women (USEPA, 2004).

EPA notes that for six life stages in Table 2 (birth to < 1 month, 1 to < 3 months, 3 to < 6 months, 16 to 18 years and 18 to 21 years and for pregnant women), the sample size used to estimate some of the drinking water ingestion rates (denoted in Table 2 by foot note [FNc]) do not meet the minimum data requirements as described in the "Third Report on Nutrition Monitoring in the United States" (LSRO, 1995). However, these are the best available data to characterize drinking water ingestion for these specific life stages. EPA also notes that these data clearly show the trend that drinking water mean ingestion rate on a per body weight basis increases as the life stage age decreases. To address this potential concern regarding sample size for some of these drinking water ingestion rates, EPA also aggregated the three youngest recommended age groups into one category on Table 2 (birth to < 6 months) based on data from EPA (USEPA, 2004). To address women of childbearing age, EPA presents HRLs calculated based upon drinking water ingestion data for women ages 15 to 44.

To estimate dietary exposure to perchlorate and to calculate RSCs, EPA used data available from two studies previously described by EPA, the FDA's Total Diet Study (Murray et al., 2008) and the NHANES-UCMR Analysis (73 FR 60269-73, October 10, 2008). In cases where these studies did not provide a dietary exposure estimate for one of the recommended child-specific life stages/age groups, EPA applied the RSC calculated for the age group closest to the age group of interest. This meant that the RSCs for the age groups between birth and 6 months, 59%, were based on the mean dietary exposure estimate for infants ages 6 through 11 months, 0.29 µg/kg-day, derived from FDA's Total Diet Study. We understand that infant diets vary significantly between birth and age 11 months and that the TDS mean dietary perchlorate exposure estimates for ages 6 through 11 months consider consumption of baby foods that are not consumed by younger infants (see http:// www.fda.gov/ Food/FoodSafety/FoodContaminantsAdulteration/ChemicalContaminants/Perchlorate/ ucm077615.htm). Researchers from the CDC (Schier et al., 2009) recently published a study in which they estimated exposures to perchlorate from the consumption of infant formula. For infants age 1 month, the researchers' central tendency estimate of perchlorate daily dose from consumption of bovine milk-based infant formula with lactose (the type of formula with the highest concentrations of perchlorate) was also 0.29 µg/kg-day, corresponding to an RSC of 59%. Thus, EPA's RSC for young infants, 59%, is supported through two different estimates of central tendency infant dietary perchlorate exposure.

**Table 2—Alternative HRLs at the Average, 90th and 95th Percentile Drinking Water Ingestion Rates for Various Life Stages**

| Life stage | RfD | RSC [a] | Mean | Alt HRL | 90th | Alt HRL | 95th | Alt HRL |
|---|---|---|---|---|---|---|---|---|
| | (µg/kg-day) | (percent) | | | | | | |

| Age group | ingestion rate[d] (mL/kg-day)[b] | (µg/L) | ingestion rate[d] (mL/kg-day)[b] | (µg/L) | Percentile ingestion rate[d] (mL/kg-day)[b] | (µg/L) | Percentile ingestion rate[d] (mL/kg-day)[b] | (µg/L) |
|---|---|---|---|---|---|---|---|---|
| Birth to < 1 month | 0.7 | 59 | 137 | 3 | 235[c] | 2 | 238[c] | 2 |
| 1 to < 3 months | 0.7 | 59 | 119 | 3 | 228[c] | 2 | 285[c] | 1 |
| 3 to < 6 months | 0.7 | 59 | 80 | 5 | 148 | 3 | 173[c] | 2 |
| Birth to < 6 months | 0.7 | 59 | 95 | 4 | 184 | 2 | 221 | 2 |
| 6 to < 12 months | 0.7 | 59 | 53 | 8 | 112 | 4 | 129 | 3 |
| 1 to < 2 years | 0.7 | 44 | 27 | 11 | 56 | 6 | 75 | 4 |
| 2 to < 3 years | 0.7 | 44 | 26 | 12 | 52 | 6 | 62 | 5 |
| 3 to < 6 years | 0.7 | 60 | 24 | 18 | 49 | 9 | 65 | 6 |
| 6 to < 11 years | 0.7 | 71 | 17 | 29 | 35 | 14 | 45 | 11 |
| 11 to < 16 years | 0.7 | 84 | 13 | 45 | 26 | 23 | 34 | 17 |
| 16 to < 18 years | 0.7 | 80 | 12 | 47 | 24 | 23 | 32[c] | 18 |
| 18 to < 21 years | 0.7 | 80 | 13 | 43 | 29 | 19 | 35[c] | 16 |
| Pregnant Women[e] | 0.7 | 62[c] | 14[c] | 31 | 33[c] | 13 | 43[c] | 10 |
| Women Ages 15-44 | 0.7 | 80 | 15 | 37 | 32 | 18 | 39 | 14 |

*41889  4. Request for Comments

***EPA Seeks Comments on the Following Issues:***

a. EPA requests comment on whether the alternative HRLs described in this notice appropriately take into account specific and appropriate exposure values for all potentially sensitive life stages, including infants, children and the fetuses of pregnant women (rather than the 70 kg body weight and 2 liter per day consumption used for past regulatory determinations).

b. EPA requests comment on the alternative HRLs in Table 2 and which of these values would be appropriate levels of health concern against which to compare the levels of perchlorate found in public water systems.

c. EPA requests comment on whether EPA used the best available and most appropriate data to estimate alternative HRLs in Table 2. EPA specifically requests comment on the drinking water ingestion rates in Table 2 (denoted by footnote [FNc]) where the sample size does not meet the minimum data requirements as described in the ''Third Report on Nutrition Monitoring in the United States'' (LSRO, 1995). Does aggregating life stages (birth to 6 months, and women ages 15-44) address sample size limitation and still provide an accurate representation of the exposure to the most vulnerable life stages?

d. EPA requests comment on the merits of the approach described here of deriving HRLs for sensitive life stages based on the RfD combined with the life stage specific exposure data and whether there are other approaches that may be useful for deriving HRLs.

### C. Occurrence Analysis

#### 1. Occurrence Analysis in the October 2008 Federal Register Notice

In the October 2008 FR notice, EPA presented information on the drinking water occurrence of perchlorate. The data source was EPA's UCMR 1 and the samples were collected between 2001 and 2005. A total of 34,331 samples were collected from 3,865 public water systems. EPA found that 1.9% of the samples (637 out of 34,331) had perchlorate at, or above, the minimum reporting level (MRL = 4 μ g/L) and that 4.1% of the systems (160 out of 3,865 systems) reported perchlorate at, or above, the MRL in at least one sample. The average perchlorate concentration among systems that detected perchlorate was 9.85 μg/L and the median was 6.40 μg/L.

Table 3 presents EPA's estimates of the population served by water systems for which the highest reported perchlorate concentration was greater than various threshold concentrations ranging from 4 μg/L (MRL) to 25 μg/L. The fourth column presents a high end estimate of the population served drinking water above a threshold. This column presents the total population served by those drinking water systems in which at least one sample was found to contain perchlorate above the threshold concentration. EPA considers this a high-end estimate because it is based upon the assumption that the entire system population is served water from the entry point that had the highest reported perchlorate concentration. In fact, many water systems have multiple entry points into which treated water is pumped for distribution to their consumers. For the systems with multiple entry points, it is unlikely that the entire service population receives water from the one entry point with the highest single concentration. Therefore, EPA also is providing a less conservative estimate of the population served water above a threshold in the fifth column in Table 3. EPA developed this estimate by assuming the population was equally distributed among all entry points. For example, if a system with 10 entry points serving 200,000 people had a sample from a single entry point with a concentration at or above a given threshold, EPA assumed that the entry point served one-tenth of the system population, and added 20,000 people to the total when estimating the population in the last column of Table 3. This approach may provide either an overestimate or an underestimate of the population served by the affected entry point. In contrast, in the example above, EPA added the entire system population of 200,000 to the more conservative population served estimate in column 4, which is most likely an overestimate. EPA noted that the population estimates in Table 3 are for people at all life stages and estimated that at any one time, 1.4 percent of the population in Table 3 are pregnant women based upon data from the U.S. Census Bureau.

**Table 3—UCMR 1 Occurrence and Population Estimates for Perchlorate Above Various Thresholds**

| Thresholds [a] | PWSs with at least 1 detection > threshold of interest | PWS entry or sample points with at least 1 detection > threshold of interest [b] | Population served by PWSs with at least 1 detection > threshold of interest [c] | Population estimate for entry or sample points having at least 1 detection > threshold of interest [d] |
|---|---|---|---|---|
| 4 µg/L | 4.01% (155 of 3,865) | 2.48% (371 of 14,987) | 16.6 M [e] —D 5.1 M. | |
| 5 µg/L | 3.16% (122 of 3,865) | 1.88% (281 of 14,987) | 14.6 M | 4.0 M. |
| 7 µg/L | 2.12% (82 of 3,865) | 1.14% (171 of 14,987) | 7.2 M | 2.2 M. |
| 10 µg/L | 1.35% (52 of 3,865) | 0.65% (97 of 14,987) | 5.0 M | 1.5 M. |
| 12 µg/L | 1.09% (42 of 3,865) | 0.42% (63 of 14,984) | 3.6 M | 1.2 M. |
| 15 µg/L | 0.80% (31 of 3,865) | 0.29% (44 of 14,987) | 2.0 M | 0.9 M. |
| 17 µg/L | 0.70% (27 of 3,865) | 0.24% (36 of 14,987) | 1.9 M | 0.8 M. |
| 20 µg/L | 0.49% (19 of 3,865) | 0.16% (24 of 14,987) | 1.5 M | 0.7 M. |
| 25 µg/L | 0.36% (14 of 3,865) | 0.12% (18 of 14,987) | 1.0 M | 0.4 M. |

**\*41890** The Agency also evaluated supplemental drinking water monitoring data for perchlorate in California and Massachusetts. EPA believes these States' monitoring results are generally consistent with the results collected by EPA under UCMR 1. Perchlorate occurrence analysis from California and Massachusetts can be found online at: http:// www2.cdph.ca.gov/ certlic/drinkingwater/Pages/Perchlorate.aspx and http:// www.mass.gov/dep/water/drinking/percinfo.htm# sites respectively.

## 2. What Were the Key Issues Raised by Commenters?

EPA received comments on the proposed decision not to regulate perchlorate based on the population exposed above the HRL. Some comments objected to the Agency's proposed HRL as being "inappropriately high" thereby "greatly reducing the size of the population predicted to be exposed at a level of public health concern * * * and significantly minimizing the need for regulation of perchlorate from an occurrence standpoint."

One commenter believes that, "Approximately 4% of public water supplies serving 17 million Americans would be in exceedance of an HRL between 2 and 6 µ g/L. This is 15 million more at risk individuals than currently estimated by the Agency."

Another commenter believes that at an HRL of 2 µg/L, 16.6 million would be exposed, and another commenter states that if EPA set the HRL at 5 µg/L, then 5-7 times more individuals would be exposed above the HRL than at 15 µg/L.

However, one commenter points out that, "An MCL of 2 µg/L could impact approximately 4% of public water systems nationally. At this level, regional impacts in California and Texas would be greater due to the higher geographical concentration of detections in those states. Yet it should be noted that water systems in Massachusetts, New Jersey and California have already established regulatory limits of 2 µg/L, 5 µg/L and 6 µg/L respectively, thereby capping the population exposure potential from community drinking water sources in those States."

## 3. Numbers of Systems and Populations That Would Be Exposed at Levels Exceeding the Alternative Approaches the Agency Is Considering

EPA plans to use the UCMR 1 perchlorate data to conduct analyses to estimate the number of systems and populations served by systems that would be exposed to the various alternative HRL concentrations of perchlorate. Estimates will be made of the populations served by systems for which the highest reported perchlorate concentration exceeds the various threshold concentrations ranging from 1 µg/L to 25 µg/L. One limitation to the UCMR 1 data is that the perchlorate analytical method MRL is 4 µg/L; only perchlorate sample detections greater than or equal to 4 µg/L can be dependably quantified and reported. Any perchlorate sample concentration with a value between 0 and 4 µg/L is recorded in the UCMR 1 data as a "non-detection." Therefore, to estimate perchlorate occurrence relative to concentrations both above and below the MRL of 4 µg/L, while fully using all perchlorate detection and non-detection data, it is necessary to estimate occurrence using modeling techniques

EPA is considering using a Bayesian hierarchical model (a form of probabilistic model that uses maximum likelihood estimation techniques) to estimate perchlorate occurrence and to estimate the uncertainty and variability of those occurrence estimates. For this modeling effort, EPA could use the basic assumption that the national distribution of perchlorate sample concentrations can be modeled as a lognormal distribution. The lognormal distribution is a fundamental probability distribution that is used commonly and effectively to characterize environmental contaminant occurrence. The basic characteristic of a lognormal distribution is that the logarithms of the values being evaluated (in this case, the perchlorate concentrations of UCMR 1 samples of drinking water) are normally distributed. One property of the lognormal distribution that makes it particularly well-suited to describing phenomena like environmental contaminant occurrence data is that it is bounded by zero on the low end and it reflects a "right-skewed" distribution—that is, it has a tail in the upper end—that is consistent with having a small proportion with relatively high values.

The Bayesian model could estimate the number of public water systems, and populations served by systems, with at least one estimated sample detection greater than 1, 2, 3, 4, 5, 7, 10, 12, 15, 17, 20, and 25 µg/L. EPA notes that systems or entry/sample points with at least one detect above the threshold may not expose the population to this level at all times. At any particular time,

perchlorate levels may be lower or higher than the highest estimated sample detection. However, EPA believes this approach more closely reflects the short term exposure during life stages of concern (i.e., fetuses, pre-term newborns, infants and young children) than does the estimated mean concentration of perchlorate at a system. EPA underscores the fact that the estimated total population exposed at thresholds that lie below the perchlorate MRL of 4 µg/L would be equal to, if not greater than, the corresponding high end estimate of 16.8 million people. To estimate the portion of the total population that is at a childhood life stage potentially exposed at these thresholds, EPA could use U.S. Census data as it did in the October 2008 FR notice to estimate the number of pregnant women potentially exposed above the HRL and could also estimate the number of infants and children potentially exposed above the HRL

Perchlorate monitoring data from the State of Massachusetts could be used to help characterize the distribution of very low perchlorate concentration occurrence. Massachusetts monitoring uses a modified version of the EPA laboratory analytical method for perchlorate that has a MRL of 1 µg/L. This is the only known, state-wide monitoring program that uses an analytical method with an MRL lower than 4 µg/L. Bayesian hierarchical modeling can use the Massachusetts data to improve the model estimates in the lower concentration ranges.

### *41891  4. Request for Comment on Alternative Approaches

***EPA Seeks Comments on the Following Issues:***
a. EPA requests comment on the potential use of a Bayesian model to estimate the number of public water systems, and populations served by such systems, with at least one estimated sample detection greater than 1, 2, 3, 4, 5, 7, 10, 12, 15, 17, 20, and 25 µg/L.

b. EPA requests comment on using U.S. Census data to estimate the portions of the population that are in the sensitive life stage at any one time.

c. EPA requests comment on how the Agency should account for the variation of perchlorate levels over time in public water systems. EPA believes that estimating the number of systems, entry points and populations with at least one detection above the HRL is appropriate for the perchlorate regulatory determination because a single quarterly or semi-annual sample more closely reflects the short term exposure during life stages of concern (i.e., fetuses, pre-term newborns, infants and young children). However, EPA requests comment on whether the Agency should consider other approaches such as estimating the number of systems, entry points and populations with two or more detections above HRL or some other approach.

### IV. Consideration of Studies Published Since EPA Adopted the NAS RfD for Perchlorate
EPA's preliminary regulatory determination is based on NRC's (NRC, 2005) recommendation to use data from the Greer et al. (2002) study as the basis for the perchlorate RfD/risk assessment.

Since the publication of the NRC report, researchers have investigated perchlorate occurrence in humans by analyzing for perchlorate in urine and breast milk—such biomonitoring data has the potential to better inform EPA's analysis of exposure to perchlorate through food and water and to provide insight into the possible interactions of other physiologic conditions (e.g., iodine deficiency) with perchlorate ingestion. EPA's preliminary regulatory determination described the consideration of these studies, many of which were published after the NRC report (including, but not limited to, Blount et al. (2006 and 2007), Steinmaus et al. (2007), and Amitai et al. (2007)) (73 FR 60267-68, October 10, 2008).

CDC researchers published two biomonitoring papers using CDC's 2001-2002 NHANES data—the first study measured perchlorate in urine (Blount et al., 2006) and the second examined the relationship between urinary perchlorate and thyroid hormone levels (Blount et al., 2007). In the urinary biomonitoring study, the authors found perchlorate in all samples tested (2,820 survey participants ages six and older) and estimated a total daily perchlorate dose for adults (doses for children were not calculated). The median dose was about one tenth (0.066 µg/kg/day) of the RfD, while the 95th percentile dose was

about one third of the RfD (0.234 µg/kg/day). In the second study, which examined the relationship between urinary levels of perchlorate and blood serum levels of thyroid hormones, Blount et al. (2007) found that for women with low iodine levels (urinary iodide levels less than 100 µg/L) urinary perchlorate is associated with a decrease in (a negative predictor for) T4 levels and an increase in (a positive predictor for) thyroid stimulating hormone levels. The perchlorate exposures at which this association was observed are lower than anticipated based on other studies. The study authors indicated that further research needs to be performed to confirm these findings. The subsequent Steinmaus (2007) analysis of the same NHANES 2001-2002 epidemiological data concluded that thiocyanate in tobacco smoke and perchlorate interact in affecting the thyroid function in low-iodine women. The Amitai et al. study assessed thyroid hormone (thyroxine) values in newborns in different perchlorate exposure groups (low, high and very high) and found no significant differences.

In studies analyzing breast milk for perchlorate, Pearce et al. (2007) and Kirk et al. (2005, 2007) all found perchlorate in study samples. The objective of the Pearce et al. (2007) study was "to determine whether breast milk iodine concentrations in Boston-area women are adequate for infant nutrition, and whether breast milk iodine concentrations may be associated with environmental perchlorate or cigarette smoke exposure." Pearce et al. (2007) did not find a significant correlation with either breast milk perchlorate or urinary perchlorate levels with breast milk iodine concentrations. The objective of the Kirk et al. (2005) study was to determine the amount of perchlorate to which children are exposed by measuring perchlorate and iodide levels in cow and human breast milk and then comparing these numbers to corresponding levels of perchlorate in drinking water in the area. Kirk et al. (2005) did not find a correlation between the levels of perchlorate in breast milk and perchlorate in drinking water, but speculated that there was a correlation between higher levels of perchlorate and lower levels of iodine in breast milk. The objective of the Kirk et al. (2007) study was to determine the variability of perchlorate, thiocyanate, and iodide in breast milk in serially collected samples (6 samples on each of the 3 study days) involving 10 women. The authors concluded that "Iodine intake may be inadequate in a significant fraction of this study population. Perchlorate and thiocyanate appear to be common in human milk. The role of these chemicals in reducing breast milk iodide is in need of further investigation."

Blount et al. (2007) suggested breast milk as an excretion pathway and Dasgupta et al. (2008) compared a woman's daily intake of iodine and perchlorate with the concentrations of each in her breast milk. The Dasgupta et al. study found that a higher proportion of perchlorate enters the breast milk compared with a small proportion of iodine.

Of those commenters that provided detailed comments to the October 2008 FR notice, many commenters believe that EPA's RfD is not adequately protective of human health. One commenter stated that "[T]he EPA reference dose for perchlorate is based on data from Greer et al. (2002) that observed the inhibition of radioiodide uptake. Ginsberg and Rice (2005) identified several problems with the Greer et al. study that suggest the need for reevaluation of the value that serves as the foundation for regulatory decision-making," and that, "* * * the results of the Blount study more closely reflect our understanding of the biological and toxicological processes pertaining to thyroid homeostasis, both in terms of thyroid hormone variability and the role of iodine." The commenter "[S]trongly recommends that the CDC data analyzed in the study of Blount et al. (2006) and Blount et al. (2007) be used as the basis for the derivation of a new reference dose."

Other commenters agree, stating that the use of the Greer et al. (2002) study "* * * is based on a limited clinical study of short duration and small sample size not representative of the variability in the human population," and the "[U]se of these limited data to calculate a regulatory trigger level has been widely criticized as inadequate * * * and no longer reflects the best available data."

Another commenter believes that "[A]dditional important data on pregnant women and their offspring **41892** have become available since the time of development of the EPA RfD in 2005 which would necessitate a reconsideration of the existing value * * * in addition EPA has discussed other data relevant to deriving an updated RfD in this Federal Register notice including Amitai et al., 2007, Blount et al., 2006, and studies discussing PBPK models."

One commenter concludes by stating, "* * * [T]hat EPA has based its argument for not regulating perchlorate contamination in public water systems on a literature that is both limited and ill focused. We believe that EPA has not performed a sufficiently

'thorough review' of the literature, that it has omitted important information, and that it has failed to perform its due diligence in the interpretation and analysis of the information that it did present. To correct this, EPA must employ the CDC study (Blount et al., 2006a) as the point of departure for RfD determination, and must focus on the neonate and infant as the most sensitive population."

One commenter does not believe that additional analysis is warranted and that EPA should issue a final determination as soon as possible, stating that "EPA has an extraordinary wealth of comprehensive, authoritative scientific information relating to perchlorate's health effects, supplemented by extensive occurrence and exposure data. The Agency is therefore exceptionally well-positioned to issue a well-considered regulatory determination." The commenter continues by stating,

* * * EPA has ample scientific and technical data to make a final determination on or before the planned date of December 2008 * * *. [P]erchlorate is one of the most well[hyphen]studied chemicals with detailed information on the mechanism of action, dose[hyphen]response, and health effects. This issue also is not new. EPA released its first draft risk assessment on perchlorate in 1998, followed by a second in 2002. The 2005 NAS report was a comprehensive review of the science. The animal and human studies that have been published since the NAS report reduce the uncertainty and reinforce the NAS panel's finding that there will not be any adverse health effects from perchlorate at environmentally[hyphen]relevant concentrations.

New studies published since the NAS report increase the weight of evidence that the current RfD protects human health including the most sensitive members of our population. In addition, testimony by Congressional members and witnesses alike have discussed the lengthy amount of time that EPA has spent studying the health effects, urging the agency to issue a determination as soon as practicable. We join them in urging EPA to issue the final determination promptly.

An additional key scientific issue was raised by EPA's OIG in the report released for public comment "OIG Scientific Analysis of Perchlorate (External Review Draft)" (EPA, 2008g). The report states,

The OIG Analysis concludes that a single chemical risk assessment of perchlorate is not sufficient to assess and characterize the combined human health risk from all four NIS stressors, (i.e., thiocyanate, nitrate, perchlorate and lack of iodide) and that * * * Only a cumulative risk assessment can fully characterize the nature and sources of risk affecting this public health issue. Furthermore, a cumulative risk assessment allows an informed environmental decision to be made on how to mitigate the risk effectively.

The report goes on to say,
Potentially lowering the perchlorate drinking water limit from 24.5 ppb to 6 ppb does not provide a meaningful opportunity to lower the public's risk. By contrast, addressing moderate and mild iodide deficiency occurring in about 29% of the U.S. pregnant and nursing population appears to be the most effective approach of increasing TIU [total iodide uptake] to healthy levels during pregnancy and nursing, thereby reducing the frequency and severity of permanent mental deficits in children.

The draft report, and comments submitted by EPA's Office of Water and Office of Research and Development, can be found in the Docket to this notice.

EPA agrees that additional important data have become available since the RfD was derived in 2005. However, EPA has evaluated the new data and has decided to make the regulatory determination based upon the current RfD. EPA will continue to evaluate any new perchlorate data to determine its relevance to the regulatory determination in accordance with the SDWA.

## V. Next Steps
The Agency will consider the information and comments submitted in response to this supplemental notice, as well as comments received on the October 10, 2008, FR notice, and all peer review comments before issuing a final regulatory determination for

perchlorate and intends to do so as expeditiously as possible. EPA believes that the alternative analyses presented in this notice could lead the Agency to make a determination to regulate perchlorate.

## VI. References

Amitai Y, Winston G, Sack J, Wasser J, Lewis M, Blount BC, Valentin-Blasini L, Fisher N, Israeli A, and Leventhal A. (2007). Gestational exposure to high perchlorate concentrations in drinking water and neonatal thyroxine levels. Thyroid. 17(9): 843-850.

Blount, B.C., J.L. Pirkle, J.D. Osterloh, L. Valent[iacute]n-Blasini, and K.L. Caldwell. 2006. Urinary perchlorate and thyroid hormone levels in adolescent and adult men and women living in the United States. Environmental Health Perspectives. Vol. 114, No. 12. pp. 1865-1871.

Blount, B.C., L. Valent[iacute]n-Blasini, J.D. Osterloh, J.P. Mauldin, and J.L. Pirkle. 2007. Perchlorate Exposure of the US Population, 2001-2002. J. Exposure Sci. Environ. Epidemiol. (2007) 17, 400-407.

Dasgupta, P.K., A.B. Kirk, J.V. Dyke, and S.I. Ohira. 2008. Intake of Iodine and Perchlorate Excretion in Human Milk. Environ. Sci. Technol. Advance online publication accessed September 18, 2008.

DeWoskin R. and C. Thompson. 2008. Renal clearance parameters for PBPK model analysis of early lifestage differences in the disposition of environmental toxicants. Regul Toxicol Pharmacol. 2008 Jun;51(1):66-86.

Ginsberg G, Rice D, 2005. The NAS Perchlorate Review: Questions Remain about the Perchlorate RfD. Environ Health Perspectives 113(9):1117-1119.

Greer, M.A., G. Goodman, R.C. Pleuss, and S.E. Greer. 2002. Health effect assessment for environmental perchlorate contamination: the dose response for inhibition of thyroidal radioiodide uptake in humans. Environ Health Perspect Vol. 110. pp. 927-937.

Kahn, H.D., and K. Stralka. 2008. Estimated daily average per capita water ingestion by child and adult age categories based on USDA's 1994-1996 and 1998 continuing survey of food intakes by individuals. Journal of Exposure Science and Environmental Epidemiology (2009) 19(4):396-404.

Kirk, A.B., P.K. Martinelango, K. Tian, A. Dutta, E.E. Smith, and P.K. Dasgupta. 2005. Perchlorate and iodide in dairy and breast milk. Environmental Science and Technology. Vol. 39, No. 7. pp. 2011-2017.

Kirk, A.B., J.V. Dyke, C.F. Martin, and P.K. Dasgupta. 2007. Temporal patterns in perchlorate, thiocyanate and iodide excretion in human milk. Environ Health Perspect Online Vol. 115, No. 2. pp. 182-186.

Life Sciences Research Office, Federation of American Societies for Experimental Biology Prepared for the Interagency Board for Nutrition Monitoring and Related Research. 1995. Third Report on Nutrition Monitoring in the United States: Volume 1. U.S. Government Printing Office, Washington DC.

Murray, C.W III, S.K. Egan, H. Kim, N. Beru, P.M. Bolger. 2008. US Food and Drug Administration's Total Diet Study: Dietary Intake of Perchlorate and Iodine. Journal of Exposure Science and Environmental Epidemiology, advance online publication January 2, 2008.

National Research Council (NRC). 2005. Health Implications of Perchlorate Ingestion. National Academies Press,  **\*41893** Board on Environmental Studies and Toxicology. January 2005. 276 p.

Pearce, E.N., A.M. Leung, B.C. Blount, H.R. Bazrafshan, X. He, S. Pino, L. Valentin-Blasini, L.E. Braverman. 2007. Breast milk iodine and perchlorate concentrations in lactating Boston-area women. J Clin Endocrin Metab Vol. 92, No. 5, pp. 1673-1677

Schier, J.G., A.F. Wolkin, L.Valentin-Blasini, M.G. Belson, S.M. Kieszak, C.S. Rubin, B.C. Blount. Journal of Exposure Science and Environmental Epidemiology, advance online publication 18 March 2009; doi: 10.1038/jes.2009.18.

Steinmaus, C., M.D. Miller, R. Howd. 2007. Impact of smoking and thiocyanate on perchlorate and thyroid hormone associations in the 2001-2002 National Health and Nutrition Examination Survey. Environ Health Perspect 115(9):1333-8.

USEPA. 1995. Guidance for Risk Characterization. Science Policy Council, February, 1995.

USEPA. 2004. Estimated Per Capita Water Ingestion and Body Weight in the United States—An Update. Office of Science and Technology, Washington, DC; EPA/822/R-00-001.

USEPA. 2005. Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants. National Center for Environmental Assessment, Washington, DC; EPA/630/P-03/003F.

USEPA. 2008a. Drinking Water: Preliminary Regulatory Determination on Perchlorate, Federal Register, Vol. 73, No. 198. p. 60262, October 10, 2008.

USEPA. 2008b. Inhibition of the Sodium-Iodide Symporter by Perchlorate: An Evaluation of Lifestage Sensitivity Using Physiologically-Based Pharmacokinetic (PBPK) Modeling. Office of Research and Development, Washington, DC; EPA/600/R-08/106A.

USEPA. 2008c. External letter peer review of EPA's draft report, Inhibition of the Sodium-Iodide Symporter by Perchlorate: An Evaluation of Lifestage Sensitivity Using Physiologically-based Pharmacokinetic (PBPK) Modeling. National Center for Environmental Assessment, Washington, DC; November 12, 2008.

USEPA. 2008d. Interim Drinking Water Health Advisory for Perchlorate. Office of Science and Technology, Washington, DC; EPA 822-R-08-025.

USEPA. 2008e. Comment Response Summary Report, Peer Review of Drinking Water Health Advisory for Perchlorate. Office of Science and Technology, Washington, DC; December 2008.

USEPA. 2008f. Child-Specific Exposure Factors Handbook. National Center for Environmental Assessment, Washington, DC; EPA/600/R-06/096F.

USEPA. 2008g. Scientific Analysis of Perchlorate (External Review Draft). Office of Inspector General, Washington, DC; Assignment No. 2008-0010.

Dated: August 5, 2009.

Peter S. Silva,

Assistant Administrator, Office of Water.


[FR Doc. E9-19507 Filed 8-18-09; 8:45 am]

BILLING CODE 6560-50-P

## Footnotes

1    On November 12, 2008, EPA extended the comment period for 15 days regarding EPA's preliminary regulatory determination for perchlorate.

2    The requirement for national drinking water regulations are in SDWA Section 1412. EPA's Web page describes the regulatory development process (see http://www.epa.gov/safewater/standard/setting.html). SDWA section 1412.e requires that EPA request comment from the Science Advisory Board prior to proposal of a maximum contaminant level goal and national primary drinking water regulation.

a The body weight (70 kg) for the average adult is the default weight used by EPA for past regulatory determinations. All other body weights are generated by the model.

b Maternal body weight was held at the value defined at the start of pregnancy (BW = 67.77 kg), and the "average adult" urinary clearance values as published by Merrill et al. (2005) were used.

c Results are based on using the maternal urinary clearance as published in Clewell et al. (2007), which equal about half of the average adult clearance.

d Results are based on setting the maternal clearance rates of both perchlorate and iodide during lactation equal to that of the average adult. Clewell et al. (2007) used an iodide clearance rate equal to that of an average adult, but a perchlorate rate only half that of the average adult.

AIU     e
inhibition
given
for the
infant
is
provided
based
upon a
value
of
urinary
clearance
scaled
from
the
adult
by BW
2/3 to
approximate
surface-
area
scaling,
and
then
multiplied

by a rising fraction vs. age based on data (DeWoskin and Thompson, 2008) to reflect the reduction in glomerular filtration rates. Clewell et al. (2007) scaled urinary clearance by BW 0.75, rather than adjusting based on GFR

AIU    f These inhibition values are based on an internal dose to the breast-fed infant of 7 µg/kg-day, the same as for the other subgroups. Maternal dose rates lower than

the POD are needed to provide 7 µg/kg-day to the infant as shown in the table. These doses differ due to changes in body weights and other PK factors with age

g Because EPA typically uses a 10 kg child as a default assumption for its drinking water health advisories, the model was run for a child at 0.97 yr, the age at which the model-simulated body weight for a child is 10 kg.

h Results were obtained by setting urinary clearance constants for the older child equal to the average adult (Merrill et al., 2005) and scaling by BW 1.

i The dose equal to the POD is 7 µg/kg-day which is 10-fold greater than the RfD. The predicted RAIU inhibition at the RfD would be less than those shown in Table 1.

a RSC calculated for nearest age range based on the mean dietary intake from TDS (see Table 5 at 73 FR 60275, October 10, 2008), RSC for pregnant women and women ages 15-44 based on the 90th percentile dietary intake from NHANES-UCMR analysis (see Table 6 at 73 FR 60276, October 10, 2008).

b Drinking Water Ingestion Rates for consumers only in Community Water Systems taken from EPA's "Child-Specific Exposure Factors Handbook" (USEPA, 2008e). Except for values for infants from birth to 6 months, which are taken from Tables 5.2.A2 of EPA's "Estimated Per Capita Water Ingestion and Body Weight in the United States—An Update" (USEPA, 2004), and for Pregnant Women and Women Ages 15-44 which are taken from Table 6.2.A2 of EPA's "Estimated Per Capita Water Ingestion and Body Weight in the United States—An Update" (USEPA, 2004).

c The sample sizes for the estimates of ingestion rates for these life stages do not meet the minimum data requirements as described in the "Third Report on Nutrition Monitoring in the United States" (LSRO, 1995).

d Ingestion rate is adjusted for the self-reported body weights from the CFSII.

e The most sensitive population identified by the NRC are the fetuses of pregnant women who might have hypothyroidism or iodide deficiency.

Footnotes:

a All occurrence measures in this table were conducted on a basis reflecting values greater than the listed thresholds.

**\*41890**  b The entry/sample-point-level population served estimate is based on the system entry/sample points that had at least 1 analytical detection for perchlorate greater than the threshold of interest. The UCMR 1 small system survey was designed to be representative of the nation's small systems, not necessarily to be representative of small system entry points.

c The system-level population served estimate is based on the systems that had at least 1 analytical detection for perchlorate greater than the threshold of interest.

d Because the population served by each entry/sample point is not known, EPA assumed that the total population served by a particular system is equally distributed across all entry/sample points. To derive the entry/sample point-level population estimate, EPA summed the population values for the entry/sample points that had at least 1 analytical detection greater than the threshold of interest.

e This value does not include the population associated with 5 systems serving 200,000 people that measured perchlorate at 4 μg/L in at least one sample because the table only shows population estimates greater than each of the thresholds in the first column.

---

**End of Document**                                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.   ADD 0059  23

**Calendar No. 226**

| 104TH CONGRESS *1st Session* | SENATE | REPORT 104–169 |
| --- | --- | --- |

# SAFE DRINKING WATER AMENDMENTS ACT OF 1995

### REPORT

OF THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS UNITED STATES SENATE

ON

# S. 1316

[Including cost estimate of the Congressional Budget Office]



November 7, 1995.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

29–010     WASHINGTON : 1995

# C O N T E N T S

|  | Page |
|---|---|
| General Statement | 1 |
| Background | 2 |
| Types of contaminants and health risks in drinking water | 6 |
| History of Federal drinking water regulations | 8 |
| Problems and solutions | 10 |
| Section-by-section summary: | |
| Section: | |
| 1. Short title | 17 |
| 2. Findings | 17 |
| 3. State revolving funds | 17 |
| 4. Selection of contaminants; schedule | 24 |
| 5. Risk assessment, management, and communication | 27 |
| 6. Standard-setting; review of standards | 30 |
| 7. Arsenic | 38 |
| 8. Radon | 41 |
| 9. Sulfate | 44 |
| 10. Filtration and disinfection | 46 |
| 11. Effective date for regulations | 48 |
| 12. Technology and treatment techniques; technology centers | 50 |
| 13. Variances and exemptions | 52 |
| 14. Small systems; technical assistance | 54 |
| 15. Capacity development; finance centers | 58 |
| 16. Operator and laboratory certification | 61 |
| 17. Source water quality protection partnerships | 62 |
| 18. State primacy; state funding | 67 |
| 19. Monitoring and information gathering | 69 |
| 20. Public notification | 77 |
| 21. Enforcement; judicial review | 79 |
| 22. Federal agencies | 83 |
| 23. Research | 85 |
| 24. Definitions | 87 |
| 25. Ground water protection | 90 |
| 26. Lead plumbing and pipes; return flows | 93 |
| 27. Bottled water | 95 |
| 28. Assessing environmental priorities, costs, and benefits | 97 |
| 29. Other amendments | 99 |
| Hearings | 100 |
| Rollcall votes | 100 |
| Regulatory impact | 101 |
| Cost of legislation | 103 |
| Changes in existing law | 112 |

(III)

ADD 0061

**Calendar No. 226**

| 104TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>104–169 |
|---|---|---|

SAFE DRINKING WATER AMENDMENTS ACT OF 1995

NOVEMBER 7, 1995.—Ordered to be printed

Mr. CHAFEE, from the Committee on Environment and Public Works, submitted the following

# REPORT

[To accompany S. 1316]

The Committee on Environment and Public Works, to which was referred the bill (S. 1316) to reauthorize and amend title XIV of the Public Health Service Act (commonly known as the "Safe Drinking Water Act"), and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill do pass.

## GENERAL STATEMENT

*Objectives of the Legislation*

The outbreak of *Cryptosporidiosis* in Milwaukee in the Spring of 1993 focused the Nation's attention on the Safe Drinking Water Act and dramatically highlighted the fundamental problem with the Act as it is currently written and implemented. Although the Environmental Protection Agency (EPA) developed a research plan to improve our understanding of *Cryptosporidium* over a decade ago, the research has not been completed and *Cryptosporidium* remains unregulated today. The problem is that the Safe Drinking Water Act unintentionally discourages EPA from concentrating its resources on regulating contaminants that pose the highest health risks. Instead, the Safe Drinking Water Act requires EPA to regulate a long list of contaminants, regardless of the seriousness of the threat they pose to public health and regardless the frequency with which they occur in drinking water.

The bill addresses the legitimate concerns that have been raised regarding current law and provides important mid-course

29–010

*Small Systems*

Many small public water systems have difficulty complying with Federal drinking water regulations, in some cases due to a lack of technical expertise and financial resources for treatment and monitoring.

As with most public utilities, there are significant economies of scale in drinking water supply. EPA and the Congressional Budget Office have published estimates indicating that systems serving more than 10,000 people experience costs that *average* less than $20 per household per year to comply with the current requirements of the Safe Drinking Water Act. By way of comparison, the average annual incremental household cost to comply with the requirements of the Safe Drinking Water Act for systems serving 25 to 100 persons is $145. Costs for some systems may be much higher than these national averages.

In addition to the loans and grants available through the new SRF program discussed above, S. 1316 will reduce the burdens faced by small systems in several ways:

- States are authorized to grant variances to small systems that cannot afford to comply with national primary drinking water regulations;

- States are to adopt capacity development strategies to assist small systems in attaining the technical, financial and managerial capacity that will make it possible to comply with the Act;

- a portion of the SRF funds may be set aside for technical assistance to small systems and the cost of training operators may be included in the SRF grant or loan;

- States may reduce monitoring requirements for many contaminants by 75 percent for small systems that do not detect a contaminant in the first test of a quarterly series; and

- the standard for radon (that will affect mostly small systems served by ground water sources) is set at 3000 pCi/L rather than 300 pCi/L as proposed by EPA in 1991.

*Selection of Contaminants for Regulation*

Because EPA had failed to take action to set national standards for contaminants that were of public health concern, the 1986 Amendments listed 83 specific contaminants and required EPA to set standards for these substances by 1989. That legislation also directed EPA to set standards for an additional 25 contaminants every 3 years beginning in 1991.

This single provision of the Safe Drinking Water Act has provoked more critical comment than virtually any other element of environmental law. Some of the 83 contaminants for which standards are required occur so infrequently in public water systems that the costs of monitoring (for a substance not present) far outweigh any health benefit that could be realized at the few systems that may detect the contaminant. In other cases, the available science is so uncertain that standards incorporate extravagant margins of safety (30,000-fold for one contaminant) making it im-

13

possible to assert that expenditures to implement the regulation are a public health necessity. Finally, the mandate that EPA set standards for an additional 25 contaminants every 3 years regardless of the threat posed by these contaminants in drinking water is for many the quintessential example of an arbitrary Federal law imposing burdens on consumers and the taxpayers of other governments with no rational relationship to the public benefits that might be realized.

Governor George Voinovich of Ohio clearly stated this view at the Committee's hearing on October 19, 1995:

> "The Safe Drinking Water Act is a perfect example of an arbitrary environmental statute in dire need of reform. After all, the very essence of the bill is a requirement that EPA promulgate 25 new contaminants every 3 years that communities must test for, regardless of whether or not they actually occur in the region's drinking water.
>
> "At this untenable pace local communities could have to monitor as many as 161 contaminants by 2001. Instead of prioritizing health risks and providing the means to address them, the current law is a one-size-fits-all program. It forces our water quality experts to spend scarce resources searching for dangers that often do not exist rather than identifying and removing real health risks from our drinking water."

S. 1316 repeals the requirement that EPA regulate an additional 25 contaminants every 3 years replacing it with a new selection process that gives EPA the discretion to identify contaminants that warrant regulation in the future. The selection process has several elements including:

- every 5 years EPA is to publish a list of high priority contaminants that should receive additional study;
- EPA may require monitoring at public water systems for up to 20 unregulated contaminants to gather information on the occurrence of contaminants in public water systems;
- EPA is to maintain a national occurrence database including information on regulated and unregulated contaminants;
- decisions made by EPA under the Act are to be guided by new principles for sound science;
- EPA is to set aside $10 million from the annual appropriation for SRF grants to conduct health effects research on contaminants that are candidates for regulation; and
- every 5 years EPA is to make regulatory decisions for at least 5 contaminants announcing whether they warrant regulation or not.

*Standard Setting*

Under current law, EPA establishes drinking water standards through a two-step process. First, the Administrator identifies the maximum contaminant level goal (MCLG) reflecting a concentration of the contaminant in drinking water at which no adverse effects to the health of persons will occur. Second, the Administrator