**ORAL ARGUMENT SCHEDULED FOR JANUARY 27, 2023**

No. 20-1335

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL REGAN, Administrator, U.S. Environmental Protection
Agency,

*Respondents.*

---

On Petition for Review of Final Action by the
United States Environmental Protection Agency

---

**FINAL BRIEF OF RESPONDENT-INTERVENOR
AMERICAN WATER WORKS ASSOCIATION**

---

Ronald J. Tenpas
Corinne V. Snow
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Office: (202) 639-6791
Fax: (202) 330-5328
rtenpas@velaw.com
csnow@velaw.com
*Counsel for Intervenor American
Water Works Association*

Dated: December 6, 2022

**CERTIFICATE AS TO PARTIES, RULINGS,**
**AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Respondent-Intervenor American Water Works Association certifies as follows:

**A. Parties and amici.**

All parties and intervenors appearing in this case are listed in the Petitioner Natural Resources Defense Council's Opening Brief.  Fourteen individual academic scientists submitted an amicus brief in support of Petitioner.  American Chemistry Council and Western Growers submitted an amicus brief in support of Respondents.

**B.  Rulings under review.**

The rulings under review are set forth in Petitioner Natural Resources Defense Council's Opening Brief.

**C. Related cases.**

Reference to the rulings at issue appear in Petitioner Natural Resources Defense Council's Opening Brief.

/s/ Ronald J. Tenpas
*Counsel for Intervenor American Water*
*Works Association*

## RULE 26.1 DISCLOSURE STATEMENT

The American Water Works Association is a non-governmental corporation with no parent corporation and no publicly held company holding 10% or more of its stock.  The American Water Works Association is a corporation organized and existing under the laws of the State of Illinois.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATUTES AND REGULATIONS.....................................................1

STATEMENT OF THE ISSUES PRESENTED....................................2

STATEMENT OF THE CASE...............................................................2

I.    Iodide Deficiency and Perchlorate. ...............................................2

II.   SDWA Background. .......................................................................4

III.  Regulatory and Procedural Background.........................................7

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW .................................................................13

ARGUMENT .......................................................................................13

I.    Based on best available science, EPA correctly determined that it could
      not regulate perchlorate because the statutory criteria were not satisfied.....13

      A.    Perchlorate is not present in drinking water at levels and
            frequencies that justify SDWA regulation. .........................................15

            1.    EPA's conservative proposed maximum contaminant level
                  goals were supported by the record and within the
                  Agency's discretion. ...........................................................16

            2.    EPA's reliance on updated UCMR 1 data was rational and
                  consistent with the statutory directive to use the best
                  available public health information to determine
                  occurrence levels.......................................................................22

            3.    EPA properly excluded other data from its analysis. ...............25

      B.    The EPA Administrator correctly found that regulation of
            perchlorate does not present a meaningful opportunity for health
            risk reduction for persons served by public water systems.................27

iv

C.    The statutory criteria would still not be satisfied even considering Petitioner's extra-record materials. ..................................28

II.    EPA had to withdraw the 2011 Determination because the SDWA does not allow EPA to regulate a contaminant unless the three statutory criteria are present at the time of regulation. .....................................................31

A.    The 1996 Amendments were designed to allow EPA to take additional time to make regulatory decisions based on updated information. .........................................................................................34

B.    Even if the statute did not compel such a result, it was well within the Agency's discretion to determine regulation of perchlorate was not warranted at this time based on the best available science. .................................................................................35

C.    Nothing in the statute prevents the Administrator from withdrawing a determination prior to issuing regulations, and nothing in the legislative history for the 1996 amendments suggests Congress intended to strip EPA of such authority. .............37

D.    EPA's delay in issuing a proposed regulation after the 2011 Determination does not bar it from relying on the best available science. .................................................................................39

CONCLUSION ........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
371 U. S. 156 (1962) ..................................................................... 22, 30

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) ................................................................................38

*Chlorine Chemistry Council v. EPA*,
206 F.3d 1286 (D.C. Cir. 2000) ....................................... 15, 32, 33, 34

*Env't Def. Fund, Inc. v. Costle*,
578 F.2d 337 (D.C. Cir. 1978) ............................................................17

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................38

*Idaho Conservation League v. Wheeler*,
930 F.3d 494 (D.C. Cir. 2019) ............................................................39

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) ....................................................... 33, 37

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ................................................................................31

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) .........................................................31

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................... 22, 24

*Nat'l Ass'n of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012) .........................................................38

*NRDC v. EPA*,
812 F.2d 721 (D.C. Cir. 1987) ....................................... 15, 16, 22, 24

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) .........................................................................31

**Statutes**

42 U.S.C. § 300g-1(b)(1)(A).......................................................................14

42 U.S.C. § 300g-1(b)(1)(A)(ii)......................................................................15

42 U.S.C. § 300g-1(b)(1)(A)(iii)..................................................... 7, 28, 35

42 U.S.C. § 300g-1(b)(1)(B)(i)(I)...................................................... 32, 40

42 U.S.C. § 300g-1(b)(1)(B)(ii)(I)..................................................... 33, 40

42 U.S.C. § 300g-1(b)(1)(B)(ii)(II)................................... 13, 22, 27, 32

42 U.S.C. § 300g-1(b)(1)(C).............................................................18

42 U.S.C. § 300g-1(b)(1)(E)........................................................ 35, 36

42 U.S.C. § 300g-1(b)(3)(A) (1986)......................................... 4, 15, 32

42 U.S.C. § 300g-1(b)(3)(C) (1986)....................................................4

42 U.S.C. § 300g-1(b)(4)...............................................................21

42 U.S.C. § 300g-1(b)(9)............................................................ 33, 37

5 U.S.C. § 706(2)(C)...................................................................31

## Regulations

64 Fed. Reg. 50,556 (Sept. 17, 1999) .........................................................4

68 Fed. Reg. 42,898 (July 18, 2003).........................................................14

73 Fed. Reg. 60,262 (Oct. 10, 2008)......................................................7, 8

76 Fed. Reg. 7762 (Feb. 11, 2011) ...................................................... 9, 38, 39

76 Fed. Reg. 78,256 (Dec. 16, 2011) ..........................................................9

84 Fed. Reg. 30,524 (June 26, 2019) ...................... 11, 18, 19, 20, 21, 23, 25, 30

85 Fed. Reg. 43,990 (July 21, 2020)...................... 2, 3, 7, 11, 17, 21, 23, 28, 30

## Other Authorities

H.R. Rep. No. 104-632 (1996)................................................... 4, 5, 6, 32

S. Hrg. 111-1178 (Jan. 14, 2009).........................................................8

S. Rep. No. 104-169 (1995) ................................................... 4, 5, 34, 36

vii

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| EPA or Agency | Environmental Protection Agency |
| NRDC | Natural Resources Defense Council |
| SDWA or Act | Safe Drinking Water Act |
| UCMR 1 | First Unregulated Contaminant Monitoring Rule |

## INTRODUCTION

The true public health concern at issue here is the impact of iodide deficiency on vulnerable subsets of the population. Although persistent exposure to perchlorate at certain high levels has been shown to limit iodide uptake, perchlorate in drinking water is only a minor part of the iodide deficiency puzzle. Simply put, perchlorate does not occur in public water systems at levels and frequencies that present a meaningful opportunity for health risk reduction. In turn, Safe Drinking Water Act ("SDWA" or "Act") regulation of perchlorate is not an appropriate method for tackling this broader public health concern.

Congress explicitly crafted the SDWA, including through specific amendments, to focus regulation on contaminants that meet three specific criteria. The Environmental Protection Agency ("EPA" or "the Agency") has repeatedly analyzed the best available science, and concluded that the statutory criteria are not satisfied. EPA correctly reached this conclusion again in 2020 and 2022. This Court should therefore uphold EPA's decision to withdraw its erroneous 2011 determination to regulate perchlorate ("2011 Determination").

## STATUTES AND REGULATIONS

Except for those included in the attached addendum, all applicable statutes and regulations are contained in the respective Briefs for Petitioner Natural Resources Defense Council ("NRDC") or Respondent EPA.

1

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether EPA correctly determined, based on the best available science, that it could not promulgate a national primary drinking water regulation for perchlorate because the statutory criteria for doing so were not satisfied.

2.     Whether EPA was obligated to regulate perchlorate based on its 2011 Determination despite a record indicating that the statutory criteria for doing so were not present.

## STATEMENT OF THE CASE

### I.     Iodide Deficiency and Perchlorate.

A number of substances found in food and drinking water have the potential to inhibit iodide uptake in the thyroid, including thiocyanate, commonly found in dairy products and vegetables, and nitrate, commonly found in processed meats. EPA, *Office of Inspector General Scientific Analysis of Perchlorate External Review Draft* at 1 (2008), EPA-HQ-OW-2018-0780-0224, JA209.  High level exposure to these substances can result in iodide deficiency, which in turn can affect thyroid hormone production, and has the potential to impact sensitive sub-populations, particularly pregnant or nursing mothers and infants.  Drinking Water: Final Action on Perchlorate, 85 Fed. Reg. 43,990, 43,991 (July 21, 2020) ("2020 Determination"). Iodide deficiency can be treated with pre-natal vitamins or other forms of iodine

supplementation. EPA, *Office of Inspector General Scientific Analysis of Perchlorate External Review Draft* at 177, JA220.

Perchlorate has been shown to inhibit iodide uptake when present at high levels, such as when perchlorate is medically prescribed to treat certain thyroid disorders. Perchlorate is not bio-accumulative, meaning that it does not build up in the body, and therefore persistent high-level exposure would be required for perchlorate to impact thyroid hormone production through iodide deficiency. The health impacts of perchlorate exposure have been studied extensively, and multiple peer-reviewed studies provide a significant weight of evidence finding that there is no adverse impact from low levels of perchlorate in drinking water and it is not associated with thyroid hormone suppression. *See, e.g.*, American Water Works Association Comment at Table 1 (Sept. 9, 2009), EPA-HQ-OW-2009-0297-0001.

Perchlorate exposure pathways include food and drinking water. EPA collected data from water systems through an SDWA program known as the first Unregulated Contaminant Monitoring Rule ("UCMR 1"), which is designed to provide national occurrence information on unregulated contaminants. 85 Fed. Reg. at 43,993. UCMR 1 is the only national survey of perchlorate occurrence in water systems, and required all large systems and a representative sample of small systems to monitor for perchlorate. *Id.*; Revisions to the Unregulated Contaminant Monitoring Regulation for Public Water Systems, 64 Fed. Reg. 50,556 (Sept. 17,

3

1999). Since the time perchlorate was first detected in some drinking water, significant steps have been taken to address the issue, including improved handling of certain drinking water disinfectants, remediation activities at contaminated sites—particularly the ongoing remediation efforts to address perchlorate contamination in groundwater adjacent to the lower Colorado River—as well as perchlorate drinking water regulations adopted in Massachusetts and California. In addition, some systems have reduced perchlorate exposure with water treatment, abandoning impacted sources, or blending multiple sources prior to distribution.

## II.    SDWA Background.

Under the SDWA, EPA imposes requirements on water systems that are designed to limit certain contaminants that may be found in drinking water. But the Act is not designed to regulate every contaminant known to potentially occur in drinking water. Indeed, Congress amended the SDWA in 1996, recognizing that the Act's prior requirements, and associated economic burdens on water systems and the States, were causing noteworthy problems because the SDWA reached too far in its then-existing formulation. S. Rep. No. 104-169 at 2, 11, 17 (1995); H.R. Rep. No. 104-632 at 9 (1996). Prior to the 1996 amendments, EPA was required to set standards for 83 specific contaminants and for an additional 25 contaminants every 3 years. 42 U.S.C. § 300g-1(b)(3)(A), (C) (1986). In amending the Act, Congress noted that:

4

This single provision of the Safe Drinking Water Act has provoked more critical comment than virtually any other element of environmental law. Some of the 83 contaminants for which standards are required occur so infrequently in public water systems that the costs of monitoring (for a substance not present) far outweigh any health benefit that could be realized at the few systems that may detect the contaminant. In other cases, the available science is so uncertain that standards incorporate extravagant margins of safety (30,000-fold for one contaminant) making it impossible to assert that expenditures to implement the regulation are a public health necessity. Finally, the mandate that EPA set standards for an additional 25 contaminants every 3 years regardless of the threat posed by these contaminants in drinking water is for many the quintessential example of an arbitrary Federal law imposing burdens on consumers and the taxpayers of other governments with no rational relationship to the public benefits that might be realized.

S. Rep. No. 104-169 at 12–13.

As Congress noted, these regulatory burdens and added costs existed (and continue to exist after the amendments) even "for a substance not present" in a water system. *Id.* This is due in part to the monitoring requirements for each regulated contaminant. *See* American Water Works Association Comment Letter at 28, 30. EPA-HQ-OW-2018-0780-0258, JA609, JA611. States similarly face a burden in tracking and processing monitoring data generated by water systems.

The prior statutory regime "force[d] our water quality experts to spend scarce resources searching for dangers that often do not exist rather than identifying and removing real health risks from our drinking water," S. Rep. No. 104-169 at 13, and

could "impose large aggregate costs nationwide while producing only small gains in public health risk reduction." *Id.* at 14.

Moreover, the burden of such mindless regulation fell to customers because such costs are passed on directly. These burdens informed Congress's amendment approach, as it recognized that "[c]ustomers will pay for safe drinking water . . . [b]ut are not willing to pay for complying with drinking water rules that provide only marginal increases in health protection at significant costs, particularly when there is so much uncertainty concerning both the occurrence and real threat to public health of many contaminants." H.R. Rep. No. 104-632 at 9 (quoting Ronald Dungan, President of the National Association of Water Companies).

The prior SDWA framework resulted in an unscientific approach to regulation as "some of these contaminants occur only infrequently in public water systems, occur at levels well below any threshold for health effects, or have not been sufficiently studied to establish reliable dose-response relationships" S. Rep. No. 104-169 at 28. Congress recognized that the previous "requirement to regulate 25 new contaminants every 3 years need[ed] to be replaced with a scientifically defensible, risk-based approach." Failing that, the "regulatory treadmill [would] dilute[] limited resources on lower priority contaminants, and as a consequence may hinder more rapid progress on high priority contaminants." H.R. Rep. No. 104-632 at 10 (quoting EPA Assistant Administrator Robert Perciasepe).

6

The 1996 amendments therefore imposed three statutory criteria for listing contaminants.  Those criteria serve to prioritize regulation for those contaminants that present the greatest public health threat and permit regulation only where, "in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems."  42 U.S.C. § 300g-1(b)(1)(A)(iii).

## III.    Regulatory and Procedural Background.

EPA has considered whether to regulate perchlorate under the SDWA since 1998.  *See* 85 Fed. Reg. at 43,992.  In 2008, EPA published a preliminary negative regulatory determination finding that perchlorate did not meet the SDWA criteria for regulation.    Drinking Water: Preliminary Regulatory Determination on Perchlorate, 73 Fed. Reg. 60,262 (Oct. 10, 2008).  As part of this process, and in a departure from standard EPA practice, EPA adopted a reference dose for perchlorate that the National Academies of Science described as "a conservative, health-protective approach" to "protect the health of even the most sensitive populations." National Academies of Science, *Health Implications of Perchlorate Ingestion* at 15, 17 (2005), EPA-HQ-OW-2018-0780-0059, JA180, JA182.

In response to a request to review EPA's analysis, including this new approach, the EPA Inspector General noted that:

> Against established EPA risk assessment procedures, EPA derived the perchlorate [reference dose] from a nonadverse biological effect instead of an adverse effect. The perchlorate [reference dose] protects against all human biological effects from exposure, which is a stricter public health criterion than limiting environmental exposure to protect against adverse effects in humans. This shift in risk management constitutes a significant change in environmental policy.

EPA, Office of Inspector General Scientific Analysis of Perchlorate, Report No. 10-P-0101, At a Glance (Apr. 19, 2010). The report found that "EPA's perchlorate [reference dose] is conservative and protective of human health, and further reducing the perchlorate exposure below the [reference dose] does not effectively lower risk" and highlighted that addressing moderate and mild iodide deficiency was a more effective way to address the risk to the pregnant and nursing population. *Id*. at At a Glance, 185. Even with this conservative approach, EPA could not justify regulating perchlorate, as EPA found that less than 1% of drinking water systems had perchlorate levels above the Health Reference Level, which it had determined to be at 15 μg/L. 73 Fed. Reg. at 60,277.

In 2009, EPA Administrator Jackson committed to review the preliminary determination during her confirmation process. *See Hearing on the Nominations of Lisa P. Jackson to be Administrator of the U.S. Environmental Protection Agency and Nancy Helen Sutley to be Chairman of the Council on Environmental Quality: Hearing Before the Committee on Environment and Public Works*, S. Hrg. 111-1178 at 116 (Jan. 14, 2009) ("Senator Boxer: Do you commit to us to immediately review

8

this failure to establish a drinking water standard for perchlorate and act to address the threat to pregnant women and children caused by this dangerous toxin? Ms. Jackson: Yes, Madam Chair."). Following Administrator Jackson's confirmation, EPA reversed the 2008 preliminary decision and published the 2011 Determination, taking the position for the first time that perchlorate met the criteria for SDWA regulation. Drinking Water: Regulatory Determination on Perchlorate, 76 Fed. Reg. 7762 (Feb. 11, 2011).

In accordance with the SDWA, EPA then charged the Science Advisory Board with reviewing the Agency's approach to developing a maximum contaminant level goal for perchlorate. *See* Request for Nominations of Experts for the Review of Approaches to Derive a Maximum Contaminant Level Goal for Perchlorate, 76 Fed. Reg. 78,256 (Dec. 16, 2011). The Science Advisory Board recommended that EPA undertake additional modeling efforts, noting "[t]he limitation of the model in its current state, similar to the limitations of the standard MCLG approach, [is] that it describes a precursor event and does not explicitly predict subsequent events or adverse outcomes." *See* EPA, Science Advisory Board, *SAB Advice on Approaches to Derive a Maximum Contaminant Level Goal for Perchlorate* at 3 (2013), EPA-HQ-OW-2018-0780-0068, JA308. In other words, the model could not directly link the presence of perchlorate at levels observed in drinking water to an adverse health effect. Instead, EPA's model inferred an effect

9

based on four separate potential outcomes: (1) at high dosage levels, perchlorate can inhibit iodide uptake, (2) inhibiting iodide uptake can result in iodide deficiency, (3) iodide deficiency can cause changes in thyroid hormone levels, and (4) decreased maternal thyroid hormone levels can have impacts on neurodevelopment under certain conditions. But this alone could not answer the question of *what* health impacts perchlorate exposure could have at *what* levels. There has been no finding that perchlorate at the concentrations found in drinking water will trigger this hypothesized causal chain.

EPA performed additional modeling based on the Science Advisory Board's recommendations. As the Science Advisory Board predicted, this modeling was a multi-year undertaking. EPA then conducted two rounds of independent peer review to further inform its efforts. As a result, EPA did not meet the statutory deadline for proposing a national primary drinking water regulation, which was triggered by the 2011 Determination, and NRDC brought a deadline citizen suit to compel EPA to issue a regulation. In accordance with a consent decree resolving that suit, EPA published a notice of proposed National Primary Drinking Water Regulation in the Federal Register on June 26, 2019, seeking public input on a range of options regarding the regulation of perchlorate in public drinking water systems. Proposed Rule: National Primary Drinking Water Regulations: Perchlorate, 84 Fed. Reg.

30,524, 30,541−44, EPA-HQ-OW-2018-0780-0001 (June 26, 2019); 85 Fed. Reg. at 43,993−94.

EPA requested comment on three potential levels for a maximum contaminant level and maximum contaminant level goal—18, 56, and 90 µg/L—and a fourth option to withdraw the 2011 Determination based on both new information indicating lower perchlorate occurrence than EPA had previously believed to exist and a new analysis of the concentration that poses a health concern.  84 Fed. Reg. at 30,525.

In 2020, EPA chose the fourth option, and issued a final action determining not to regulate perchlorate because the statutory criteria for doing so were not present.  85 Fed. Reg. at 43,990.  Specifically, EPA determined that perchlorate does not occur with a frequency and at levels of public health concern within the meaning of the SDWA.  EPA's updated occurrence analysis showed that the frequency of occurrence of perchlorate in public water systems at levels exceeding any of the proposed maximum contaminant level goals was significantly lower than the frequency used in the analysis for the 2011 Determination.  *Id.* at 43,992.  This updated analysis showed that no more than 15 systems (0.03% of all water systems in the U.S.) would need to take action to reduce levels of perchlorate even if EPA adopted the most stringent regulatory level under consideration (18 µg/L).  *Id.*

11

In 2021, under a new administration, pursuant to Executive Order 13990, EPA undertook a multi-month review of the 2020 Determination and concluded that the 2020 Determination "is supported by the best available peer reviewed science." Press Release, EPA, EPA Announces Plan to Protect the Public from Perchlorate in Drinking Water (Mar. 31, 2022).

## SUMMARY OF ARGUMENT

EPA correctly determined, based on best available science, that it could not regulate perchlorate because the statutory criteria under the SDWA were not satisfied. Once EPA determined that the statutory criteria were not present, it was obligated to withdraw its determination to regulate perchlorate and doing otherwise would have violated both the SDWA and the Administrative Procedure Act.

NRDC acknowledges that the decision to regulate must be made based on the best *available* science, but then simultaneously argues that the body of "available" science is both frozen in time as of the 2011 Determination but should also include extra-record analysis performed after EPA finalized the 2020 Determination. Neither position is correct; EPA properly based its decision on the body of science and record at the time of the 2020 Determination. Likewise, NRDC complains that EPA was too slow to act and engaged in "foot-dragging," while simultaneously asserting that EPA should have undertaken additional time-consuming analyses to reach the result NRDC seeks. Despite these protests that the porridge is both too hot

and too cold, EPA was well within its discretion to rely on the information it selected in determining regulation was not warranted.

## STANDARD OF REVIEW

The American Water Works Association adopts EPA's description of the standard of review.

## ARGUMENT

I.  **Based on best available science, EPA correctly determined that it could not regulate perchlorate because the statutory criteria were not satisfied.**

The SDWA is not intended to regulate every possible contaminant found in drinking water that could adversely affect public health. Congress explicitly amended the SDWA to replace the previous scheme—under which EPA was obligated to regulate contaminants without sensible guardrails—and instead imposed three specific statutory criteria which must be satisfied before EPA may issue a maximum contaminant level goal and national primary drinking water regulation for the contaminant. *See* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II). Specifically, EPA must determine that (1) "the contaminant may have an adverse effect on the health of persons"; (2) "the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern"; and (3) "in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity

13

for health risk reduction for persons served by public water systems." *Id.* § 300g-1(b)(1)(A).

NRDC focuses heavily on perchlorate's potential adverse impacts for certain population subsets, but fails to demonstrate that the second two statutory criteria are satisfied. Many contaminants may meet the first criteria, but nonetheless do not warrant regulation under the SDWA. For example, sodium is ubiquitous at low levels, and contributes to heart disease and stroke. But EPA has reasonably declined to adopt SDWA regulations in part "[b]ecause sodium in drinking water is a very small contributor to daily dietary intake." Announcement of Regulatory Determinations for Priority Contaminants on the Drinking Water Contaminant Candidate List, 68 Fed. Reg. 42,898, 42,902 (July 18, 2003). Likewise, the public is regularly exposed to multiple substances that can inhibit iodide uptake, including dairy products, leafy green vegetables, and processed meats. EPA, *Office of Inspector General Scientific Analysis of Perchlorate External Review Draft* at 1−2, EPA-HQ-OW-2018-0780-0224, JA209−10. Because perchlorate in drinking water is a small contributor to the broader public health concern, the EPA Administrator correctly determined that regulation under the SDWA will not create a meaningful health risk reduction. *See* EPA, *Office of Inspector General Scientific Analysis of Perchlorate* at At A Glance, 9, 185, Report No. 10-P-0101 (Apr. 19, 2010) ("further reducing the perchlorate exposure below the [reference dose] does not effectively

14

lower risk" and addressing moderate and mild iodide deficiency are more effective ways to address the risk to the pregnant and nursing population).

### A.    Perchlorate is not present in drinking water at levels and frequencies that justify SDWA regulation.

Even after applying a conservative approach that was more protective of public health than its ordinary practice, EPA correctly found that perchlorate does not occur in public water systems with a frequency and at levels of public health concern.  42 U.S.C. § 300g-1(b)(1)(A)(ii).  EPA did so consistent with the SDWA's directive that such determinations be based on the best available science and data collected by accepted methods, and this Court's instruction that EPA take action based on the "best available evidence *at the time* of the rulemaking."  *See id.* § 300g-1(b)(3)(A); *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1291 (D.C. Cir. 2000) (emphasis added).  While NRDC disagrees with EPA's process and may wish to substitute its judgment for that of the Agency, this Court has been clear that its review is limited to inspecting the Agency's action "to insure that [it] has a rational basis . . . that reasonably promotes the legislative design."  *NRDC v. EPA*, 812 F.2d 721, 725 (D.C. Cir. 1987) (per curiam).  EPA's determination satisfies both.

15

1.    **EPA's conservative proposed maximum contaminant level goals were supported by the record and within the Agency's discretion.**

Contrary to NRDC's assertions, EPA's development of the proposed maximum contaminant level goals was *more conservative* than EPA's ordinary approach.  As the EPA Inspector General explained, EPA selected a reference dose using a stricter public health criterion, thus creating a "shift in risk management [that] constitutes a significant change in environmental policy."  EPA, *Office of Inspector General Scientific Analysis of Perchlorate* at At a Glance.  Indeed, "EPA derived the perchlorate [reference dose] from a nonadverse biological effect instead of an adverse effect" and did so "[a]gainst established EPA risk assessment procedures."  *Id.*; *see also* National Academies of Science, *Health Implications of Perchlorate Ingestion* at 15 (2005), EPA-HQ-OW-2018-0780-0059, JA180 (acknowledging an approach more conservative than the traditional EPA approach).

This more conservative approach was within EPA's discretion:  EPA reasonably interpreted the statute, evaluated the sometimes conflicting evidence in the extensive administrative record, provided rational explanations for its determinations, and responded to public comments on the levels of the proposed maximum contaminant level goals.  As a result, this Court should "avoid[] all temptation to direct the agency in a choice between rational alternatives."  *NRDC*,

16

812 F.2d at 725 (quoting *Env't Def. Fund, Inc. v. Costle*, 578 F.2d 337, 339 (D.C. Cir. 1978)).

The proposed maximum contaminant level goal options reflect an extensive peer review process and EPA's thorough analysis of the best available science, and contain numerous conservative science policy choices that significantly overstate both the potential risk of perchlorate exposure and the anticipated benefit of any potential national primary drinking water regulation. *See also* Resp'ts' Br. at 16−17. As required by Section 1412(d), EPA requested comments from the Science Advisory Board as part of the development process, seeking guidance on (among other things) how best to consider and interpret the totality of perchlorate health information to derive a maximum contaminant level goal for perchlorate. 85 Fed. Reg. at 43,993. EPA ultimately chose to develop the proposed maximum contaminant level goals using dose-response functions from the epidemiological literature to estimate neurodevelopmental impacts in the offspring of pregnant women exposed to perchlorate. 85 Fed. Reg. at 43,993−94.

Contrary to NRDC's assertion that EPA's selected thresholds were not adequately protective of public health, EPA calculated proposed maximum contaminant level goals based on the risk of perchlorate to a hypersensitive individual, rather than a broader "sensitive subpopulation," resulting in proposed maximum contaminant level goals that overstated the potential adverse effects of

17

perchlorate exposure.  EPA developed the proposed maximum contaminant level goals to protect the fetuses of a theoretical first trimester pregnant mother with low-iodide uptake levels, low fT4 levels, *and* weak Thyroid Stimulating Hormone feedback strength.  *Id.*  EPA's selection of this theoretical outlier goes beyond what is required under the SDWA, which only directs that the Administrator must take into consideration the effect of contaminants upon "subgroups that comprise a meaningful portion of the general population," such as infants, children, or pregnant women.  42 U.S.C. § 300g-1(b)(1)(C).

The Science Advisory Board also recommended that EPA integrate its model results with data on neurodevelopmental outcomes from epidemiological studies.  In keeping with the statutory directive to utilize the best available scientific information, EPA evaluated the relevant body of literature and identified and screened seventy-one epidemiological studies based on a number of criteria, including a low risk of bias and access to underlying data.  84 Fed. Reg. at 30,532. EPA eventually analyzed seven studies in order to determine which data to use in calculating the level of perchlorate exposure at which health impacts could begin to occur.  The Agency ultimately chose to use its independent analysis of the Korevaar data as the basis for calculating the point of departure—the level at which there are no known or anticipated adverse effects on the health of the most sensitive

population—for the maximum contaminant level goal and provided multiple reasons for taking this approach.  *Id.* at 30,534.

NRDC takes issue with EPA selecting this study, claiming that EPA ignored "compelling evidence" in the other studies that IQ loss is not an appropriate surrogate for all adverse health effects.  Pet'r's Br. at 55.  The opposite is true. Rather than giving equal weight to studies that did not show a relationship between thyroid hormone levels and neurodevelopmental outcomes, EPA once again took a conservative approach and only considered studies that had sufficient data to show a quantitative relationship between maternal fT4 and a neurodevelopmental outcome.  *See* 84 Fed. Reg. at 30,531.  In selecting the final five studies for use in its assessment, EPA excluded other high-quality studies that demonstrated that *no* significant relationship exists between maternal hypothyroxinemia and adverse neurodevelopmental outcomes.  Comments of the Perchlorate Study Group on the U.S. Environmental Protection Agency's Proposed National Primary Drinking Water Regulation on Perchlorate at A-19−A-20 (Aug. 26, 2019), EPA-HQ-OW-2018-0780-0262, JA640−41.  As a result, EPA's methodology actually overstates the relationship, if any, between lower fT4 first trimester and subsequent neurodevelopmental outcomes.

EPA reasonably considered the information contained in the studies that NRDC claims EPA ignored, and provided a rational explanation for both its decision

19

to use the reanalysis of the Korevaar data and its decision to rely on IQ as a surrogate for other potential neurodevelopmental effects. EPA recognized that "[t]here are a variety of neurodevelopmental endpoints used to examine behavior and cognition in children," and selected IQ decrements because that was the endpoint evaluated in the Korevaar study, which EPA determined was "the most rigorous analysis that examined the relationship between decreased thyroid hormones and neurodevelopmental effects." 84 Fed. Reg. at 30,536. EPA further explained that its conclusion was based on its "analysis of the literature on the connection between altered thyroid hormones . . . and neurodevelopmental outcomes (which was peer reviewed in 2018)." EPA, Comment Response Document for the Proposed National Primary Drinking Water Regulation for Perchlorate (Categorized Public Comments) at 2-1 (2020), EPA-HQ-OW-2018-0780-0304, JA673. Additionally, the Agency had "presented approaches for several neurodevelopmental endpoints . . . [and] the peer review panel indicated IQ was preferred." *Id.* at 8-27, JA732. EPA's use of IQ as a surrogate for neurodevelopmental endpoints was conservative, particularly in light of the National Academies of Science's finding that "the continuum of possible effects of iodide-uptake inhibition caused by perchlorate exposure is only proposed and has not been demonstrated in humans exposed to perchlorate." National Academies of Science, *Health Implications of Perchlorate Ingestion* at 165, JA201. While NRDC may disagree with EPA's decision to use IQ as a surrogate for other

20

neurodevelopmental impacts, EPA's policy decision is more than adequately protective of human health and was supported by its independent peer review panel.

EPA also went beyond the SDWA directive, which only requires consideration of "known or anticipated adverse effects" on human health, and made a policy decision, informed by science and consistent with statutory directives, to conservatively set the proposed maximum contaminant level goals by thoroughly evaluating the conflicting evidence in the record on the potential impact of perchlorate on various neurodevelopmental effects. *See* 42 U.S.C. § 300g-1(b)(4); 84 Fed. Reg. at 30,535−36 (noting "not every study identified an association between maternal fT4 and the specified outcome of interest"; "the state of the science on this relationship is continuously evolving"; and "challenges associated with regulating chemicals for which potential effects are indirect, and scientific data do not address all uncertainties").

NRDC also misunderstands EPA's use of an IQ decrease in defining the level of public health concern, which does *not* indicate that the Agency is insensitive to the loss of IQ as an adverse health effect. Pet'r's Br. at 44−49. Rather, as EPA explained, "there are scientific challenges to 'evaluating a continuous outcome such as IQ' where there is natural variability in the human population." *See* Resp'ts' Br. at 35 (citing Technical Support Document at 10-1, JA415; 85 Fed. Reg. at 43,999; 84 Fed. Reg. at 30,537). EPA therefore had to select *some* threshold to account for

21

that variation in order to evaluate the potential impact of perchlorate and was well within its discretion to select the three IQ thresholds that it did.

EPA thus more than fulfilled its obligation to "examine the relevant data and articulate a satisfactory explanation for its action" in developing the proposed maximum contaminant level goals. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U. S. 156, 168 (1962)); *see also NRDC*, 812 F.2d at 725. The proposed maximum contaminant level goals were conservatively set at levels that were within the bounds of EPA's discretion, and it was reasonable for EPA to rely on them as the "levels of public health concern" in conducting its updated assessment of perchlorate occurrence. *See NRDC*, 812 F.2d at 723.

> **2.    EPA's reliance on updated UCMR 1 data was rational and consistent with the statutory directive to use the best available public health information to determine occurrence levels.**

EPA's use of the updated UCMR 1 data complies with the SDWA's statutory directive to regulate based on the best available public health information because it was the most comprehensive/only national review of perchlorate occurrence in water supplies. *See* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II). UCMR 1 information was based on perchlorate occurrence data collected between 2001 and 2005. In the 2019 proposal, EPA explained that it "modified the UCMR 1 data set in response to

[stakeholder concerns] regarding the data quality and to represent current conditions in California and Massachusetts, which [had] enacted perchlorate regulations" subsequent to the data being gathered.  85 Fed. Reg. at 43,995.  This modification resulted in EPA excluding "199 source water samples . . . that could be paired with a second follow-up sample located at the entry point to the distribution system."  84 Fed. Reg. at 30,542.  EPA retained any source water sample perchlorate detections for which no follow-up entry point sampling had been conducted by a public water system.  EPA's decision to rely on the updated UCMR 1 data was well within the Agency's discretion, and entirely appropriate to ensure that the Agency was reviewing the best available information.

Petitioner's claim that EPA "fail[ed] to even consider the possibility that selectively revising its dataset would create unreliable and misleading results" is false.  *See* Pet'r's Br. at 65.  EPA considered various reports, studies, and other information related to potential increases and decreases in perchlorate occurrence in recent years, and ultimately determined that it was not appropriate to update the UCMR 1 data based on that information.  *See* EPA, *Perchlorate Occurrence and Monitoring Report, Appendix A: Occurrence in Ambient Water and in Drinking Water (from Sources Other than UCMR 1)*, EPA 816-R-19-003 (2019), EPA-HQ-OW-2018-0780-0127, JA465; EPA, Comment Response Document for the Proposed National Primary Drinking Water Regulation for Perchlorate (Categorized

23

Public Comments) at 6-1, 6-18 JA700, JA717.  EPA fulfilled its obligation under *State Farm*, 463 U.S. at 43, by reasonably explaining that it "updated the UCMR 1 data set to improve its accuracy in representing the current conditions for states that have enacted perchlorate regulations since the UCMR 1 monitoring was conducted." EPA, Comment Response Document for the Proposed National Primary Drinking Water Regulation for Perchlorate (Categorized Public Comments) at 6-1, JA700. EPA further explained that "[u]pdates were conducted only for systems in these two States because the EPA recognized that the promulgation of State standards for perchlorate standards represented a significant action that needed to be considered to adequately estimate perchlorate occurrence." *Id.* at 6-18, JA717.

EPA also considered and responded to comments suggesting that the data relied on in reaching the 2020 Determination not to regulate both under-represented and over-represented the national occurrence of perchlorate. *Id.* at 6-1−6-22, JA700−21.  As this Court has noted, opposition to EPA action by both public-interest forces and industrial representatives reflects EPA's "careful efforts to carry out its regulatory obligations." *NRDC v. EPA*, 824 F.2d 1211, 1219 (D.C. Cir. 1987).  So too here.  EPA did not ignore the criticism of its decision to update the UCMR 1 data.  Instead, the Agency adequately responded to comments and sufficiently defended its ultimate decision to update the UCMR 1 data.

24

### 3.    EPA properly excluded other data from its analysis.

While Petitioners argue that EPA should have considered the occurrence of perchlorate in other bodies of water, EPA correctly focused its analysis on the levels of perchlorate that water system end users receive.  84 Fed. Reg. at 30,542; Pet'r's Br. at 65-68.  It is the occurrence of perchlorate in public *drinking water systems*, not the occurrence of perchlorate in untreated source water samples, that matters under the statutory scheme.  Focusing on the end state, not the source, is sensible for perchlorate, just as for other contaminants, because water systems frequently blend water from multiple sources before it reaches end users.   In turn, data that characterize contaminant occurrence in public drinking water systems at entry points to the distribution systems (as compared to data for ambient or source water) "much more closely reflect[s] the quality of water delivered to and consumed by the populations served by" these systems.    EPA, *Perchlorate Occurrence and Monitoring Report, Appendix A* at A-1, JA466.

NRDC cites various data points to support its contention that EPA ignored relevant data that undermined the Agency's assessment of perchlorate occurrence, but stops short of arguing that the studies cited better reflect the national occurrence of perchlorate contamination in drinking water.  Pet'r's Br. at 67-70.  And for good reason.  Many of the studies that NRDC alleges EPA ignored provided data points focused on perchlorate occurrence in ambient sources rather than perchlorate

occurrence in drinking water.  For example, only 18 of the 4,626 total samples collected in the 2017 USGS National Water Information System NRDC cites were from finished water, rather than ground or surface water.   EPA, *Perchlorate Occurrence and Monitoring Report, Appendix A* at A-5, JA470.  NRDC does not, and cannot, argue that a study with a sample size of 18 represents better information than what was available to EPA from the UCMR 1 data.  NRDC also references separate data collected in 2018 from an EPA database, which indicated that perchlorate contamination was found in 88% of water samples.  However, none were drinking water samples.  *Id.* at A-6, JA471.  Additionally, EPA noted a variety of concerns with this data, including data quality limitations and the fact that there were no requirements that submitted data meet analytical methods or quality assurance standards.  *Id.* at A-5, JA470.

While NRDC criticizes EPA for finding that perchlorate contamination is decreasing, other commenters argue the reverse—that the estimates of occurrence and adverse effects in the docket overestimate both perchlorate's occurrence and any public health gains that could potentially be obtained.  *See* Comments of the Perchlorate Study Group on the U.S. Environmental Protection Agency's Proposed National Primary Drinking Water Regulation on Perchlorate at vii, JA621.  The Agency did not ignore relevant data or fail to grapple with whether other available data sources supported its conclusion that perchlorate contamination in public

26

drinking water sources was decreasing.  Instead, EPA "evaluated the available peer-reviewed science and supporting studies, as well as data collected by accepted methods on the national occurrence of perchlorate in drinking water" and determined that the UCMR 1 data was the "best available nationally representative data for characterizing the frequency and levels of perchlorate occurrence in public drinking water systems."  EPA, *Perchlorate Occurrence and Monitoring Report* at i, JA423. The Agency's review of the available evidence in the administrative record and its decision to rely on the updated UCMR 1 data in conducting its occurrence analysis is in line with the statutory directive that the Agency's findings must be based on the best available public health information.  42 U.S.C. § 300g-1(b)(1)(B)(ii)(II).

### B.    The EPA Administrator correctly found that regulation of perchlorate does not present a meaningful opportunity for health risk reduction for persons served by public water systems.

The Administrator correctly determined, based on his review of the data and information available in the administrative record, that perchlorate does not meet the statutory criteria for regulation.  Given the record evidence, it would have been arbitrary and capricious for the Agency to conclude otherwise:  EPA's updated occurrence analysis showed that the frequency of occurrence of perchlorate in public water systems at levels exceeding any of the alternative proposed Maximum Contaminant Level Goals (18 μg/L–90 μg/L) was significantly lower (0.03%–0.002%) than the frequency underlying the analysis for the 2011 Determination

(4%–0.39%)  *See* EPA, *Perchlorate Occurrence and Monitoring Report,* JA423−24; 85 Fed. Reg. at 43,992.  Even at the most stringent regulatory level considered in the 2019 proposal (18 μg/L), not more than 15 systems (0.03% of all water systems in the U.S. serving approximately 620,000 people) would need to take action to reduce levels of perchlorate.  85 Fed. Reg. at 43,992.

The fact that such a small number of water systems met or exceeded even the lowest proposed maximum contaminant level goal, and the correspondingly small population served, provides ample support for EPA's conclusion that the regulation of perchlorate *does not* present a "meaningful opportunity for health risk reduction for persons served by public water systems."   42 U.S.C. § 300g-1(b)(1)(A)(iii). EPA's determination not to regulate is therefore consistent with the Congressional directive that EPA prioritize contaminants for which regulatory action would lead to meaningful opportunities to improve public health, limiting burdensome and excessive regulation.

## C.    The statutory criteria would still not be satisfied even considering Petitioner's extra-record materials.

NRDC seeks to rely on four admittedly extra-record documents in its challenge to EPA's decision not to issue drinking water standards for perchlorate. *See* Pet'r's Mot. to Suppl. the Administrative R., Doc. 1952068 at 1.  As discussed in Intervenor American Water Works Association's Opposition to Petitioner's

28

Motion to Supplement the Administrative Record, NRDC attempts to end-run the Administrative Procedure Act's requirements that judicial review of agency decisions be constrained to the administrative record, and accordingly should be denied. *See* American Water Works Association Opp'n Br., Doc. 1953541 at 1. However, even if NRDC's motion is granted, the documents that NRDC advances would not change the fact that the statutory criteria required to regulate perchlorate under the SDWA are not satisfied. In particular:

- Dr. Solomon did not provide any additional data related to perchlorate occurrence in public drinking water. And while Dr. Solomon criticizes EPA's proposed maximum contaminant level goals and the data EPA relied on in conducting its occurrence analysis, he fails to raise any points that EPA had not already considered and addressed during the normal course of the rulemaking. *See* EPA, Comment Response Document for the Proposed National Primary Drinking Water Regulation for Perchlorate (Categorized Public Comments) at 2-1−4-10, 6-1−6-22, JA673−94, JA700−21.

- Dr. Curriero's declaration fails to provide new data sufficient to show that perchlorate exists at a level and frequency sufficient to justify regulation under the SDWA. Dr. Curriero speculates that changes in the fireworks industry are one of many "possible examples of a change that may have caused perchlorate

29

levels in drinking water to increase nationwide," but does not provide any actual data showing that any such changes have occurred in perchlorate occurrence in public drinking water. Curriero Decl., Doc. 1952068 Ex. D, at 8−9. The mere existence of factual circumstances that could *potentially* have caused perchlorate levels to increase is insufficient to demand a change in EPA's determination not to regulate or EPA's reliance on actual known and non-speculative data.

- Exhibit A, an internal communication showing that the Agency did not specifically consider one of an infinite number of possible thresholds for IQ loss, in no way demonstrates that the Agency did not consider all relevant factors. EPA received and responded to comments on whether to use a lower IQ threshold and reasonably explained its decision to use the 1% IQ change threshold. *See* Doc. 1952068 Ex. A; 85 Fed. Reg. at 43,999; *Burlington Truck Lines, Inc. v. United States*, 371 U. S. 156, 168 (1962).

- Exhibit B similarly addresses an issue—whether and how to update perchlorate occurrence data—that was before the Agency during the rulemaking process and was considered at length by commenters and EPA alike. *See* Doc. 1952068 Ex. B; 84 Fed. Reg. at 30,541−44; 85 Fed. Reg. at 43,993−98.

30

II.    **EPA had to withdraw the 2011 Determination because the SDWA does not allow EPA to regulate a contaminant unless the three statutory criteria are present at the time of regulation.**

Once EPA determined that the statutory criteria were not satisfied, it was obligated to withdraw its determination to regulate perchlorate.  Doing otherwise would have violated the SDWA and the Administrative Procedure Act.  "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (cleaned up).  And it is well settled that "an agency literally has no power to act . . . unless and until Congress confers power upon it."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.  Thus, if there is no statute conferring authority, a federal agency has none.") (cleaned up).  As a result, EPA does not have the authority to regulate outside of the SDWA's express authorizing criteria.  Otherwise EPA would be acting "in excess of statutory jurisdiction" in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(C); *see also Michigan*, 268 F.3d at 1081.

It is therefore especially notable that Congress explicitly amended the SDWA to replace a previous scheme—under which EPA was obligated to regulate specified

31

contaminants at specified rates, regardless of demonstrated ability to meaningfully benefit the public—and instead imposed three specific statutory criteria which now must be satisfied. *See* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II) ("A determination to regulate a contaminant *shall* be based on findings that the criteria of clauses (i), (ii), and (iii) of subparagraph (A) are satisfied.") (emphasis added). Congress further required that "[s]uch findings *shall* be based on the best available public health information, including the occurrence data base established under section 300j–4(g) of this title." *Id.* (emphasis added). Congress recognized that the prior statutory regime for regulation "need[ed] to be replaced with a scientifically defensible, risk-based approach," H.R. Rep. No. 104-632 at 10 (quoting EPA Assistant Administrator Robert Perciasepe), and therefore amended the SDWA to require EPA to use "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices" to evaluate whether the criteria for regulation are met. 42 U.S.C. § 300g-1(b)(3)(A). This means the best available science *at the time* of the rulemaking. *See Chlorine Chemistry Council,* 206 F.3d at 1291.

The broader statutory scheme reinforces the fact that regulatory decisions should be made based on updated and current science—for example, the SDWA requires EPA to repeatedly reevaluate contaminants for possible regulation. *See, e.g.*, 42 U.S.C. § 300g-1(b)(1)(B)(i)(I) (EPA must release a list of unregulated

32

contaminants for consideration to regulate every 5 years); *id.* at § 300g-1(b)(1)(B)(ii)(I) (determinations to regulate to be published every 5 years); *id.* at § 300g-1(b)(9) (regulations to be reviewed and revised as appropriate at least every 6 years); *see also* S. Rep. No. 104-169 at 38 (new scientific information may cause revisions to less stringent levels).

NRDC asserts that EPA could not look to updated scientific information after reaching the 2011 Determination because Congress "made clear that such consultations 'shall, under no circumstances, be used to delay final promulgation of any national primary drinking water standard.'" Pet'r's Br. at 36. But there is a difference between prohibiting *delay* and prohibiting the use of updated science. While EPA's delay was improper, as EPA acknowledged in the consent decree that gave rise to the 2020 Determination, once EPA was undertaking that required analysis, EPA was not foreclosed from reviewing updated scientific information now available; in fact, under the SDWA, the opposite is true. *See Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). EPA properly took action based on the Science Advisory Board recommendation to consider additional information.

NRDC points to *Chlorine Chemistry Council* to argue that EPA had to use the best available science at the time of the 2011 Determination. Pet'r's Br. at 35-36. In *Chlorine Chemistry Council*, this Court was reviewing a proposed regulation, and not a determination. *Chlorine Chemistry Council*, 206 F.3d at 1287. There, the

33

Court made the point that EPA "cannot reject the 'best available' evidence simply because of the possibility of contradiction in the future by evidence unavailable at the time of action—a possibility that will *always* be present." *Id.* at 1290−91. But EPA did no such thing here. Rather, it *did* take into account the best *available* information—information updated and more current than what was available at the time of the 2011 Determination.

As discussed in Section I.A-B, the best available science and record evidence supports EPA's determination not to regulate because the final two criteria were not met. Given the record evidence, it would have been arbitrary and capricious for the Agency to conclude otherwise. As a result, EPA was obligated to withdraw the 2011 Determination.

### A. The 1996 Amendments were designed to allow EPA to take additional time to make regulatory decisions based on updated information.

Contrary to NRDC's theory of the SDWA, Pet'r's Br. at 31, in the 1996 amendments, Congress deliberately moved away from a model where EPA was required to regulate contaminants on a specific schedule. *See* S. Rep. No. 104-169 at 12−13 ("the mandate that EPA set standards for an additional 25 contaminants every 3 years regardless of the threat posed by these contaminants in drinking water is for many the quintessential example of an arbitrary Federal law imposing burdens on consumers and the taxpayers of other governments with no rational relationship

to the public benefits that might be realized").  And contrary to NRDC's argument that the amendments were designed to prevent "foot dragging," Pet'r's Br. at 38, the amendments gave EPA *more* time and flexibility.

**B.    Even if the statute did not compel such a result, it was well within the Agency's discretion to determine regulation of perchlorate was not warranted at this time based on the best available science.**

The statutory criteria explicitly provide the Administrator with the discretion to determine regulation is *not* appropriate even when the first two criteria are met and only require regulation when "in the sole judgment of the Administrator" such regulation "presents a meaningful opportunity for health risk reduction for persons served by public water systems."  42 U.S.C. § 300g-1(b)(1)(A)(iii).  The statute thus makes clear that there is only a duty to issue regulations where the Administrator has determined to regulate.  *See* 42 U.S.C. § 300g-1(b)(1)(E) (requiring maximum contaminant level goals and national primary drinking water regulations only for "each contaminant that the Administrator determines to regulate under subparagraph (B)").  This stands in notable contrast to the prior SDWA language, which *required* EPA to issue regulations for 25 contaminants every 3 years.

NRDC agrees that "EPA has discretion on which contaminants to prioritize for regulation," Pet'r's Br. at 31, but misunderstands where the 2011 Determination fits within this statutory scheme.  True, a determination to regulate triggers an obligation to issue such regulations under Section 300g-1(b)(1)(E).  But NRDC

35

incorrectly reads Section 300g-1(b)(1)(E) to strip the Administrator of any discretion once a determination has been made.  Pet'r's Br. at 32.  Section 300g-1(b)(1)(E) is more appropriately read as a timing provision, constraining the Administrator's timeline to promulgate regulations once the Administrator has deemed it appropriate to regulate.  It does not, however, remove the Administrator's discretion to withdraw that determination prior to issuing such regulations.  This reading appropriately reflects the Congressional compromise that the 1996 amendments struck to ensure that EPA was not required to regulate when doing so would "force[] our water quality experts to spend scarce resources searching for dangers that often do not exist rather than identifying and removing real health risks from our drinking water."  S. Rep. No. 104-169 at 13 (quoting George Voinovich, Governor of Ohio).  Instead, Section 300g-1(b)(1)(E) prompts regulation at an appropriate pace only when the statutory criteria are present.  Congress could not have been clearer in amending the Act that it wished to avoid over-regulation of contaminants under the SDWA based on arbitrary rationales.  It did so by putting a thumb on the scale in favor of allowing EPA discretion *not* to regulate.  *See* S. Rep. No. 104-169 at 12−13.

**C.    Nothing in the statute prevents the Administrator from withdrawing a determination prior to issuing regulations, and nothing in the legislative history for the 1996 amendments suggests Congress intended to strip EPA of such authority.**

Congress knows how to prevent EPA from changing course after finalizing an action, and used such language in the SDWA to prevent "back-sliding" once a contaminant is regulated under the Act.  But Congress did not impose a similar constraint on withdrawing a determination to regulate.   The "anti-backslide" provision in the Act clearly contemplates situations where regulations are already in place and does not impact EPA's ability to withdraw a determination prior to issuing a regulation.  Specifically, the provision states that "[t]he Administrator shall, not less often than every 6 years, review and revise, as appropriate, each national primary drinking water *regulation* promulgated under this subchapter.  Any revision of a national primary drinking water *regulation* shall be promulgated in accordance with this section, except that each revision shall maintain, or provide for greater, protection of the health of persons."   42 U.S.C. § 300g-1(b)(9) (emphasis added). The provision twice references *regulations* while remaining notably silent (as is the rest of the statute) on *determinations* to regulate.

Contrary to NRDC's assertions, agencies have inherent authority to reconsider their decisions, where, as here, Congress has not expressly limited the agency's power to do so.  *See Ivy Sports Med., LLC v. Burwell*, 767 F.3d at 86; *see*

37

*also* Resp'ts' Br. at 25.  It is well settled that agencies are permitted to change policy; rules are not "instantly carved in stone." *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 863 (1984).  There is no heightened standard of review when rescinding a rule; agencies must simply "display awareness" of the change and provide a "reasoned explanation." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And an agency can explain why it disregarded prior factual findings by introducing new evidence or by reevaluating existing evidence. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012).

Contrary to NRDC's theory, under which the 2011 Determination was a final decision from which there was no turning back, the 2011 Determination was just one more step in a decision-making pathway towards potential regulation.  Indeed, the 2011 Determination repeatedly acknowledged as much:

- "EPA is initiating the development of a proposed NPDWR for perchlorate.  However, this is not the end of a decision process but a middle step in a process that leads to a final drinking water standard."  Drinking Water: Regulatory Determination on Perchlorate, 76 Fed. Reg. 7762, 7767 (Feb. 11, 2011);

- "this action also initiates the process to develop a national primary drinking water regulation (NPDWR) for perchlorate."  *Id.* at 7762;

38

- "EPA will continue to evaluate the science as we develop the proposed NPDWR." *Id.* at 7767.

EPA's view that a final determination can be revisited is also consistent with prior agency practice.  Indeed, in the context of perchlorate, EPA's 2011 Determination reviewed and reversed its 2008 determination *not* to regulate.  *See Idaho Conservation League v. Wheeler*, 930 F.3d 494, 504 (D.C. Cir. 2019) (EPA retains discretion not to issue a rule after deciding to undertake a rulemaking); Resp'ts' Br. at 18−19.

### D.    EPA's delay in issuing a proposed regulation after the 2011 Determination does not bar it from relying on the best available science.

NRDC argues that EPA's delay after the 2011 Determination barred it from reconsidering whether the statutory criteria for regulating were still present in 2020.  Pet'r's Br. at 39−40.  This is not the case.  And as EPA notes, Resp'ts' Br. at 27−29, the cases cited by NRDC are distinguishable.  EPA's decisions must be made based on the best available science at the time of the decision.  Put simply, two wrongs don't make a right:  While EPA's delay may have been unlawful, it cannot be remedied by an equally unlawful circumvention of the statute now that EPA has concluded, based on reviewing the best available science, that the statutory criteria are not met.  This also provides EPA with the ability to revisit its determination in the future, and should NRDC have updated information indicating that regulation is

39

now warranted, it may petition the Agency to undertake such an analysis. And even without an outside petition, the SDWA requires EPA to continue to review and revisit whether to regulate contaminants. *See* 42 U.S.C. § 300g-1(b)(1)(B)(i)(I); *id.* § 300g-1(b)(1)(B)(ii)(I).

## CONCLUSION

Based on updated data and the best available science, EPA correctly concluded that perchlorate does not occur at levels and a frequency in our drinking water that would justify promulgating regulations under the SDWA. This is good news, and reflects improvements in water quality in some areas of prior concern. While addressing the broader public health concern of iodide deficiency is important, the SDWA is not the right mechanism for doing so based on the statutory framework that Congress provided. Accordingly, the Court should uphold EPA's determination.

Dated: December 6, 2022                    Respectfully submitted,

/s/ Ronald J. Tenpas
Ronald J. Tenpas
Corinne V. Snow
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Office: (202) 639-6791
Fax: (202) 330-5328
rtenpas@velaw.com
csnow@velaw.com

40

*Counsel for Intervenor American*
*Water Works Association*

## CERTIFICATE OF COMPLIANCE

This Brief of Respondent-Intervenor American Water Works Association complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8902 words.

This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Ronald J. Tenpas
Ronald J. Tenpas
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Office: (202) 639-6791
Fax: (202) 330-5328
rtenpas@velaw.com

42

## CERTIFICATE OF SERVICE

On December 6, 2022, I served a copy of the foregoing Final Brief of Respondent-Intervenor American Water Works Association using this Court's CM/ECF system. All parties are represented by registered CM/ECF users that will be served by the CM/ECF system.

> /s/ Ronald J. Tenpas
> Ronald J. Tenpas
> Vinson & Elkins LLP
> 2200 Pennsylvania Avenue NW
> Suite 500 West
> Washington, DC 20037
> Office: (202) 639-6791
> Fax: (202) 330-5328
> rtenpas@velaw.com